UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------
ANTHONY ZAPPIN,                                    :

                Plaintiff,              :
                                          Case No. 16-cv-5985

              - against -             :

MATTHEW F. COOPER,                                 :        **COMPLAINT**
a Justice of the Supreme Court
of the State of New York, in his                            Jury Trial Demanded
individual and personal capacity,

                Defendant.
------------------------------------------------------------ X

       Plaintiff Anthony Zappin ("Plaintiff") hereby alleges the following against Defendant

Matthew Cooper ("Justice Cooper" or "Defendant"):

## NATURE OF THE CASE

       1.    This is a civil action brought under state common law for defamation/injurious

falsehood, tortious interference with prospective economic advantage, intentional infliction of

emotional distress, abuse of process and prima facie tort.  Plaintiff also asserts claims under 42

U.S.C. § 1983 against Defendant for committing acts, under color of law, with the intent and

purpose of depriving Plaintiff of his rights secured under the Constitution and laws of the United

States.  Plaintiff brings this action against Defendant in his individual capacity.

       2.    Ringing true the age-old adage that a false statement is half-way around the world

before the truth gets its shoes on, Defendant – a duly sworn judicial officer – maliciously and

knowingly made and publicized false statements and vicious personal attacks about Plaintiff in a

September 18, 2015 decision in the matter *Anthony Zappin v. Claire Comfort*, Index No.

301568/14 pending in the Supreme Court of New York County ("September 18 Decision").  (*See*

Ex. 1.)   It was not Defendant's rendering of the September 18 Decision that caused Plaintiff the harm complained of herein, however.   Rather, Defendant engaged in extrajudicial conduct designed to maximize publicity of his false statements and the harm sustained by Plaintiff.   This included publishing the September 18 Decision in *The New York Law Journal*, despite the fact that the decision was statutorily sealed under New York Domestic Relations Law Section 235 ("DRL 235").   Even worse, Defendant personally sent copies of the September 18 Decision to a blogger at *The New York Law Journal* as well as tabloid reporters at *The New York Post* and *The Daily News* to improperly generate media attention and coverage of the decision.

3.     Defendant's September 18 Decision was nothing more than a publicity stunt.   It was designed to summarily destroy Plaintiff's reputation, employment prospects and legal career without giving Plaintiff even a hint of an opportunity to defend himself.   Simply put, Defendant's attack on Plaintiff was an extraordinary abuse of authority unprecedented in American Jurisprudence.   No judicial officer has ever gone to the lengths Defendant has – which includes manufacturing factual assertions divorced from the parties' allegations and evidence, making summary findings of purported misconduct without affording the litigant/attorney minimal due process, engaging in *ex parte* communications with the media and violating a New York sealing statute – to deliberately injure and publicly humiliate a litigant, and more importantly, harm the child at issue in the proceeding by turning the infant into tabloid fodder.

4.     To put things in perspective, without so much as Plaintiff speaking a word in his courtroom, Defendant ruined the career of a young professional, destroyed the earning power of a two (2) year old child's father directly affecting the child's well-being, blazoned a sealed matrimonial action and the child at issue across tabloid headlines, disclosed confidential facts about the child to the public and used a statutorily sealed judicial decision to inflict harm on a

2

litigant by personally seeing to its publication and dissemination to the media.  And, what did Plaintiff do to deserve this?  He wanted to be a father to his two (2) year old son.

5.      As a result of Defendant's wrongful actions, Plaintiff has suffered significant damages, including but not limited to loss of his employment, destruction of his future earning potential, irreparable harm to his reputation and, most importantly, the denial of a full and fair trial concerning custody of his two (2) year old son and financial issues by Defendant's unlawful act of soliciting prejudicial pretrial publicity.  It is unlikely that Plaintiff will ever recover from the harm that Defendant has wrongfully inflicted.  Accordingly, Plaintiff seeks both actual and punitive damages against Defendant.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  The Court also has federal question jurisdiction under 28 U.S.C. § 1331.

7.      Venue is proper pursuant to 28 U.S.C. § 1332(b)(1) and (b)(2) because the events that gave rise to this action occurred in this Judicial District.

## THE PARTIES

### The Plaintiff Anthony Zappin

8.      Plaintiff Anthony Zappin is a resident of the State of West Virginia with an address of 1827 Washington Blvd., Huntington, WV 25701.  He is the Plaintiff in the matrimonial action *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending before the New York County Supreme Court (the "Matrimonial Action" or "*Zappin v. Comfort*").  The central issue in dispute in the Matrimonial Action was custody and access of the parties' now

two (2) year old child, although Defendant has also now inflicted crippling financial pain on Plaintiff at a June 27, 2016 financial trial in *Zappin v. Comfort*. The sole issue decided by Defendant at the financial trial – despite the apparent conflict of interest – was the extent of the damages he caused by his extrajudicial acts of publishing and disseminating to the media the September 18 Decision, which resulted in the loss of Plaintiff's employment.

9.      Plaintiff was sucked into the broken family court system in 2013 when his wife, Claire Comfort ("Ms. Comfort"), and her parents unlawfully abducted his then four (4) week old son from their home in Washington, DC to Tacoma, WA. Plaintiff immediately initiated legal action for custody and then divorce against Ms. Comfort. Unbeknownst to Plaintiff, he was entering a world where up is down, black is white, the rules of civil procedure are viewed as an annoyance and personal attacks are rewarded over legal and factual arguments.

10.      Since presiding over the case, Defendant has allowed the Matrimonial Action to become so over-the-top that Plaintiff has been forced to defend himself against a wide-array of far-fetched assertions ranging from accusations that he cracked Apple's proprietary iPhone/iOS software – something that the United States government apparently is unable to do – to contentions that he dated ***Taylor Swift***.[1]  One can only imagine all the claims Plaintiff had to defend in-between. However, none were more damaging than the false accusations and

---

[1] During the course of the matrimonial litigation, Ms. Comfort made allegations to the forensic custody evaluator that Plaintiff had dated Taylor Swift. At trial in November 2015, the forensic custody evaluator confirmed the allegations from Ms. Comfort:

Q:      Last Question. During the course of the forensic custody evaluation, did you have to assess where or not [Mr. Zappin] had engaged in a sexual relationship with Taylor Swift?

A:      No. I had to assess whether or not [Mr. Zappin] had dated Taylor Swift.

Defendant not only entertained Ms. Comfort's claim, but reveled at the mere inkling that Ms. Swift could be hauled into his courtroom to testify about a purported relationship with Plaintiff.

4

statements lodged at Plaintiff in Defendant's September 18 Decision.  It was Defendant's extrajudicial conduct of publishing and disseminating the September 18 Decision to the media that thrust the Matrimonial Action into public and tabloid spectacle, and ultimately caused irreparable harm to Plaintiff and his infant son.

<u>The Defendant Matthew Cooper</u>

11.    Upon information and belief, Defendant Matthew Cooper is a resident of the State of New York.  He is a sitting Justice of the Supreme Court of New York County, IAS Part 51, which hears matrimonial cases.  Defendant is the presiding judge in the matter *Anthony Zappin v. Claire Comfort*, Index No 301568/14 pending before the New York County Supreme Court.

12.    Justice Cooper was appointed to the New York City Civil Court in 2001.  In 2008, he became a Justice of the New York County Supreme Court.  Upon information and belief, he began presiding over matrimonial proceedings in 2011.  Prior to becoming a judge, Justice Cooper had little, if any, litigation experience in private practice, particularly with respect to matrimonial litigation.  Upon information and belief, Justice Cooper's sole private practice experience was as Director of Legal Services for the Teams Local 237 from 1988 to 2000.  As demonstrated below, since assuming the matrimonial bench in 2011, Justice Cooper has engaged in a pattern of behavior inconsistent with his judicial responsibilities.  His conduct makes it apparent that he thrives on publicly demeaning litigants and attorneys that appear before him.

*Justice Cooper's Philosophy on the Media*

13.    In New York, matrimonial proceedings are presumptively sealed by statute due to their sensitive nature in order to protect the confidentiality of the parties.  *See* N.Y. Dom. Rel. Law § 235. The New York Court of Appeals has explained that such statutory protections are "founded upon a recognition of the inherently personal nature of matrimonial proceedings and

the obvious desirability that records of such proceedings not be used to gratify private spite or promote public scandal." *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 15 (1970).  Indeed, the enactment of DRL 235 was for "the protection of the privacy of the parties to a matrimonial action." *See Janecka v. Casey*, 121 A.D.2d 28, 30 (1st Dept. 1986).

14.     Since taking the matrimonial bench five (5) years ago, Justice Cooper has left a paper trail that makes it quite clear that he has ignored the privacy enactments of the legislature and holdings of the New York Court of Appeals in the matrimonial cases he presides over.  In a Continuing Legal Education ("CLE") presentation in 2013, he explained his philosophy regarding the opportunities that having the media in the courtroom presents for his own self-promotion and publicity:

> COOPER:     There was a lot of press there.  Everybody… I think my other judges might agree most often you don't want the press there.  But, every once in awhile you say hey this could be a great occasion.  Maybe I will craft a line that might sound printable, that might resonate.

(*available at* https://www.youtube.com/watch?v=G9xociqC300.)[2]

---

[2] It bears mentioning that in another portion of the CLE presentation, Justice Cooper makes statements that are appalling and call into question his temperament as a matrimonial judge.  In explaining how he was sitting as a duty judge in the *Ex Parte* Part of the court when called upon decide a temporary injunction involving a Picasso painting, Justice Cooper remarked:

> COOPER:  Ten lawyers in grey suits come walking with incredible purposeful stride.  So that's what was happening.  It was four o'clock on a Friday.  I was finishing a contentious matter involving two families.  People come in.  I see this.  I said ut-oh.  So I said, look I'm involved in a very serious family matter involving a child.  This is way more important than whatever nonsense you have.  Maybe not said that, whatever you have.  Go out and talk to my court attorney.  About five minutes later my court attorney comes in and says judge you are going to want this [Picasso case].  He tells me.  ***I said who cares about this kid… where the family… Who cares about this kid!***

Justice Cooper's open admission of his willingness to create "printable" sound bites to generate media coverage is quite troubling, particularly where he presides over highly sensitive and confidential matrimonial proceedings.    And, as explored below, Justice Cooper frequently generates these "printable" sound bites, which are largely used to denigrate, insult and bully litigants and their attorneys.[3]

15.    It is quite clear that Defendant viewed the September 18 Decision as one of these "great occasions" to put himself in the media spotlight and use the publicity as a tool against Plaintiff.    The September 18 Decision is laced with so-called "printable" sound bites and alliterations such as Defendant asserting Plaintiff engaged in a "maelstrom of misconduct," quoting Abraham Lincoln to call Plaintiff a "fool" and reciting purported salacious details of the proceeding far removed from the sealed motion papers and the parties' contentions.  (*See* Ex. 1.) If anything, the above CLE clip serves to confirm that the September 18 Decision was a premeditated publicity stunt drafted purely for media consumption with the apparent intent to irreparably harm Plaintiff, and not to decide any actual issue in the Matrimonial Action.

*Justice Cooper's Use of Tabloids to Denigrate Litigants*

16.    A simple Google search reveals that Justice Cooper has repeated this conduct of generating "printable" sound bites for years.  In fact, he does not shy away from the scandal and

---

(*available at* *https://www.youtube.com/watch?v=0DpZtTX9YXk*.)

(emphasis added.)  Justice Cooper's statements are precisely the type of comments that undermine the public's confidence in the family court system.

[3] Justice Cooper's use of published decisions as a means to denigrate litigants has not ceased. Just a few weeks ago, Justice Cooper published a decision in the matter *Genger v. Genger*, 302435/2002, NYLJ 1202759751298 (Sup. Ct. N.Y. Cnty., June 3, 2016).  He used the decision to insult the Genger family accusing them of abuse of judicial resources.  Ever seeking publicity, however, Justice Cooper solicited a front page articles in *The New York Law Journal* and even had a photographer come to his chambers        to        take        a        portrait        of        him        for        the        publication.        *See* http://www.newyorklawjournal.com/id=1202759971618/Judge-Rein-In-Interminable-Litigation-Over-Family-Assets.

acrimony inherent in matrimonial actions, but rather is an active participant in stoking the flames.  Justice Cooper is frequently quoted in the tabloid headlines belittling, shaming and publicly humiliating litigants all the while airing the salacious details of their confidential divorces in front of the press.  Defendant's over-the-top verbal attacks have frequently earned litigants in the cases before his court the shame of bold-print headlines in the tabloids papers *The New York Post* and *The Daily News*.  It is quite telling that Defendant appears in these two (2) tabloids far more, perhaps orders of magnitude more, than any other judge in New York City.  The following examples are only a sampling of Defendant's crafted "printable" sound bites used to demean litigants in the courtroom and expose personal details of their matrimonial actions[4]:

- "Judge Rips 'Broke' Deadbeat Dad Who Skied in Alps," by *The New York Post*.  (Ex. 2.)[5]

- "Divorce Judge Slams 'Bed-Pooping, Cokehead' Banker, Alcoholic Wife," by *The New York Post*.  (Ex. 3.)

- "Judge Scolds Wealthy Manhattan Couple for Letting Children Learn About Salacious Details During Their Divorce," by *The Daily News*.  (Ex. 4.)

- "Judge Calls Carnegie Deli Manager 'the Shyster of Smoked Meat,'" by *The New York Post*.  (Ex. 5.)

- "Judge Slams Carnegie Deli manager as 'Shyster of Smoked Meat," by *The Daily News*.  (Ex. 6.)

- "Judge Rips into Carnegie Deli Owners During Divorce Hearing," by *The Daily News*.  (Ex. 7.)

- "Stephanie March Slammed by Judge for Taking Ex Bobby Flay Back to Court over Food Network Videos," by *The Daily News*.  (Ex. 8.)[6]

---

[4] Defendant appears in many other articles written in *The New York Post* by Julia Marsh and *The Daily News* by Barbara Ross harrying litigants that do not explicitly refer to Defendant in the headline of the article.  In fact, Ms. Marsh and Ms. Ross have even written puff-pieces specifically about Defendant on dog custody, service via Facebook and moving Picaso paintings.

[5] Witnesses observed Justice Cooper call *The New York Post* reporter to the Part Clerk's desk and engage in an *ex parte* conversation prior to calling Mr. Phillips' case.

- "A Second Deadbeat Dad Warrant Is Out for Damon Dash," by *The Daily News*.  (Ex. 9.)

- "Judge Slams Paul George for Being a Deadbeat Dad," by *The New York Post*.  (Ex. 10.)

- "Patent-lawyer a 'Fool' for Representing Himself in Divorce Battle: Judge," by *The New York Post*.  (Ex. 11.)

- "Judge Rejects Woman's Bid for More Divorce Cash to Protest Abortion Clinics," by *The Daily News*.  (Ex. 12.)

- "Judge Issues 20-year Order of Protection Against Woman's Ex-Hubby," by *The New York Post*.  (Ex. 13.)

17.    Justice Cooper's repeated appearances in tabloid headlines disparaging litigants raises serious concerns beyond merely his fascination with coming up with a "printable" sound bite for the media to print.  It goes without saying that Defendant's discourteous statements to litigants and disclosure to the media of happenings in presumptively sealed proceedings are inconsistent with his responsibilities and ethical duties under the Judicial Canons and New York state law.  *See* 22 NYCRR 100.3(B)(3)[6]; N.Y. Dom. Rel. Law § 235.  It is all the more troubling when Justice Cooper's derogatory statements and insults, uttered on a repeated basis as shown above, are declared with tabloid media present in the courtroom writing their Page Six blurb exposing a litigant's most private and intimate facts to the public.  As was the case in Plaintiff's

---

[6] The day before the Stephanie March and Bobby Flay hearing, witnesses observed Justice Cooper stop a trial, leave the bench and engage in *ex parte* communications with *The New York Post* and *The Daily News* reporters about the March/Flay hearing.  Justice Cooper's Part Clerk, Charlotte Williams, was observed to hand the reporters what appeared to be documents from the March/Flay case during the *ex parte* conversation.

[7] Judicial Canon 3(B)(3) – codified in 22 NYCRR 100.3 – provides that: "A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity …."

matrimonial action, Justice Cooper actively embraces the tabloid media in his courtroom, often times referencing them by name from the bench as he did in the middle of the custody trial in *Zappin v. Comfort*:

> THE COURT:      Ms. Ross, you are becoming a celebrity.  Fine.  Go ahead.
>
> Ms. Ross, if you hear the name of the child, I'm asking you not to print [sic] if you were going to print anything. Thank you.  I appreciate it.

It begs the question, how do *The New York Post* and *The Daily News* learn about so many salacious matrimonial cases when they are sealed proceedings?  There is only one inescapable conclusion – which has been confirmed in *Zappin v. Comfort* – which is that Justice Cooper is encouraging these stories by tipping off *The New York Post* and *The Daily News.*

18.     More importantly, though, one wonders how Justice Cooper's uncivil behavior – exemplified by calling a litigant "The Shyster of Smoke Meat," another a "Bed-Pooping Cokehead" and multiple litigants "Deadbeat Dads" – has persisted so long in the press media without any repercussions or actions from the New York State Judicial Commission or the Office of Court Admission as his conduct and name-calling erodes and undermines public confidence in the judiciary.

*Justice Cooper's Attacks on Non-Matrimonial Attorneys Rajic v. George*

19.     Studying Justice Cooper's printed statements, it becomes clear that his "printable" sound bites are generally used to bully and pressure the outcome he desires in the case.  Case in point, almost exactly one (1) year before *Zappin v. Comfort* and the September 18 Decision, Justice Cooper's penchant for denigrating litigants went beyond Page Six and spilled into his judicial decisions.  On September 22, 2014, Justice Cooper issued and published a decision in *Rajic v. George* in which he attacked not only Mr. George, but his counsel at *Gordon & Rees*

*LLP. See* 45 Misc. 3d 1025 (N.Y. Cnty. Sup. Ct. 2014). In that decision, which draws stark parallels to the September 18 Decision in *Zappin v. Comfort*, Justice Cooper published statements that were wholly inconsistent with the best interests of the child at issue in the proceeding and will only serve to erode the relationship between Mr. George and his child as she gets older and is able to read Justice Cooper's decision spread across the omnipresent Internet. Specifically, Justice Cooper wrote, among other derogatory things, about Mr. George:

> Even though it is all but certain that respondent [Paul George] is the father of the five month old baby girl who is at the center of this case, he has gone to every length imaginable to avoid taking responsibility for his actions.

*See id.* There was no legitimate purpose or precedential value in publishing the *Rajic v. George* decision and, in fact, it violated DRL 235. Rather, the purpose of publishing the decision is quite clear: it was designed to shame Mr. George, paint him as a villain, pressure him into hiring "experienced" matrimonial counsel and draw a media circus to the case. In fact, that is exactly what happened.

20. The *Rajic v. George* decision was not published in the New York State Reporter until October 7, 2014.[8] Similarly, it was not published in *The New York Law Journal* until September 29, 2014.[9] Yet, *The New York Post* and *The Daily News* both had access to the decision and began running stories calling Mr. George a "deadbeat dad" on September 22, 2015. (*See* Ex. 10.) Hundreds of other media outlets piggybacked on *The New York Post* and *The Daily News* stories creating a wildfire of negative stories about Mr. George and doing a massive disservice to the infant child.

---

[8] *See* http://www.courts.state.ny.us/reporter/slipidx/miscolo_2014_October.shtml.

[9] *See* http://www.newyorklawjournal.com/id=1202671347019/Rajic-v-George.

21.     More disturbing were the affronts and accusations lodged at Mr. Georges' then attorneys, *Gordon & Rees LLP*, by Justice Cooper.   As outsiders in the matrimonial arena much like Plaintiff, *Gordon & Rees LLP* were prime targets for Justice Cooper.   Indeed, he publicly accused them of attorney misconduct and even felony criminal behavior in the published *Rajic v. George* decision.   More precisely, Justice Cooper published the following accusations:

> The attempt by respondent's attorneys to remove a child custody proceeding to federal court given the facts of this case and existing law is an egregious abuse of court resources and likely rises to the level of frivolity (see NY Rules of Professional, Rule 3.1).   Furthermore, given respondent's counsel's string of flawed legal strategy and motion practice, delay tactics (i.e. removal to federal court, with patently false statements made to seek such removal), improper applications (i.e., motion sequence 003 to reargue the denial of an informal telephone adjournment request), submitting an apparent falsified affidavit (discussed in Note 6, below), coupled with their wealth of inexperience in the area of domestic relations, it appear that counsel may be in violation of Rule 1.1 of the NY Rules of Professional Conduct …

> \*\*\*

> It is must be noted that respondent's affidavit dated June 25, 2014 raises serious questions of validity.   It appears that the affidavit that was submitted in connection with the Federal Action was resubmitted in this action with a changed caption.   If one examines the sworn affidavit and and [sic] notary signatures on the last page on both documents, they appear to be identical.   If respondent's counsel submitted the same signature page of respondent on both documents, counsel may be subject to disciplinary action and may even have committed a crime (see NY Penal Law 175.30, et seq).   At the very least, it is sanctionable.

*See* 45 Misc. 3d at 1025-28, fns. 4 and 6.   Of course, the accusations lodged against *Gordon & Rees LLP* by Justice Cooper were ultimately unsubstantiated.   The decision, however, raises serious concerns as to the propriety of Justice Cooper's taking justice into his own hands, so to speak, by publishing and publicly accusing those attorneys of misconduct and criminal behavior rather than reporting them to the appropriate authorities or the Departmental Disciplinary Committee to investigate.   But, the bullying attack on *Gordon & Rees, LLP* accomplished its apparent goal of ousting *Gordon & Reese LLP* as Mr. George fired them and hired – upon

information and belief, on Justice Cooper's recommendation – Harriet Newman Cohen of *Cohen Rabin Stine & Schumann LLP*, the self-proclaimed "maestro" of the New York City matrimonial bar.[10]  And as fate may have it, the court-appointed Attorney for the Child in *Zappin v. Comfort* was none other than Harriet Newman Cohen.

*Justice Cooper's Misconduct and*
*Inappropriate Statements Behind Closed Doors at CLEs*

22.     Defendant's contemptible conduct and deplorable statements made to litigants and their attorneys in the courtroom and published decisions illustrated above pale in comparison to his statements made behind closed doors away from the bench and in the company of matrimonial practitioners.  By way of example, Defendant was a panelist for a CLE presented to a small group of matrimonial attorneys entitled "Enforcing Money & Other Judgments in Matrimonial Cases" hosted by the New York Women's Bar Association.  Defendant's portion of the presentation was entitled "Will I Put the Spouse in Jail?  The role of the Court in Enforcing Judgments."  (Ex. 14.)  The program was captured on video, which has recently gone viral due to the outrageous nature of the statements made by Justice Cooper during the CLE presentation.  Specifically, Defendant made the following shocking remarks, which are by no means exhaustive:

WHITE:          I hope that's a good segway to asking you, what do we have to do
                to convince you to put them [dads][11] in jail?

COOPER:      Not much!   ::audible laughter::

---

[10] *See* https://www.nycla.org/siteFiles/Publications/Publications1433_0.pdf ("Amongst the City's power elite, Harriet Newman Cohen is considered the 'maestro' of the highly public marital split.")

[11] Although not on the video clip, the moderator, Judith White of *Lee Anav Chung White and Kim LLP*, had previously recited a story about her client in which she stated that her client's husband "did what every prospective deadbeat dad does, he fired his attorneys and went *pro se*."

13

(*available at* https://www.youtube.com/watch?v=X661udvkcC8.)

\*\*\*

COOPER:        It made me feel better about some of the language I use.  She sorta

definitely approvingly liked the family court judge referring to the

non-payor spouses proof as pathetic.  I like it, no mincing words!

(*available at* https://www.youtube.com/watch?v=zuIT1MEvJug.)

\*\*\*

COOPER:        Contempt is the remedy of last resort.  But, I'm trying to find, it's

also, I'm trying to find the technical legal word for it.  ***It's actually***

***one of the coolest remedies too!***  (emphasis added)

(*available at* *https://www.youtube.com/watch?v=9yVOCGVqCGA.*)

\*\*\*

COOPER:        Why would you want to hold someone in contempt?  It is very

very effective when done correctly.   ***There is nothing like***

***threatening someone***.  One is a threat, ***and this is one of the***

***things I kinda live for in the job***, to tell people if you don't there is

a good chance you're going to be.  I have a lot of different lines.  I

don't use bring your tooth brush next time, that doesn't really

work.  My new line that seems to work very well is:  Sir we are

going to adjourn this case.  But, I want you now I need you to

provide the bridge officer with a list of the medications you take so

that can be passed onto the Department of Corrections.  I hope I'm

not giving away a trade secret!  (emphasis added)

14

(*available at* https://www.youtube.com/watch?v=cTOnYzcGeg0.)

\*\*\*

COOPER:        There is nothing more gratifying for your client then seeing the person they hate most in life with those handcuffs on!

\*\*\*

COOPER:        My favorite question is:  What kinda car do you drive?  If it is a Range Rover, an Escalade or a high-end Lexus, that's *prima facie* case for imprisonment!  ::audible laughter::

(*available at* https://www.youtube.com/watch?v=kiIzRmy73vU.)

\*\*\*

COOPER:        Then the Sheriffs arrive.  I do an order of commitment.  They then take the contemptor to the Department, and then lodge him – him or her, actually I've only done hims so far – to the Department of Corrections.  At that point, that's when the money is generally is produced.  It is so scary the prospect of going to jail.    My understanding – I shouldn't say this – it is not as bad as going to Riker's.

(*available at* https://www.youtube.com/watch?v=Jeb2dNLB2Wo.)

Such statements would cause any reasonable person to question Justice Cooper's temperament and fitness to decide matrimonial cases.  And, they are revealing in that Justice Cooper appears to be laughing throughout the presentation humoring himself with his pithy remarks, suggesting that he takes pleasure in inflicting pain and suffering on others.  Defendant's statements illustrated above are precisely the types of statements that diminish public confidence in the

judiciary, undermine the administration of justice and rightly weaken the public's perception of a fair and impartial judicial system.  It should further be noted that sometime after the video clips of Defendant's statements were released publicly on YouTube, the CLE presentation was removed from the New York City Bar Associations website for purchase.

*Justice Cooper's Public Admission to Shaming Litigants*

23.     Staying true to course, Justice Cooper has unapologetically declared, in testimony to the New York State Assembly no less, that he is not afraid to use tactics in his courtroom to shame litigants into outcomes he believes are just, even when they are contrary to the law.  In 2013, Defendant testified before the Senate Standing Committee on Judiciary regarding the issue of temporary spousal support.  As a sitting judge, his testimony is astounding as he appears to boast about his harrying of litigants to force outcomes inconsistent with the law, but which he personally believes are justified:

> What might be surprising to hear is that a good percentage of the temporary maintenance cases that have come before me, the party demanding support is the husband.  In many of these cases, the husband, who without good reason has worked on a limited basis and has contributed little to the household during the course of the marriage either financially or as a homemaker, is the one invoking the statute as giving him the "right" to collect thousands of dollars in monthly maintenance from his wife.

> In one particularly memorable case, the husband, a retired dentist, had left his wife of more than 30 years, a practicing doctor, to live with his girlfriend, who happened to be the much younger daughter of his wife's best friend.  Relying on the formula, the husband's attorney insisted that the plain language of the law required the wife, the monied spouse, pay the husband, the non-monied spouse, $7,000 a month, regardless of the fact that the money would be used to finance the husband's new life with his live-in girlfriend.  Because "chutzpah" is not one of the 19 factors to be considered when deviating from the guidelines, ***I had no legal reason to deny the husband's application.  It was only by focusing on the shamelessness of his behavior that I was able to convince the husband to back off from his claim.***

> Similarly, there was the case where the husband with an MBA decided that rather than work in finance he'd prefer to volunteer in a yoga studio.  He too, when you

16

apply the guidelines, would be entitled to a huge amount of maintenance from his hard working wife under the statutory guidelines, even if common sense tells us he deserves little or nothing.

(Ex. 15, (emphasis added).)

*Justice Cooper's Presiding over Matrimonial*
*Actions Where a Conflict of Interest Is Apparent*

24.     Justice Cooper's inappropriate behavior has not been limited to solely to his statements, however.   Justice Cooper has presided over cases where there has been an appearance of impropriety based on his improper conduct as well as apparent conflicts of interests.  The following example is merely one of dozens of such cases.  In the matter *Amy W. v. Ben H.*, Index No. 309228/10 pending before the Supreme Court of New York County, Justice Sarah Lee Evans awarded primary physical and legal custody of the parties' two (2) young girls to the mother in May 2013 due to behavioral and parenting issues with the father.  Shortly thereafter, Justice Evans retired from the bench and Justice Cooper took over her docket.

25.     Less than one (1) year after the custody award in February 2014, the father moved to modify the award of custody to the mother.  At the time, the father had retained Lawrence Goodman, Esq. as his appellate counsel in the divorce action.  As it turns out, upon information and belief, Mr. Goodman was Justice Cooper's campaign manager for his election to the New York County Supreme Court in 2008.  At a hearing on March 28, 2014 observing Mr. Goodman sitting in the gallery Justice Cooper admitted when pressed to the apparent conflict of interest:

COOPER:     I want to state on the record that I see Mr. Goodman has been retained as appellate counsel.  I have had the appointment of Mr. Goodman through politics when I ran for Supreme Court Judge. Mr. Goodman is involved in the political process.  I've socialized with him  … I had lunch with him about two months ago just to discuss life in general and his future career path …  I am friendly with him but not a close personal friend.  I just wanted that put on the record."

17

Mr. Goodman's "future career path" included entering an appearance as trial counsel on behalf of the father at a modification hearing commenced in July 2015. Mr. Goodman's notice of appearance was served five (5) days before the start of trial.[12] The mother immediately filed a motion to recuse Justice Cooper from the proceeding based on the apparent conflict of interest with Mr. Goodman and the appearance of impropriety. Justice Cooper refused to entertain the motion and ordered that the modification hearing proceed as calendared. Mr. Goodman proceeded as the father's trial counsel at the modification hearing. And, based on Mr. Goodman's notice of appearance filed and served on the eve of the hearing, the mother had virtually no appellate remedy.

26.     Upon being assigned the case, Justice Cooper increased the father's access with the children without first holding a hearing as required by law. Even more astonishing, in his decision rendered on the record on December 22, 2014, Justice Cooper overturned Justice Evans' original custody award in its entirety awarding full permanent legal and physical custody to the father. This is despite the fact that based on the record and Justice Cooper's decision the father failed to raise any "substantial change in circumstances" to warrant modification of Justice Evan's decision.

27.     Irregardless, Justice Cooper should have recused himself, or at the very least, entertained the motion to recuse. This is particularly so where there was a clear appearance of impropriety in that Justice Cooper fraternized with the father's trial counsel during the pendency of the case and was politically involved with the father's trial counsel during his election

---

[12] It is rather astonishing that in all of the New York City metro area, the father was unable to find appellate counsel or a trial attorney who did not also happen to be politically involved with Justice Cooper such that they had lunch together during the pendency of the case. Indeed, Mr. Goodman is not even a matrimonial lawyer. According to his LinkedIn profile, Mr. Goodman specializes in "personal injury" and "commercial" litigation.

campaign.  Justice Cooper's failure to do so raises series questions as to the propriety of his presiding over the case with an apparent conflict of interest.  More importantly, the appearance created by Justice Cooper in refusing to entertain a motion where there was a substantial evidence as to an appearance of impropriety directly undermines the integrity and public confidence in the judiciary.  Once Mr. Goodman became involved, Justice Cooper should have recused himself and should not have touched the *Amy W. v. Ben H*. matter.

*Justice Cooper's Intimidation of Sebastian Doggart*

28.    Although Justice Cooper has demonstrated a penchant for embracing the friendly media and tabloids in his courtroom, he has equally shown that he will use improper means to deflect scrutiny and control the flow of information out of his courtroom.  For example, Defendant has locked horns and gained attention for his intimidation tactics used against world-renowned and Emmy Award winning filmmaker Sebastian Doggart.  Mr. Doggart is currently directing and producing a documentary investigating possible abuses in the family court system in the United States.  At a hearing on November 6, 2015, Mr. Doggart was sitting in the gallery observing proceedings in Justice Cooper's courtroom.  Justice Cooper abruptly interrupted the proceedings, pulled Mr. Doggart out of the gallery, screamed at him, insulted his professional credentials and interrogated him for nearly thirty (30) minutes – even going so far as to deny Mr. Doggart any right to counsel:

| | |
|---|---|
| THE COURT: | I'm going to ask you again otherwise I'm going to say you cannot take the 5th Amendment on that, otherwise I will hold you in contempt of court. |
| MR. DOGGART: | I seek counsel on this. |
| THE COURT: | All right.  You're going to come back on Monday for a contempt proceeding.  You have your telephone with you. |
| MR. DOGGART: | I want my counsel. |

THE COURT:      I would like the witness will turn his telephone over, otherwise I will have it seized from you.  You have been recording these proceedings.  That is in violation of state law without permission.  You could easily correct this situation by telling me under oath that you have not, but you have said you're not going to tell me one way or the other.  You do not have a right to take the 5th amendment in this case since there is no proceedings being brought against you.

MR. SCHORR:      Your Honor.

THE COURT:      I want your telephone turned over.

MR. SCHORR:      Your Honor, may I ask on what basis?

THE COURT:      He is recording testimony.

MR. SCHORR:      On Mr. Wallack's allegations.

THE COURT:      On Mr. Wallack's allegations.

MR. DOGGART:      I feel as – as a member of the press I'm being bullied by you.

THE COURT:      Bullied.  Member of the press.

MR. DOGGART:      I'm a film maker and a journalist.

THE COURT:      Have you asked permission to film these proceedings?

MR. DOGGART:      Under oath ---

THE COURT:      Let me finish.  Stop it.  Stop it.  Stop it.  Sit down Mr. Schorr.

MR. DOGGART:      Please don't scream at me.

MR. SCHORR:      Please stop screaming at Mr. Doggurt [sic].  You are screaming at him.

***

MR. DOGGART:      I need to consult with my counsel.  I need to speak with my counsel.  I have a right to counsel.

THE COURT:        You're staying on the stand.

                                    ***

MR. DOGGART:      I do not recognize this court's authority to interrogate a member of the press in a bullying manner.  I have – I made it very clear.

THE COURT:        You're going to turn over your telephone.  I have take [sic] it into custody.  I want your phone turned over.  Your phone is being turned over.

MR. SCHORR:       Based on what allegation?

THE COURT:        He has said he refused to answer.  Turn over your phone.

                                    ***

MR. DOGGART:      This is going to be wrongful arrest and it's just exacerbating this entire thing.

THE COURT:        Sir, you are doing it.  Sir, you are coming in here and you were told.  Not every knows you cannot record.  You ask [sic] permission previously to do a documentary.

MR. SCHORR:       Your Honor, you have no basis for this allegation.

THE COURT:        If he tells me he's not recording it.

MR. SCHORR:       Do you go and ask everyone in the gallery whether they are recording?

THE COURT:        Mr. Wallack, what did you see?  Tell me what happened?

MR. WALLACK:      I saw the gentleman with his phone out.  He was approached by your court officer who questioned whether he was recording the proceeding.  He then said he had a right to record the proceeding.

COURT OFFICER:    That's not what he said.

                                    ***

THE COURT:        It doesn't work that way.  This could be easily cleared up if I get a direct answer.  I will first ask my court officer.  Let

21

me find out what's happened.  Just because Mr. Wallack said he saw something doesn't mean it's the case.  It could easily be corrected by, what's your name again, Mr. Doggurt [sic] telling me he wasn't.  He said I will take the 5th amendment which is an odd way to respond in this instance.

MR. DOGGART:     Because I'm not accepting this court's authority to interrogate a member of the press.  I have a first amendment right here.  This is a bullying interrogatory way.  This court should be transparent.  Yes, I believe it should be filmed.  I have not been filming it.  It will be filmed.  I'm seeking to film it.  I will be appealing the order of this court.

THE COURT:     Stop it.  Stop it.  There hasn't been an order.  You simply you never made a motion.

MR. DOGGART:     You made an order that I cannot record proceedings.

THE COURT:     Make a motion.

MR. DOGGART:     I'm asking for you to make a motion.

THE COURT:     Make [sic] appropriate motion, and I'll set forth the law.

MR. DOGGART:     I will appeal that and seek to record it particularly for the trial.  I think there are huge public interest issues here particularly you using orders as a press release to target individuals.  And that is the story I am covering.

THE COURT:     Enough.

COURT OFFICER:     During the break I told him, you know, to put his phone away because his phone was out.  And he said I can't look at it.  I said you're not allowed to film in the courtroom and he said others are doing it.  And I said I don't know the way you're holding the phone.  I don't know if you're filming or not.  He said he was not and he put it away.  When you came into the bench he was just checking his emails.

MR. DOGGART:     Did you see any evidence I was filming?

COURT OFFICER:     I didn't, but you were holding it.

22

THE COURT:          The bottom line we have rules about things being filmed. Tell you the truth, I don't care what's on there, everything that's gone on today.  Fine.  The world can know.  I want the world to know.  I have a transcript with every word that has been said in this courtroom is an official transcript.[13] Mr. Doggurt [sic] find [sic] it so needs to make a surreptitious recording, you know what, it's not worth it. I'm getting upset because the rules aren't being following. I'm getting upset Mr. Doggurt [sic].  Rather than give me a simple answer doesn't give me a simple answer.  I don't want to be interrupted.

MR. DOGGART:        Sorry, your Honor.

THE COURT:          I want to have a trial in this case.  I am sick of these side shows.  I'll say this once more.  This case is about a child. I don't want to hear about press releases.  I released a decision because there was reprehensible conduct by an attorney.  Reprehensible.

Mr. Doggart subsequently sought court intervention for Justice Cooper's conduct towards him and issued a press release that gained some media attention.  (*See* Ex. 16.)   To Plaintiff's knowledge, Justice Cooper suffered no consequences for his egregious actions towards Mr. Doggart.  Regardless, Justice Cooper's conduct towards Mr. Doggart remains one incident in a pattern of unacceptable behavior of an elected official and judicial officer.

*Justice Cooper's Pattern of Inappropriate Conduct Leading to Zappin v. Comfort*

29.      The above represents only a very small portion of Defendant's reprehensible conduct on the bench.  Since matrimonial actions are sealed in New York State and not subject to regular public scrutiny, there is really no telling how far Defendant's improper conduct reaches.  Yet, the above is illustrative of Defendant's ill temperament, disregard for the law and lack of

---

[13] It has been well-documented that portions of exchange between Defendant and Mr. Doggart are missing from the official transcript.  Notably, in at least one missing portion, Defendant remanded Mr. Doggart into custody over the weekend (which was later withdrawn) for invoking the Fifth Amendment.

respect for litigants and others in his courtroom.  There is simply no telling how many men, women and, most importantly, children Defendant has harmed.

30.     Plaintiff highlights the above conduct by Defendant to set the backdrop that Defendant's unprecedented conduct towards Plaintiff is not an isolated occurrence.  Rather, it is the result of an escalation of a pattern of improper and inappropriate conduct by a judicial officer.  In this case, though, it is apparent that Defendant abused his authority to deliberately and unlawfully cause Plaintiff irreparable harm through extrajudicial conduct as set forth below.

## PURPOSE OF THIS LITIGATION

31.     Plaintiff brings this action after careful consideration, much thoughtfulness and pointed deliberation.  It goes without saying that commencing an action against a judge is an extreme measure, and rarely successful due to the doctrine of judicial immunity.   But, Defendant's conduct is simply unprecedented, uncalled for on any level and exceeds the bounds of judicial immunity.  It must come stop and Defendant must be held accountable for his reprehensible conduct.

32.     In issuing the September 18 Decision, Defendant divorced himself from his role as an adjudicator and became an active litigant against Plaintiff intent on publicly destroying Plaintiff's reputation and livelihood through falsehoods cloaked in a judicial decision.  But, the law is clear that Defendant simply went too far by publishing and disseminating the September 18 Decision to the media, acting outside his jurisdiction and authority thus subjecting him to liability.  Instead of attempting to mitigate the damage cause to Plaintiff and the child, Defendant has doubled down and ratcheted up his behavior by engaging in improper acts designed to deny Plaintiff full and fair trials in the Matrimonial Action in order to justify the September 18

Decision.  There is no question that once Defendant unlawfully published and disseminated that decision, he had a vested interest in the outcome of the litigation.

33.     At this stage, Plaintiff simply has no other alternative than to pursue this action to remedy the irreparable damage caused to him by Defendant.  The September 18 Decision is currently on appeal.  And, although an appellate reversal would be an extremely meaningful legal victory, it would be virtually meaningless to remedy the damage that Defendant was inflicted.  An appellate reversal will not get Plaintiff his job back or return his lost earnings, purge the September 18 Decision from Westlaw, LexisNexis, Justia or the numerous websites that now host copies of the decision, remove the over one hundred (100) defamatory articles and blog posts about Plaintiff as a result of the decision, return the hundreds of thousands of dollars Plaintiff expended on the case since Justice Cooper began presiding over it or, most importantly, give back the time Plaintiff was denied with his two (2) year old son as a result of Justice Cooper's improper actions.  The damages Justice Cooper caused by his extrajudicial acts of publishing and disseminating the September 18 Decision to the media are real and immense.  Plaintiff has no other remedy, legal or otherwise, to rectify the damages incurred other than to bring the instant action to hold Defendant accountable for his misconduct.

34.     Moreover, while Justice Cooper has publicly slandered and destroyed Plaintiff's reputation with the megaphone of published judicial decision sent to the tabloid media, Plaintiff's attempts to respond to Justice Cooper's attacks have been reduced to a mere whisper, if that.  Plaintiff's attempts to have *The New York Law Journal*, *The New York Post* and *The Daily News* print a rebuttal piece have been ignored.  Plaintiff's motion for reconsideration – statutorily required to be filed under seal – was summarily denied without any press coverage.  Thus, Plaintiff now must exercise his right to petition and turn to the most public of forums, this

court, to offer his response and defense to Justice Cooper's September 18 Decision.  Perhaps even more important than remedying the wrongs Defendant has inflicted on Plaintiff through Justice Cooper's unlawful publication and dissemination to the media of the September 18 Decision, the instant action and this complaint serves to respond to the September 18 Decision and cement in the public record the actual facts of the underlying Matrimonial Action.

35.     Furthermore, Plaintiff must point out the individual has suffered the most as a result of Defendant's wrongful conduct:  Plaintiff's two (2) year old son.  With the stroke of a pen, Defendant turned an infant child into tabloid fodder to be the subject of ridicule throughout his youth.  There is no doubt that Defendant inflicted harm on the child as he wrongfully and irreparably destroyed the earning power of one of the child's parents directly affecting the child's well-being.  True to Defendant's nature, when Plaintiff attempted to point out the damage Defendant needlessly caused to the child in response to questions by the Attorney for the Child, Defendant doubled-down on his wrongful conduct and blamed Plaintiff for Defendant's dissemination of the facts of the case to public and media:

| | |
|---|---|
| AFC COHEN: | You are not going to be able to restrain yourself from saying to him buddy, your mama kidnapped you when you were a little tyke, will you?  You will not be able to stop yourself from saying that will you? |
| MR. ZAPPIN: | I don't think him knowing about his first two years or this period of time which he will have no memory, I don't think it serves any purpose me telling him what happens.  So, no, I don't intend.  I venture I will never tell him what happened.  But, I mean, due to Justice Cooper, he can read about it on the Internet. |
| AFC COHEN: | What was that last remark? |
| MR. ZAPPIN: | Due to Justice Cooper he can read about it on the Internet. |
| THE COURT: | He can read about what you did as a lawyer.  Because of what you did he can read about it on a number of web sites. |

> He can see his picture because of what you did.  He can see pictures of his mother holding him because of what you did.  He can see his mother's medical records, is that not correct, sir?

MR. ZAPPIN:          I don't know.  I haven't seen the web sites.

Needless to say, Defendant – the individual charged with determining the best interests of the child – acted in direct contravention to the well-being of the child through his wrongful extrajudicial actions of publishing and disseminating the September 18 Decision to the media.

36.     Most importantly, Plaintiff also has a duty and a right to challenge Defendant's wrongful conduct.     "Criticism of government is at the very center of the constitutionally protected area of free discussion."  *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1996).  "Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values …."  *Barrett v. Harrington*, 130 F.3d 246, 262 (6th Cir. 1997).  As laid out in this complaint, Justice Cooper's conduct raises substantial questions concerning his fitness as a judicial officer and whether he is guilty of judicial misconduct.  Such conduct includes the following:

- Justice Cooper has engaged in undignified and discourteous conduct by directing demeaning insults and personal attacks at countless litigants and attorneys appearing in his courtroom (*see* Judicial Canon 3(B)(3));

- Justice Cooper has engaged in undignified and discourteous conduct by screaming, provoking, unlawfully detaining and physically threatening litigants, attorneys and innocent bystanders in his courtroom (*see* Judicial Canon 3(B)(3));

- Justice Cooper has diminished public confidence and the integrity of the judiciary by making statements in writing and recorded on video that are wholly inappropriate and unfaithful to the law that shock to the conscience (*see* Judicial Canon 2(B));

- Justice Cooper has made overtly sexist and discriminatory statements both inside and outside the courtroom detracting from the dignity of the judicial office (*see* Judicial Canon 3(B)(4), Judicial Canon 4(A));

27

- Justice Cooper has engaged in extrajudicial activities by contacting the media and distributing confidential and/or sealed documents that call into question his impartiality and detract from the dignity of the office (Judicial Canon 4(A));

- Justice Cooper has knowingly and deliberately misrepresented litigant's contentions and the record in matters before him (*see* Judicial Canons 2(A), 3(B)(1) and 3(B)(4));

- Justice Cooper has willfully and intentionally violated sealing statutes (DRL 235) and court regulations concerning confidentiality (22 NYCRR 202.16(m)) (*see* Judicial Canons 2(A), 3(B)(11));

- Justice Cooper has repeatedly made improper public statements on controversies and issues that are likely to come before him that are inconsistent with the impartial performance of his adjudicative duties (*see* Judicial Canon 3(B)(9));

- Justice Cooper has willfully and intentionally denied Plaintiff and countless other litigants the "right to be heard according to the law," which in Plaintiff's case is explained more fully below (*see* Judicial Cannon 3(B)(6));

- Justice Cooper has engaged in improper *ex parte* communications – many time concerning confidential matters – with the media, attorneys and witnesses (*see* Judicial Canon 3(B)(6) and (11));

- Justice Cooper has engaged in improper extrajudicial activities detracting from the dignity of his judicial office by knowingly making a false report to the Office of Court Administration (*see* Judicial Canons 2(A), 4(A));

- Justice Cooper has refused to disqualify himself from matters where he is "interested" per Judiciary Law § 14 and/or where his "impartiality might reasonably be question" (*see* Judicial Canon 3(E)); and

- Justice Cooper has compromised statutory confidentiality of the litigants appearing before him and their children for his personal interests of self-promotion and grasps at notoriety by engaging in extrajudicial acts to publicize the matters and cases before him (*see* Judicial Canon 2(A)).

Given the widespread and persistent nature of Defendant's improper behavior and statements that run contrary to the Judicial Canons, Plaintiff feels compelled to bring it to the public's attention where Defendant is a duly elected public official and Plaintiff has been a victim (one of many) of Defendant's conduct.  And, unlike other judges, Defendant exerts authority over nearly

every aspect of the lives of the litigants before him and his conduct directly affects the lives of children.[14]  For these reasons alone, the public should be made aware of Defendant's conduct.

## **FACTUAL BACKGROUND**

<u>Defendant's Conduct Prior to the September 18 Sanctions Decision</u>

37.     The operative facts in this matter stem from Plaintiff's matrimonial action, *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending before Defendant in the New York County Supreme Court.  Justice Cooper has presided over the matter since July 22, 2015.  Prior to that, the matter was pending before Justice Deborah Kaplan since February 11, 2013.  The case was transferred to Defendant after Justice Kaplan was assigned to another position in the court system in May 2015.

38.     At that point in time, Plaintiff was understandably frustrated that he had been subject to twenty (20) months of supervised access with his son at $150 an hour (over $100,000 in total) imposed without a hearing or fact-finding on the issue.  Plaintiff had made repeated pleas to the court for a hearing on the issue, which were denied no less than five (5) times or continuously delayed by the court, Ms. Comfort and most often the Attorney for the Child.  Moreover, Plaintiff was forced to litigate custody of the child with Ms. Comfort in no less than three (3) different jurisdictions.  Ms. Comfort originally abducted the child when he was four (4) weeks old from Washington, DC taking him to Tacoma, WA.  Ms. Comfort filed actions in both the District of Columbia and Washington State in November 2013.  Some months later in February 2014, Ms. Comfort again moved the child without consent from Tacoma, WA to New York, NY where Plaintiff ended up in New York County Supreme Court.  Plaintiff had to hire

---

[14] Plaintiff will be sending a copy of this complaint to the New York State Judicial Commission along with a formal request that it commence an investigation of Justice Cooper's improper and inappropriate conduct.

counsel in all three jurisdictions, which eventually depleted his savings. Plaintiff's income was also exhausted on supervised access and counsel fees putting him in debt, which forced him to proceed *pro se*. To add insult to injury, the record was replete with instances where he was mocked, personally insulted and stonewalled from all sides, particularly by the court-appointed Attorney for the Child. Regardless, Plaintiff's sole desire was to be a parent to his only child.

39.     On July 22, 2015, a hearing was held before Justice Cooper on pre-trial motions that were previously pending before Justice Kaplan. It was the parties' first appearance before Justice Cooper in the case. Justice Cooper, who had no previous involvement in the case, did not take any time to hear the parties' positions, become familiar with the issues on the record or otherwise determine if common ground and/or settlement could be reached on some or all issues in dispute. Instead, he came out of the gate swinging at Plaintiff.

40.     At that first hearing, Justice Cooper personally attacked Plaintiff relentlessly on the record, impugned his character and questioned his professional competency – all without any prior first-hand experience of or with Plaintiff. It was quite apparent that Justice Cooper had already predetermined the result and the facts of the case. Defendant even went so far as to go out of his way to mention the full name of his then employer on the record in open court with the public in the courtroom, no doubt a veiled threat towards Plaintiff's livelihood. Moreover, Plaintiff was made to look like a punching bag, unable to defend himself, as the Defendant began the proceeding by forbidding him from speaking in the courtroom.

41.     Justice Cooper's inappropriate and discourteous behavior continued after the July 22, 2015 spilling over into his written orders. In these orders Defendant would engage in improper and unprofessional *ad hominem* and personal attacks directed at Plaintiff, without ever addressing the substance of Plaintiff's requests for relief. For example, where Justice Kaplan

had previously described the allegations of attorney misconduct against the Attorney for the Child as "quite serious" setting a briefing schedule and hearing on a motion to recuse her.  Yet, when Justice Cooper took over the case he concluded that the allegations were "baseless" without so much requiring a response by the Attorney for the Child.  Justice Cooper justified his decision by casting conclusory, unsupported and highly improper personal attacks at Plaintiff's character and motivations.   Most disturbing, however, Justice Cooper engaged in nonstop assaults at Plaintiff's employment going out of his way to gratuitously mention the full name of his former employer in written decisions and falsely accusing him of misconduct.   Justice Cooper's improper conduct was called-out and summarized by Plaintiff in a September 1, 2015 affidavit filed *before* the September 18 Decision only serving to highlight Justice Cooper's depravity and clear disregard to the best interests of the child:

> Since unlawfully taking over this case on July 22, 2015, Justice Cooper has attacked me personally and impugned my character and integrity relentlessly, going so far as to endanger my legal career by threatening to file [frivolous] disciplinary charges and gratuitously mentioning the name of my employer on the record and in various court orders.  I would ask that this Court consider whether destroying my ability to make a living would be in the best interests of [the child], the 2-year old little boy in question.

(Ex. 17 at 2.)[15]  In apparent response to Plaintiff's contention that Defendant was assaulting his livelihood, Defendant did not temper his statements or conduct.  Instead, he double-downed just days later by publishing and disseminating to the tabloid media the September 18 Decision illustrative of Defendant's intemperance and capacity to inflict terror on litigants.

---

[15] As Plaintiff's affidavit demonstrates, the circumstances of Justice Cooper taking over the *Zappin v. Comfort* case were highly irregular and mysterious.  (*See* Ex. 17.)  Out of over 120 cases reassigned from Justice Kaplan's docket, *Zappin v. Comfort* was the only case to be assigned to Justice Cooper.  Neither Justice Cooper, nor the Office of Court Administration have provided any explanation as to how Justice Cooper was chosen to preside over the case.  Given how quickly Justice Cooper launched an assault on Plaintiff's livelihood and professional standing immediately after taking over the case as well as his highly prejudicial statements concerning Plaintiff without hearing a single exhibit of evidence, there are substantial questions looming as to Justice Cooper's assignment to the case.

### The Attorney for the Child's Motion Practice

42.    The September 18 Sanction Decision was instigated by the Attorney for the Child, Harriet Newman Cohen of *Cohen Rabin Stine Schumann LLP* ("Ms. Cohen" or "Attorney for the Child"). Ms. Cohen had filed two separate motions. The first was to quash a subpoena served on her prior to a July 22, 2015 hearing seeking *inter alia* the amount of fees billed to Plaintiff's wife.[16]  Pursuant to an order issued by the state court, Ms. Cohen was required to bill her fees fifty percent (50%) to each party. However, financial records from Ms. Comfort received during discovery revealed that Ms. Cohen was billing Ms. Comfort significantly less than what was billed to Plaintiff. By way of example, for period between February 1, 2015 to July 1, 2015, Ms. Cohen billed Plaintiff $47,207.06 while billing Ms. Comfort only $3,516.78 without permission of the court to deviate from the court's order. Ms. Cohen subsequently conceded that she violated the court's order in motion papers filed in September 2015 as well as at trial in November and December 2015.[17]  Nevertheless, Ms. Cohen brought motions for entry money judgments to incite and put financial pressure on Plaintiff. In serving the July 22, 2015 subpoena, Plaintiff simply sought disclosure of Ms. Cohen records to determine her compliance with the court's so that Plaintiff could defend against her various motions for money judgments.

---

[16] The subpoena also requested Ms. Cohen disclose the source of a text message Plaintiff purportedly sent to Ms. Comfort that was attached to a prior filing by Ms. Cohen. The purported text message was not a screenshot, but rather a list of "bubbles" made to appear as a text message. Screenshots from Plaintiff's phone revealed that the purported text messages were fabricated.

[17] For the less than four (4) month period between September 1, 2015 and December 21, 2015, Ms. Cohen billed the parties an astounding, and quite frankly unethical, **$501,296.26** as Attorney for the Child, of which **$278,005.64** was billed to Plaintiff. The total included Ms. Cohen's luxury car service to and from the courthouse, expensive sit-down lunches and dinners during trial and work that was unrelated to the Matrimonial Action. Even more astonishing was that fact that Ms. Cohen billed $600 per hour for her law partner, Paul Kurland, to sit in the courtroom with her and her daughter, Martha Cohen Stine, to sit in the gallery during proceedings. Neither Mr. Kurland, nor Ms. Stine, ever received court permission to bill as the child's fiduciary as required by law. Ms. Cohen turned *Zappin v. Comfort* into a profiteering scheme and endeavor.

43.    Ms. Cohen brought a second motion in August 2015 seeking *inter alia* damages and attorneys' fees in retaliation for Plaintiff filing a confidential grievance against her retained expert to peer review the forensic custody evaluation, Dr. Aaron Metrikin, M.D., with the New York Office of Professional Medical Conduct ("OPMC").  Plaintiff filed the grievance in good faith for four (4) reasons:

- Dr. Metrikin had no prior experience whatsoever with child psychology, forensic custody evaluations or child custody cases.  Without specialized knowledge and competence in the area, Dr. Metrikin's attempts to review the forensic custody evaluation were an apparent violation of the ethical guidelines set forth in Guideline 4 of the American Psychological Association's Guidelines for Child Custody Evaluations in Family Law Proceedings[18] and Rule 1.1 of the Association of Family and Conciliation Court's Model Standards Practice for Child Custody Evaluations.[19]

- Dr. Metrikin charged a rate of $700 per hour, roughly $200-350 per hour above the standard rate for forensic child custody evaluators and peer reviewers.  It quite clear that Dr. Metrikin was price-gouging the parties.

- Dr. Metrikin improperly attempted to bill Plaintiff for "lost-time" for a purported cancelled hearing, despite no appearances ever being scheduled for the dates billed.  Moreover, he attempted to bill Plaintiff solely for his "lost-time" even though he was directed by the court to split his fees equally with Ms. Comfort.

- Dr. Metrikin was retained by Ms. Cohen to also provide a mental health diagnosis of Plaintiff and Ms. Comfort and opine on their parenting skills without ever examining either party or observing them with the child.  This was clearly improper and malpractice.

Plaintiff raised his concerns about Dr. Metrikin numerous times with the court through motions, letters and on the record, including with Defendant, but they were never addressed.  Faced with improper threats of motions for money judgments from Ms. Cohen and Dr. Metrikin, Plaintiff filed the confidential grievance with the OPMC.

---

[18] *See* https://www.apa.org/practice/guidelines/child-custody.pdf.

[19] *See* http://www.afccnet.org/portals/0/modelstdschildcustodyevalsept2006.pdf.

44.     Of note, Ms. Cohen did not request sanctions in either of her two motions.  After Plaintiff responded with a cross-motion seeking disqualification of Ms. Cohen and pointing out that Ms. Cohen's request for damages on behalf of Dr. Metrikin's created an apparent conflict of interest with her representation of the child, it was only then Ms. Cohen improperly requested sanctions against Plaintiff for his filing the confidential grievance with the OPMC in **reply papers**.  *See Tray Wrap, Inc. v. Pacific Tomato Growers, Ltd.*, 2008 N.Y. Misc. LEXIS 223, at *61 (Sup. Ct. Bronx Cnty. Jan. 25, 2008) ("To the extent that legal fees as a sanction pursuant to 22 NYCRR 130-1.1 were first requested in FFVA's reply, such relief is denied as it constitutes an improper use of reply papers.")

<u>The September 18, 2015 Sanctions Decision</u>

45.     With less than two (2) months before the start of the custody and access trial scheduled to commence on November 12, 2015, Defendant published and disseminated to the media his September 18 Decision.  Justice Cooper used Ms. Cohen's sanctions request in her reply papers as pretext to inappropriately impose sanctions on Plaintiff.  But the main thrust of the September 18 Decision was to purposefully inject into the media and publicize scandalous and incorrect statements of fact about Plaintiff designed to harm his reputation and professional standing.[20]

---

[20] Defendant also had an ulterior motive in publishing the September 18 Decision.  Without question, he viewed the September 18 Decision as one of his believed "great occasions" to make his mark in the media and grasp at judicial notoriety.  If there was ever any doubt that he had hopes of self-promotion, one only needs to look at the decision itself in which he gives a "shout-out" to the New York Women's Bar Association ("NYWBA"), an organization mostly comprised of matrimonial lawyers, praising them for providing legal services to indigent (female) litigants.  Defendant insinuates that the NYWBA had some sort of participation in *Zappin v. Comfort* after Plaintiff requested the appointment of counsel.  However, the NYWBA was <u>never</u> involved in any part of *Zappin v. Comfort*.  Defendant's mentioning of the NYWBA was no doubt a shameless plug after the organization honored him – and every other matrimonial judge in Manhattan – with the NYWBA "President's Special Award" just two (2) months prior at Gala Event.  *See* http://www2.nywba.org/content/uploads/2015/09/2015-Journal-80th-AnniversaryGala.pdf.  It should further be noted that the CLE presentation where Defendant made the

34

46.     Revealingly, between July 22, 2015 (the date of the first hearing before Defendant) and September 18, 2015, the parties did not have any appearances or hearings before Defendant.  In fact, the oral argument was schedule on Ms. Cohen's two motions for September 9, 2015, but was specifically cancelled by Justice Cooper at the last minute.  (*See* Ex. 18.)  In other words, without Plaintiff even so much as uttering a word in his courtroom, Justice Cooper imposed a maximum sanction under 22 NYCRR 130-1.2 of $10,000 for the filing of a confidential grievance with a wholly independent quasi-judicial administrative body, the OPMC. To highlight how truly warped the Defendant's conduct actions were, Defendant goes to great lengths to claim that Plaintiff interfered with Dr. Metrikin's professional license with the confidential grievance (*see* Ex. 1 at 16), yet fails to acknowledge (which continues to this day) the damage he inflicted on Plaintiff's professional standing and livelihood by publishing and disseminating to the media the September 18 Decision containing blatantly incorrect and defamatory statements concerning Plaintiff intended to cause harm.

47.     Justice Cooper's factual recitations in the decision, however, were not simply limited to Plaintiff's filing of a grievance with the OPMC, the conduct which Justice Cooper deemed "frivolous."   Justice Cooper instead recited allegations as facts without affording Plaintiff a hearing in addition to disclosing purported facts that were not only contrary to the record, but also wholly divorced and inconsistent with the parties' allegations.  In fact, as shown more fully below, the vast majority of Defendant's statements concerning Plaintiff in the September 18 Decision are false, defamatory and pulled out of thin air.  Even more troubling, the September 18 Decision was strewn with personal and *ad hominem* attacks on Plaintiff lacking

---

deplorable and intemperate statements cited above were hosted by the NYWBA, who subsequently removed all traces of the CLE presentation on their website when the clips were posted to YouTube.

any basis in fact or the record, even going so far as to unlawfully and publicly question his ability to practice law, in a conclusory statement no less.

48.     Plaintiff was never given any opportunity to dispute Defendant's statements and factual recitations prior to issuance or publication of the September 18 Decision.  Plaintiff was given no notice that Justice Cooper was considering sanctions, let alone that the Justice Cooper would make such radical and extraordinary statements about Plaintiff in a published decision. Moreover, Plaintiff was never given notice that Justice Cooper intended to publish and disseminate the September 18 Decision to the media.  To put it simply, Plaintiff was blind-sided and left without any means or opportunity to defend himself.

49.     On October 28, 2015, Plaintiff brought a motion seeking *inter alia* correction of the September 18 Decision.  It contained a detailed chart plotting each inaccurate statement made by Justice Cooper against contradictory citations to evidence and documents in the record.  The chart is attached hereto as Exhibit 19.  Even after bringing a motion asking for a correction of the September 18 Decision and demonstrating to Justice Cooper the irreparable harm the decision caused to Plaintiff's reputation, livelihood and the well-being of the child at-issue, Justice Cooper refused to correct the misstatements or take any remedial action whatsoever.

<u>Justice Cooper's Publication and Dissemination of the September 18 Decision</u>

50.     It was not the sanction itself that devastated Plaintiff.  Rather, it was Justice Cooper's extrajudicial actions taken after issuing the decision that caused irreparable harm. Specifically, Justice Cooper deliberately took extrajudicial steps to inject the September 18 Decision into the media and ensure that it would be published by the press and receive maximum publicity.  Defendant's improper actions included:  (i) violating the statutory seal under DRL 235 by publishing the decision in *The New York Law Journal*; (ii) sending the decision to a blogger

36

for the *The New York Law Journal* resulting in a front-page article in the publication; and (iii) providing the decision directly to *The New York Post* and *The Daily News* tabloids.  The initial dissemination of the September 18 Decision by Justice Cooper to the legal news media and tabloid newspapers set off a cascading series of articles, blogs, Facebook posts and the like across the Internet.

51.     Plaintiff received the September 18 Decision by e-mail from Defendant's law clerk, Timothy Corbo, in the afternoon of Friday September 18, 2015.  Although not explicit, it was immediately clear from the form and substance of the decision that Defendant intended to publish it.  Accordingly, Plaintiff and his counsel sent a series of e-mails that day and over the weekend to Justice Cooper, his law clerks and the New York Attorney General's Office requesting that the September 18 Decision be embargoed until Plaintiff had an opportunity to brief the issue of publication.  All of Plaintiff's e-mails were ignored and Justice Cooper went on to publish and disseminate the decision to the media.

### The New York Law Journal

52.     By his own admission, Justice Cooper sent the September 18 Decision to *The New York Journal* for publication, which was an ostensible act to ensure the decision would receive publicity.  On November 2, 2015, Defendant stated the following on the record in open court:

> THE COURT:     [T]he decision was sent to decisions at ALM dot com. ALM dot com is where decisions to the law journal are sent. … It was sent to the New York Law Journal … [T]he decision was sent to the law journal at decisions at ALM dot com.[21]

---

[21] Upon information and belief, ALM Media Properties, LLC is the owner and operator of *The New York Law Journal*.

*The New York Law Journal* is an unofficial reporter for the Supreme Court of the State of New York Appellate Decision, First Department pursuant to Judiciary Law § 90(1), which only permits the publication of notices, calendars and advertisements – not judicial decisions.  Justice Cooper's overt act of personally sending decision the September 18 Decision to *The New York Law Journal* for publication– particularly given its sealed nature – was inappropriate, contrary to the law and an extrajudicial act.

53.     As a result of Justice Cooper's improper publication of the September 18 Decision in *The New York Law Journal*, the decision can be obtained from numerous other sources with a simple web search including, but not limited to, Westlaw, LexisNexis and Justia. The September 18 Decision remains publicly accessible as of the date of filing of this Complaint. Upon information and belief, the September 18 Decision and its defamatory contents have been viewed by thousands of people as a result of its publication in *The New York Law Journal*.

54.     Plaintiff has requested numerous times that Justice Cooper produce his communications with *The New York Law Journal* in which he sent the September 18 Decision. Pursuant to 22 NYCRR 100.3(B)(6), a judge must "make[] provision for prompt notification of other parties or their lawyers of the substance of the ex parte communication …."  Justice Cooper, however, has refused to provide copies of his communications.

### *Blogger Benjamin Bedell*

55.     Upon information and belief, Justice Cooper also sent the September 18 Decision to blogger Benjamin Bedell at *The New York Law Journal*.  On Monday September 21, 2015, Mr. Bedell contacted Plaintiff for comment about the decision.  During a telephone conversation that day between Plaintiff, his counsel and Mr. Bedell, Plaintiff asked Mr. Bedell how he

obtained the decision.  Mr. Bedell responded:  "I received it from chambers."  Plaintiff then inquired:  "They sent it directly to you?"  Mr. Bedell responded:  "Yes."

56.     Counsel for *The New York Law Journal* subsequently confirmed Mr. Bedell's above statements.  On October 21, 2015, Plaintiff had a telephone call with Camille Calman of *Davis Wright Tremaine LLP* in which she confirmed that Mr. Bedell received the September 18 Decision directly from Justice Cooper's law clerk.  Ms. Calman followed-up the telephone conversation with the below e-mail:

> Thanks very much for speaking with me this afternoon.  Just to clarify, what I said was that it was my understanding that the reporter had already told you that he received the decision from a clerk in Justice Cooper's chambers.

(Ex. 20.)

57.     On the evening on September 21, 2015, Mr. Bedell briefly published a copy of the September 18 Decision that he obtained from chambers on *The New York Law Journal*'s website.  Mr. Bedell's copy differs substantially from the version sent to the parties in the Matrimonial Action.  It is unsigned and contains several typographical errors and formatting mistakes.  It is attached hereto as Exhibit 21.  It appears that Mr. Bedell received an unsigned draft copy of the September 18 Decision.

58.     Additionally, on the evening of September 21, 2015, Mr. Bedell published a blog post summarizing the September 18 Decision.  It is entitled "Attorney Sanctions for Handling His Own Divorce."  It is attached hereto as Exhibit 22.  Upon information and belief, Mr. Bedell's blog post has been viewed by thousands of people and is a direct result of Justice Cooper's improper dissemination of the September 18 Decision to Mr. Bedell.

### *The New York Post and The Daily News*

59.     Upon information and belief, Defendant also sent the September 18 Decision to tabloid journalists Julia Marsh at *The New York Post* and Barbara Ross at *The Daily News* – who, as detailed above, have written virtually all of the numerous articles disparaging litigants appearing in Justice Cooper's courtroom.  On Monday September 21, 2015, both Ms. Marsh and Ms. Ross contacted Plaintiff numerous times via e-mail and telephone requesting comment concerning Justice Cooper's September 18 Decision.  Based on records confirming the time of the calls and the e-mails, Ms. Marsh and Ms. Ross were in possession of the September 18 Decision at least several hours (and possibly days) prior to its publication on *The New York Law Journal* website and the New York State Reporter's archive of unpublished decisions.

60.     At the conclusion of a hearing on October 6, 2015, Plaintiff spoke with both Ms. Marsh and Ms. Ross in the hallway with his counsel.  During the course of the conversation, they both confirmed they received copies of the September 18 Decision directly from Justice Cooper's chambers.  Ms. Marsh was unequivocal stating to Plaintiff that:  "It was published. Tim Corbo [Defendant's law clerk] gave it to me."[22]  Ms. Ross reiterated the same.

---

[22] To highlight the absurdity of Justice Cooper and Julia Marsh's conduct in publicizing *Zappin v. Comfort*, on July 26, 2016 Ms. Marsh published an article in *The New York Post* entitled:  "How Celebs Manipulate the System to Keep Messy Divorces Private."  *See* http://pagesix.com/2016/07/26/how-celebs-manipulate-the-system-to-keep-messy-divorces-private/.  In that article, Ms. Marsh praised Justice Cooper for maintaining the secrecy of celebrity divorces and wrote:

> Manhattan Justice Matthew Cooper is particularly intent on maintaining the charade of secrecy in Gere's case, calling the actor "Mr. Anonymous" even in the courtroom. During a recent court appearance, Gere didn't even realize he was being summoned when Cooper called for him using the moniker.

It is unfortunate that Justice Cooper holds sacrosanct the privacy of Hollywood movie star Richard Gere and not "country boy" Anthony Zappin and his child.  Even worse, Ms. Marsh quotes Harriet Cohen, the Attorney for the Child in *Zappin v. Comfort*, as an expert "veteran divorce lawyer" in the article.  Ms. Cohen is quoted as saying:

61.     On September 22, 2015, Ms. Marsh wrote an article both in the print and online editions of *The New York Post* entitled "Patent-lawyer a 'Fool' for Representing Himself in Divorce Battle: Judge." (*See* Ex. 11.)  Upon information and belief, the online version of the article appeared on the front page of *The New York Post*'s website for multiple days.  The article summarizes and extensively quotes from Defendant's September 18 Decision.  Upon information and belief, Ms. Marsh's article has been viewed by thousands of people and is a direct result of Justice Cooper's improper dissemination of the September 18 Sanctions Decision to her.

62.     On September 22, 2015, Ms. Ross wrote an article both in the print and online editions of *The Daily News* entitled "Manhattan Lawyer Fined $10G for Bullying Judge and Attorney in His Divorce Case." (*See* Ex. 23.)  Upon information and belief, the online version of the article appeared on the front page of *The Daily News'* website for multiple days.  The article summarizes and extensively quotes from Defendant's September 18 Decision.  Upon information and belief, Ms. Ross' article has been viewed by thousands of people and is a direct result of Justice Cooper's improper dissemination of the September 18 Sanctions Decision to her.

### *Other Publications*

63.     The articles published in *The New York Law Journal, The New York Post* and *The Daily News* were a direct result of Justice Cooper's dissemination of the September 18 Decision to those publications, which spawned numerous other articles containing Justice Cooper's untrue

---

Sometimes the biggest piece of leverage you have in the case is that it will never hit Page Six.

Indeed, after Justice Cooper published and disseminated to the media the September 18 Decision, Ms. Cohen was regularly offered interviews to the media and compromised the privacy of the child.  One such interview with *The Huffington Post* is available on YouTube.  *See* https://www.youtube.com/watch?v=YgK-hW08T6Q.   If anything, Ms. Marsh's article serves to demonstrate the incestuous relationship between the court, the tabloid media and the select cartel of matrimonial lawyers in Manhattan.

statements concerning Plaintiff by other publications. This includes published articles and blog posts by prominent publications in the legal industry such as the *ABA Journal*, *Law360.com*, *The Family Lawyer Magazine* and *Above the Law* to name a few. The decision also generated perpetual coverage of the matrimonial action by tabloids *The New York Post* and *The Daily News*, which continued to target Plaintiff well-after the September 18 Decision by publishing untrue allegations made by Ms. Comfort throughout the remainder of the proceeding.

<u>Justice Cooper's Taunting of Plaintiff Concerning the September 18 Decision</u>

64.     Justice Cooper's issuance of the September 18 Decision that destroyed Plaintiff's livelihood and reputation was apparently not enough for him. Justice Cooper used the September 18 Decision as a means to persistently taunt, mock and ridicule Plaintiff in the aftermath of the publication of the decision. Justice Cooper's behavior was callous and revealed an ever present deep-seeded antagonism towards Plaintiff throughout the proceeding and that he in fact intended to harm Plaintiff with the publication and dissemination to the media of the September 18 Decision. The excerpts below are illustrative, but by no means exhaustive, examples of Defendant's reductive taunting and mocking of Plaintiff concerning the September 18 Decision.

65.     At a hearing on November 2, 2015, Justice Cooper proudly proclaimed that the September 18 Decision made the front page of *The New York Law Journal*:

> THE COURT:        In fact, I'm told the decision was published and there was an article on the front page because apparently sometimes the law journal decides to write articles in matters that they think are of importance to the bar or the bench.

Notably, Justice Cooper blatantly deflects from the fact that he instigated the front page article by contacting Mr. Bedell with a draft copy of the September 18 Decision.

66.     On November 10, 2015, Defendant acknowledged his September 18 Decision destroyed Plaintiff's professional standing taking pains to make reference to it on the record while *The New York Post* and *The Daily News* reporters were in the courtroom:

> THE COURT:     I have actually allowed and I welcome having Mr. Schorr involved.  As I made clear in my sanction's decision, Mr. Zappin representing himself did an amazing disservice both to himself and to this case and to his – and in fact to his professional standing.

It is important to point out that David Schorr entered his appearance and began representing Plaintiff on July 28, 2015, some ***two (2) months*** prior to Defendant's September 18 Decision. (*See* Ex. 24.)  But, Justice Cooper's statement illustrates that the publication and dissemination to the media of September 18 Decision was directed squarely at attacking Plaintiff's professional standing and reputation.

67.     During trial on November 23, 2015, Justice Cooper interrupted Plaintiff's testimony to mock Plaintiff concerning the September 18 Decision and claim ignorance as to why Plaintiff lost his job – even though Plaintiff was terminated the same day that Mr. Bedell's article on the September 18 Decision appeared in *The New York Law Journal*:

> MR. ZAPPIN:     I would like to have a job.  I would like to have a career.  I would like to have access to my child –
>
> THE COURT:     Maybe you should have comported yourself properly and maybe you wouldn't have been fired and I have no reason why you were fired but I did the right thing in writing a decision about totally inexcusable behavior ….

Justice Cooper's claims that he had no idea why Plaintiff was fired from his job was an amazing, yet illustrative, display of mendacity.  Regardless, Justice Cooper's interruption of Plaintiff's testimony to mock Plaintiff was inappropriate to say the least and was demonstrative of Defendant's overall intent to harm Plaintiff.

68.     During the trial on December 1, 2015, Justice Cooper again taunted Plaintiff concerning his release of the September 18 Decision to the media:

> THE COURT:     It's done.  I did it.  And if you want to keep coming back and making threats I'm going to expose how you released it to the media, be my guest …
>
> You want to focus on your child or do you want to focus on you, what's more important?  You sit up here and say nothing matters to me more than my son.  I would give anything for my son.  You know, prove it.

Contrary to Justice Cooper's statement, Plaintiff never "threatened to expose" Justice Cooper concerning the release of the September 18 Decision to the media, but rather simply requested copies of his admitted communications with *The New York Law Journal* and other publications, which have never been produced.  Moreover, Justice Cooper's attempts to tie Plaintiff's requests concerning the September 18 Decision – which cost Plaintiff his job – into evidence that Plaintiff did not care for his child was inexplicable.

69.     During the trial on December 10, 2015, Justice Cooper mocked Plaintiff again about losing his job due to the September 18 Decision:

> THE COURT:     We won't.  If she testifies at 2:15, it's not going to work.  Then what I should do is written summations.
>
> MR. ZAPPIN:     I would prefer written summations.
>
> THE COURT:     You would.  You have all the time in the world, but let's be honest here.

Justice Cooper's above crass statements were disrespectful and evidence that – much like his inappropriate demeanor in the above-referenced YouTube videos – he would go out of his way to mock and ridicule Plaintiff.

<u>Loss of Plaintiff's Employment as a Result of the September 18 Sanctions Decision</u>

70.     As a result of Justice Cooper's improper conduct associated with the September 18 Decision, Plaintiff has suffered in an incalculable amount of damages.  On September 22, 2015 – the day Mr. Bedell, Ms. Marsh and Ms. Ross published their articles – Plaintiff was terminated from his position as an associate at *Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.* ("Mintz Levin").  After receiving a glowing report during his annual review from the firm just one (1) month prior, Plaintiff the sole stated reason for Plaintiff's termination was Justice Cooper's September 18 Decision and the incendiary statements contained therein.  Plaintiff was humiliated in front of his colleagues when he was frog-marched out of the office by building security shortly after being told copies of the September 18 Decision and Ms. Marsh's article in *The New York Post* were faxed to the firm's main New York fax number.

## DEFENDANT IS NOT ENTITLED TO IMMUNITY

71.     Justice Cooper is not entitled to judicial immunity for his publication of the September 18 Sanctions Decision in *The New York Law Journal*.  The New York Court of Appeals has held that a judge sending a decision to *The New York Law Journal* is <u>not</u> a judicial act.  Specially, the Court of Appeals has stated:

> We are asked to take judicial notice that the New York Law Journal and the New York Supplement, though not official reports, are recognized legal publications, and that "opinions in the New York Supplement are continually cited both by judges and attorneys in opinions, decisions and briefs."  Even though that be true, a judge has no official duty in connection with any publication of opinions except in the official reports.  The publication of an opinion begins when the judicial decision is complete, and though in some degree connect with the exercise of a judicial function, *since the law imposes upon the judge no duty to publish opinions in unofficial reports, acts connected with such publications are not performed by the judge in his judicial capacity*.  The judge's rights and duties there are the same as those of any private person and if he chooses to act he must be held liable like any other person for damages resulting from a wrongful act ….

*Murray v. Brancato*, 290 N.Y. 52, 57 (N.Y. 1942) (emphasis added).

45

72.     Justice Cooper's action of sending the September 18 Sanctions Decision directly to *The New York Law Journal* for publication is <u>not</u> a judicial act is all the more confirmed by statute directed at judicial officers.   DRL 235 specifically enjoins a judicial officer from releasing matrimonial files for public viewing:

> ***An officer of the court*** with whom the proceedings in a matrimonial action … [is] filed … or his clerk, either before or after termination of the suit, shall not permit a copy of any of the pleadings, affidavits, findings of fact, conclusions of law, judgment of dissolution, written agreement of separation or memorandum thereof, or testimony, or any examination or perusal thereof, to be taken by any other person than a party, or the attorney or counsel of a party ….

(emphasis added.)  New York courts have explained that "Domestic Relations §235(1) prohibits a court employee from disseminating papers filed in a matrimonial action …." *Tornheim v. Blue & White Food Prods. Corp*, 73 A.D.3d 747, 748 (2nd Dept. 2010).  In *Danziger v. Hearst Corp.*, 304 N.Y. 244 (1952), the New York Court of Appeals explained that "[t]he rule is addressed to officers and clerks of the New York Supreme Court."  *Id*. at 248.  Even Defendant himself has professed the confidentiality of matrimonial proceedings on the record:

> THE COURT:     He [Plaintiff] also threatened that if the AFC attempted to collect the fees owed by the husband any such attempt will be swiftly and publicly met with claims against the AFC and the AFC's firm, even though ***matrimonial actions are presumptively sealed***.

(emphasis added.)  Justice Cooper's above statement was made on July 22, 2015, less than two months prior to the September 18 Decision.

73.     Similarly, Justice Cooper is not entitled to judicial immunity for his dissemination of the September 18 Decision to blogger Benjamin Bedell at *The New York Law Journal*, Julia Marsh at *The New York Post* or Barbara Ross at *The Daily News*.  It is not a judicial act for a judicial officer to directly contact a member of the media, much less with a sealed judicial decision or an unsigned draft copy of it seeking publicity.  "It is well-settled that the making

allegedly false statements to the news media does not qualify as a judicial act." *Barrett v. Harrington*, 130 F.3d 246, 260-61 (6th Cir. 1997). Defendant's *ex parte* communications with the media are akin to releasing a press release to the media containing false and defamatory statements, which has been held not to be a judicial act. *See Yoder v. Workman*, 244 F. Supp. 2d 1077, 1080 (S.D.W.Va. 2002) ("A press release about the recusal order was not a judicial act and, as such, absolute judicial immunity does not apply to shield its author.").

74. Justice Cooper cannot avail himself to the "Fair Report Privilege." New York Civil Rights Law § 74 typically shields the author from liability for "the publication of a fair and true report of any judicial proceeding …." However, even assuming *arguendo* that Justice Cooper's false statements in the September 18 Decision were a "true and accurate" report of the proceedings (which they were not as discussed more fully below), the privilege is not applicable in matrimonial cases. Specifically, the New York Court of Appeals has carved out an exception to the Fair Report Privilege for matrimonial cases. It has held that:

> In most types of proceedings the advantage in having judicial proceedings public more than counterbalances the inconveniences to the private person whose conduct may be the subject of such proceedings. On the other hand, however, the Legislature has, at least since 1847, made it plain that in matrimonial action the balance of convenience is in favor of the individual and that in the case of papers filed in such actions the public interest is served not by publicizing them but by sealing them and prohibiting their examination by the public.

> Since, then, such matrimonial actions were and are not proceedings which the public had the right to hear or see, it follows – and it has been consistently held – that the privilege generally according to report of judicial proceedings is unavailable to reports of matrimonial actions … It is apparent, therefore, that the privilege created by section 74 of the Civil Rights Law does not attach to the publication of a report of matrimonial proceedings.

*Shiles v. News Syndicate Co.*, 7 N.Y.2d 9, 14-15 (N.Y. 1970) (internal quotation marks and citations omitted).

75.     Lastly, Defendant acted wholly without jurisdiction in imposing sanctions and a fine on Plaintiff.  *See Stump v. Sparkman*, 435 U.S. 349 (1978).  Defendant had no jurisdiction to adjudicate the merits of a complaint filed in an administrative action before a quasi-judicial body, the New York Office of Professional Medical Conduct, in which the aggrieved party failed to petition Defendant for relief.  *See Canzona v. Atanasio*, 2012 N.Y. Misc. LEXIS 6797, at *6 (Sup. Ct. Suffolk Cnty. Aug. 16, 2012); *Nichols v. Branton*, 995 N.Y.S.2d 450, 455 (Sup. Ct. Columbia Cnty. Sept. 24, 2014).  This is confirmed by Defendant's finding that the Attorney for the Child was not acting on Dr. Metrikin's behalf in seeking damages and that there was "no evidence that the expert was even aware of the relief being sought."   (Ex. 1 at 22.)  Consequently, there was no case or controversy before Defendant as the Attorney for the Child lacked standing to seek relief and Defendant was therefore completely without jurisdiction as to Plaintiff's OPMC complaint.  *See Silver v. Pataki*, 96 N.Y.2d 532, 539 (N.Y. 2001).

## DEFENDANT'S DEFAMATORY STATEMENTS

76.     In the September 18 Decision, Justice Cooper unlawfully published and disseminated numerous false and defamatory statements concerning Plaintiff.[23]   These false statements, as set forth below, were made deliberately and with actual malice.  Justice Cooper had knowledge that the statements were false, inaccurate and misleading when the September 18 Decision was published and disseminated to the media and acted with reckless disregard for the truth or falsity of his statements.  By publishing the September 18 Decision in *The New York Law Journal* and disseminating these materially false statements to the media, Justice Cooper

---

[23] Plaintiff notes that Defendant's September 18 Sanctions Decision is laced with false statements of fact concerning the matrimonial proceeding and litigations with Plaintiff's wife.  Although many of Defendant's false statements are defamatory (which are outlined below), Plaintiff is unsure whether some of Defendant's other false and inaccurate statements are defamatory or actionable under the law.  For a full list of Defendant's misrepresentation in the September 18 Decision, the reader should refer to the chart contained in Exhibit 19.

engaged in acts that were not within his adjudicatory role that irreparably harmed Plaintiff by unlawfully damaging his reputation and professional standing.

<u>Defendant's False Statements Concerning the Filing of the OPMC Complaint</u>

77.     In the September 18 Decision, Defendant made the following statements with regard to Plaintiff's filing of a complaint with the OPMC against Dr. Aaron Metrikin:

> What is so concerning about plaintiff's complaint to the OPMC is not so much what he says – as reckless and dishonest as those statements may be – but what he has chosen not to say. ***Never once in his letter does he mention that the psychiatrist was court-appointed pursuant to an order signed by Justice Kaplan on September 12, 2014.  Never once does he mention that the rate the psychiatrist was to be paid is specified in Justice Kaplan's order; the fee being set by the court, not by the doctor himself … And never once does plaintiff mention that Justice Kaplan's order provides that the reason for the appointment is to enable the AFC to have her own expert review the report of the forensic evaluator and observe his testimony, something generally referred to as a "peer review."***  These facts, which plaintiff chose not to reveal, are overwhelming significant and relevant to the disciplinary proceeding that plaintiff commence through his complaining letter, and they would certainly be essential to the AFC's expert's defense against the charges ….

> It is beyond question that action taken in this case by the AFC's expert was done in accordance with a valid court order.  It is equally clear that plaintiff's sole reason for filing the complaint with the OPMC – and doing so only two weeks after I awarded the doctor a money judgment against him – was to send a not-so-subtle message.  That message is [sic] being:  If you do something the plaintiff does not agree with – whether you [sic] a party, an attorney, a judge, or a doctor – he will do whatever he can to harm you.  ***Here, plaintiff has gone beyond the pale by cynically and maliciously interfering with a physician's most valuable asset: his license to practice medicine.***  It is ironic that plaintiff, in his papers, bristles at the mere suggestion that he has violated the Rules of Professional Conduct, and he accuses anyone who makes such a suggestion of recklessly seeking to destroy his livelihood by preventing him from practicing law.  Ironically, it seems plaintiff has no compunction against doing this to another professional.

(Ex. 1 at 16-17 (emphasis added).)  Again, it bemoans the point that Defendant engaged in the precise conduct for which he purportedly sanctioned Plaintiff.  However, where Plaintiff filed a confidential grievance to the OPMC supported by uncontroverted evidence, Defendant went out

of his way to publish and disseminated to the media the September 18 Decision containing untrue statements of fact and aspersions directed at Plaintiff's professional standing to "cynically and maliciously interfere with [Plaintiff]'s most valuable asset:" his ability to practice law.

78.    Defendant's factual statements concerning Plaintiff's OPMC complaint against Dr. Metrkin and assertions that Plaintiff was "dishonest" in filing the complaint are demonstrably false.  Defendant's statement that Plaintiff failed to mention to the OPMC that Dr. Metrikin was "court-appointed" is not true.  This is because Dr. Metrikin was not "court-appointed," but rather "retained" by the Attorney for the Child.  This is evidenced by Defendant's own words at the July 22, 2015 motions hearing:

> THE COURT:    In terms of Aaron A. Metrikin, M.D., there was an expert *retained* by Ms. Cohen.  Judge Kaplan's order, which was never appealed from or modified, dated the 12th day of September 2014, requires both sides to pay $2,500 each, for a total of $5,000 as a retainer to Dr. Metrikin.  The defendant paid her part.  The plaintiff has not paid his part.  He now says that it's unnecessary.  He takes issue with Dr. Metrikin being *retained*, but Judge Kaplan's order stands.

(emphasis added.)  The spuriousness of Defendant's statements in his September 18 Decision is further confirmed by an order dated February 27, 2015 written by Justice Deborah Kaplan in which she states:

> In an Order, dated September 12, 2014, the court granted the AFC permission to *retain* Dr. Aaron Metrikin, M.D., to review the Forensic Report and to observe any testimony given by Dr. Ravitz.

(emphasis added.)  But to truly point out the absurdity of Defendant's false statement, it is contradicted by his own words in the September 18 Decision:

> The second motion (Motion Sequence 21) is for permission to communication with the New York State Office of Professional Medical Conduct (the "OPMC") and to release court documents in connection with a disciplinary complaint plaintiff filed with the OPMC against the psychiatrist she *retained* as an expert witness …

50

(Ex. 1 at 3 (emphasis added).)  Accordingly, Defendant's statement that Plaintiff was "dishonest" and improperly withheld information from the OPMC that Dr. Metrikin was "court-appointed" is indisputably untrue and defamatory.

79.     Defendant's statement that Plaintiff was "dishonest" and failed to inform the OPMC that Dr. Metrikin's rate of $700 per hour was a rate set by the court is false.  Again, this is because the rate was set and requested by Dr. Metrikin as evidenced by a September 12, 2014 order signed by Justice Deborah Kaplan, which states: "Dr. Metrikin requests a $10,000 retainer and an hourly rate of $700 per hour."  Consequently, Defendant's statement that Plaintiff was "dishonest" and improperly withheld information from the OPMC that Dr. Metrikin's rate of $700 was chosen by the court is false and defamatory.

80.     Defendant's statement that Plaintiff was "dishonest" and failed to inform the OPMC that the reason for Dr. Metrikin's "appointment" was to allow the Attorney for the Child to peer review the forensic custody evaluation is plainly false.  Exactly the opposite is true as Plaintiff states in the first page his complaint to the OPMC:

> Ms. Cohen has stated that [Dr. Metrikin] has been retained to "assist [her] in [the] review of Dr. Alan Ravitz's forensic child custody report …."  (*See* Attachment A.)

(Ex. 19 at 12.)  Notably, Plaintiff quoted directly from the Attorney for the Child's September 10, 2014 letter to the court concerning her retention of Dr. Metrikin.  Defendant extensively quotes from Plaintiff's grievance filed with the OPMC in his September 18 Decision and therefore knew that his statements and representations concerning Plaintiff's complaint to the OPMC were false.  Put simply, Defendant deliberately misrepresented Plaintiff's statements to the OPMC in the September 18 Decision.  Accordingly, Defendant's statement that Plaintiff was

51

"dishonest" and improperly withheld information from the OPMC that Dr. Metrikin was retained to do a peer review of the forensic child custody report is false and defamatory.

81.    Defendant's statement that Plaintiff's "sole purpose" of filing the OPMC complaint was to send a "not-so-subtle" message to "harm" Dr. Metrikin is false.  Likewise, Defendant's contention that Plaintiff "cynically and maliciously interfered" with Dr. Metrikin's medical license is false.  As explained above, Plaintiff had a good faith basis to alert the OPMC of potential fraud and medical malpractice by Dr. Metrikin.  Plaintiff exercised his First Amendment privilege and statutory right under New York law to petition the OPMC.  The righteousness of Plaintiff's complaints to the OPMC were confirmed when the Attorney for the Child removed Dr. Metrikin from her witness list filed with Defendant just days later on October 6, 2015.  The Attorney for the Child did not use Dr. Metrikin for any purpose at the custody and access trial after the September 18 Decision.

82.    Ironically, it is Defendant's false statements published and disseminated to the media (unlike Plaintiff's highly confidential complaint to the OPMC) as highlighted above that have harmed Plaintiff's most-valuable assets:  his livelihood and professional standing.  Defendant has refused to correct his deliberate misstatements of fact.  This is demonstrative of Defendant's deep-seeded antagonism and feverous intent to cause harm to Plaintiff.

Defendant's False Statements Concerning Plaintiff and the Attorney for the Child

83.    In the September 18 Decision, Defendant made the following statements with regard to Plaintiff's conduct towards the Attorney for the Child, Ms. Cohen:

> True to his word, plaintiff responded by "swiftly and publicly" retaliating against Ms. Cohen and her law firm.  He did so by having Zappin Enterprises, a company which lists plaintiff and his father as its owners and plaintiff as its designated agent, and is run from the same West Virginia address where plaintiff claimed to have lived when he left New York, register the internet domain

*www.harrietnewmancohen.com*.   "Harriet Newman Cohen" is the AFC's full name.

The purpose of the website was chillingly clear from various posting made under plaintiff's father's name.  Illustrative of these posting, and indicative of the whole nature of the enterprise, are the following messages:

> Harriet.  You're a very sick and greedy woman.  I pray for you and hope you seek help.

> I intend to keep the public apprised of your misconduct and disturbing behavior.

> Quickly climbing up the Google rankings.  Stay tuned for updates.

(Ex. 1 at 13-14.)

84.    Defendant's statement that Plaintiff placed the various "postings" to the website concerning Ms. Cohen are false.  This is illustrative by the Ms. Cohen's motion papers in which she unequivocally avows that the statements quoted by Defendant were ***private e-mails*** sent by Plaintiff's father:

> 4.   I had also received threatening and harassing emails on July 16th, purportedly emanating from the email account of Anthony Zappin's father, who was staying in Anthony Zappin's residence.  They read as follows:
>
>> Email dated July 16, 2015, 1:01 a.m., Subject: Reid Zappin: **"Harriet You're a very sick and greedy woman. I pray for you and hope you seek help**. Jeff;"
>>
>> Email dated July 16, 2015, 3:35 a.m., Subject: Reid Zappin: **"Harriet My company now owns www. harrietnewmancohen.com, I intend to keep the public apprised of your continued misconduct and disturbing behavior. Jeff;**" and
>>
>> Email dated July 16, 2015 10:35 a.m., Subject: Harriet Cohen's New Website: "www.harrietnewmancohen.com.  **Quickly climbing up the Google rankings. Stay tuned for updates.  Jeff Zappin.**" (Emphasis added.)

(Ex. 19 at 10.)  Defendant knew that his statements in the September 18 Decision concerning the alleged "posts" were not true as evidenced by the fact that he altered and excised sentences from the quoted passages in Ms. Cohen's motion papers that made it clear the quoted messages were ***private e-mails*** and not "postings" to a website.  Moreover, Defendant's statement that Plaintiff

53

unlawfully used his father's name and/or Zappin Enterprises LLC to make "postings" or statements concerning the AFC is false.

85.     Defendant's contention that Plaintiff has "retaliated" against Ms. Cohen and her law firm are false.   Plaintiff has never "retaliated" against either party, either publicly or privately.

86.     It should be further noted that Defendant's contention that Plaintiff had Zappin Enterprises LLC register the domain name www.harrietnewmancohen.com to retaliate against Ms. Cohen is false.  Defendant received a sworn affidavit on July 22, 2015 from the Chairman of Zappin Enterprises LLC with corroborating exhibits attached attesting that Plaintiff "has not had anything to do with the company."   This affidavit with attached exhibits was uncontroverted. Likewise, Defendant's claim that Zappin Enterprises LLC is registered to Plaintiff's residential address is inaccurate and contrary to the record in the Matrimonial Action.   Accordingly, Defendant's     statements     concerning     Plaintiff     registering     and     "posting"     to www.harrietnewmancohen.com are false and defamatory.

### Defendant's False Statements Concerning His Son's Medical Evaluation

87.     In the September 18 Decision, Defendant made the following statement directed at Plaintiff seeking a developmental assessment for his son:

> In my July 22, 2015 decision, I detailed the fact that there was nothing in the record to indicate that the child suffered from any developmental issues, and that all the evidence firmly established that he is a healthy, thriving infant, ***who, in the words of his pediatrician, "will reach developmental milestones in a timely fashion."***  In our legal system, we do not force children involved in a divorce to undergo unnecessary medical exams so that one parent can pursue an unfounded fixation or search for material to use against the other.

(Ex. 1 at 24.)

88.     In this instance, Defendant deliberately and intentionally misrepresents the record that was before him.  Specifically, the child's pediatrician never uttered Defendant's purported quote above.  Rather, Defendant quotes comes from "Goals" section of the child's initial assessment with a physical therapist, which stated:

> History of Presenting Problem:  Mild developmental delay.

> ***

> ASSESSMENT:  Almost 7 month old infant referred to PT with dx of torticollis. P L torticollis with spasms, stiffness, weakness & mild developmental delay of gross motor skills.

> ***

> GOALS:

> ***

> Functional Outcomes:  PT will reach developmental milestones in timely fashion and neutral positioning of cervical spine.

(Ex. 25.)  Defendant had the complete medical record from the physical therapist before him. Accordingly, Defendant knew that his representations concerning the pediatrician's statements were false and that the child was diagnosed with developmental delay.

89.     Moreover, as reflected in the child's medical records in the possession of the court, the child's pediatrician specifically recommended physical therapy as well as a developmental assessment.   Plaintiff's concerns of the child's developmental delay were corroborated by supervisors who indicated that the child had trouble verbalizing and socializing with other children as well as that the child was still suffering from a congenital medical condition.  In fact, Defendant was aware that through e-mails attached to motion papers that Ms. Comfort offered to take the child to the Department of Pediatric Child Development at Weill Cornell for the developmental assessment.  The dispute was over which parent would take the

child to the assessment, not whether the child would be taken for the assessment. Consequently, Defendant's statements that Plaintiff attempted to subject his child to "unnecessary medical exams" or that he was fixated on searching for material to use against the child's mother are simply false and defamatory. Moreover, Defendant's publicizing private facts about the child's medical care and Plaintiff's relationship with the child was shameful and in direct contravention of the best interests of the child.

<u>Defendant's False Statements Concerning "Neglect" of the Child by Ms. Comfort</u>

90.     In the September 18 Decision, Defendant made the following statements asserting that Plaintiff had alleged that his wife "neglected or abused" their child:

> It also involves the AFC's assertions that whatever minor bruises and scrapes the child has exhibited, and which plaintiff has sought repeatedly to portray as proof of defendant's physical neglect or abuse of the boy, are simply the normal result of being an active two-year-old … Rather, it is the AFC advocating on behalf of her client, the child, by seeking to have him avoid needless medical exams or unwarranted, and very likely harmful, intervention by the police or child protection officials.

(Ex. 1 at 25.)

91.     Defendant's statement that Plaintiff accused Ms. Comfort of "neglect and abuse" of their child for "minor bruises and scrapes" is false. Plaintiff never made any such assertion to the court or otherwise.

92.     Defendant's assertion that Plaintiff attempted to subject the child to "needless medical exams" is false. Plaintiff has addressed the speciousness and falsity of Defendant's assertions above.

93.     Defendant's assertion that Plaintiff attempted to subject the child to "unwarranted" and "harmful" intervention by "police or child protection officials" is false and defamatory. Plaintiff never sought any such unwarranted intervention by police or child

protection officials.  Defendant's publicizing purported private facts about the child's care and Plaintiff's relationship with the child was disgraceful and in direct contravention of the best interests of the child.

### Defendant's False Statements that Plaintiff "Harmed" His Son

94.     In the September 18 Decision, Defendant made the following statements concerning Plaintiff's conduct towards his two (2) year old son:

> This divorce case, unfortunately, presented a situation where an attorney has used his *pro se* status to inflict harm … on their child …[24]

(Ex. 1 at 2.)

95.     Defendant's conclusory contention that he inflicted harm on his child is unequivocally false.  Despite the acrimonious nature of their divorce – and to her credit – Ms. Comfort has never alleged or claimed that Plaintiff has harmed or attempted to harm their child. It is important to note that, Defendant made such a wildly baseless statement without entertaining or reviewing a single piece of evidence in the case and after having presided over the case for a single motions hearing in which the parties and counsel did not speak.  Defendant knew that his statement was contrary to the record and made such statement anyways without regard for its falsity or the damage it might inflict on Plaintiff or the child.  Defendant's conduct in publishing and disseminating to the media such a false statement that will no doubt be read by Plaintiff's child was again shameful and entirely contrary to the best interests of child.

### Defendant's Statement that Plaintiff "Delayed" Commencement of Trial

96.     In the September 18 Decision, Defendant made the following statements concerning Plaintiff's conduct during the Matrimonial Action:

---

[24] Plaintiff disputes Defendant's further contentions that he inflicted harm on "his wife" and "the court" as well.  However, Defendant's statements concerning Plaintiff's child are wildly egregious warranting harsh legal consequences against Defendant.

Although plaintiff has repeatedly charged that he is being deprived of a prompt hearing to determine whether his access to the child must remain supervised, the record shows that he has acted in a manner actually designed to prevent such a hearing from happened.

***

Even after the case moved beyond the machinations described by Justice Kaplan – including plaintiff first discontinuing the divorce action in the middle of trial, then claiming to have relocated to North Carolina, then to West Virginia, and finally reinstating the action, plaintiff has endeavored to halt its forward progress.  In the relatively brief time that I have had the case, it has become apparent that while plaintiff vehemently complains that he is being denied a hearing on continued supervised access with the child, he intentionally continues the pattern of delay and disruption described by Justice Kaplan.

After plaintiff interrupted the custody trial by discontinuing the action, only to then reinstate it, Justice Kaplan sought to set new dates for the trial to continue.  By an order dated February 13, 2015, she directed that the trial resume on March 6, 2015.  However, the trial did not go forward as schedule and was adjourned to May, apparently at plaintiff's request.  When May approached, plaintiff delayed the trial again.

***

Plaintiff's barrage of motion and his deluge of subpoenas, coupled with constant e-mails to the court and his threats to commence Article 78 proceedings and federal civil rights actions, are reflective of an unfortunate litigation strategy: avoid resuming the trial in favor of attempting to bludgeon defendant, the AFC, and the court into submission.  As that strategy have proven increasingly unsuccessful, plaintiff's tactics, and the language he employs in his motion papers, have grown evermore extreme and out of step with what is appropriate and permissible advocacy by an attorney, even on representing himself.  It is in the midst of this maelstrom of misconduct that the AFC has been forced to bring the two motions that are not before the court.

(Ex. 1 at 6-9.)

97.     Unfortunately, Defendant in his quest to discredit and injure Plaintiff paints an untrue and misleading picture of the litigation.  Defendant's statements that Plaintiff engaged in misconduct as he wished to "avoid" trial in the Matrimonial Action are not only false, but

58

illogical.  It defies logic that Plaintiff would avoid a trial only to pay $5,500 to $6,500 a month for limited access with his son.

98.     Defendant's statements that Plaintiff wrongfully "delayed" trial are contrary to the record.  The record is quite clear that Ms. Comfort and her attorney requested several adjournments of trial dates, which were granted.  (*See* Ex. 19 at 4.)  The Attorney for the Child also requested adjournment of all trial dates in April 2015 for the stated reason that she was going on a European vacation.  (*See id.* at 4-5.)  Moreover, Defendant's statement that Plaintiff "delayed the trial again" in May 2015 are false as Plaintiff's employer, Mintz Levin, submitted an affidavit requesting an adjournment of trial due to a conflict with a statutory deadline on a matter Plaintiff's was engaged.  (*See id.* at 5.)

99.     Defendant statements that Plaintiff wrongfully "interrupted" trial in September 2014 are false.  This is evident by the fact that there was no trial concerning custody and access that commenced in September 2014.  Defendant conceded this during statements made on the record during the actual trial that commenced on November 12, 2015.

100.    Defendant's conclusory statement that Plaintiff engaged in a strategy of "bludgeon[ing] defendant, the AFC, and the court into submission" are false.  In fact, quite the opposite is true.  Ms. Comfort (through demands for costly supervised visitation), the Attorney for the Child (with needless experts and bills totaling in the hundreds of thousands of dollars) and the court, (through its September 18 Sanctions Decision causing Plaintiff to lose his job, among other things) pummeled Plaintiff into financial submission to a point where not only could he not try the Matrimonial Action, but he now does not have the financial means to even see his son.

101.    Defendant's statement that Plaintiff used "extreme" language that was "out of step" with permissible advocacy is false.  Quite telling, Defendant cites no examples in his motion papers before his court.[25]  Moreover, Defendant's statements that Plaintiff engaged in a "maelstrom of misconduct" are false as evidenced by that fact that Defendant relies upon his demonstrably false statements of fact to reach his stated conclusion.  Defendant's conclusory statements concerning Plaintiff's actions in the Matrimonial Action which he uses to conclude that Plaintiff engaged in misconduct are materially false and defamatory.

Defendant's Misleading Statements
Concerning the Handwritten Note to Judge Anthony Epstein

102.    In the September 18 Decision, Defendant made the following statements concerning a purported handwritten note to Judge Anthony Epstein on the Superior Court for the District of Columbia:

> Not only was plaintiff unreceptive to Judge Epstein's suggestion that he retain counsel, but he was aggressively hostile to the judge's criticism of his conduct as a self-represented attorney.  Judge Epstein, in a decision dated May 28, 2014 in which he denied plaintiff's motion to reconsider his prior ruling, referred to an incident where he believed plaintiff had engaged in inappropriate conduct towards him.  He described the incident as follows:
>
>> On the front of the copy of the reconsideration motion that Mr. Zappin provided to chambers, a handwritten note is attached that states, "You're pathetic (Judicial Complaint forthcoming)."  The note is unsigned, but Mr. Zappin, who now represents himself in this case and provided the document, appears to be the person who wrote and attached the note.

(Ex. 1 at 4-5.)

---

[25] Justice Cooper points to an order by Judge Anthony Epstein of the Superior Court for the District of Columbia claiming that Plaintiff filed a motion "replete with intemperate and uncivil language …."  (*See* Ex. 1 at 4.)  The motion in question is attached hereto as Appendix Exhibit F in Exhibit 19.  Plaintiff is at loss as to what could be considered "intemperate and uncivil language" in that motion.  However, Judge Epstein's order was confidential and sealed.  Justice Cooper admittedly failed to review Plaintiff's motion before including Judge Epstein's seemingly incorrect statement in the September 18 Decision.

103.    Defendant's inclusion of this "incident" as a purported factual finding in the September 18 Decision was materially misleading and contained knowingly false and defamatory representations.  On October 31, 2014, Plaintiff provided overwhelming evidence to Justice Kaplan that he did not attach the handwritten note to Judge Epstein.  (*See* Ex. 19 at 3.) This included evidence that Plaintiff was in West Virginia when his hard-copy of the motion papers were mailed, while the FedEx receipt to Judge Epstein's chambers confirmed that the package was mailed from his former New York office.  (*See id*.)  Plaintiff theorized that the handwritten note was sent by his Ms. Comfort.  This was all but confirmed after issuance of the September 15 Decision when a copy of the motion papers surfaced with the note attached that had a court e-filing stamp on the top from the version of the motion automatically served only on Ms. Comfort's counsel by the e-filing system.    Accordingly, Defendant's statements that Plaintiff sent the handwritten note and "breach[ed]" the Rules of Professional Conduct are false and defamatory.  (*See* Ex. 1 at 10.)

104.    It bears noting that neither Ms. Comfort, nor the court raised the note as an issue again after the evidence was presented to the court that the note was not sent by Plaintiff.  That is until Defendant resurrected this diversion in his September 18 Decision without notice, warning or providing any opportunity to legitimately adjudicate the contention.  Indeed, Judge Epstein made no finding that Plaintiff sent the note and mentioned its receipt in passing in a footnote of an order without taking any further action.

Defendant's Statements Concerning Conduct toward Robert Wallack

105.    In the September 18 Decision, Defendant makes the following statements concerning Plaintiff's conduct towards his wife's counsel, Robert Wallack:

> As I set forth in my July 22, 2015 decision, he persisted in sending Mr. Wallack and his associates taunting emails referring to Mr. Wallack's personal life and

relationships. Such communications are in clear violation of an attorney's obligation to refrain from engaging in "undignified or discourteous conduct" ….

(Ex. 1 at 10-11.)

106.    Defendant's statement that Plaintiff sent taunting e-mails to Mr. Wallack is false. As is often the case with Defendant, the record reveals the exact opposite is true. Mr. Wallack persistently taunted, mocked and terrorized Plaintiff with unprofessional behavior, which is illustrated by the e-mail exchange referred to in Defendant's July 22, 2015 decision:

### E-mail from Anthony Zappin – May 8, 2015 at 10:25 AM

Rob and Harriet –

Please be advised that I intend to present an emergency application to the Court at 10:00 a.m. on Tuesday May 12, 2015.

Best,
Anthony Zappin

### E-mail from Robert M. Wallack – May 8, 2015 at 10:47 AM

An "emergency application" seeking what relief?

### E-mail from Anthony Zappin – May 8, 2015 at 11:13 AM

Rob,
Provisions to safeguard the well-being of the child.
Anthony

### E-mail from Robert M. Wallack – May 8, 2015 at 11:35 AM

So, it's a motion to prohibit you from having contact with [the child]?

(Ex. 26.) These statements are illustrative of Mr. Wallack's discourteous behavior throughout the proceeding.[26] Regardless, Defendant's statements and accusations of misconduct concerning Plaintiff's communications to Mr. Wallack are false and defamatory.

---

[26] Mr. Wallack was disruptive and discourteous throughout the proceeding. Highlights of Mr. Wallack's behavior include, but are not limited to, falsely accusing Mr. Doggart of recording a

<u>Defendant's False Statements Concerning Child Support</u>

107.    In the September 18 Decision, Defendant makes the following statements

concerning Plaintiff paying child support:

> He pays no child support to defendant [Ms. Comfort], the full-time custodial
> parent, but instead contends that it is he who is actually supporting the child
> because he buys him toys, clothing and diapers.  In making this claim, plaintiff
> seems to have ignored the fact that a child's needs also include food, shelter,
> medical care, and where, as here, the custodial parent works, childcare.  If
> plaintiff were in fact paying child support as legally required, his basic obligation,
> based on his base salary alone and in accordance with child support calculations
> applicable to high income parties in New York County, would compute to
> approximately $37,000 per year.  With statutory add-ons for medical costs and
> childcare, his total obligation would likely exceed $55,000 per year.  This is far
> more than plaintiff possibly pays for supervised access, clothing, diapers and toys.

---

proceeding, directly calling Plaintiff's employer to threaten and intimidate service of a subpoena,
proffering demonstrably untrue statements to the court concerning his repeated failure to timely serve
papers, falsely accusing Plaintiff of spitting on him outside his office (which was unequivocally proven
untrue by Plaintiff's calendar and phone records), stripping metadata out of digital files that were ordered
to be produced and even attempting to serve an entirely frivolous subpoena to Taylor Swift (to promote
his "celebrity divorce attorney" mantra, no doubt).  Perhaps most egregious, Mr. Wallack responded to a
contempt motion to compel compliance with a so-ordered Judicial Subpoena signed by Justice Kaplan
with a discourteous and wholly inappropriate written affirmation responding with "blah, blah, blah, blah
…."  (*See* Ex. 27.)

Not unsurprising, Mr. Wallack had previously been reprimanded by Justice Kaplan in other
matters for attempting to engage in impermissible *ex parte* communications with the court, bombarding
the court with unsolicited letters, sending "misleading" letters to banks falsely representing that the court
had frozen the opposing parties' funds, repeatedly disregarding "agreements, orders and directors,"
making "unsubstantiated claims" and "omit[ing] salient facts" in papers filed with the court and
interfering with the Attorney for the Child's access to the children.  (*See* Ex. 28.)  Even with respect to
Justice Kaplan's letter, Mr. Wallack falsely asserted to the court that Plaintiff had "hacked" his computer
to obtain the file when in fact the letter is a public document attached to the complaint in a malpractice
action asserted against Mr. Wallack, *Nacos v. The Wallack Firm, P.C.*, Index No 154278/12 (Sup. Ct.
N.Y. Cnty. 2012).  Mr. Wallack's improper behavior only escalated in *Zappin v. Comfort*.

Not once was Mr. Wallack chastised or reprimanded by Defendant.  Indeed, Defendant embraced
Mr. Wallack's flamboyant behavior as evidenced by his statements during the custody and access trial.
After repeatedly complaining that Plaintiff was delaying the trial and stating that the trial must be
concluded forthwith, Defendant interrupted Plaintiff's cross-examination by Mr. Wallack to compliment
Mr. Wallack on his hair:

> THE COURT:   I would observe Mr. Wallack's hairline is a lot better than my hairline.  I
>                             would be very happy to have that hairline.

It was unreal and a microcosm of Defendant's bizarre behavior throughout the proceeding.

(Ex. 1 at 13, fn 4.)

108.    Defendant's contention that Plaintiff did not pay his wife child support is false and merely an attempt to inappropriately label Plaintiff as a "deadbeat dad" like he has done to so many others in *The New York Post* and *The Dailey News*.  (*See supra* at ¶ 16.)  Defendant knew his statements were false as Ms. Comfort **never** filed a motion seeking child support in the Matrimonial Action.  In fact, Ms. Comfort revealed during testimony at the custody and access trial in December 2015, that in addition to bearing the full cost of supervised visitation as well as "clothing, diapers and toys," Plaintiff had given her **thousands of dollars** in child support since their separation in November 2013, despite Plaintiff bearing the full cost of supervised visitation which was approximately six (6) times the amount of any child support obligation that could be imposed.  That cost is an enumerated statutory factor in Child Support Standards Act for reduction or elimination of child support.  *See* Family Court Act § 413(f)(9).

<u>Damages to Plaintiff as a Result of Defendant's False Statements</u>

109.    As a result of Defendant's false and defamatory statements in the September 18 Decision, Plaintiff has suffered incalculable damages.  As a direct result of Defendant's false statements published and disseminated to the media, Plaintiff lost his job and has been unable to find new employment.  Defendant's false statements directed at the bar have irreparably harmed Plaintiff's professional standing.  Furthermore, Defendant's seeking out media attention for the September 18 Decision by contacting at least *The New York Law Journal*, *The New York Post* and *The Daily News* created undue and prejudicial publicity targeting Plaintiff with false statements.  Plaintiff has been unjustly held up to public contempt, ridicule and disgrace because of Defendant's unlawful conduct towards Plaintiff.  Moreover, due to Defendant's false statements, Plaintiff has suffered immense psychological and physical distress.  Lastly, Plaintiff

has been forced to expend tens of thousands of dollars in legal expenses and costs in order to defend himself against Defendant's false statements of fact contained in the September 18 Decision.

## DEFENDANT'S TORTIOUS INTEFERENCE

110.    By and through Defendant's false statements in his September 18 Decision, which he published and disseminated to the media in an extrajudicial capacity, Defendant tortiously interfered with Plaintiff's employment and professional standing.  As stated above, Plaintiff was terminated as an associate at Mintz Levin.   The firm's sole stated reason for Plaintiff's termination was because of Defendant's September 18 decision and the incendiary statements contained therein disparaging Plaintiff and falsely asserting that he had committed misconduct.

111.    Although Plaintiff's employment at Mintz Levin was "at-will," but for Defendant's September 18 Decision Plaintiff expected to remain employed at the firm and obtain prospective economic advantages.

112.    At the time Defendant improperly published and disseminated his September 18 Decision to the media he was aware that Plaintiff was employed as an associate attorney at Mintz Levin.  Defendant gratuitously stated the full name of Plaintiff's former employer multiple times on the record on July 22, 2015 as well as in orders dated July 24, 2015, August 13, 2015 and August 26, 2015.

113.    Upon information and belief, Defendant's September 18 Decision was written and improperly disseminated to the media with the intent to cause Plaintiff to lose his employment at Mintz Levin as well as standing in the legal profession.  Defendant knew or should have known that his false and misleading statements concerning Plaintiff contained in the September 18 Decision would have an adverse effect on his employment.  This is all the more the case where

Defendant violated a statutory prohibition against publication of the September 18 Decision to take deliberate acts to ensure dissemination of false statements concerning Plaintiff, including in legal journals and tabloid media.

114.    At the time of the September 18 Decision, there was no pressing urgency to publish the decision, particularly where he was statutorily forbidden from doing so under DRL 235.[27]   Even so, Defendant could have avoided any harm to Plaintiff if he had issued the September 18 Decision and embargoed its publication until after the custody and access trial to prevent prejudice.   He could have also issued the September 18 Decision with appropriate redaction of the parties' names pursuant to 22 NYCRR 202.16(h).   Defendant did not even give Plaintiff the opportunity to contest decision's publication.   Indeed, it was apparent that Defendant issued the September 18 Decision with the intent to cause harm to Plaintiff's reputation and employment at Mintz Levin.

115.    During a hearing on November 6, 2015, Defendant specifically admitted that the September 18 Decision was directed at the bar and consequently Plaintiff's employment:

> THE COURT:          The decision was released in its form because it was a decision that was important for the bar.

By directing it at the bar – in *The New York Law Journal*, no less – Defendant deliberately intended for the September 18 Decision to be seen by members at Mintz Levin with whom Plaintiff had a prospective relationship with as an associate.   Defendant should have known that his materially false statements of fact concerning Plaintiff in the September 18 Decision would be read by members at Mintz Levin with whom Plaintiff had a prospective relationship with as

---

[27] It bears noting that the New York State Reporter refused to publish the September 18 Decision in its official reports, despite Justice Cooper requesting that it do so.   The New York State Reporter appears to have concluded that the September 18 Decision had no precedential value reaffirming the apparent fact that the September 18 Decision was little more than an unbridled, improper and unwarranted assault on Plaintiff's reputation and livelihood.

an associate.  Accordingly, Defendant tortiously interfered with Plaintiff's prospective business relationship with Mintz Levin by unlawfully issuing and disseminating the September 18 Decision containing defamatory and disparaging statements concerning Plaintiff and false statements alleging that Plaintiff had committed misconduct.

## DEFENDANT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

116.    Defendant intentionally and/or recklessly engaged in extreme and outrageous conduct designed to caused Plaintiff to suffer severe emotional distress.  Defendant's actions toward Plaintiff cannot be characterized as anything other than "extreme" and "outrageous" given the nature of Defendant's position as a judge.  As a duly elected member of the judiciary, Defendant is unquestionably held to a higher standard both in the legal profession and in our society.  But here, Defendant abused his position as a member of the judiciary.  Defendant has violated a host of Judicial Canons with his conduct towards Plaintiff eroding confidence in the judiciary.

117.    Defendant's conduct is unprecedented.  There is no recorded record of any judge acting with such blatant disregard for his authority and injecting himself as an active adversary to maliciously and wrongfully injure a litigant.  Defendant did not simply issue an inaccurate order.  Rather, Defendant repeatedly and deliberately recited materially false statements of fact concerning Plaintiff that were primarily targeted at irreparably harming his professional reputation and employment, in addition to irreparably damaging his relationship with his infant son.  Defendant engaged in such conduct without providing Plaintiff notice or an opportunity to be heard.  All the more, Defendant undertook extraordinary actions – in violation of New York statute and law – to ensure that the false statements would be published not only in preeminent legal journal in New York, but also in New York's most popular tabloid newspapers.  As a

consequence, in addition to causing Plaintiff harm professionally and personally, Defendant's conduct caused Plaintiff to suffer severe psychological distress and mental anguish.

## DEFENDANT'S DENIAL OF PLAINTIFF'S RIGHT TO DUE PROCESS

118.    In the September 18 Decision, Defendant makes numerous statements that Plaintiff committed acts of attorney misconduct.  (*See generally* Ex. 1.)  Defendant also publicly questioned Plaintiff's "call[ed]" into question [Plaintiff's] fitness to practice law" and stated that Plaintiff "use[d] his law license as a tool to threaten, bully and intimidate."  (Ex. 1 at 2.)  As shown above, Defendant's statements were based on false and inaccurate findings and/or recitations of facts.  As a result, they are without merit.  Nonetheless, Defendant's statements render the September 18 Decision – publicly issued and disseminated to the media – an improper *de facto* disciplinary censure.

119.    In issuing the *de facto* disciplinary censure, Defendant acted without jurisdiction usurping the power of the Appellate Division.  Section 90 of the New York Judiciary Act gives the Appellate Division – not the trial court – exclusive jurisdiction to investigate and discipline attorneys admitted to practice in New York State.  Moreover, as established above, Defendant's acts of publishing the September 18 Decision in violation of New York statute and disseminating it to the media were not acts taken in Defendant's adjudicatory role.

120.    Attorneys accused of misconduct are entitled to due process under of the law.  *See Spevack v. Klein*, 385 U.S. 511 (1967).  This is confirmed by the fact that New York Judiciary Law § 90 guarantees procedural safeguards in attorney disciplinary matters, such as notice of formal charges, subpoena power and a hearing before a referee.  Moreover, New York Judiciary Law § 90(10) requires that attorney disciplinary files remain private and confidential until, and if and when, the Appellate Division determines that public discipline is warranted.  Defendant

acted in clear contravention of the statute by publishing and disseminating to the media the September 18 Decision.

121.     Defendant acted without jurisdiction and engaged in extrajudicial acts that denied Plaintiff due process by publishing the September 18 Decision asserting that Plaintiff had committed acts of attorney misconduct and questioning his fitness to practice law.  Plaintiff was never given notice or opportunity to be heard as to these statements or the underlying issues.  In fact, Plaintiff was not even aware Defendant was considering imposing sanctions on him, let alone that he intended to publicize a decision discussing, at length, issues that were not before the court and accuse Plaintiff of misconduct.  As a result, Defendant intentionally and willfully denied Plaintiff due process and unlawfully inflicted harm on his professional livelihood.

## DEFENDANT'S DENIAL OF PLAINTIFF'S RIGHT TO A FAIR CUSTODY TRIAL

122.     At the time Defendant issued the September 18 Decision, the custody and access trial in Plaintiff's Matrimonial Action was calendared to begin on November 12, 2015. Defendant's improper conduct of publishing and disseminating the September 18 Decision denied Plaintiff the right to a fair custody trial.  Specifically, Defendant took deliberate and intentional acts to generate unwarranted and deleterious pre-trial publicity of the Matrimonial Action less than two (2) months prior to the commencement of the custody trial.  This publicity was highly prejudicial to Plaintiff and his ability to try the case, particularly where Plaintiff and Defendant's credibility were in direct conflict as a result of Defendant's false statements of fact in the September 18 Decision.  Moreover, Defendant's conduct of disseminating the September 18 Decision to the media was an improper "leak" of information or statement to the press prejudicing Plaintiff's right to a fair trial.  *See Powers v. Coe*, 728 F.2d 97, 100 (2d Cir. 1984);

*Jovanovic v. City of New York*, 2006 U.S. Dist. LEXIS 591165 at *42-44 (S.D.N.Y. Aug. 17 2006).

123.    Defendant was in the unique role of being the sole fact-finder at the custody trial. No reasonable person could conclude that Plaintiff would receive a full and fair trial after Defendant published the September 18 Decision and sparked the media attention surrounding it. This is particularly so where Defendant intentionally and deliberately publicized false statements of fact concerning Plaintiff. And, in fact, Plaintiff did not receive a full and fair trial from Defendant as a result of the September 18 Decision.[28]  Defendant did not grant Plaintiff a single item of relief from the custody trial, and, actually granted Ms. Comfort extraordinary and unusual remedies, many of which she did not even request.

124.    Defendant undertook no actions to ensure that Plaintiff received a fair custody trial. As set forth more fully below, Defendant used the custody trial to provoke, discredit and mock Plaintiff as well as attempt to justify his September 18 Decision. Where Defendant was the sole finder of fact, the only remedy that would have ensured Plaintiff received a fair trial was Defendant's recusal from the case and declaration of a mistrial. On October 28, 2015, Plaintiff did indeed seek recusal of Defendant prior to the commencement of trial. By order dated November 6, 2015, Defendant denied Plaintiff's motion for recusal. Furthermore, Plaintiff stated his intention on November 24, 2015 of bringing a motion for a mistrial due to Defendant's improper conduct during trial. Defendant denied the motion without even reviewing it:

> MR. ZAPPIN:    I would like [sic] to know given what happened yesterday, given the numerous statements where you attacked me,

---

[28] Defendant's surprise September 18 Decision gave Ms. Comfort license to proceed and force Plaintiff into a lengthy and costly custody trial. Ms. Comfort refused numerous attempts by Plaintiff to settle the case. Likewise, Defendant not only refused to intervene and hold any settlement conferences or hearings, but became an active litigant prosecuting Plaintiff as discussed below.

|  |  |
|---|---|
|  | given the history of this case with you I'm filing a motion for a mistrial Monday … |
| THE COURT: | That motion for a mistrial will be denied immediately. Don't even bother bringing it. |

***

|  |  |
|---|---|
| THE COURT: | There's been enough time wasted on nonsense and a request for a mistrial is nonsense.  And – |
| MR. ZAPPIN: | Your Honor, you haven't heard the motion. |
| THE COURT: | I'm not going to hear the motion. |

There were no other alternative remedies available to Plaintiff.

<u>Defendant's Admission That He Was Not Giving Plaintiff a Fair Trial</u>

125.    Most telling are Defendant's own words as to the issue of whether Plaintiff received a fair trial.  On November 23, 2015, during a heated exchange between Plaintiff and Defendant during trial, Defendant acknowledged that he was not according Plaintiff a fair trial:

|  |  |
|---|---|
| MR. ZAPPIN: | Your Honor, I want a fair [trial] – |
| THE COURT: | ***No***.  I want you to grow up, number one, and number two, comport yourself properly and when Mr. Schorr just touched you on the shoulder I know you just said get your hand off me.[29]  Come on.  What are you going to sue him for assault now too.  Stop it. |

(emphasis added.)  Defendant's outright admission to denying Plaintiff a full and fair trial is corroborated by his conduct exhibited throughout trial as set forth more fully below.  More importantly, however, the passage demonstrates Defendant's deep-seeded antagonism towards Plaintiff in that he made such a crass remark and embellished the record at a time where Plaintiff's counsel who was merely leaning over to whisper something to Plaintiff.

---

[29] Mr. Schorr, who was sitting next to Plaintiff, leaned over to whisper something in Plaintiff's ear concerning the trial.  Defendant's statement was exaggerated and an inaccurate depiction of the interaction, a common occurrence by Defendant.

<u>Defendant's Conduct Prejudiced Plaintiff's Financial Ability to Try the Case</u>

126.    Plaintiff incurred significant costs in attempting to prosecute the custody and access trial.   To illustrate just how costly the 13-day custody trial was, Plaintiff incurred transcript fees totaling well over $25,000.  Based on the issues in dispute, he was forced to retain three experts (two of which testified) – a psychologist to peer review the forensic custody evaluator's report, a digital forensic expert and a forensic pathologist – whose fees and expenses totaled well over $30,000.  Plaintiff paid copying costs for exhibits and other items that totaled over $15,000 for the several hundred exhibits at issue.  He was ordered to pay the forensic custody evaluator, Dr. Alan Ravitz, $6,000 for his testimony alone and over $42,000 in total.  Also, Plaintiff solely paid five social workers who supervised his visits with the child for their time testifying at trial.  This was in addition to the ***hundreds of thousands of dollars*** of fees imposed by the Attorney for the Child and her experts.

127.    Plaintiff made numerous efforts to settle the case, and in the alternative, to reallocate some of the costs to Plaintiff's wife who makes approximately $380,000 per year at *Weil, Gotshal & Manges LLP*.  Defendant summarily denied each of Plaintiff's attempts to seek financial relief.   As a consequence, without any source of income as a result of Defendant's September 18 Decision, Plaintiff was forced to turn to his father for financial support.  However, that support was limited as Plaintiff's father's sole source of income is social security disability after Plaintiff's father had a heart attack while working at his place of employment as a pharmacist in July 2012.

128.    In publishing and disseminating the September 18 Decision, Defendant undertook deliberate actions to interfere with Plaintiff's employment and cut-off his sole source of income needed to try the custody and access trial.  Again, Defendant knew or should have known that

the September 18 Decision would result in the loss of Plaintiff's employment.   Plaintiff was forced into a costly trial without any source of income to sustain the overwhelming cost of trial, exacerbated by Defendant's September 18 Decision.   As a result of the loss of Plaintiff's employment due to Defendant's publication and dissemination of the September 18 Decision, he was unable to financially prosecute the case as it left Plaintiff without the financial means to hire the additional experts demanded by Defendant, retain experienced trial counsel and pay other necessary litigation expenses.

129.   Plaintiff's loss of income as a result of Defendant's improper conduct had a direct and prejudicial effect of the outcome of trial.   This came partially in the form of Defendant bogging Plaintiff down with needless and costly expert fees he could not afford – something he did not do to Ms. Comfort – as a vehicle to exclude evidence favorable to Plaintiff.   Indeed, evidencing Defendant's prejudice towards Plaintiff, Defendant shifted the burden to Plaintiff to both affirmatively prove the authenticity of his evidence and disprove the authenticity Ms. Comfort's evidence with technical experts:

- During the trial, Plaintiff disputed a purported text message Ms. Comfort provided to the forensic custody evaluator where she changed the words "yelled at" to "hit."   Ms. Comfort never hired her own expert, permitted Plaintiff (or his expert) to examine her phone or even provided an actual screenshot of the text message.   Rather, she gave the forensic custody evaluator a computer print-out of "bubbles" containing the purported text messages generated by a computer program.   These print-out "bubbles" were later discovered to contain different text than the "bubbles" she entered into evidence.[30]   Plaintiff, in addition to retaining his own expert to confirm the authenticity of the text message contained on his phone, put into evidence a screenshot of the actual text message from his iPad and allowed opposing

---

[30] Plaintiff filed a motion on June 24, 2016 for a new trial or to otherwise amend Defendant's factual findings placing the two different versions of Ms. Comfort's "bubble" text messages side-by-side demonstrating her alterations.   Defendant not only denied Plaintiff's motion on June 27, 2016 without permitting opposition papers, but he make his ruling from the bench ***without reading Plaintiff's affidavit or exhibits***.   It was illustrative of the Defendant's bias towards Plaintiff and his tunneled intention to engineer an outcome in the proceeding adverse to Plaintiff.

counsel, the Attorney for the Child and the court to inspect the iPad. Immediately after and during the middle of trial, Defendant appointed his own "neutral" expert ordering Plaintiff to pay tens of thousands of dollars in costs even though he had no source of income.  When Plaintiff could not afford to pay the "neutral" expert, Defendant excluded Plaintiff's digital forensic expert prior to his testimony and decided the issue of text message on "credibility." Of course, Defendant concluded that Plaintiff's text message on his iPad was inauthentic, and, by implication farcically found that Plaintiff cracked Apple's encryption to alter the message.

- Ms. Comfort introduced several photographs at trial.  The metadata to the photographs conclusively revealed that they were digitally altered using filters and photo editing programs such as Photoshop.  Despite Justice Kaplan issuing a Judicial Subpoena for the metadata to be produced by September 15, 2014 in addition to three subsequent orders directing production of the digital images, Ms. Comfort did not produce the files until November 6, 2015 – over a year later and less than a week before trial.  On the last day of trial, Defendant refused to permit Plaintiff, mark as an exhibit, let alone question Ms. Comfort concerning the metadata without expert testimony – even though Ms. Comfort did not provide any expert testimony of her own on the issue. When Plaintiff could afford to hire an expert, Defendant excluded the metadata from evidence and concluded that Ms. Comfort's photographs were authentic.

- Ms. Comfort introduced audio recordings of Plaintiff at trial (which were obtained through illegal wiretaps).  Digital records, timestamps and fact witness testimony conclusively showed that audio recordings were spliced and portions were missing.  Plaintiff attempted to introduce the digital records and timestamps into evidence, but again Defendant, in the middle of trial, refused to permit Plaintiff's documents into evidence without expert testimony that the audio recordings were spliced.  Ms. Comfort did not produce any expert testimony of her own to corroborate her claims as to the authenticity of the audio recordings.  When Plaintiff could not afford to hire an expert, Defendant credited the audio recordings.

Had Plaintiff not lost his job as a result of the September 18 Decision, it is very likely that he would have had the financial ability to retain the numerous experts enumerated above and fully try the case.  Defendant made no attempts to remedy this prejudice to Plaintiff, and, in fact, aggravated it.  This is demonstrated by his own statements made during trial showing that he had little regard for Plaintiff's financial circumstances and expected Plaintiff to continue to request money from his disabled father living on a fixed income:

74

| MR. ZAPPIN: | But it has nothing to do with a neutral expert and – it's a real problem because I've already went out and spent $10,000.  I don't have any income to pay a neutral and – |
|---|---|
| THE COURT: | I heard you spent Ms. – what was her name again, Kase case, $13,000 for her.  What was it $12,000, $10,000 for the other expert.  A whole lot of money being spent.  You've told me that your father is paying for everything that's why you are giving him – you were turning over – that was your reason for turning over all the records because your father is footing the bill.  So I don't understand why suddenly money is now an issue. |
| MR. ZAPPIN: | Money does not grow on trees and Miss – I find it shocking that I bring in an iPad here in court and yet we have never seen Miss Comfort's phone, not once. |

130.    Plaintiff also could not afford trial counsel as a result of the loss of his income. He was forced to proceed largely *pro se* with the assistance of David Schorr, Esq. who had never previously tried a case on behalf of a client and had not practiced law in at least fifteen (15) years.  Defendant repeatedly denied Plaintiff's requests for the appointment of counsel.  *See Moloney v. Moloney*, 19 A.D. 496, 497 (2nd Dept. 2005) ("The deprivation of a party's fundamental right to counsel in a custody or visitation proceeding is a denial of due process and requires reversal, without regard to the merits of the unrepresented party's position.")  As a result, Plaintiff did not receive a full and fair trial as a result of Defendant's publication and dissemination of the September 18 Decision that costs Plaintiff his employment.

<u>Defendant Generated Prejudicial Media Coverage</u>

131.    As demonstrated above, Defendant deliberately attracted media attention to the matter with the publication and dissemination to the media of the September 18 Decision.  That media attention was pointedly negative towards Plaintiff and painted him in a false and unfavorable light to the public.  This targeted negative media coverage brought on by Defendant through his extrajudicial acts was prejudicial to Plaintiff's right to a fair trial.

132.    It is fundamental that "the trial judge has an affirmative constitutional duty to *minimize* the effects of prejudicial pretrial publicity." *Westchester Rockland Newspapers, Inc. v. Legget*, 48 N.Y.2d 430, 438 (N.Y. 1978) (emphasis added).   Prejudicial pretrial publicity can occur even in bench trials.  *See Anonymous v. Anonymous*, 191 Misc.2d 707 (Sup. Ct. N.Y. Cnty. 2002) ("[D]isseminaton of news or comments may tend to influence the judge … from being impartial at trial.");  *see also In re Halkin*, 598 F.2d 176, 193 (D.C. Cir. 1979) (nothing that "the threat of prejudicial publicity is entitled to some weight in a bench trial").   As a result of publication and dissemination of the September 18 Decision, *The New York Post* and *The Daily News* – Defendant's apparent go-to tabloid publications – were a constant presence in the courtroom during pretrial proceedings and the custody trial itself.   Plaintiff provides some examples below, although not exhaustive, of how he was prejudiced as a result of the inappropriate publicity generated by Defendant.

133.    For example, Defendant did everything to unconstitutionally *maximize* publicity prejudicial to Plaintiff with the September 18 Decision.   The effect was felt throughout the pretrial proceedings and the custody trial itself.   Indeed, Defendant encouraged media coverage of the case.   To illustrate, Defendant held an impromptu evidentiary hearing prior to the custody trial on November 10, 2015 that the parties did not learn about until they walked into the courtroom.[31]   He did not provide any prior notice to the parties of an evidentiary hearing and refused to permit Plaintiff to call witnesses, even though Defendant called three (3) of his own witnesses.[32]   At the conclusion of the hearing, Defendant read from a prepared statement calling

---

[31] The parties were supposed to appear on an unrelated motion to quash a subpoena filed by Plaintiff's wife three (3) days prior, which had not been on the calendar.

[32] Defendant's impromptu November 10, 2015 was again illustrative of Defendant's intention to steer the outcome of the proceeding against Plaintiff.  On November 6, 2015, the Attorney for the Child's partner, Paul Kurland, ripped subpoenaed documents out of Plaintiff's hands and elbowed him

Plaintiff a "criminal."   Reporters from *The New York Post* and *The Daily News* were prepared and sitting in the front row of the gallery at the start of the proceeding and later published articles about the hearing.   Plaintiff later learned from those reporters that they were tipped off about the hearing by Defendant and his staff earlier in the day.

134.   Defendant also improperly permitted *The New York Post* and *The Daily News* into the courtroom during the testimony of the forensic custody evaluator, Dr. Alan Ravitz.   In child custody cases, the forensic custody report is highly confidential and numerous safeguards are placed on the report, including forbidding its removal from the courtroom, to prevent dissemination of its contents.   Almost always, the courtroom is sealed during testimony of the forensic custody evaluator due to the sensitive nature of their testimony.   In *Zappin v. Comfort*, however, Defendant permitted Ms. Comfort's counsel to read from virtually the entire report with the press in the gallery, even though the report was already in evidence as a court exhibit. Indeed, Mr. Schorr noted to Defendant that "Mr. Wallack [was] holding a news conference with the media" in the courtroom reading the salacious details of the forensic custody report to the press, which Defendant ignored.   *The New York Post* and *The Daily News* subsequently published series of articles containing unsubstantiated and false allegations as well as purported assertions about Plaintiff's mental health gleaned from Ms. Comfort's counsel selectively reading portions of the forensic custody report that painted Plaintiff in an unfavorable light.

---

unprovoked.   Plaintiff had just had surgery to relieve a congenital illness in his back.   Defendant subsequently called no less than six (6) witnesses to the incident into his chambers between November 7, 2015 and the morning of November 10, 2015 and interviewed them *ex parte* as to the substance of their potential testimony.   Defendant never provided notice to the parties that he was doing so.   He then selected the three (3) witnesses whose rendition was most unfavorable to Plaintiff – including his own clerk – again without noticing the parties of his doing so.   The three (3) witnesses then testified at the impromptu hearing as "court witnesses" giving vastly different accounts of what they saw.   Nevertheless, Defendant read his "decision" from a ***prepared statement*** reaffirming that he was predisposed against Plaintiff.

They did not publish anything unfavorable about Ms. Comfort, despite a treasure trove of salacious material in the forensic custody report.  More importantly, they published <u>nothing</u> positive about Plaintiff.  As a result, Defendant's refusal to enact safeguards to prevent the dissemination of the contents of the forensic child custody report undeniably prejudiced Plaintiff's ability to receive a fair trial.

135.    By way of another example, Plaintiff moved to close the courtroom to protect the identity of certain witnesses he intended to call as a result of *The New York Post* and *The Daily News'* persistent presence in the courtroom during trial.  Defendant waited until both tabloids were in the courtroom to deny the motion, in effect alerting them as to who Plaintiff's witnesses were.  As a result, Plaintiff was unable to call these witnesses as they feared being negatively portrayed in *The New York Post* and *The Daily News*, which would have no doubt resulted in an adverse effect on their jobs and reputations.[33]  All of the potential witnesses had agreed to testify prior to Defendant's publication and dissemination of the September 18 Decision.  These witnesses included:

- An individual who was violently assaulted by Ms. Comfort in a nightclub in 2012;

- An individual who saw Ms. Comfort consuming alcohol during her pregnancy, an issue at the trial.  The witness also observed Ms. Comfort referring to the unborn child with racial slurs and stating that Plaintiff was not the father of the child;

- An individual who observed Ms. Comfort physically abuse Plaintiff;

- Individuals at Plaintiff's former employers who saw Ms. Comfort initiate altercations with Plaintiff at his office; and

---

[33] Most of these witnesses reside outside New York.  Plaintiff therefore could not compel their testimony.

- A witness who observed Plaintiff with a stab wound inflicted by Ms. Comfort on November 1, 2013.

Had it not been for Defendant's publication and dissemination of the September 18 Decision, Plaintiff would have likely been able to call many, if not all, of these witnesses voluntarily at trial.  As a result, Plaintiff did not receive a fair trial as a result of Defendant's prejudicial press coverage improperly initiated and encouraged by Defendant.

136.    Throughout the course of the proceeding, *The New York Post* and *The Daily News* published approximately a dozen articles about the Matrimonial Action.  All of these articles were precipitated by Defendant's publication and dissemination of the September 18 Decision. And, in every one of these articles, Plaintiff was portrayed in a negative and unfavorable light almost entirely as a result of statements or actions by Defendant.  Defendant took no action to remedy the prejudicial effect of the media that he himself generated.  Rather, the record is clear that Defendant fed the media circus.  As a result, Plaintiff did not receive a fair custody trial as a result of Defendant's tortious and extrajudicial conduct.

<u>Defendant Improperly Used the Custody Trial to Justify the September 18 Sanctions Decision</u>

137.    Defendant used the custody and access trial to inappropriately question Plaintiff in an attempt to bolster his extrajudicial conduct of publishing and disseminating to the media the September 18 Decision.  The below is illustrative of Defendant's improper questioning and conduct:

MR. ZAPPIN:        And I will say that started after Mr. Wallack made the comment to me that I should seek an – that whatever exhibit, the e-mail was that I should seek an order of protection keeping [the child] away from me or whatever that e-mail said to that effect.  I thought that was, to use Justice Cooper's words, outrageous.

THE COURT:          Mr. Zappin, do you believe Mr. Wallack's alleged misbehavior or misconduct should be something that should be brought to the public?

MR. ZAPPIN:        If he's actually committed misconduct, yes.  If he hasn't then no.

THE COURT:          So you believe he has committed misconduct?

MR. ZAPPIN:        Misconduct in what sense?  Attorney misconduct, yes. He's made false statements on the record.  He's proffered knowingly frivolous arguments.  He's bullied, intimidated third-parties.  Yes, I think he's committed attorney misconduct.

THE COURT:          That should be brought to the notice of the public?

MR. ZAPPIN:        If he's actually done it, yes.

THE COURT:          Next question.  We're sort of meandering here.

As the above passage demonstrates, Defendant interjected himself as a participant to question Plaintiff on a wholly irrelevant topic – Mr. Wallack's alleged misconduct in the proceeding – in an effort to use Plaintiff's own testimony against him to justify publication of the September 18 Decision.  The record is replete with such instances of Defendant's improper conduct such as that highlighted above.  As a consequence, Plaintiff did not receive a fair trial where Defendant abandoned his role as a neutral arbiter to become an active litigant in the proceeding to reinforce his own credibility and conduct.

Defendant Deliberately Provoked and Antagonized Plaintiff Throughout the Trial

138.    Perhaps most disturbing was Defendant's use of the custody and access trial to mock, antagonize and provoke Plaintiff to diminish his credibility and lure sound bites out of Plaintiff to validate his September 18 Decision.  The record is replete with instances where Defendant personally insulted and attempted to incite Plaintiff, both verbally and physically.  As

shown by the examples below, which are by no means exhaustive, Defendant's conduct denied Plaintiff a fair custody trial.

139.　　Perhaps most illustrative were Defendant's bizarre interruptions during testimony to attempt to irritate Plaintiff and paint him as sexist.  This began during trial on November 19, 2015 when Defendant interjected to apparently insinuate – out of the blue, no less – that Plaintiff was engaged in a relationship with an underage girl:

| | |
|---|---|
| MR. SCHORR: | Can you tell us who Amy Steadman is.[34] |
| MR. ZAPPIN: | She's a girl who reached out to me in March of 2014 and I hung out with her maybe a dozen times intermittently. |
| THE COURT: | A girl?  How old is she? |
| MR. ZAPPIN: | I think she's 31. |
| THE COURT: | 31? |
| MR. ZAPPIN: | Yes. |
| THE COURT: | She's a woman? |
| MR. ZAPPIN: | Yeah.  Her name is Amy. |
| THE COURT: | You said a girl. |
| MR. ZAPPIN: | Yeah.  I hung out with her but she had a lot questions [sic]. |
| THE COURT: | My question is a girl is somebody who is under a certain age.  She's a woman.  Correct? |
| MR. ZAPPIN: | Well, yes. |
| THE COURT: | Go on. |

---

[34] Defendant knew exactly who Amy Steadman was.  On his own accord, Defendant referenced her numerous times during pre-trial proceedings.

It continued during trial on November 24, 2015 when Defendant interjected again with similar inappropriate suggestions and questioning:

| | |
|---|---|
| MR. ZAPPIN: | Okay.  I will get through this quickly.  We were at a party.  The girl was there and Claire had called her a shrew.  The girl said something not so nice to Claire.  They started pulling each other's hair.  They had to be pulled apart. |
| MR. SCHORR: | Where was this and when was this? |
| MR. ZAPPIN: | It was maybe December of 2012.  I think it was like the Ganza Bar [sic]. |
| THE COURT: | When you say girl, you don't mean somebody whose 15 or 16? |
| MR. ZAPPIN: | I mean a woman. |

Defendant's sexist innuendo continued throughout trial, but only with respect to Plaintiff and never to Ms. Comfort, despite Ms. Comfort using the word "girl" repeatedly during her testimony.  It reached a crescendo on December 10, 2015 when Defendant flat-out called Plaintiff sexist after he questioned his wife about her admission during her direct testimony that she was having sex with other men during their relationship and around the time period of the conception of the child in late 2013:

| | |
|---|---|
| MR. ZAPPIN: | You testified that you were having sex with multiple men … in November 2013, is that correct? |
| MS. COMFORT: | Yes … |

***

| | |
|---|---|
| THE COURT: | Were you married to Mr. Zappin at the time? |
| MS. COMFORT: | We weren't even engaged or married. [35] |

---

[35] Plaintiff and his wife married in early May 2013, approximately five months into the pregnancy of the child.  The passage is also demonstrative of how Defendant would interject to question Ms. Comfort to bolster and/or rehabilitate her testimony.

| | |
|---|---|
| THE COURT: | I'm putting an end to this absurd line of questioning. |
| MR. ZAPPIN: | It's not an absurd line of questioning.  This is all about – |
| THE COURT: | If you're arguing to me that she slept with somebody else while she was dating you and that somehow that enticed you to do what you did, that is – |
| MR. ZAPPIN: | Do what I did?  Are you making a finding? |
| THE COURT: | That's really far fetched. |
| MR. ZAPPIN: | No, your Honor. |
| THE COURT: | Far fetched problems.  Go on to something else, sir. |
| MR. ZAPPIN: | What I'm trying to show is that this is [the] Miss Claire Comfort Show.  She has no empathy, show [sic] sympathy, for anyone else. |
| THE COURT: | I find it an amazingly sexist position, amazingly old fashioned position in line with you calling Miss Cohen honey, it's to be able to be pillaging her because she had sexual relations with a man; is that what you are doing? |
| MR. ZAPPIN: | No, I'm pillaging her – I'm not even pillaging.  I'm asking her questions because it goes to a pattern of her not showing any sort of feelings, any caring to any other individual … You're beating me up.  You're just picking on me.  You're beating me up. |
| THE COURT: | Go ahead, sir.  Go ahead, sir. |
| MR. ZAPPIN: | Do we need summations because we know what the decision is going to be? |
| THE COURT: | You know, you want to keep doing that, it's sad.  Then I shouldn't bother you if you want to call your witness tomorrow.  If you know what the decision is, don't bother calling your other witness. |

Plaintiff's line of questioning was important as it was not only meant to establish that Ms.

Comfort was emotionally uncaring towards Plaintiff as the child's father, but that the paternity of

the child was in dispute.  Unrefuted testimony had previously established that Ms. Comfort had

repeatedly told Plaintiff during her pregnancy that he was not the child's father and that a partner at her law firm was.   And, as shown above, Ms. Comfort admitted to a relationship with this individual around the time of the conception of the child during her direct testimony. Accordingly, Defendant's statements were highly prejudicial and evidenced that Defendant was not a neutral fact-finder, but a participant in the prosecution of the case against Plaintiff.

140.   Additionally, Defendant openly mocked and ridiculed Plaintiff during the trial evidencing a deep-seeded antagonism towards Plaintiff.   This ranged from making fun of Plaintiff for texting with his mother:

> THE COURT:   How often do you speak to your mother?  You're an adult male.  Do you speak to her like – do you send her text messages every day about everything in your life?

to Defendant even interjecting himself to ridicule Plaintiff because he was not potty-trained at the age of three:

> MS. COHEN:   [Y]ou've been using the computer since the age of three.  Is that accurate?
>
> MR. ZAPPIN:   No way.  I was still pooping in diapers at the age of three.
>
> MS. COHEN:   And that you could program at the age of four.  Is that accurate?[36]

---

[36] In order to support his finding in the February 29, 2016 custody decision in *Zappin v. Comfort* that Plaintiff hacked Apple's iPhone proprietary and uncrackable encryption to change a single inconsequential text message, Defendant relied on assertions by Ms. Comfort in the forensic custody report that Plaintiff began using a computer at the age of three (3) and began programming computers at the age of (4):

> In addition, as the custody forensic report reveals, plaintiff began using a computer by the time he was three-years old, and he started to program at a very early age.

Defendant's only other support for his conclusion was that Plaintiff was a Computer Science major. Nonetheless, Defendant's statements concerning Plaintiff programming computers at the age of four (4) highlight the absurdity of not only the entire proceeding, but his clear and apparent antagonism towards Plaintiff that he would accept anything Ms. Comfort said as gospel.   Putting aside the fact that Ms. Comfort did not know Plaintiff until he was twenty-four (24) years of age and that Plaintiff could *maybe* read a few words at the age of four (4), it would have been impossible for Plaintiff to use a computer at

84

THE COURT:          You weren't toilet trained at the age of three?

to outright insults and aspersions casts at Plaintiff by Defendant designed to antagonize, disparage and incite him. This included Defendant repeatedly name-calling Plaintiff during trial, which included Defendant stating that Plaintiff was a "sad" or "sick" person suggesting that he was predisposed against Plaintiff. In the midst of trial, Defendant would attack Plaintiff over and over again calling him "disingenuous," "dishonest" and "not credible," most of the time concerning issues that were not in dispute.[37] If Plaintiff disputed something a witness claimed he said, Defendant would make remarks like "that sounds like something you [Plaintiff] would say" prior to Plaintiff cross-examining the witness or presenting rebuttal evidence, again suggesting a predisposition. Defendant regularly would make sarcastic remarks such as stating "I would like

---

such an early age because personal computers did not exist in rural West Virginia (where Plaintiff was born) in the mid-to-late 1980's.

[37] In one instance, Defendant called Plaintiff "disingenuous" for denying putting the child's name and unredacted photograph on the Internet. Plaintiff never put the child's name or unredacted photograph on the Internet. In fact, neither Ms. Comfort nor the Attorney for the Child ever made any such assertion. Rather, Defendant wholly concocted the allegation based on his alleged own personal Internet research. Defendant admitted it at trial:

> MR. ZAPPIN:          Barbara Ross is sitting in the gallery. [The witness] should not use the child's name.
>
> THE COURT:          I notice, Mr. Zappin, that the child's name is still on various web sites. I would ask you to have them removed.
>
> MR. ZAPPIN:          What web sites?
>
> THE COURT:          It's on – I had to look something up and someone brought it to my attention it's on Judicialwatch.com.
>
> MR. ZAPPIN:          I don't own the website.

Indeed, JudicialWatch.com never printed anything about *Zappin v. Comfort*, and Defendant's statement appears to be categorically untrue. Nonetheless, Justice Cooper's use of the Internet to conduct independent research about purported facts not in evidence was improper and denied Plaintiff a full and fair hearing, particularly where they were relied upon in rendering a decision.

the record to reflect that I have a father who really cares about his child," after Defendant sent a third-party witness out of the courtroom in the middle of testimony to read from a prepared statement attacking Plaintiff, which Plaintiff pointed out on the record.  Defendant would make remarks evidencing that he loathed Plaintiff such as stating that Plaintiff was the "last person he wanted to talk to" during Plaintiff's testimony.   Indeed, Defendant went even further to repeatedly attack Plaintiff's professional competence.   For instance, he repeatedly interrupted Plaintiff's cross-examination of Ms. Comfort's father to berate Plaintiff that he was incompetent and doing a poor cross-examination.  Defendant incessantly derided Plaintiff about even the most minor things such as marking exhibits or moving in evidence, even where Plaintiff did it correctly.   Likewise, Defendant continually placed Plaintiff under a microscope throughout the trial with never-ending criticisms of him for actions such as smiling, placing a paperclip in his mouth while looking for a document, exhaling and placing his hand on counsel's table to name a few examples.  This is all merely illustrative as many of Defendant's attacks are so voluminous and personal that a complete list would be a disservice to this Complaint.

141.   What was most offensive and personal to Plaintiff was Defendant's mocking of his upbringing and southern background.  Defendant referred to Plaintiff as a "country boy" multiple times on the record apparently to make fun of him.  He incessantly mocked and criticized the way Plaintiff talked claiming that he could not understand Plaintiff.  Defendant audibly huffed and laughed when there was discussion that Plaintiff attended NASCAR races. Even more offensive, Plaintiff and several other witnesses heard Defendant and his court staff

refer to Plaintiff as "Gomer Pile" on a persistent basis.  Defendant's conduct was unprofessional, highly offensive and demonstrated a deep seeded personal prejudice against Plaintiff.[38]

142.    Defendant's attacks were not limited to words, however.  On November 23, 2015, Defendant attempted to provoke a physical altercation or "rumble" in the courtroom because Plaintiff exhaled while walking off the witness stand:

| | |
|---|---|
| THE COURT: | Mr. Schorr, how much longer will Mr. Zappin's testimony take? |
| MR. SCHORR: | Unfortunately, Your Honor, it will take some time.  We are going through the daily – the various days of November and moving in various things into evidence. |
| THE COURT: | It will move faster it we don't have outbursts like we had.  Mr. Zappin, were you just now – you had no reaction?  You didn't just look up? |
| MR. ZAPPIN: | I sighed.  I sighed.  You want to have a hearing on it?  Let's do it right now.[39] |

---

[38] If there was ever any doubt that Defendant was highly critical of conservative values, Plaintiff is in possession of an audio recording from 2014 in which he rails against Ted Cruz and strongly insinuates that he would rule against any Ted Cruz supporter.

[39] Defendant previously attacked Plaintiff and threatened to hold a hearing to determine whether Plaintiff had *smiled* in the courtroom:

| | |
|---|---|
| THE COURT: | And do not sit there and smile.  Do not sit there and smirk.  It shows a lack of control on your part and – |
| MR. ZAPPIN: | Your Honor, you are tainting the record. |
| THE COURT: | Don't give me that stuff about tainting the record.  You, Sir, are doing what you are doing.  I'm simply admonishing you for acting unprofessionally. |
| MR. ZAPPIN: | I would like the record to reflect I'm sitting here with my laptop open, I have three sets of documents, and I'm writing on a note pad.  So, your saying me smiling is absolutely false.  I would like to put that on the record. |
| THE COURT: | I think probably everyone else saw it.  If you want to have a hearing on whether you were smiling, Sir ... |

THE COURT:          What is this a schoolyard.  You want to go ahead.  ***You want to rumble***?  Is that what you are doing?  Come on.

It should be noted that Defendant was observed to gesture at Plaintiff as if to provoke him closer

to the bench.  Of course, no altercation broke out because Plaintiff ignored Defendant's attempts

to antagonize him.  Moreover, Defendant admitted to engaging in violent physical outbursts

directed at Plaintiff throughout the trial prompted by the most routine procedures such as

preserving an objection to a document in evidence:

MR. WALLACK:       Offer Defendant's N, except for the first page, but from the second page on.  The first page was the email coversheet to Miss Comfort.

MR. ZAPPIN:        Obviously I object, Your Honor.  It was sent to Miss Comfort.  It wasn't sent to him.

THE COURT:         I said you are to make simply objections on word.

MR. ZAPPIN:        Please don't slam your hand at me.  I'm scared.  I'm scared, Your Honor.  You're scaring me … You slammed your hand down very hard …

THE COURT:         I've done that numerous times.

On another occasion during trial, Defendant's conduct actually turned frightfully violent.  While

Defendant was in the middle of a so-called "impromptu" reprimand of Plaintiff's conduct,

Plaintiff pointed out that Defendant was reading from a prepared statement.  Defendant stood up

from the bench and began approaching Plaintiff, screamed at Plaintiff and forcefully threw his

papers in Plaintiff's direction.[40]  These outbursts caused Plaintiff to be fearful of his safety just

---

This exchange only one example of the over-the-top attacks Defendant inflicted on Plaintiff during the trial and demonstrates an apparent antagonism towards Plaintiff, even where he simply and respectfully preserved the record.

[40] Multiple witnesses have observed, including Plaintiff, that Justice Cooper keeps a small sign on his desk that states "STAY QUIET" suggesting he is aware of his temper.

being in the courtroom.  The outbursts and attempts at physical provocation are yet even more evidence of a deep seeded antagonism by Defendant towards Plaintiff that began with the September 18 Decision, which made it impossible for Plaintiff to receive a fair trial before Defendant.

143.    Additionally, Defendant's conduct during Plaintiff's testimony demonstrated that he had utter disdain and contempt for Plaintiff.  During Plaintiff's seven (7) days of testimony, Defendant engaged in conduct that revealed that he was not interested in listening to the vast majority of Plaintiff's testimony.  For instance, while Plaintiff was testifying Justice Cooper read the newspaper, peeled and ate oranges, read motions and papers from other cases, texted between his legs on his cell phone and did cross-word puzzles.[41]  Defendant also took the opportunity to antagonize Plaintiff while he was on the state.  For example, while Plaintiff was testifying about his time with his child, Defendant proudly displayed and was reading from the September 18 Decision in an apparent attempt to taunt Plaintiff.  When Plaintiff pointed it out, Defendant did not deny it but rather chastised Plaintiff for looking at him:

> MR. ZAPPIN:        I'm sure there's never been an instance stance [sic] of American jurisprudence of a judge writing a decision the way you did or speaking to a litigant the way you did.  I saw you up there this morning sitting there reading your sanctions decision, sitting there, you know, with a big smile on your face.

> THE COURT:        Mr. Zappin, what are you doing when you are up there you're looking up on the bench to see what I am doing?  Is that what you are spending –

When Ms. Comfort testified, however, it was observed that Defendant attentively listened to her testimony and took notes.  Again, Defendant's behavior was indicative of his deep-seeded

---

[41] Plaintiff was sitting next to Defendant during his testimony.  Defendant's actions were clearly visible to Plaintiff as he had a full view of Defendant's desk/bench.

prejudice and predisposition towards Plaintiff that denied Plaintiff a full and fair opportunity to be heard.

<u>Defendant's Prejudicial Active Participation in Prosecuting Plaintiff</u>

144.    Defendant's prejudice towards Plaintiff was apparent throughout the trial to the extent that he would personally direct Ms. Comfort's counsel how to try the case.  This included directing Ms. Comfort's counsel to perform a *voir dire* of Plaintiff's expert, telling Ms. Comfort's counsel how to rephrase objectionable questions, suggesting that Ms. Comfort's counsel move the court for a missing-witness charge and assisting Ms. Comfort's counsel in coming up with lines of questioning for Plaintiff during his cross-examination of Plaintiff to name a few of Defendant's improper actions.  Needless to say, by assisting Ms. Comfort's counsel throughout the trial and directing him how to prosecute the case, Defendant abandoned his role as a neutral arbiter and became an active participant in the prosecution of Plaintiff. Defendant's conduct was highly prejudicial and denied Plaintiff and full and fair trial.

145.    Defendant not only gave guidance to Ms. Comfort's counsel as to how to prosecute the case, but Defendant actively participated in questioning witnesses that went well beyond merely clarifying issues.  For example, Defendant interjected multiple questions during the cross-examination of Ms. Comfort and her father to ask questions that were clearly designed to rehabilitate their testimony.  Moreover, throughout the trial and prior to the close of evidence, Defendant repeatedly referred to Ms. Comfort as "very honest" and "credible."

146.    Defendant would refer to Plaintiff with statements during the proceeding inferring the opposite, that he was "dishonest" and "not credible," demonstrating clear preconceived and prejudicial notions about Ms. Comfort and Plaintiff.   In fact, Defendant actively cross-examined Plaintiff during parts of his testimony that lasted seven (7) days.  Defendant's questions went

well-beyond merely clarifying issues and demonstrated an intent to undermine Plaintiff's claims even in other litigations.  For example, Defendant took over the cross-examination of Plaintiff to interrogate him for nearly twenty (20) minutes on a wholly unconnected allegation Plaintiff made concerning his mother in an unrelated proceeding.  (*See* Ex. 29.)  Defendant was well-aware that Plaintiff did not have notice that the allegation would be at issue, that the information Defendant was questioning Plaintiff about was statutorily and administratively sealed, that Plaintiff was unable to compel the testimony of out-of-state witnesses that could corroborate Plaintiff's allegation and that Defendant was improperly eliciting hearsay testimony.  (*See id*.) Nonetheless, Defendant used his improper cross-examination to conclude in his February 29, 2016 decision on custody and access that Plaintiff had falsely testified on the issue.  Defendant's inappropriate cross-examination of Plaintiff cited above is illustrative of his questioning of Plaintiff throughout the proceeding, which denied Plaintiff a fair trial.

147.    Defendant directed repeated questions to Plaintiff's peer review expert and forensic pathologist that were clearly designed to impeach their credibility.   Defendant's questions were highly inappropriate and went beyond merely clarifying issues or testimony.  The questions demonstrated a desire to undermine Plaintiff's claims.

148.    Defendant posed questions to both the forensic custody evaluator and Plaintiff's peer review expert only about Plaintiff's conduct and his mental health.  This is despite the fact that both experts raised substantial questions about Ms. Comfort's parenting, credibility and claims in the case.  In fact, the forensic custody evaluator diagnosed Ms. Comfort as suffering from "moderately severe mental illness" and administered psychological testing that revealed she was "highly deceptive."  Defendant failed to ask the forensic custody evaluator a single question

about Ms. Comfort, however.  It was quite apparent that Justice Cooper's questioning of the expert was designed to elicit testimony that he could rely on to rule against Plaintiff.

149.    Plaintiff has not quoted from the transcripts as to Defendant's statements and questioning (with the exception of Defendant's questioning of Plaintiff on a wholly unrelated issue and Defendant's flashing the September 18 Decision during Plaintiff's testimony cited above) discussed above in this Complaint since much of the questioning is highly confidential and pertains to the child.  Plaintiff will, however, provide the transcripts separately to the Court under seal if needed.  Regardless, Defendant's conduct was a clear departure from his role as an arbiter and demonstrated that he became an active litigant against Plaintiff.  As a result, Plaintiff was denied a full and fair hearing as a result of Defendant's conduct.

<u>Defendant's Statements Indicating That He Predetermined the Facts</u>

150.    Both prior to and during the custody and access trial, Defendant made improper statements that he had predetermined the facts of the case prior to the close of the evidence – and in some instances – prior to reviewing any evidence at all.

151.    In the September 18 Decision and prior to trial, Defendant states that Plaintiff had "harmed" Ms. Comfort and the child.  (*See* Ex. 1 at 2.)  Defendant made such statements without the parties uttering a single word in his courtroom, much less him reviewing any evidence as to the issues in dispute.  Defendant's statements in the September 18 Decision were prejudicial and indicated that he had predetermined the facts of the case.

152.    On April 30, 2015, Judge Carol Goldstein of the New York County Family Court issued an Order of Protection against Ms. Comfort on Plaintiff's behalf based primarily on an incident that took place on April 29, 2015 as well as other prior events.   Judge Goldstein held a hearing, took testimony and received evidence prior to issuing the Order of Protection.  Indeed,

92

Ms. Comfort did not contest its issuance.  When the Family Court matter was consolidated into the Matrimonial Action on July 22, 2015, Defendant summarily vacated Judge Goldstein's Order of Protection calling Plaintiff's accusations "farcical."[42]  Defendant did not review the transcript of the hearing before Judge Goldstein.  He similarly did not review any of the evidence or testimony presented to her.  Rather, it was quite apparent that Defendant had predisposition against Plaintiff.

153.    Ms. Comfort attempted to subpoena Plaintiff's ex-girlfriend (and her law school friend), "Ms. Doe," to testify as to whether Plaintiff had certain injuries to his back prior to 2012. Both Plaintiff and Ms. Doe requested that Defendant not compel her testimony as it would be irrelevant.   In granting request, Defendant made wholly improper and outrageous statements radically mischaracterizing the record and casting Plaintiff's ex-girlfriend as a domestic violence victim:

> THE COURT:    I understand how it could be relevant to any claims that Mr. Zappin makes of his good character etcetera, but when I weigh everything here requiring this woman to testify, to have to come into court and to have to relive things that happened five or six years ago, the negative, the downside of doing that, the problems are going to outweigh what I see the importance of her testimony is in this proceeding … This case does not need Jane Doe's testimony particularly in light of what I am seeing today.  I believe she's suffered enough.  From what I'm told she does not need to suffer anymore by being brought here as a witness.

Ms. Doe never made a single allegation of domestic abuse, recited anything that would require her to "relive" events or claimed that she "suffered."  Ms. Doe did not want to testify because her testimony would have drummed up comprising photographs taken of her and statements made by

---

[42] It bears reminding that Defendant did not allow the parties or counsel to speak at the July 22, 2015 hearing when the Family Court action was consolidated into the Matrimonial Action.

her in 2011.  Indeed, in petitioning the court, Ms. Doe sought to enjoin the "filing, publishing or disseminating [of] any photographs of Jane Doe in any manner."   Defendant's statements implying that Ms. Doe was a domestic violence victim were improper and deliberately misrepresented the record.  These statements demonstrate not only Defendant's predisposition against Plaintiff, but his willingness to recast the facts to paint Plaintiff in an unfavorable light.

154.    As mentioned above, during Plaintiff's cross-examination of Ms. Comfort, Defendant indicated that he had already determined that Plaintiff had committed family offenses prior to the close of evidence.  (*See supra* at ¶ 128.)  Unprompted, Defendant stated that Plaintiff was questioning Ms. Comfort in order to justify "do[ing] what you [Mr. Zappin] did."  (*See id*.)  Plaintiff vigorously denied ever having committed a family offense.  Defendant's statements during Ms. Comfort's cross-examination were prejudicial and indicated that Defendant had predetermined that Plaintiff had committed family offenses prior to the close of evidence.

155.    Defendant statements make clear that he had a predisposition against Plaintiff and had predetermined the facts and outcome of the case prior to hearing all the evidence.  His predisposition was apparent in the September 18 Decision and continued throughout the proceeding in an apparent attempt to justify his publishing and dissemination to the media of the September 18 Decision, which cast Plaintiff in a highly unfavorable manner.  With Defendant as the fact-finder, Plaintiff was denied a neutral arbiter and consequently deprived of his right to a full and fair trial.

<u>Defendant's Erroneous Evidentiary Rulings That Denied Plaintiff a Full and Fair Hearing</u>

156.    Defendant interjected himself to improperly manipulate the evidence deduced and heard at the custody and access trial so as to conform to his statements and portrayal of Plaintiff in the September 18 Decision.  In fact, Defendant found a way to exclude or render meaningless

virtually every piece of evidence favorable to Plaintiff.  Defendant's evidentiary rulings were blatantly erroneous, unfair, prejudicial and contrary to the law that Defendant made it impossible for Plaintiff to present a case.  In so doing, Defendant denied Plaintiff his right to a full and fair hearing on the merits.

157.    Defendant went out of his way to disparage Plaintiff's evidence admitted at trial. For example, as referenced above, Defendant repeatedly claimed that Plaintiff put the child's name and photograph on the Internet.  In denying Plaintiff custody and imposing supervised visitation, Defendant stated that Plaintiff "revealed the name of the parties' child and made available to the world photographs taken of him" on the Internet.  Again, Defendant's statements are not accurate and lack an evidentiary basis.  Nonetheless, when Plaintiff introduced numerous Facebook postings made by Ms. Comfort and her friend containing the name, photograph and location of the child, Defendant disparaged his evidence:

| | |
|---|---|
| MR. ZAPPIN: | When did you take this photograph? |
| WITNESS: | I don't know when I took the photo, but it appears on December 15 … |
| MR. ZAPPIN: | And that was a time that Ms. Comfort was in DC …, is that correct? |
| WITNESS: | That is correct? |
| MR. ZAPPIN: | And it says lunch with Claire and baby [R].  So you posted the name of the child on the Interest; is that correct? |
| MR. WALLACK: | Objection. |
| THE COURT: | Sustained. |
| MR. ZAPPIN: | It says at Soho DC.  Can you tell me what Soho DC is? |
| WITNESS: | It's a restaurant in DC. |
| MR. ZAPPIN: | You posted the location of the child on the Internet? |

| MR. WALLACK: | Objection. |
| THE COURT: | That's an absurd question.  If you want to answer it, go ahead. |
| WITNESS: | Yes. |

Defendant's statements clearly demonstrate the application of a double standard.  His statements were prejudicial and denied Plaintiff a full and fair trial.

158.    As mentioned above, the New York County Family Court issued an Order of Protection against Ms. Comfort and in favor of Plaintiff primarily based on an April 29, 2015 incident at the Time Warner Center in New York, NY.  Defendant improperly excluded security footage of the incident from evidence that had been ordered to be produced by the Family Court and was in the case file.  Defendant failed to provide any explanation for the exclusion of the security footage that would have corroborated Plaintiff's allegations concerning the incident.  In fact, the record in the Matrimonial Action reflects that Defendant not only failed to view the video, but made his decision without ever reviewing the motion papers concerning the footage. In his February 29, 2016 custody and access decision, Defendant went on to make findings of facts against Plaintiff based on credibility, despite excluding the best evidence of the incident without a legal basis – the security footage.

159.    On November 30, 2015 in the middle of trial, Plaintiff filed a motion *in limine* (Mot. Seq. 33) during trial seeking various evidentiary relief, including among other requests, inclusion of testimony from two (2) witnesses on an issue central to the case, exclusion of audio recordings that were illegal wiretaps and relief related to the Court's appointment of a neutral digital forensic expert ("Mot Seq. 33").  Mot. Seq. 33 was stamped in the *Ex Parte* Clerk's office and, according to the Clerk, delivered to Justice Cooper's chambers that day.  It was also

electronically docketed that day as well.  When Plaintiff raised Mot. Seq. 33 with Defendant on the record on November 30, December 1, December 3 and December 4, 2015, Defendant claimed he was not in possession of the motion.  His statements were demonstrably false. Defendant made no effort to find the motion and refused to accept a copy from Plaintiff. Defendant did not decide Mot. Seq. 33 until well over a month after the conclusion of trial on January 15, 2016.  At that point, the requested relief was denied as moot and not considered on the merits.  Defendant's failure to timely consider Mot. Seq. 33 denied Plaintiff a full and fair opportunity to be heard at trial on issues that were central and in dispute.

160.    During the Matrimonial Action, Ms. Comfort placed at issue and entered into evidence at trial approximately a dozen photographs central to the issues litigated at the custody and access trial.  Although the photographs were produced to Defendant in digital form on a flashdrive, they were produced only two (2) days before trial and fourteen (14) months after having been subpoenaed.[43]  Defendant refused to give Plaintiff proper access to the digital photographs themselves to examine the photographs and their metadata.  Defendant provided Plaintiff only a partial print out generated by his law clerks from the website JeffreyExif.com of the metadata connected to the photographs.  Even those printouts indicated that they had been visually altered, which Plaintiff explained both in a motion *in limine* and on the record at trial on November 19, 2015, in addition to contradicting Ms. Comfort's sworn statements as to when the photographs were taken.   However, Defendant refused to permit Plaintiff access to the digital copies of the photographs and excluded the metadata from evidence, which was contrary to

---

[43] On September 8, 2014, Justice Deborah Kaplan signed a so-ordered Judicial Subpoena directing Ms. Comfort to produce the digital photographs by September 15, 2014.  Ms. Comfort failed to produce them by that date.  The court subsequently issued two more orders directing Ms. Comfort to comply with the Judicial Subpoena.  She declined in both instances and did not produce the photographs until the eve of trial.

established case law.  Defendant subsequently credited Ms. Comfort's altered photographs as authentic and relied on them in making his determinations as to custody and access of the child. Defendant's erroneous evidentiary ruling as to providing Plaintiff access to the highly relevant digital photographs and excluding the metadata from evidence were prejudicial and denied Plaintiff a full and fair trial.

161.    Defendant improperly excluded Ms. Comfort's medical records related to her mental health and substance abuse and denied Plaintiff an opportunity to inspect them prior to trial.[44]  Ms. Comfort had conceded in sworn statements submitted to the court that she had been diagnosed and treated for psychiatric disorders.  Moreover, during law school and just prior to her pregnancy in 2012, Ms. Comfort received treatment for substance abuse.  Ms. Comfort admitted many of these facts to the forensic custody evaluator in the Matrimonial Action, as well as conceding to him that she used illegal drugs and prescription medication without a prescription, which is noted in his report.  As substance abuse is subject to recidivism, Ms. Comfort's medical records were clearly relevant to the child custody proceeding and at least warranted inspection of her medical records.  Moreover, the forensic custody evaluator's report indicated that Ms. Comfort suffered from several mental health disorders in addition to suffering from delusions and indicated she was "highly deceptive."  Despite the multitude of evidence that Ms. Comfort's medical records should have been examined, Defendant denied Plaintiff a full and fair opportunity to examine the records and explore these highly relevant issues at trial.  It bears reminding that despite Defendant directing numerous questions to the forensic custody evaluator

---

[44] A litigant's "mental health [is] clearly a relevant consideration" in determining custody and access of a child.  *See Frierson v. Golston*, 9 A.D.3d 612, 615 (3rd Dept. 2004).  "It is also true that parties to a contested custody proceeding place their physical and mental condition at issue."  *See Garvin v. Garvin*, 162 A.D.2d 497, 499 (2nd Dept. 1990).

at trial concerning Plaintiff's mental health, Defendant failed to ask the evaluator a single question concerning Ms. Comfort on any issue.

162.    While Defendant denied Plaintiff an opportunity to inspect Ms. Comfort's mental health records, Defendant applied an unequal standard to the issue and permitted Ms. Comfort, the Attorney for the Child and the forensic custody evaluator access to his.  In fact, Ms. Comfort and the Attorney for the Child were allowed to inspect the records in the courtroom twice on October 2, 2015 and again on November 6, 2015.  Defendant then permitted Ms. Comfort's counsel and the Attorney for the Child to question witnesses about the records and argue in summations the information gleaned from them.  Moreover, information from Plaintiff's mental health records were included in the forensic custody evaluator's report, which was not the case for Ms. Comfort.  Here, Defendant's unequal evidentiary standard denied Plaintiff a full and fair opportunity to litigate the case.

163.    During the trial, Defendant admitted illegal audio recordings, which Plaintiff also contended were spliced.  (*See* Ex. 30.)  Defendant admitted the audio recordings without an authenticating witness and over Plaintiff's objections.  (*See id*.)  Indeed, Defendant used Plaintiff's testimony elicited through Defendant's cross-examination of Plaintiff to improperly admit the recordings.  (*See id*.)  Plaintiff sought to include evidence that the recordings were illegally obtained and were incomplete in his motion *in limine* Mot. Seq. 33, but Defendant refused to issue a timely ruling on Mot. Seq. 33 during trial.  Defendant subsequently heavily relied on the recordings in denying Plaintiff custody and access to his son.  Defendant's conduct was plain error and denied Plaintiff a fair trial.

164.    Defendant improperly conducted trial summations *ex parte* without Plaintiff present, which denied Plaintiff a full and fair opportunity to be heard.  On December 21, 2015,

Defendant heard summations from Ms. Comfort's counsel and the Attorney for the Child while Plaintiff was not present due to illness confirmed by an emergency room doctor's note. Defendant permitted Ms. Comfort's counsel and the Attorney for the Child to introduce new theories, facts and contentions that were not previously part of the trial record that Defendant later relied upon in rendering a decision.   For example, Plaintiff had introduced several photographs and text messages showing that Ms. Comfort had beat Plaintiff and stabbed him on the night of November 1, 2013.[45]   During trial, Ms. Comfort offered no evidence to refute Plaintiff's claims.  However, Ms. Comfort's counsel raised for the first time during summations the theory that Plaintiff had self-inflicted injuries.[46]  Plaintiff obviously was not present to object. Defendant went on to credit this theory – solely based on attorney argument – in rendering a decision on custody and access, which was acknowledged in his February 29, 2016 decision:

> The inescapable conclusion that must be drawn is that, to the extent the photos do not depict injuries inflicted on him by persons other than defendant, they reflect injuries that were self-inflicted.  As defendant's counsel stated in his closing argument, plaintiff was so intent on avoiding being held responsible for what he did to defendant that he would even stab himself to create false evidence against her.

Needless to say, Defendant denied Plaintiff a full and fair opportunity to be heard not only by engaging in *ex parte* communications with Ms. Comfort's counsel and the Attorney for the Child, but by knowingly relying on attorney argument not in the record and wholly

---

[45] Mot. Seq. 33 mentioned above sought to introduce testimony of an out-of-state witness who observed Ms. Comfort's attack on Plaintiff on November 1, 2013.   This testimony would have corroborated the photographs and text messages already in the record.  It is no mystery why Defendant failed to rule on Mot. Seq. 33 under over a month after trial concluded.

[46] On June 27, 2016, Plaintiff received copies of Ms. Comfort's invoices from her counsel.  They indicate that Defendant and the matrimonial court engaged in numerous *ex parte* phone calls and e-mails with Ms. Comfort's counsel and the Attorney for the Child prior to and during the custody and access trial, not unlike the *ex parte* summations that Defendant conducted.  This was wholly improper and only serves to highlight Defendant's misconduct.

unsubstantiated by evidence.   It further serves to highlight Defendant's prejudice and predisposition against Plaintiff that denied him a fair trial.

<u>Plaintiff Did Not Receive a Fair Trial with Defendant as Fact-Finder</u>

165.   It would be a disservice to this already very long Complaint to include each and every instance where Defendant acted inappropriately and denied Plaintiff the right to a fair trial. However, the above is illustrative that Defendant's improper conduct permeated every aspect of the custody and access trial and the Matrimonial Action itself.   Ultimately, Defendant issued a decision that was unconscionable and designed solely to punish and caused further harm to Plaintiff, rather than address the best interests of the child, which included:

- Imposing supervised visitation with the child for at least eighteen (18) additional months at a cost of approximately $130,000 per year.[47]   Plaintiff was ordered to pay the cost even though the issue was not addressed at trial and Plaintiff remains unemployed as a result of Defendant's September 18 Decision;

- Directing that Plaintiff's weekday visitation with the child take place between the business hours of 4:00 p.m. to 6:00 p.m.   Previously, Plaintiff's visitation during weekdays took place from 6:00 p.m. to 8:00 p.m.   Neither Plaintiff, nor Ms. Comfort requested the change.   Defendant's decision was designed to force Plaintiff to make the impossible decision of going to school/work or seeing his child;

- Directing that Plaintiff cease communications with the child's caregivers and extracurricular providers.   Ms. Comfort never made such a request for relief; and

- Ordering a five (5) year Order of Protection against Plaintiff on behalf of Ms. Comfort, despite the fact that Ms. Comfort did not request an Order of Protection in her Pre-trial Statement of Disposition. Defendant issued the prolonged order despite failing to make findings of "aggravating factors" as

---

[47] It bears reiteration that Ms. Comfort never made an allegation that Plaintiff had harmed the child.  Plaintiff had supervised visitation for over two (2) and a half years receiving glowing reports from supervisors and without even a single suggestion that continued supervised visitation was necessary. Indeed, supervisors who had spent hundreds of hours with Plaintiff and the child testified at trial and stated that they had never observed anything that would warrant continued supervised visitation.

required by Family Court Act § 842.  Defendant's issuance of the Order of
Protection effectively ended any hope that the parties would be able to resolve
the matter and/or co-parent the child and ensured continued conflict.

Indeed, Plaintiff parental rights were *de facto* terminated by Defendant.  In rendering his custody

and access decision, Defendant – much like he did with the September 18 Decision – made

findings of fact that did not comport with the record, evidence or the parties' allegations.

Defendant's decision is currently on appeal.

166.    Each and every one of Defendant's improper actions or erroneous and prejudicial

rulings can be tied back to buttressing his pronouncements against Plaintiff in the September 18

Decision.   Given  the  nature  of  the  publicity  Defendant  generated  with  the  decision  and

Defendant's  ostensible  extrajudicial  acts,  it  was  overwhelmingly  and  demonstrably  in

Defendant's interests that Plaintiff be unable to fully and fairly prosecute the custody and access

trial.  Based on his statements and conduct, no reasonable person could conclude that Defendant

was an impartial fact-finder.  Indeed, it is perhaps one of the greatest travesties and injustices of

the American court system that Justice Cooper was permitted to not only preside over the

custody and access trial in *Zappin v. Comfort*, but act as the sole fact-finder when he issued the

September 18 Decision.  It destroyed a litigant and the well-being of an infant child.  As the

above demonstrates, Plaintiff was deprived of his right to a fair trial as a result of Defendant's

provoking pretrial publicity by publishing and disseminating the September 18 Decision.

## **DEFENDANT'S DENIAL OF PLAINTIFF'S RIGHT TO A FAIR FINANCIAL TRIAL**

167.    In addition to the custody trial, Defendant improperly presided over the financial

trial in *Zappin v. Comfort* that commenced and concluded June 27, 2016.  The primary issue for

determination  was  Plaintiff's  income  and/or  earning  potential  after  Defendant  unlawfully

published and disseminated the September 18 Decision that resulted in the loss of Plaintiff's

employment and professional standing.  Plaintiff could not possibly receive a full and fair trial where Defendant was the sole fact-finder in determining and assessing the damages he caused as a result of his extrajudicial conduct intentionally directed at injuring Plaintiff's livelihood and placing at peril Plaintiff's employment.  And, Defendant did in fact deny Plaintiff the right to a fair trial imposing extraordinary financial penalties on Plaintiff to inhibit Plaintiff's ability to seek appellate relief of Defendant's decisions or otherwise seek relief against Defendant for his extrajudicial conduct.

168.     Where Plaintiff's diminution of earning capacity was a direct result of Defendant's extrajudicial conduct of publishing and disseminating to the media the September 18 Decision, Defendant had a vested interest in the outcome of the financial trial.[48]  In other words, Justice Cooper had a direct conflict of interest making him an "interested" person requiring disqualification under Judiciary Law § 14.  Courts have held that judges who engage in the extrajudicial act of contacting the media concerning a pending case are necessarily "interested" in the matter.  *U.S. v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (holding that a judge's deliberate choice to inject "strong views" on a pending case in the media forum "conveyed an uncommon interest … in the subject matter" and "created the appearance that the judge had become an active participant in [the litigation]"); *see also In re Boston's Children First*, 233 F.3d 164, 170 (1st Cir. 2001) (noting that, in highly publicized cases, "even ambiguous comments may create the appearance of impropriety" and "in fact, the very rarity of such public statements, and the ease with which they may be avoided, make it likely that a reasonable person will interpret such statements as evidence of bias"); *Ligon v. City of New York*, 736 F.3d 118,

---

[48] Given that Plaintiff's diminution in income was a direct result of Justice Cooper's extrajudicial conduct, there is a substantial question as to whether Justice Cooper was a material witness at the financial trial in *Zappin v. Comfort*, which would have barred him from presiding over the matter.

124 (2nd Cir. 2013).  Despite Plaintiff making multiple motions for Defendant's disqualification, Defendant refused to recuse himself.  Defendant refused to take any remedial action, including referring the financial trial to a referee to avoid an appearance of impropriety, which is done in the normal course in matrimonial case.

169.    As mentioned above, Defendant had already made public statements in the September 18 Decision concerning financial matters in *Zappin v. Comfort* falsely asserting that Plaintiff had failed to pay child support.  At that time, child support was not an issue before Defendant.  As a result, Defendant made improper public statements concerning matters and issues that would likely come before him in violation of Judicial Canon 3(B)(9).  By making such assertions in the September 18 Decision, there was not only an appearance of impropriety with Defendant presiding over the financial trial in the Matrimonial Action, but it placed Defendant's credibility directly at issue.  As a result, Plaintiff was denied a fair financial trial where Defendant was the sole fact-finder.

170.    Prior to the financial trial on June 27, 2016, Defendant engaged in conduct that was prejudicial and denied Plaintiff a full and fair opportunity to be heard.  First, Defendant calendared trial dates on May 11, 2016 without either party requesting trial and no Notice of Issue being filed pursuant to CPLR 3402, 22 NYCRR 202.16(i) or 22 NYCRR 202.21(a) certifying trial readiness.  Plaintiff was given less than forty-five (45) days to prepare for a complex financial trial where the complexing resulted from Defendant's September 18 Decision.  Second, Ms. Comfort had failed to provide Plaintiff any financial discovery.  When Plaintiff moved to compel Ms. Comfort to comply with discovery demands, Defendant refused to entertain the request.  Defendant forced Plaintiff to proceed to trial without a single financial document from Ms. Comfort, which prejudiced Plaintiff's ability to try the case.  Lastly,

Defendant refused to permit Plaintiff to introduce expert testimony to opine on Plaintiff's earning capacity as a result of Defendant's unlawfully published and disseminated to the media the September 18 Decision. Defendant's prejudicial and unexplained conduct made clear that he did not intend to give Plaintiff a full and fair opportunity to be heard.

171.    Plaintiff reached out to Ms. Comfort and her counsel multiple times in an attempt to resolve the financial matters in *Zappin v. Comfort*. Ms. Comfort's counsel not only failed to make a settlement proposal, but refused to respond to Plaintiff's settlement inquiries. This was raised with Defendant, who refused to broker a settlement conference. Instead, Defendant rewarded the deleterious and wasteful behavior of Ms. Comfort's counsel.

172.    Perhaps most important to this proceeding, on June 24, 2016, Defendant issued a two (2) page order in response to a letter from Plaintiff requesting an adjournment of trial due to Ms. Comfort's failure to comply with discovery demands. (*See* Ex. 31.) In that order, Defendant knowingly and intentionally misrepresented the record in the case adverse to Plaintiff, much as he did in the September 18 Decision. (*See id*.) That day, Plaintiff requested a corrected order from Defendant, which Defendant ignored. Frustrated that Defendant's inappropriate behavior was continuing, Plaintiff filed a complaint on June 25, 2016 with the State Commission on Judicial Conduct for Defendant's deliberate false statements in the June 24, 2016 order. (*See id*.) After Defendant learned of the complaint, Defendant issued a corrected order on the morning of June 27, 2016 acknowledging his false statements in the original order. (*See* Ex. 32.) As demonstrated below, Defendant admittedly retaliated against Plaintiff for filing the complaint by imposing staggering financial burdens at the conclusion of the financial trial in order to, by Defendant's own words, "end" Plaintiff.

173.    During the actual financial trial on June 27, 2016, Defendant engaged in conduct that can only be categorized as bizarre, unprofessional and prejudicial.  Once again, Defendant showed utter disdain and contempt for Plaintiff.  For example, Defendant answered his cell phone while Plaintiff was testifying interrupting Plaintiff's testimony.  When Plaintiff introduced into evidence the voluminous media articles written about him stemming from Defendant's September 18 Decision, Plaintiff and several members of the gallery observed that Defendant was noticeably laughing, smirking and snickering.  At another point, Defendant left the bench during Plaintiff's testimony to water his plants.  Moreover, during Plaintiff's summation, Defendant again left the bench and went into his robing room to chit-chat with his clerks.  When Plaintiff noted it for the record, Defendant attempted to claim he was "multi-tasking."  It was plainly evident that Defendant had no intention of giving Plaintiff a fair trial.

174.    At the financial trial, Plaintiff introduced uncontroverted evidence that he had been financially harmed by Defendant with the publication and dissemination to the media of the September 18 Decision as well as by acts of Ms. Comfort and her counsel.[49]  Plaintiff introduced uncontroverted evidence and government records that he had been looking for employment, but was unable to find a job as a result of the Matrimonial Action and Defendant's extrajudicial conduct.  Plaintiff testified that he was living off of unemployment insurance and relied on Medicaid health insurance.  In fact, Plaintiff was forced to move out of New York away from his child and back to West Virginia.  These facts were unrefuted by Ms. Comfort.

175.    Despite these facts, Defendant imputed an income of $231,000 on Plaintiff – his prior salary at Mintz Levin.  In doing so, Defendant asserted his basis for imputing income on

---

[49] After Justice Cooper initially triggered *The New York Post* and *The Daily News* articles with the September 18 Decision, Ms. Comfort and her counsel have unapologetically sent numerous sealed decisions, papers and other documents, including the sealed February 29, 2016 custody and access decision, to stir up tabloid articles by those two papers to diminish Plaintiff's earning ability.

Plaintiff was, contrary to the evidence, that Plaintiff had not been looking for a job since his termination. Defendant further asserted that Plaintiff was "more than capable" of finding another Biglaw job earning $231,000 as a fifth year associate, despite the September 18 Decision and that he had no idea why Plaintiff was terminated. The finding highlights how out of step Defendant is from reality. No reasonable person can conclude that Plaintiff will find another legal job at a preeminent law firm after Defendant's September 18 Decision. Defendant's findings were clearing deflecting from the undeniable fact that it was Defendant's extrajudicial and unlawful acts that caused Plaintiff to lose his job, which did irreparable damage to Plaintiff's earning capacity.

176. Defendant used the imputation of Plaintiff's income to order a child support payment of $6,000 - $7,000 per month. This was improper under New York Domestic Relations Law Section 240(1-b)(b)(5)(v) which only permits imputation of a noncustodial parent's income where that parent "has reduced resources or income *in order to reduce or avoid the parent's obligation for child support*."[50] (emphasis added.) It is irrefutable that Plaintiff did not voluntarily leave Mintz Levin. Defendant's order was in addition to Defendant's directing Plaintiff to pay over $11,000 per month for limited supervised access with the child. Defendant refused to even entertain the notion that Plaintiff's visitation take place at a less costly company. It bears reminding that Ms. Comfort makes over $380,000 per year.

---

[50] It is beyond dispute that from day one since taking the case Justice Cooper has engaged in an unbridled assault on Plaintiff's law license and professional standing. Defendant's child support award is the latest illustration. Defendant has ordered Plaintiff to pay extraordinary sums contrary to the law and the facts. When Plaintiff is unable to pay these obligations in a few short months because he lacks the means as a result of Defendant's extrajudicial media contact, Defendant is empowered and will suspend Plaintiff's law license and imprison him, something which he has boasted about in the YouTube clips. There was no possible way Plaintiff could have received a fair trial from Defendant, which Defendant has unapologetically denied at every turn.

177.    Defendant unabashedly acknowledged that he was imposing extraordinary and unlawful financial penalties and obligations on Plaintiff for the purpose of restricting and inhibiting Plaintiff's ability to exercise his right to petition concerning Defendant's alleged misconduct and extrajudicial actions that have without question harmed Plaintiff.  Specifically, at the June 27, 2016 financial trial, Defendant stated the following immediately prior to rendering his decision as to Plaintiff's child support obligations:

THE COURT:          Sir, again, you have been a master of psychologically abusing everybody.  This is – you have perfected it.  That is what I found in the sanctions decision.  That's what I found in the custody decision.  You have engaged in litigation terrorism.  You have.  And when you don't like something somebody does, you get back to them.  You put up a website.  Listen, I am talking.  You put up a website up or you sue them.  You will sue me in the Southern District.

MR. ZAPPIN:         It is called the United States Constitution, a right to petition.

THE COURT:          You will sue me in the Southern District.  You will sue – you will file a disciplinary complaint with the Judicial Review Board … You will do whatever you need to extract your sole amount of vengeance because somehow it builds you up.  It makes you feel powerful.  It makes you feel like a big man.  And I feel really sorry for you.  ***I am going to end it***.

(emphasis added.)  Needless to say, Plaintiff disagrees with Defendant's over-the-top hyperbole at odds with reality and is yet another example of Defendant improperly taking justice into his own hands, much as he bragged about in his New York State Assembly testimony.  Moreover, no litigant should ever be spoken to the way Defendant did Plaintiff mocking him calling him a "big man" and other *ad hominem* aspersions.  Here, though, the record and evidence is crystal clear that it is Defendant who has waged "litigation terrorism" by repeatedly issuing decisions with knowing falsehoods, engaging in act after act that violates not only the Judicial Canons, but

New York statute and attacking a young professional's career without so much as affording basic notice.  But, what this Complaint makes clear, Defendant's "litigation terrorism" is not limited to just Plaintiff.  Rather, Defendant's has shamelessly boasted about the pain he inflicts on litigants in testimony before the New York Senate, tabloid news articles and at CLE presentations captured on YouTube videos.   Most importantly, the above quote demonstrates that Defendant – who even references his fear of this very litigation being filed – is willing to breach the law and his judicial responsibilities to "end" a litigant by imposing unlawful financial sanctions on Plaintiff to restrain Plaintiff's right to seek relief of the courts.  Defendant's statements are unequivocally those of an individual with a vested interest in the outcome of the litigation.  By Defendant's very own words his rulings and actions are motivated by a desire to silence and "end" Plaintiff.

178.    Again, each and every one of Defendant's improper actions as well as erroneous and prejudicial rulings can be tied back to buttressing his pronouncements against Plaintiff in the September 18 Decision.  Where Defendant's extrajudicial acts of publishing and disseminating the media the September 18 Decision were directly tied to Plaintiff's loss of income, it was abundantly clear that Defendant had a vested interest in the outcome of the trial.  Based on his statements and conduct, no reasonable person could conclude that Defendant was an impartial fact-finder where he was ostensibly "interested" in the outcome.  In presiding over the financial trial in *Zappin v. Comfort*, engaging in prejudicial pretrial behavior and issuing a decision unsupported by the law or the facts, Defendant denied Plaintiff the right to a fair trial.

### DEFENDANT ABUSE PROCESS BY FILING A KNOWINGLY FALSE REPORT AGAINST PLAINTIFF

179.    Sometime in September 2015, Defendant abused process by filing a knowingly false report with New York State Court Officers and/or the Office of Court Administration

demanding that Plaintiff's Attorney Secure ID Pass be revoked.  Defendant purportedly alleged that Plaintiff caused a "disturbance" in his courtroom sometime during the week of September 22, 2015.  As explained below, Defendant's report was false because at that time Plaintiff had not been in Defendant's courtroom since July 22, 2015, the date of the initial hearing before Justice Cooper.  Defendant's filing of a false report was not a judicial act and therefore not entitled to judicial immunity.

180.    On October 2, 2015 – approximately two (2) weeks after Defendant published and disseminated to the media the September 18 Decision – Plaintiff appeared at a scheduled pre-trial conference before Defendant.  When Plaintiff entered the courthouse, he was stopped at the entrance by no less than four (4) court officers.  The officers detained and restrained Plaintiff for several minutes searching his belongings.  The officers then seized Plaintiff's Attorney Secure ID Pass.  The whole incident took place in front of well over one hundred (100) people waiting in the security check-in line, including several of Plaintiff's colleagues at a prior firm.  Plaintiff was humiliated and emotionally distressed.

181.    Shortly after Plaintiff's Attorney Secure ID Pass was seized, Plaintiff was approached by Lieutenant Christopher Mazzella ("Lt. Mazzella").[51]  Plaintiff inquired as to the basis for the detention, search and seizure.  Lt. Mazzella stated to Plaintiff that Defendant had filed a report against Plaintiff alleging that Plaintiff had caused a "disturbance" in Defendant's courtroom the week prior.  He provided no other details concerning the "disturbance."  Plaintiff informed Lt. Mazzella that he had not been in Defendant's courtroom and that he wished to see a

---

[51] It should be noted that Lt. Mazzella has often been used to intimidate and harass Plaintiff at the behest of Defendant.  Throughout the custody and financial trials, Lt. Mazzella or other officers acting on Lt. Mazzella's direction would "shadow" Plaintiff in the courtroom, even standing at the foot of the witness stand while Plaintiff was testifying.  When Plaintiff or his counsel questioned the appropriateness of Lt. Mazzella's and the other court officer's actions, Defendant would simply state that he "determined it was necessary."

copy of Defendant's report.  Lt. Mazzella refused to provide any further information, except to state that Plaintiff would receive a letter in the mail.

182.    Plaintiff subsequently received letter from the Office of Court Administration dated October 5, 2015 concerning the seizure of Plaintiff's Attorney Secure ID Pass.  (*See* Ex. 33.)  The letter provides no details as to the substance of Defendant's complaint or the alleged acts by Plaintiff warranting seizure of his identification card.  Instead, the letter vaguely states that the "determination was based on [Mr. Zappin] having engaged in disruptive courthouse behavior …."  (*See id*.)  The three (3) sentence letter provides no further detail.  Upon information and belief, the Officer of Court Administration confirmed that Plaintiff had not been in Justice Cooper's courtroom as alleged by Defendant and simply proffered an ambiguous nondescript justification for Plaintiff's unlawful detention and seizure of his Attorney Secure ID Pass three (3) days prior based on Justice Cooper's false report.  It bears noting that Plaintiff had never been warned, cited or otherwise put on notice prior to the October 5, 2015 letter that he was ever "disruptive" in the courthouse.

183.    Plaintiff appealed the determination by letter dated October 15, 2015.  (*See* Ex. 34.)  As detailed in the letter, Plaintiff disputed that he had engaged in any "disruptive behavior."  He further requested specific details as to the origination of the report against Plaintiff, information as to when the purported "disruptive conduct" occurred and a description of the precise conduct that was deemed "disruptive."  (*See id*.)  The Office of Court Administration never provided a response to Plaintiff's appeal.

184.    Upon information and belief, Defendant made the false report falsely accusing Plaintiff of disruptive behavior for the collateral purpose of harassing and tormenting Plaintiff.  Furthermore, it was apparent that Defendant's false report was made in furtherance and for the

collateral purpose of improperly attacking his professional standing by instigating the revocation of his Attorney Secure ID Pass.  There was no reasonable or justifiable basis for Defendant's report containing false assertions.  Defendant abused lawful process and, more importantly, his judicial authority with his filing of a false report against Plaintiff.

## **CONCLUSIONS**

185.    The evidence cited above conclusively demonstrates that Justice Cooper is a man who set out not only to destroy a young professional's career, but virtually every aspect of Plaintiff's life making it impossible to move forward.  It began by Justice Cooper's unlawful publication and dissemination to the media, through *ex parte* communications, falsehoods concerning Plaintiff targeted at destroying Plaintiff's reputation and livelihood.  Justice Cooper's acts were without question extrajudicial.  And when Plaintiff challenged Justice Cooper's unlawful conduct, Justice Cooper acted in furtherance of his wrongful conduct to justify and conceal his improper conduct by falsely vilifying Plaintiff and denying him any opportunity for a full and fair opportunity to be heard as to the underlying merits of the litigation.

186.    One only needs to look at the crippling financial burdens and penalties that Defendant has imposed on Plaintiff that have no basis in law or fact to observe Justice Cooper's insidious intent to harm and silence Plaintiff.  These include:  (i) a $10,000 sanction, even after Plaintiff lost his job; (ii) approximately $11,000 per month for limited supervised access with him son; (iii) well over $300,000 in fees for the Attorney for the Child without an accounting as to her bills or inquiry into the appropriateness of her $600 per hour rate;  (iv) $6,000 - $7,000 per month in child support based on an improper imputation of Plaintiff's income; and (v) tens of thousands of dollars in continued unnecessary litigation expenses.  All the while, these burdens were imposed even after Defendant undertook deliberate and wrongful extrajudicial actions to

cut-off Plaintiff's income and to prevent him from seeking new employment.  These financial burdens are wholly unnecessary, unlawful and based on findings detached from reality.  No one could sustain these financial obligations, much less a young professional who has lost his job and whose reputation has been publicly maimed as a result of Justice Cooper's wrongful and extrajudicial conduct of publishing and disseminating the September 18 Decision to the media.

187.    It is without question that Justice Cooper has imposed these extraordinary financial burdens on Plaintiff not only to harm him, but also to deny him the financial resources and ability to prosecute the Matrimonial Action, obtain competent counsel, seek appellate review of his improper and erroneous rulings or otherwise bring to light his extraordinarily inappropriate conduct.  And, each one of these rulings is directly intertwined with Justice Cooper's assault on Plaintiff's livelihood and law license further directed at silencing Plaintiff.  Meanwhile, a two (2) year old boy goes day after day without his father based on the reprehensible conduct of an immoderate judicial officer.

188.    Justice Cooper's behavior described above is an affront and is the antithesis to the values and principles espoused by the judiciary.  There is no justification or excuse for his wrongful conduct or abuse of his position as a judicial officer.  Rather than attempting to resolve the case such that all parties could move on with their lives peacefully, Justice Cooper turned *Zappin v. Comfort* in a media spectacle with publicity stunts and extrajudicial conduct.  And, in doing so, he took a productive member of society and buried him with deliberate falsehoods, personal attacks and assaults on his livelihood improperly aired to the public through non-judicial means doing a monumental disservice to the child he was entrusted to protect.  Accordingly, Justice Cooper must be held accountable and responsible for his extrajudicial actions that have caused immense harm and untolled damages to Plaintiff.

## COUNT I – DEFAMATION/INJURIOUS FALSEHOOD

189.    Plaintiff re-alleges and incorporates by references paragraph 1 - 189 of this Complaint as though fully set forth herein.

190.    Defendant has made false and defamatory statements concerning Plaintiff as set forth above in this Complaint.

191.    Defendant's statements are statement of fact and are demonstrably false.

192.    Defendant has published these false statements to numerous individuals through print and electronic means.  Defendant has also caused and participated in the publication of these false statements with third-parties.

193.    Defendant enjoys no privilege concerning his statements:

    a.      Defendant knew his statements were false and/or made his statements with reckless disregard as to the truth;

    b.      His statements were outrageous, unnecessarily insulting and were intentionally directed at permanently harming Plaintiff's personal and profession reputation;

    c.      Defendant's publication in an unofficial reporter and dissemination to the media of his false statements concerning Plaintiff were not a judicial act.

194.    When Plaintiff made Defendant aware that his statements concerning Plaintiff were false, Defendant took no action to mitigate Plaintiff's damages or retract his false statements concerning Plaintiff.

195.    As a result of Defendant's defamatory statements, Plaintiff has suffered severe harm and is entitled to actual and punitive damages in an amount to be proven at trial.

114

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

196.    Plaintiff re-alleges and incorporates by references paragraph 1 - 195 of this Complaint as though fully set forth herein.

197.    Defendant has engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff, namely the publication and dissemination to the media of Defendant's statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*, which contains numerous untrue statements of fact and false accusations of misconduct discussed in detail above.

198.    As a proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer severe and extreme emotional distress, entitling him to actual and punitive damages in an amount to be proven at trial.

## COUNT III – TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE

199.    Plaintiff re-alleges and incorporates by references paragraph 1 - 198 of this Complaint as though fully set forth herein.

200.    At the time of the September 18, 2015 Decision in *Zappin v. Comfort*, Plaintiff maintained a continuing economic relationship with Mintz Levin Cohn Ferris Glovsky & Popeo P.C. as an associate attorney.  Plaintiff expected his employment with the firm to continue, which would have resulted in the continuation of economic benefits and other future economic benefits to Plaintiff.

201.    Defendant knew or should have known about Plaintiff's prospective economic relationship with Mintz Levin Cohn Ferris Glovsky & Popeo P.C. at all relevant times.

202.     Defendant intentionally acted to disrupt the relationship between Plaintiff and Mintz Levin Cohn Ferris Glovsky & Popeo P.C. by publishing and disseminating to the media his statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*.

203.     As a direct and proximate result of Defendant's intentional acts to disrupt Plaintiff's continuing and prospective economic relationship with Mintz Levin Cohn Ferris Glovsky & Popeo P.C., Plaintiff suffered actual and consequential damages, including the loss of his employment as well as other business opportunities, revenues, good will, and profits, and Plaintiff will continue to suffer similar losses after the filing of this Complaint.  Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial.

## COUNT IV – *PRIMA FACIE* TORT

204.     Plaintiff re-alleges and incorporates by references paragraph 1 - 203 of this Complaint as though fully set forth herein.

205.     Defendant undertook actions – namely the publication and dissemination to the media of his statutorily sealed September 18, 2015 decision containing untrue statements of fact and accusations of misconduct described above – to intentionally and deliberately inflict harm on Plaintiff.

206.     Defendant's actions were unlawful and tortious.  In engaging in such action, Defendant violated New York statute, binding case law and court rules as described above.

207.     Defendant has no excuse or justification for his unlawful actions.

208.     As a result of Defendant's conduct, Plaintiff has suffered special damages, including but not limited to, permanent loss of his income, damage to his personal and professional reputation and severe emotional distress.  Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial.

## COUNT V – ABUSE OF PROCESS

209.    Plaintiff re-alleges and incorporates by references paragraph 1 - 208 of this Complaint as though fully set forth herein.

210.    Defendant used criminal and administrative process against Plaintiff by filing a false report with New York State Court Officers and/or the New York Office of Court Administration sometime in September and/or October 2015.

211.    Defendant's statements concerning Plaintiff in the report were false.

212.    Defendant filed the false report for the collateral purpose of harassing, intimidating and otherwise tormenting Plaintiff.

213.    Defendant filed the false report for the collateral purpose of instigating the revocation of Plaintiff Attorney Secure ID pass in order to interfere with and harm Plaintiff's professional standing.

214.    As a result of Defendant's malicious abuse of process, Plaintiff has suffered damages, including but not limited to, damage to his personal and professional reputation, loss of professional privilege and severe emotional distress.  Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial.

### COUNT VI – DEPRIVATION OF DUE PROCESS BY FAILING TO PROVIDE NOTICE AND OPPORTUNITY TO BE HEARD PRIOR TO ISSUING A *DE FACTO* DISCIPLINARY CENSURE (42 U.S.C. §§ 1983, 1988)

215.    Plaintiff re-alleges and incorporates by references paragraph 1 - 214 of this Complaint as though fully set forth herein.

216.    Plaintiff was entitled to notice and opportunity to be heard on the issue of sanctions prior to the issuance of Defendant's September 18, 2015 decision in *Zappin v.*

*Comfort*.  Plaintiff was not afforded notice or an opportunity to be heard on that issue.  Plaintiff was denied the opportunity to full and fairly defend himself.

217.    Plaintiff was entitled to notice and opportunity to be heard on the issue of Defendant's accusations and purported findings of attorney misconduct prior to the issuance of Defendant's September 18, 2015 decision in *Zappin v. Comfort*.  That decision constituted an improper and unlawful *de facto* disciplinary censure in violation of, among other things, the New York Judiciary Act.  Plaintiff was not afforded notice or an opportunity to be heard on these issues.  Plaintiff was denied the opportunity to full and fairly defend himself.

218.    Defendant's failure to provide Plaintiff notice or an opportunity to be heard prior to the issuance of the September 18, 2015 decision in *Zappin v. Comfort* constituted an unconstitutional deprivation of Plaintiff's right to due process under the United States Constitution, Fourteenth Amendment.

219.    As a result of Defendant's unlawful deprivation of due process, Plaintiff has suffered substantial economics losses, permanent damage to his personal and professional reputation and the loss of his property.  Plaintiff is entitled to damages in an amount to be determined at trial.

## COUNT VII – DENIAL OF A TRIAL DUE TO EXTRAJUDICIAL STATEMENTS AND CONDUCT BY DEFENDANT THAT DENIED PLAINTIFF THE RIGHT TO AN IMPARTIAL ARBITER ON FINANCIAL ISSUES (42 U.S.C. §§ 1983, 1988)

220.    Plaintiff re-alleges and incorporates by references paragraph 1 - 219 of this Complaint as though fully set forth herein.

221.    Defendant made extrajudicial statements to the press by publishing and personally disseminating to the media the statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*.

222.    As detailed above, Defendant engaged in the extrajudicial act of sending an unsigned draft of the September 18, 2015 decision in *Zappin v. Comfort* to *The New York Law Journal*.  Defendant also provided copies of the decision to *The New York Post* and *The Daily News*.  Additionally, he personally provided a copy of decision for publication to *The New York Law Journal*.  Such publication was prohibited by New York Domestic Relations Law 235.  Moreover, personally directing the publication of a judicial decision or order in *The New York Law Journal* – an unofficial reporter – has been explicitly held to be an extrajudicial act.  Defendant published and disseminated the September 18, 2015 decision in *Zappin v. Comfort* with the express purpose of generating media coverage.

223.    Defendant made such extrajudicial statements in order to create a "high-profile" case that would generate negative publicity towards Plaintiff to cause him harm and prevent him from fully and fairly litigating the custody and access trial in *Zappin v. Comfort*.  Indeed, Defendant succeeded as Plaintiff lost his job and suffered damage to his professional standing as a result of Defendant's publication of the September 18, 2015 decision in *Zappin v. Comfort.*  Plaintiff's earning capacity has been irreparable diminished by Defendant's extrajudicial acts.

224.    Defendant knew his statements about Plaintiff in the September 18, 2015 decision in *Zappin v. Comfort* were false and untrue as explained in more detail above.  Defendant made his false statements knowing they were false and/or with reckless disregard for the falsity.  Furthermore, Defendant made such statements with the deliberate intent to harm Plaintiff's reputation, employment, livelihood and professional standing.

225.    As set forth above, the primary issue in dispute at financial trial in *Zappin v. Comfort* was to determine Plaintiff's earning capacity after he was terminated from his job as a result of Defendant's September 18, 2015 decision. Plaintiff was unduly prejudiced at trial and

119

denied his right to an impartial arbiter where Defendant was the sole fact-finder to determine the extent of the damages caused to Plaintiff's earning capacity as a result of Defendant's extrajudicial acts of publishing and disseminating to the media the September 18, 2015 decision. By engaging in such acts, Defendant became "interested" into the proceeding requiring recusal under New York Judiciary Law Section 14 and the New York State Judicial Canons.

226.    As a result of Defendant's extrajudicial statements and actions with respect to the September 18, 2015 decision in *Zappin v. Comfort*, Plaintiff was denied his constitutional right to due process and to a fair financial trial under the United States Constitution, Fourteenth Amendment.  Plaintiff's constitutional right to a trial by an impartial arbiter was denied by Defendant's extrajudicial acts.  Deprivation to Plaintiff's constitutional rights continues where Defendant has imposed unlawful and improper financial burdens on Plaintiff.  Additionally, Plaintiff has unconstitutionally been denied and stripped of his property as a result of Defendant's denial of Plaintiff's right to a fair financial trial.  Plaintiff has suffered substantial economic losses, permanent damage to his personal and professional reputation and deprivation of his liberty.  Plaintiff is entitled to damages in an amount to be determined at trial.

**COUNT VIII – DENIAL OF FAIR TRIAL DUE TO EXTRAJUDICIAL
STATEMENTS MADE BY DEFENDANT AND UNDUE PRETRIAL
PUBLICLITY CAUSED BY DEFENDANT PRIOR TO TRIAL (42 U.S.C. §§ 1983, 1988)**

227.    Plaintiff re-alleges and incorporates by references paragraph 1 - 226 of this Complaint as though fully set forth herein.

228.    Defendant made extrajudicial statements to the press by publishing and personally disseminating to the media the statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*.

229.    As detailed above, Defendant engaged in the extrajudicial act of sending an unsigned draft of the September 18, 2015 decision in *Zappin v. Comfort* to *The New York Law Journal*.  Defendant also provided copies of the decision to *The New York Post* and *The Daily News*.  Additionally, he personally provided a copy of decision for publication to *The New York Law Journal*.  Such publication was prohibited by New York Domestic Relations Law 235.  Moreover, personally directing the publication of a judicial decision or order in *The New York Law Journal* – an unofficial reporter – has been explicitly held to be an extrajudicial act.  Defendant published and disseminated the September 18, 2015 decision in *Zappin v. Comfort* with the express purpose of generating media coverage.

230.    Defendant made such extrajudicial statements in order to create a "high-profile" case that would generate negative publicity towards Plaintiff to cause him harm and prevent him from fully and fairly litigating the custody and access trial in *Zappin v. Comfort*.

231.    Defendant knew his statements about Plaintiff in the September 18, 2015 decision in *Zappin v. Comfort* were false and untrue as explained in more detail above.  Defendant made his false statements particularly salacious and over-the-top to generate media coverage and to inflict harm on Plaintiff.   Defendant made his false statements knowing they were false and/or with reckless disregard for the falsity.  Furthermore, Defendant made such statements with the deliberate intent to harm Plaintiff's reputation, employment, livelihood and professional standing.

232.    As set forth above, the custody and access trial was heavily influenced by Defendant's September 18, 2015 decision in *Zappin v. Comfort*.  Plaintiff was unduly prejudiced at trial by the September 18, 2015 decision and Defendant's extrajudicial acts of publishing and disseminating it to the media.

233.     As a result of Defendant's extrajudicial statements to the press, Plaintiff was denied his constitutional right to due process and to a fair trial in *Zappin v. Comfort* under the United States Constitution, Fourteenth Amendment.  Plaintiff's constitutional right to access to his child has been unduly restricted and denied for an extended period of time, which continues as of the filing of this Complaint.  Additionally, Plaintiff has unconstitutionally been denied and stripped of his property as a result of Defendant's denial of Plaintiff's right to a fair trial. Plaintiff has suffered substantial economic losses, permanent damage to his personal and professional reputation and deprivation of his liberty.  Plaintiff is entitled to damages in an amount to be determined at trial.

### COUNT IX – IMPROPER IMPOSITION OF A FINE IN VIOLATION OF THE NEW YORK STATE CONSTITUTION (N.Y. Civil Rights Law § 11)

234.     Plaintiff re-alleges and incorporates by references paragraph 1 - 233 of this Complaint as though fully set forth herein.

235.     Section 11 of the New York Civil Rights Law guarantees that "[n]o citizen of this state ought to be fined or amerced without reasonable cause, and such fine should always be proportioned to the nature of the offense."  At the time of the September 18, 2015 decision in *Zappin v. Comfort*, Plaintiff was a citizen of the State of New York.

236.     Defendant violated Plaintiff's constitutional right under Section 11 by imposing an unlawful fine of $10,000 under 22 NYCRR 130.1-1 without providing Plaintiff notice or opportunity to be heard as explained in detail above.

237.     Defendant's acts are not protected by judicial immunity.  Defendant knowingly acted wholly without jurisdiction to impose a fine under 22 NYCRR 130.1-1 because there was no case or controversy as to Plaintiff's alleged conduct – filing a grievance with the New York Office of Professional Medical Conduct against Dr. Aaron Metrikin – before the New York

County Supreme Court.  Indeed, Plaintiff's alleged conduct was undertaken outside the scope of the litigation in *Zappin v. Comfort* and was not therefore within the purview of 22 NYCRR 130.1-1.  Jurisdiction to determine Plaintiff's alleged conduct rested solely with the New York Office of Professional Medical Conduct, an administrative tribunal.  Moreover, the aggrieved party – Dr. Aaron Metrikin – made no petition to New York County Supreme Court for relief as Defendant found in the September 18, 2015 decision in *Zappin v. Comfort* that Harriet Newman Cohen was not his counsel.  Harriet Newman Cohen lacked standing to request relief under 22 NYCRR 130.1-1 for Plaintiff's alleged conduct.

238.    Defendant provided no explanation as to why the $10,000 fine imposed under 22 NYCRR 130.1-1 was reasonable or proportionate to the nature of Plaintiff's alleged conduct in his September 18, 2015 decision in *Zappin v. Comfort*.  Indeed, the fine was not reasonable or proportionate to Plaintiff's conduct as explained in detail above.

239.    As a result of Defendant's conduct that deprived Plaintiff of his rights secured under Section 11 of the New York Civil Rights Law, Plaintiff has suffered substantial economic losses, permanent damage to his personal and professional reputation and deprivation of his liberty.  Plaintiff is entitled to damages in an amount to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

(a)    Enter judgment in favor of Plaintiff against Defendant;

(b)    Enter judgment awarding Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendant's activity complained of herein and for any injury complained of herein, inclusive of interest and costs, in an amount to be determined at trial;

(c)    Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)    Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)    Order such other relief that the Court deems just and appropriate.


Dated: July 27, 2016
Huntington, WV

_____
Anthony Zappin
1827 Washington Blvd.
Huntington, WV 25701
(304) 654-6195 (tel.)
anthony.zappin@gmail.com
*Plaintiff, Pro Se*