# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 51
-----------------------------------------------------------------------X
ANTHONY ZAPPIN,

                         Plaintiff,

             -against-

CLAIRE COMFORT,

                        Defendant.
-----------------------------------------------------------------------X

Index No. 301568/14
Mot. Seq. Nos. 19 and 21

**DECISION AND ORDER**

| **For the Plaintiff** | **For the Defendant** | **Attorney for the Child** |
|---|---|---|
| Anthony Zappin, Esq, | Robert Wallack, Esq., | Harriet N. Cohen, Esq. |
| Self-represented | The Wallack Firm, P.C. | Cohen Rabin Stine Schumann, LLP |
| 194 W. 10th Street, #D1 | 777 Third Avenue, 21st Fl. | 11 Times Square, 10th Fl. |
| New York, NY 10014 | New York, NY 10016 | New York, NY 10036 |

      As required by CPLR 2219 (a), the following is a recitation of the papers considered in the review of Motion Sequence 19: (1) Attorney for the Child's Order to Show Cause, Affirmation, Exhibits; (2) Plaintiff's Affidavit in Opposition, Exhibits; (3) Attorney for the Child's Reply Affirmation, Exhibits; (4) Plaintiff's Sur-Reply Affidavit, Exhibits.

      As required by CPLR 2219 (a), the following is a recitation of the papers considered in the review of Motion Sequence 21: (1) Attorney for the Child's Order to Show Cause, Affirmation, Exhibits; (2) Plaintiff's Notice of Cross-Motion, Affidavit, Exhibits; (3) Plaintiff's Affidavit in Opposition and Exhibits; (4) Plaintiff's Supplemental Affidavit; (5) Attorney for the Child's Reply Affirmation; (6) Plaintiff's Sur-Reply Affidavit, Exhibits.

---

**Hon. Matthew F. Cooper, J.S.C.**

      More often than not, it is a problem when lawyers choose to represent themselves in their own lawsuits. As no less an authority than the United States Supreme Court has written, "[t]he adage that 'a lawyer who represents himself has a fool for a client' is the product of years of experience by seasoned litigators" (*Kay v Ehrler*, 499 US 432, 437 [1991]). In the words of the High Court, an attorney appearing *pro se* is "deprived of the judgment of an independent third

party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and making sure that reason, rather than emotion, dictates the proper tactical response to unforseen developments in the court room" *(id.)*.

Despite the Supreme Court's admonition, it is all too common for spouses who are lawyers to represent themselves in divorce proceedings. Because matrimonial practice is a specialized area of the law, with its own rules and ways, most lawyers who attempt to proceed *pro se* find themselves ill-equipped to competently handle the procedural and/or substantive aspects of their divorce cases on their own. And because a contested divorce is almost guaranteed to be emotionally charged, a self-represented lawyer may be hard-pressed to summon the level of rational thought and independent judgment that is required of a capable litigator.

This divorce case, unfortunately, presents a situation where an attorney has used his *pro se* status to inflict harm on his wife, their child and the court, and in so doing has caused significant harm to himself. Plaintiff, Anthony Zappin, an attorney admitted to practice in the courts of the State of New York, is a lawyer at a major law firm where he specializes in patent infringement litigation. He has chosen to be his own attorney in an action where his access to the parties' infant son is a central issue and where there are allegations of domestic violence.[1] Rather

---

[1] Article 18B of the New York County law provides for the assignment of counsel in cases where child custody and/or access is at issue and a party is financially unable to retain an attorney. Assigned counsel must be from what is known as the "18B" panel and paid a statutory hourly rate from state and county funds. Additionally in New York County, the Matrimonial Pro Bono Project run by the New York Women's Bar Association can often provide a volunteer lawyer to represent a party in a divorce case where there is financial hardship and custody and/or

than act in a constructive manner, plaintiff has done everything in his power to undermine the legal process and use his law license as a tool to threaten, bully, and intimidate. As will be discussed below in further detail, his ill-advised behavior seriously calls into question his fitness to practice law. It is also, according to defendant and the attorney for the child, indicative of a personality that makes plaintiff incapable of properly parenting the parties' child.

As a direct result of plaintiff's conduct in this case, the attorney for the child, Harriet N. Cohen, Esq., (the "AFC") has been forced to bring the two motions that are now before the court. The first motion (Motion Sequence 19) is to quash a subpoena served on her by plaintiff. The second motion (Motion Sequence 21) is for permission to communicate with the New York State Office of Professional Medical Conduct (the "OPMC") and to release court documents in connection with a disciplinary complaint plaintiff filed with the OPMC against the psychiatrist she retained as an expert witness, as well as to require plaintiff to bear responsibility for the legal fees her expert incurs and financial losses suffered with regard to plaintiff's complaint. The AFC also asks the court to impose financial sanctions against plaintiff pursuant to 22 NYCRR 130-1.1 as a result of his actions with respect to her expert and his overall misconduct throughout the pendency of the divorce action.

Plaintiff has cross-moved in Motion Sequence 21 to have Ms. Cohen disqualified as the AFC, relief he has sought a number of times prior. In the event she is not disqualified, he seeks to be able to call Ms. Cohen as a witness at trial and be permitted to cross-examine her. Additionally, plaintiff cross-moves to renew his application for leave to take the child to a

---

access is not at issue. Plaintiff, as an attorney making a base salary of $230,000 a year, is not eligible for assigned or volunteer counsel.

hospital for a developmental assessment. Lastly, plaintiff seeks to vacate this court's July 22, 2015 order that granted the AFC a money judgment against him for fees that are due her and he has refused to pay.

### Background

The parties were married in 2013 and have a child together, a boy, who is soon to be two-years-old. Since their son's birth, the parties have engaged themselves in what has seemingly been perpetual litigation, initially in the courts of the District of Columbia and now in New York. Throughout most of the litigation, plaintiff has represented himself, while defendant, Claire Comfort, who is also a patent attorney at a major law firm, has retained counsel.

Plaintiff's difficulties as an attorney *pro se* began in the Superior Court of the District of Columbia, where the parties entered into a "Consent Order" on November 20, 2013. By way of the Consent Order, plaintiff agreed to have no contact with defendant and to have supervised visitation as a condition for access to his son. In a decision dated April 7, 2014, Superior Court Judge Anthony Epstein found that a motion brought by plaintiff was "replete with intemperate and uncivil language about which the Court previously cautioned him." He also stated that "much of the matter in [plaintiff's] motion is redundant, immaterial, impertinent, or scandalous." In the decision, Judge Epstein went on to note that plaintiff "had discharged two sets of attorneys in this case – attorneys who have represented him more civilly and, from this Court's perspective, more effectively than he has represented himself."

Not only was plaintiff unreceptive to Judge Epstein's suggestion that he retain counsel, but he was aggressively hostile to the judge's criticism of his conduct as a self-represented attorney. Judge Epstein, in a decision dated May 28, 2014 in which he denied plaintiff's motion

4

to reconsider his prior ruling, referred to an incident where he believed plaintiff had engaged in inappropriate conduct towards him. He described the incident as follows:

> On the front of the copy of the reconsideration motion that Mr. Zappin provided to chambers, a handwritten note is attached that states, "You're pathetic! (Judicial Complaint forthcoming)." The note is unsigned, but Mr. Zappin, who now represents himself in this case and provided the document, appears to be the person who wrote and attached the note.

Plaintiff's improper behavior towards the court did not cease once the case was no longer before Judge Epstein. On February 11, 2014, after both parties had moved to New York, plaintiff commenced this action for divorce in New York County Supreme Court. Subsequently, jurisdiction over custody and visitation issues was transferred from the District of Columbia to this court, where, by a stipulation dated April 2, 2014, plaintiff agreed that his access to the child would continue to be supervised. On March 3, 2015, Justice Deborah A. Kaplan, the judge who presided over the case until it was transferred to me, made certain rulings on the record. After she had finished, the following colloquy between Justice Kaplan and plaintiff took place in open court:

> THE COURT: Is there anything else, Mr. Zappin?
>
> MR. ZAPPIN: Yeah, your Honor. I am tired of these lies coming from you on the record. The motion about Dr. Ravitz was not fully briefed and you know that. And you put it in your order. You put it in your order that I withdrew the Article 78 proceeding after the attorney general had filed responsive papers. That's not true. He filed it after I filed a notice of discontinuance. It's lie after lie after lie that comes out of your mouth. And I am tired of it.

Plaintiff's accusations as to "lies" coming from the court did not end there. The transcript provides that plaintiff concluded his argument in this manner:

5

MR. ZAPPIN:  I just want to make it known on the record that I am tired of the lies coming from the court and tainting of the record, knowing full well this is going to go to the Appellate Division. And we're gonna be in the Appellate Division tomorrow, getting a stay, and then we'll go back down to D.C. on Friday, and we're going to open up to Ms. Comfort's domestic violence petition, and we're gonna have a hearing down there in from of Judge Blant, because that's who she lied to, saying that she filed the motion and we'll have him make a finding of domestic violence. So that's all I have to say.

THE COURT: Are you finished?

MR. ZAPPIN: Oh, I'm finished, your Honor.

Plaintiff's contemptuous remarks directed towards Justice Kaplan – made to her face in her own courtroom in front of attorneys, litigants and court staff – were not restricted to the statements quoted above. Without reciting the other deeply personal, and frankly outrageous, verbal attacks that plaintiff launched against Justice Kaplan when he was before her on March 3, 2015, they can only be described as words not said in civil discourse, let alone ones that should ever be uttered by an attorney to a judge in the context of a court proceeding.

During the time she had the case, Justice Kaplan rendered a number of decisions in which she paints a vivid picture of plaintiff doing all he can to thwart the orderly administration of justice. Although plaintiff has repeatedly charged that he is being deprived of a prompt hearing to determine whether his access to the child must remain supervised, the record shows that he has acted in a manner actually designed to prevent such a hearing from happening. In a 64-page decision issued on February 27, 2015, Justice Kaplan wrote the following:

> The court notes that the husband has engaged in a pattern of
> conduct which has undoubtedly delayed the resolution of this
> matter. Most obviously, the husband discontinued his divorce
> action in the midst of an evidentiary hearing on the issue of
> whether his access time should be supervised. He has also filed
> numerous motions in this action, many on an emergency basis, that

6

he later withdrew or failed to carry through with the relief the court
granted him. The husband filed a motion to depose his mother,
which the court granted in part, but he decided to not carry through
with the deposition. Then, he noticed counsel in this case that he
was bringing an Article 78 proceeding in the Appellate Division,
but changed the date without informing them. The husband
withdrew his Article 78 petition only after the Assistant Attorney
General prepared and submitted opposition papers. He also filed
motions to disqualify the AFC and to strike the report and
testimony of Dr. Ravitz [the court appointed forensic psychiatrist],
only to withdraw these applications after they were opposed by the
wife and AFC, fully submitted to the court, and *sub judice.*

Even after the case moved beyond the machinations described by Justice Kaplan –

including plaintiff first discontinuing the divorce action in the middle of trial, then claiming to

have relocated to North Carolina, then to West Virginia, and finally reinstating the action –

plaintiff has endeavored to halt its forward progress. In the relatively brief time that I have had

the case, it has become apparent that while plaintiff vehemently complains that he is being

denied a hearing on continued supervised access with the child, he intentionally continues the

pattern of delay and disruption described by Justice Kaplan. In a decision I rendered in open

court on July 22, 2015, which dealt with, *inter alia*, plaintiff's application to immediately lift

supervision, I stated:

> Seventeen months of supervised visitation is a long time. The
> problem is the plaintiff has done everything he could to thwart this
> case going forward. This case has not been adjourned by the
> defendant. It has not been adjourned by the attorney for the child.
> It has not been delayed by either of them. It's been delayed by the
> plaintiff.

After plaintiff interrupted the custody trial by discontinuing the action, only to then

reinstate it, Justice Kaplan sought to set new dates for the trial to continue. By an order dated

February 13, 2015, she directed that the trial resume on March 6, 2015. However, the trial did

7

not go forward as scheduled and was adjourned to May, apparently at plaintiff's request. When

May approached, plaintiff delayed the trial again. Justice Kaplan's order of May 6, 2015 stated:

> Given the father's representations concerning his professional
> obligations – including his fear of losing his position at [his law
> firm] if the trial is not adjourned – the court grants his request to
> vacate the trial dates for May 18 and 22, 2015, June 8, 11, 12, 15
> and 16, 2015. The custody trial in these matters shall continue on
> November 12, 2015 at 10 a.m . . . .

In a series of decisions rendered over the past two months, I have stated in no uncertain

terms that the trial will go forward as scheduled on November 12, as ordered by Justice Kaplan,

and then will continue to its completion on November 24, 2015. Despite these pronouncements,

plaintiff persists in filing applications for interim relief and seeking discovery as if the case were

in its early stages while ignoring the fact that the child custody and access trial, that he purports

to want so badly, is set to resume imminently with a final decision to be rendered soon thereafter.

Since July 22, 2015, I have denied three motions brought by plaintiff seeking *pendente lite* relief

and have declined to sign no less than four other Orders to Show Cause presented by him,

finding that they were all without merit. Within the last few weeks, he reportedly has served at

least 14 new subpoenas, including one on defendant's attorney and one on the law firm where

defendant is employed. Plaintiff has also made demands for defendant's medical records from

doctors who treated her as far back as college.

Plaintiff's barrage of motions and his deluge of subpoenas, coupled with constant e-mails

to the court and his threats to commence Article 78 proceedings and federal civil rights actions,

are reflective of an unfortunate litigation strategy: avoid resuming the trial in favor of attempting

8

to bludgeon defendant, the AFC, and the court into submission.[2]  As that strategy has proven

increasingly unsuccessful, plaintiff's tactics, and the language he employs in his motion papers,

have grown evermore extreme and out of step with what is appropriate and permissible advocacy

by an attorney, even one who is representing himself.  It is in the midst of this maelstrom of

misconduct that the AFC has been forced to bring the two motions that are now before the court.

### Legal Analysis

There does not exist one set of standards for an attorney representing others and another

set of standards for an attorney representing him or herself: in both instances an attorney must

---

[2] Plaintiff is a constant presence in this courthouse filing his own motions and his response to the other attorneys' motions, almost all of which have been precipitated by his actions. His papers – voluminous, citation-strewn, and, in the end, largely redundant – are never-ending, as are his e-mails, letters, subpoenas, and discovery demands.

Moreover, plaintiff's *pro se* activities connected to this matter have by no means been limited to the divorce proceeding in this court, or his subsequent petition for a writ of habeas corpus that was consolidated with the divorce action. His numerous forays into other courts include recently filing a petition against defendant in New York County Family Court; suing defendant, her family and her lawyers in the Federal District Courts for the Southern District of New York and the District of Columbia; and bringing Article 78 proceedings in the Appellate Division against the judges who have been assigned to this case, proceedings that he has ended up withdrawing after forcing the Attorney General's office to go through the time and expense of having to prepare opposition. Plaintiff also stated in an e-mail last month to the Attorney General, following the denial of one of his many Orders to Show Cause, that he intends to commence an action in federal court for deprivation of his civil rights pursuant to 42 U.S. Code § 1983.

In addition, as evidenced by a copy of the complaint he has attached as an exhibit to his cross-motion, plaintiff is now representing himself in the New York State Court of Claims in a case entitled *Anthony Zappin v State of New York*. In that case, he seeks damages for what he alleges are wrongs committed against him by a judge and a court officer of the New York State Unified Court System, both of whom he contends are guilty of "assault & battery," "false arrest/imprisonment," and "civil conspiracy to commit assault & battery and false arrest/imprisonment." Plaintiff further alleges in the complaint that as an act of "retaliation" against him for bringing an Article 78 proceeding, the judge in question "contact[ed] the West Virginia State Parole Board to recommend that Claimant's mother (who is currently incarcerated in West Virginia) be denied early parole."

adhere to the same ethical prescriptions that guide the legal profession.  As the Supreme Court of

the State of Connecticut has aptly written:

> Whether an attorney represents himself or not, his basic obligation
> to the court as an attorney remains the same.  He is an officer of the
> court . . . .  Disciplinary proceedings not only concern the rights of
> the lawyer and the client, but also the rights of the public and the
> rights of the judiciary to ensure that lawyers uphold their unique
> position as officers . . . of the court . . . .  An attorney must conduct
> himself or herself in a manner that comports with the proper
> functioning of the judicial system (*Notopoulos v Statewide
> Grievance Committee,* 277 Conn 218, 231-32 [2006], *cert denied,*
> 549 US 823 [2006], quoting *Matter of Presnick,* 19 Conn App 340,
> 345 [Conn App 1989], as quoted in *In the Matter of Charlene
> Morisseau,* 763 F Supp 2d 648, 652 [SDNY 2011]).

Thus, when plaintiff is before this court representing himself in his own divorce action,

he is as bound by the Rules of Professional Conduct and is required to conform his behavior to

its dictates as much as when he is before a federal court representing a party in a patent

infringement case.

There is little question that the manner in which plaintiff spoke to Justice Kaplan, or, for

that matter, what he wrote to Judge Epstein in the District of Columbia proceeding, constitutes a

breach of the Rules of Professional Conduct (*see e.g., Matter of Delio,* 290 AD2d 61 [1st Dept,

2001]; *Matter of Dinhoffer,* 257 AD2d 326 [1st Dept 1999]).[3]  Regrettably, plaintiff has treated

his opposing counsel, Robert Wallack, Esq., in the same offensive and patently improper manner.

Justice Kaplan criticized plaintiff for having submitted papers in which he included "irrelevant,

personal information about the wife's counsel."  She stated that what was "[e]ven more egregious

---

[3] Effective April 2009, the Rules of Professional Conduct were promulgated as Joint
Rules of the Appellate Divisions of the Supreme Court.  They supersede the former Part 1200,
formerly known as the Disciplinary Rules of the Code of Professional Responsibility.

is the husband's inclusion of pictures of the attorney's young son." This conduct prompted Justice Kaplan, in her decision of August 8, 2014, to write: "The husband is a practicing attorney and shall conduct himself in these proceedings in a professional manner. He is referred to the Rules of Professional Conduct, particularly Rule 3.3 entitled Conduct Before Tribunal."

However, plaintiff continues to fail to abide by Justice Kaplan's directive to conduct himself in a professional manner when dealing with opposing counsel. As I set forth in my July 22, 2015 decision, he persisted in sending Mr. Wallack and his associates taunting emails referring to Mr. Wallack's personal life and relationships. Such communications are in clear violation of an attorney's obligation to refrain from engaging in "undignified or discourteous conduct" (*see* Rules of Professional Conduct 3.3 (f) (2); *see also Matter of Kavanagh*, 189 AD2d 521 [1st Dept 1993]). Although I found that Mr. Wallack's status as opposing counsel did not come within the ambit of being a "protected person" for the purposes of granting an order of protection, I did enter an order limiting plaintiff's communications with him and his firm to matters directly concerning the case and directing plaintiff to make no reference to counsel's family or personal relationships.

### *The AFC's Motion to Quash Plaintiff's Subpoena (Motion Seq. 19)*

It is neither plaintiff's penchant for insulting and denigrating the judges before whom he appears, nor his propensity for engaging in improper conduct towards opposing counsel, that constitutes the worst form of behavior he has exhibited as a self-represented attorney in this case. That dubious distinction goes to the manner in which plaintiff has treated the AFC. The record reflects that soon after Ms. Cohen was appointed to her role in the case, plaintiff began doing everything in his power to prevent her from performing her court-appointed duty to represent the

11

parties' son.  Even more disturbingly, he has actively campaigned to impugn her reputation in the public forum.  Consistent with what I found in my July 23, 2015 decision – denying one of plaintiff's many applications to disqualify Ms. Cohen from continuing to be the child's attorney – the motive for his aggressions is quite simple: She is advocating a position he disagrees with.

Ms. Cohen was appointed to be the AFC by orders issued by Justice Sherry Klein Heitler, in her capacity as then Administrative Judge, on August 11, 2014, and by Justice Kaplan on October 27, 2014.  Soon after her appointment, Ms. Cohen took the position, exercising substituted judgment for a non-verbal infant, that visitation should continue to be supervised as a result of concerns raised about plaintiff's emotional state.  From that point on, plaintiff has dedicated himself to having her removed from her role.

Plaintiff's efforts to rid himself of the AFC have not been limited to the multiple motions for disqualification that he has made to both Justice Kaplan and me – including part of his cross-motion here – but rather, those efforts have extended to tactics designed to extort, bully, and intimidate.  The first was to intentionally violate Justice Kaplan's order that he share the cost of Ms. Cohen's services equally with defendant.  He did so by refusing to pay even one dollar of the fees incurred by Ms. Cohen for her services, even as his onslaught of motions directed at her clearly caused her to expend substantial time and effort to oppose them.  The idea, it appears, was to inflict financial hardship on the AFC, so that she would be unable to discharge her duty to represent the child's interests.

When the AFC demanded payment, plaintiff responded with a threatening letter.  The letter, dated February 12, 2015, which I referred to in my July 22, 2015 decision, contains the following passage:

12

> I want to be clear, this letter is the first instance in which I am
> telling you that I will not pay your invoices. And, it is for the very
> justifiable reason that supervised visitation – which you have
> advocated for without any record in the case – has made me
> indigent.[4] More importantly, at each appearance, you have
> inappropriately threatened me with "judgments." Putting aside the
> lack of respect and cordiality you have displayed to a fellow
> member of the bar, you are more than welcome to seek judgments
> against me if you feel it is appropriate. However, you should be
> aware that any such attempt will be swiftly and publicly met with
> claims against you and your firm for fraud, tortious interference
> with parental rights, legal malpractice and disgorgement, among
> others.

In spite of the threats made to her by plaintiff, the AFC pressed her claim by moving for

an order directing plaintiff to pay her the many thousands of dollars that he owes. True to his

word, plaintiff responded by "swiftly and publicly" retaliating against Ms. Cohen and her law

firm. He did so by having Zappin Enterprises, a company which lists plaintiff and his father as

its owners and plaintiff as its designated agent, and is run from the same West Virginia address

where plaintiff claimed to have lived when he left New York, register the internet domain name

*www.harrietnewmancohen.com*. "Harriet Newman Cohen" is the AFC's full name.

---

[4] The notion that supervised visitation has rendered plaintiff "indigent" is not even
remotely plausible. Not only is supervised access something plaintiff voluntarily agreed to in the
first place, but it has continued because of real concerns about his behavior, concerns that still
have not been addressed because he has continuously prevented the trial from going forward.
Moreover, as stated above, plaintiff earns at least $230,000 a year. He pays no child support to
defendant, the full-time custodial parent, but instead contends that it is he who is actually
supporting the child because he buys him toys, clothing and diapers. In making this claim,
plaintiff seems to have ignored the fact that a child's needs also include food, shelter, medical
care, and where, as here, the custodial parent works, childcare. If plaintiff were in fact paying
child support as legally required, his basic obligation, based on his base salary alone and in
accordance with child support calculations applicable to high income parties in New York
County, would compute to approximately $37,000 per year. With statutory add-ons for medical
costs and childcare, his total obligation would likely exceed $55,000 per year. This is far more
than what plaintiff possibly pays for supervised access, clothing, diapers and toys.

13

The purpose of the website was chillingly clear from various postings made under the plaintiff's father's name. Illustrative of these postings, and indicative of the whole nature of the enterprise, are the following messages:

> Harriet. You're a very sick and greedy woman. I pray for you and hope you seek help.

> I intend to keep the public apprised of your misconduct and disturbing behavior.

> Quickly climbing up the Google rankings. Stay tuned for updates.

In response to this development, the AFC brought on an emergency Order to Show Cause seeking a temporary restraining order barring plaintiff from continuing to operate the website. She also sought an order of protection against him. Prior to the motion being heard, plaintiff had the website's postings removed.

On July 22, 2015, the date on which I placed the decision on the record resolving five open motions, I denied Ms. Cohen's application for an order of protection. But as a similar consequence to plaintiff's unacceptable conduct towards Mr. Wallack, I ordered him to comply with his ethical obligations when dealing with the AFC. I also awarded Ms. Cohen and her firm a judgment against plaintiff in the sum of $18,286.32, with an additional $3,600 in fees for having to bring the enforcement motion. The amount awarded represented plaintiff's share of the fees for Ms. Cohen's services through January 31, 2015. In the decision, I further provided that the AFC could renew her request for fees incurred after January 31, 2015 upon more complete papers and a clearer account as to what portion of the total remaining balance was attributable to plaintiff.

No sooner than I had made my rulings, plaintiff, in what the AFC termed a clear act of

14

retaliation, had Ms. Cohen served with a subpoena.  The subpoena demands that she produce a

wide range of documents from her case file.  The AFC correctly asserts that she is not a party to

the action, nor is she a non-party witness; she is an attorney duly appointed by the court to

perform a clearly defined duty: representing the child to the best of her ability (*see* 22 NYCRR

§7.2[d] ["Where the child is the subject, the attorney for the child must zealously advocate the

child's position"]).  Moreover, as courts have clearly stated, her role "is to be an advocate for and

represent the best interests of the child, not the parents" (*In re Brittany W.*, 25 AD3d 560 [2d

Dept 2006]).

　　　Contrary to plaintiff's apparent intentions, Ms. Cohen's position as an advocate cannot be

compromised by plaintiff's efforts to make her into a witness.  Nor can he seek to invade the

privilege afforded her – or any other attorney representing a client – under CPLR 3401 (c) and (d)

to the confidentiality of her attorney work-product and the material she has prepared in

anticipation of litigation.  Moreover, plaintiff cannot be permitted to violate the longstanding rule

in the First and Second Judicial Departments prohibiting parties from engaging in extensive

discovery in custody cases (*see S.B. v U.B.*, 38 Misc 3d 487, 497 [Sup Ct, Kings County, 2012]).

　　　As the Appellate Division for the Second Department has noted, "because the potential

for abuse in matrimonial and custody cases is so 'great,' the court's discretionary power to limit

disclosure and grant protective orders is equally broad" (*Garvin v Garvin*, 162 Ad2d 497, 499

[2d Dept 1990] [internal citations omitted]).  On its face, and even more so when viewed within

the context of plaintiff's overall conduct towards Ms. Cohen in this proceeding, plaintiff's

subpoena on her constitutes another tactic in what threatens to be an inexhaustible arsenal.

Because the documents sought are either irrelevant to plaintiff's case, privileged, or otherwise

15

subject to established principles militating against their production, the motion by the AFC to quash the subpoena must be granted, as must her application for a protective order requiring plaintiff to obtain leave of court before serving any further such subpoenas.

*The AFC's Motion With Regard to Plaintiff's Complaint to the Office of Professional Medical Conduct (OPMC) (Motion Seq. 21)*

Perhaps the most troubling action taken to date by plaintiff against the AFC is not something that he has done directly to her. Instead, it is something that he has done to Ms. Cohen's expert witness, a board certified psychiatrist. Plaintiff has filed a complaint against the psychiatrist with the OPMC, the agency responsible for disciplining medical doctors.

Plaintiff's complaint to the OPMC, in the form of a three-page, single-spaced letter dated August 7, 2015, begins, "I write to file a formal complaint of professional misconduct, negligence and fraud against [the psychiatrist] . . . As explained below, [his] egregious conduct warrants discipline by the Office of Professional Medical Conduct." Plaintiff goes on to state that because he has concluded that the psychiatrist has no experience in custody or child-related matters, "any work performed by him on the matter necessarily amounts to medical malpractice and negligence as well as is tantamount to fraud." Plaintiff further complains that the psychiatrist's hourly rate is "outrageous and unconscionable," he has engaged in a "fraudulent scheme," and has filed "frivolous money judgments." According to plaintiff, "such clearly dishonest behavior by a medical professional warrants discipline by the OPMC." Finally, plaintiff writes in the letter that what is "perhaps most disturbing" is that the psychiatrist will be called as a witness by the AFC to "opine on the mental status" of the parties when he has never spoken to or evaluated them. This, the letter claims, "constitutes malpractice."

16

What is so concerning about plaintiff's complaint to the OPMC is not so much what he says – as reckless and dishonest as those statements may be – but what he has chosen not to say. Never once in his letter does he mention that the psychiatrist was court-appointed pursuant to an order signed by Justice Kaplan on September 12, 2014.  Never once does he mention that the rate the psychiatrist was to be paid is specified in Justice Kaplan's order; the fee being set by the court, not by the doctor himself.  Never once does he mention that after plaintiff violated the order by refusing for almost a year to pay his share of the psychiatrist's retainer, the AFC moved to compel him to comply with the order, and that on July 22, 2015, I granted the motion and found that the psychiatrist was entitled to enter judgment against plaintiff for the long-outstanding sum.  And never once does plaintiff mention that Justice Kaplan's order provides that the reason for the appointment is to enable the AFC to have her own expert review the report of the forensic evaluator and observe his testimony, something generally referred to as a "peer review."[5]  These facts, which plaintiff chose not to reveal, are overwhelmingly significant and relevant to the disciplinary proceeding that plaintiff commenced through his complaining letter, and they would certainly be essential to the AFC's expert's defense against the charges (*see Janecka v Casey*, 121 AD2d 28 [1st Dept 1986]).

It is beyond question that action taken in this case by the AFC's expert was done in accordance with a valid court order.  It is equally clear that plaintiff's sole reason for filing the complaint with the OPMC – and doing so only two weeks after I awarded the doctor a money judgment against him – was to send a not-so-subtle message.  That message is being: If you do

---

[5] Notably, plaintiff informed the court via an e-mail dated September 8, 2015, that he retained his own expert to do a peer review of the forensic custody evaluation report.

17

something that plaintiff does not agree with – whether you a party, an attorney, a judge, or a doctor – he will do whatever he can to harm you. Here, plaintiff has gone beyond the pale by cynically and maliciously interfering with a physician's most valuable asset: his license to practice medicine. It is ironic that plaintiff, in his papers, bristles at the mere suggestion that he has violated the Rules of Professional Conduct, and he accuses anyone who makes such a suggestion of recklessly seeking to destroy his livelihood by preventing him from practicing law. Ironically, it seems plaintiff has no compunction against doing this to another professional.[6]

As it turns out, the OPMC acted swiftly on plaintiff's complaint against the doctor by finding the complaint was without merit and dismissing it less than three weeks after it was filed. On September 14, 2015, plaintiff submitted a sur-reply affidavit, to which he attached as an exhibit a letter sent to him by the OPMC. The letter, dated August 27, 2015, which plaintiff acknowledges receiving on August 31, 2015, states that the OPMC is dismissing the complaint without further proceedings because "the circumstances described in your correspondence do not constitute prosecutable professional misconduct in the practice of medicine." As a result, the relief sought by the AFC in Motion Sequence 21, with the exception of her request for sanctions, is now moot inasmuch as her expert will not have to defend himself in a medical disciplinary

---

[6] Plaintiff apparently has no problem adhering to a double standard in this litigation. On one hand, he has complained about any mention of the law firm where he is employed, contending that it will jeopardize his position there, and he has sought and been granted a protective order barring defendant from issuing a subpoena to his firm. On the other hand, plaintiff has issued subpoenas to the law firm where defendant is employed, regularly mentions defendant's firm by name in his papers, and has attached as an exhibit to a prior motion a copy of an internal memo from her firm.

18

proceeding.[7]

*The AFC's Application for the Imposition of Sanctions Against Plaintiff (Motion Seq. 21)*

The OPMC's summary dismissal of the complaint confirms the righteousness of the

AFC's position that plaintiff acted with malice and reckless disregard for the truth in bringing

disciplinary charges against the psychiatrist. This, in turn, reinforces her request for sanctions to

be imposed against plaintiff as a result of the bad-faith disciplinary complaint he filed. Although

the AFC's request for sanctions was initially made in her reply affirmation, plaintiff had ample

opportunity to respond, and thus be heard on the issue of sanctions, in his sur-reply.[8] Even in the

face of the summary dismissal of the complaint by the OPMC, plaintiff, in his sur-reply, offers

no defense for his actions. In fact, the only defense he has ever offered for filing the disciplinary

complaint is in his Affidavit in Opposition, where he claims "qualified immunity" under Section

230 (11) (b) of the New York Public Health Law. That provision, as quoted by plaintiff in his

[7] It is noted that plaintiff did not submit his sur-reply until September 14, 2015, which was full week after he admits to having received the OPMC letter of dismissal on August 31, 2015. If plaintiff had promptly notified the AFC of the dismissal, she would not have had to prepare much of her reply, which was submitted on September 9, 2015, the final submission date for all papers on the motion. Nor would the court have had to address, as it did in a draft of this decision, those applications by the AFC that are now moot. It is further noted, that plaintiff's affidavit in opposition and cross-motion are both dated September 1, 2015, but they make no mention of the dismissal letter even though plaintiff concedes having received it the day before. Finally, it is noted that although plaintiff's sur-reply was submitted without court approval and after the September 9 submission date, I have nevertheless fully considered it in deciding the motion.

[8] Both the AFC and defendant have made numerous requests in prior motions for sanctions to be imposed against plaintiff for transgressions alleged to be in violation of the Rules of Professional Conduct and other acts of attorney misconduct. Both Justice Kaplan and I, in the decisions rendered on those motions, chose not to sanction plaintiff. Instead, each of us opted to caution plaintiff about his behavior and remind him of his ethical obligations as an attorney at law.

19

affidavit in opposition, states: "Any person . . . who reports or provides information to the board

in good faith, and without malice shall not be subject to an action for civil damages or other

relief as a result of such report."  Plaintiff, however, offers absolutely nothing to indicate that his

actions taken toward the AFC's expert were done either in good faith or without malice.

22 NYCRR § 130-1.1 provides in relevant part the following with regard to sanctions:

(a) The court, in its discretion, may . . . impose financial sanctions
upon any party or attorney in a civil action or proceeding who
engages in frivolous conduct as defined in this Part, which shall be
payable as provided in section 130-1.3 of this Part.

(b) The court, as appropriate, may . . . such financial sanctions
against either an attorney or a party to the litigation or against both
. . . .

(c) For purposes of this Part, conduct is frivolous if: (1) it is
completely without merit in law and cannot be supported by a
reasonable argument for an extension, modification or reversal of
existing law; (2) it is undertaken primarily to delay or prolong the
resolution of the litigation, or to harass or maliciously injure
another; or (3) it asserts material factual statements that are false.

Plaintiff's letter of complaint to the OPMC, which intentionally omits reference to several

court orders that belie every allegation contained therein, falls squarely into the above definition

of frivolous conduct.  Similarly, the timing of the complaint, coming as it did only after I ordered

plaintiff to pay the AFC's expert the retainer that Justice Kaplan had set in her appointment

order, reflects an obvious intent on plaintiff's part to retaliate against him.  And as evidenced by

its summary dismissal, plaintiff, a self-described "trained and skilled" litigator, could not have

reasonably believed that there was ever any merit to the complaint to begin with.  Thus, the

inescapable conclusion is that what plaintiff did he was for one purpose, and one purpose

alone: "to harass or maliciously injure another."

20

In determining sanctions, "the court shall consider, among other issues the . . . circumstances under which the conduct took place" (22 NYCRR § 130-1.1 [c][3]). As should be obvious from the recitation of the history of this case, plaintiff's misconduct exhibited with regard to the OPMC complaint is not an isolated incident. Regrettably, it is but one instance in a pattern of improper behavior. Although the hope was that plaintiff would heed the court's admonitions and represent himself according to the dictates of his profession, that has not happened.

Under these circumstances, where warnings have had no effect on plaintiff's conduct, it is incumbent – for the integrity of the judicial process, as well as for the protection of the other litigants and the child – that penalties be imposed (*see L.G. v M.G.,* New York Law Journal, August 31, 2015, J. Gesmer [imposition of $317,480 in sanctions for attorney misconduct]; *see also Gabrelian v Gabrelian*, 108 AD2d 445, 454 [2d Dept 2009] ["(Courts have) the specific power to impose financial sanctions upon a party or an attorney who has engaged in abusive litigation practices"]; *D.W. v R.W.*, 34 Misc 3d 1222[A] [Sup Ct, Westchester County 2012] ["Costs and sanctions may be imposed against an offending party or attorney to punish past conduct and to deter them from engaging in further frivolous conduct"]). Accordingly, plaintiff is sanctioned $10,000, with half to be paid to the AFC to compensate her for the cost of bringing the two motions that are the subject of this decision, and half to be paid to the Lawyers Fund for Client Protection to penalize plaintiff for conduct that has wasted judicial resources and otherwise adversely impacted the administration of justice (*see* 22 NYCRR 130-1.3).

*Plaintiff's Cross-Motion (Motion Seq. 21)*

The first branch of plaintiff's cross-motion to be considered is his latest attempt to have

21

Ms. Cohen disqualified from continuing to serve as the AFC. Plaintiff asserts that she should be

disqualified because she has a conflict of interest. The conflict, according to plaintiff, stems

from the AFC's motion to have him held responsible for her expert's attorney's fees and "lost

billable time" resulting from the filing of the OPMC disciplinary complaint. By advocating for

relief for her expert, plaintiff argues, Ms. Cohen is in effect representing the expert at the same

time she is representing the child, something that she would be barred from doing.[9]

Plaintiff cites two cases in support of his request to disqualify the AFC on these grounds

but both are clearly irrelevant, distinguishable, and misplaced. In *Cooke v Laidlaw Adams &*

*Peck, Inc.*, (126 AD2d 453, 455 [1st Dept 1987]), corporate counsel that appeared on behalf of a

corporate officer in an SEC investigation was deemed to have created a presumption of an

attorney-client relationship and was later disqualified to represent the corporation against the

officer for wrongdoing. Here however, the mere fact that a request for fees was requested by the

AFC does not conflict the AFC from her role in this custody dispute, and certainly does not rise

to the level of creating an attorney-client relationship that would warrant her disqualification.

Further to this point, in *NLRB v Jackson Hosp. Corp.*, (257 FRD 302, 311-312 [DDC 2009]),

cited by the plaintiff,[10] the District Court for the District of Columbia acknowledged that in Equal

---

[9] In light of the decision by the OPMC dismissing the complaint against the AFC's
expert, which rendered moot the AFC's need to seek relief for her expert, it stands to reason that
plaintiff would abandon his application to have Ms. Cohen removed as the AFC because of what
he perceives as her conflict of interest. Plaintiff, however, in his sur-reply, filed after the
dismissal, continues to press for her removal on these grounds.

[10] Plaintiff does not cite *NLRB* for its actual holding (which found that no de facto
attorney-client relationship was present), but rather for a line of EEOC "collecting cases"
appearing in the court's legal analysis. It is not clear why plaintiff failed to simply cite the
desired EEOC cases directly. Nevertheless, the EEOC cases that plaintiff seeks to point the
court's attention to actually support the AFC's position, not his.

22

Employment Opportunity Commission ("EEOC") proceedings, the actions of the "client" are the determining factor in determining whether a de-facto attorney-client relationship has been created between the aggrieved and the commission (". . . a de facto attorney-client relationship existed by the fact that the 'clients' had expressly asked the EEOC to seek relief on their behalf" *NLRB*, 257 FRD at 312; "The question of whether an attorney-client relationship exists rests on the actions of [the 'client']" who affirmatively "accepted [the Secretary's legal staff] as his own lawyers" *id.*, quoting *Donovan v Teamsters Union Local 25, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 103 FRD 550, 552-53 [D. Mass. 1984]).

Here, quite tellingly, the AFC's motion did not contain an affirmation or affidavit from the expert, nor was there a statement from him of any kind. Consequently, there is no evidence that the expert was even aware of the relief being sought or any affirmative action on his part demonstrating his intent to have the AFC appear on his behalf. Accordingly, an attorney-client relationship was never created. Thus, there is no basis to conclude that there is a conflict of interest on the part of the AFC, and plaintiff's application to disqualify her must be denied.

The second branch of plaintiff's cross-motion seeks to renew his prior motion to disqualify Ms. Cohen. In my July 22, 2015 decision, and again in my decision of July 23, 2015, wherein I declined to sign plaintiff's Order to Show Cause seeking to renew his application for disqualification, I thoroughly set the out the reasons why plaintiff's application was baseless and why it was in the child's best interests that Ms. Cohen remain in the role. Plaintiff has failed to allege any new facts that were not considered in my two prior denials. Thus, the application does not meet the basic requirement for a motion to renew (*see* CPLR 2221), and it must accordingly be denied.

The same holds true with regard to plaintiff's application to vacate my previous orders requiring him to pay his court-ordered, fifty percent share of the fees the AFC incurred in her representation of the parties' child. This will be the fourth time that I have had to address the same application in the last two months, having rendered decisions on July 22, July 23 and August 12, 2015. Each time, I have set forth the reasons why plaintiff is obligated to pay the sums due that he has unjustifiably refused to pay, with such refusal having entitled the AFC and her firm to enter a money judgment against him. If plaintiff disagrees with my decisions, he should appeal them to the Appellate Division, not continuously present the same meritless application, or he will risk further sanctions.

Plaintiff has also sought in his cross-motion leave to renew his application for an order permitting him to take the child to Weill-Cornell Medical Center to be examined for what plaintiff claims are "multiple signs of development delay." Once again, plaintiff has failed to set forth any new facts that were not considered when I made my decision denying his initial application. In my July 22, 2015 decision, I detailed the fact that there was nothing in the record to indicate that the child suffered from any developmental issues, and that all the evidence firmly established that he is a healthy, thriving infant, who, in the words of his pediatrician, "will reach developmental milestones in a timely fashion." In our legal system, we do not force children involved in a divorce to undergo unnecessary medical exams so that one parent can pursue an unfounded fixation or search for material to use against the other.

In the last branch of his cross-motion, plaintiff seeks permission to call the AFC as a witness and cross-examine her in the upcoming custody trial. He bases this request in part on the AFC having opposed his request to have the child examined for development delay. It also

24

involves the AFC's assertions that whatever minor bruises and scrapes the child has exhibited, and which plaintiff has sought repeatedly to portray as proof of defendant's physical neglect or abuse of the boy, are simply the normal result of being an active two-year-old. Contrary to plaintiff's position, these assertions do not constitute the AFC acting as a fact witness. Rather, it is the AFC advocating on behalf of her client, the child, by seeking to have him avoid needless medical exams or unwarranted, and very likely harmful, intervention by the police or child protection officials. To inform the court as to what she has observed with regard to the child's health and functioning, as well as what she has learned from the child's treating pediatrician, is entirely within the scope of the AFC's duty to "make their positions known to the court orally or in writing" (*Cervera v Bressler*, 50 AD3d 837, 841 [2d Dept, 2008]). Thus, this application, along with the other branches of plaintiff's cross-motion, must be denied.

### *Conclusion*

Plaintiff has every right to represent himself in his own divorce. He has that right even if "his self-representation may make the litigation process more difficult or unpleasant" (*Nimkoff v Nimkoff*, 18 AD3d 344, 346 [1st Dept 2005], *rearg denied* 2005 NY App Div LEXIS 8744 [1st Dept, Aug. 18, 2005]). But he does not have the right to represent himself in the way that this decision has documented. As one distinguished federal judge has written, "the fact that one appears *pro se* is not a license to abuse the process of the Court and to use it without restraint as a weapon of harassment and libelous bombardment" (*Kane v New York*, 468 F Supp 586, 592 [SDNY 1979] [Weinfeld, J.]. Plaintiff needs to recognize that continuing his campaign of harassment and abuse will only serve to further undermine his case and result in the imposition of additional sanctions against him.

25

In accordance with the foregoing, it is

ORDERED, that Motion Sequence 19, the AFC's motion to quash the subpoena and issue a protective order, is granted; and it is further

ORDERED, that Motion Sequence 21, the AFC's motion for relief with respect to plaintiff's disciplinary complaint to the OPMC concerning her expert psychiatrist, is denied as moot, except to the extent that it is further

ORDERED, that pursuant to 22 NYCRR § 130-1.1, plaintiff is sanctioned for his conduct and as a consequence thereof is directed to pay the sum of $10,000, with $5,000 to be paid to the Attorney for the Child for her attorney's fees incurred as a result of plaintiff's misconduct necessitating the instant motions, and with $5,000 to be paid to the Lawyer's Fund for Client Protection as a result of plaintiff's misconduct that has wasted judicial resources and otherwise adversely impacted the administration of justice; and it is further

ORDERED, that plaintiff is directed to pay each $5,000 portion of the aforesaid $10,000 sanction on or before October 30, 2015; and it is further

ORDERED, that plaintiff's cross-motion is denied in all respects.

This constitutes the decision and order of the court.

Dated: September 18, 2015                    Enter:  _____

      SEP 1 8 2015                                      Matthew F. Cooper, J.S.C.

**MATTHEW F. COOPER**
**J.S.C.**