UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

ANTHONY ZAPPIN,

                            Plaintiff,                                    Case No. 16-cv-5985

              - against -

MATTHEW F. COOPER,                                          **FIRST AMENDED**
a Justice of the Supreme Court                              **COMPLAINT**
of the State of New York, in his
individual and personal capacity,                           Jury Trial Demanded

                            Defendant.
-------------------------------------------------------------- X

        Plaintiff Anthony Zappin ("Plaintiff") hereby alleges the following against Defendant

Matthew Cooper ("Justice Cooper" or "Defendant"):

## NATURE OF THE CASE

        1.      This is a civil action brought under state common law for defamation/injurious

falsehood, tortious interference with prospective economic advantage, intentional infliction of

emotional distress and prima facie tort.  Plaintiff also asserts claims under 42 U.S.C. § 1983

against Defendant for committing acts, under color of law, with the intent and purpose of

depriving Plaintiff of his rights secured under the Constitution and laws of the United States.

Plaintiff brings this action against Defendant in his individual capacity.

## PRELIMINARY STATEMENT

        2.      Ringing true the age-old adage that a false statement is half-way around the world

before the truth gets its shoes on, Defendant – a duly sworn judicial officer – maliciously and

knowingly made and publicized false statements and defamatory personal attacks towards

Plaintiff in a September 18, 2015 decision in the matter *Anthony Zappin v. Claire Comfort*, Index

No. 301568/14 pending in the Supreme Court of New York County ("September 18 Decision"). (*See* Ex. 1.)    It was not Defendant's rendering of the September 18 Decision that caused Plaintiff the harm complained of herein, however.  Rather, Defendant engaged in extrajudicial conduct designed to maximize publicity of his false statements and the harm sustained by Plaintiff.  This included publishing the September 18 Decision in *The New York Law Journal*, despite the fact that the decision was statutorily sealed under New York Domestic Relations Law Section 235 ("DRL 235").  Even worse, Defendant personally sent copies of the September 18 Decision to a blogger at *The New York Law Journal* as well as tabloid reporters at *The New York Post* and *The Daily News* to improperly generate media attention and coverage of the decision.

      3.    The September 18 Decision is troubling for many reasons.    Foremost, Defendant's September 18 Decision was nothing more than a publicity stunt perpetrated by a man obsessed with media attention.  Defendant had bragged during Continuing Legal Education presentations that he intentionally crafts "printable" soundbites to generate media attention for his cases.  (*See* https://www.youtube.com/watch?v=G9xociqC300.[1])  Indeed, the September 18 Decision is littered with these so-called "printable" soundbites repeatedly quoted in the tabloid headlines Defendant forwarded the decision to after its issuance.   Even more troubling, Defendant regularly acts as a confidential informant feeding salacious information to the *The New York Post*, *The Daily News* and *The New York Law Journal* concerning gossip-worthy and celebrity divorce matters.   Indeed, Defendant and his ***confidential*** divorce proceedings have

---

[1] As mentioned in the Original Complaint, Justice Cooper has made numerous statements during Continuing Legal Educations that without question constitute judicial misconduct.  These outrageous statements include Justice Cooper boasting about threatening litigants is "one of the things [he] kinda live[s] for in the job" and exclaiming that he only puts fathers in jail.  (*See* *https://www.youtube.com/watch?v=cTOnYzcGeg0.*)  Moreover, in testimony before the New York State Assembly, Justice Cooper has bragged that he "shames" litigants into outcomes he believes are just, even when they are contrary to the law. For more information about this videos, please see the July 27, 2016 Original Complaint.  (*See* Dkt. 1.)

appeared in the headlines of *The New York Post* and *The Daily News* dozens upon dozens of times and orders of magnitude more than any other judge in Manhattan.  A partial, yet lengthy, list of Defendant's forays in *The New York Post* and *The Daily News* is enclosed herewith as Exhibit 2.[2]  Needless to say, a judge acting as an informant to the tabloid media, particularly in confidential divorce and custody proceedings, is not only extrajudicial conduct, but is appalling and calls into question his fitness to sit on the bench.

4.      Perhaps the most troubling aspect of the September 18 Decision is that not only was it unnecessary and undoubtedly caused permanent harm to the child at issue in the case, but every action Defendant took in connection with the decision was with the intent to irreparably cause harm to Plaintiff.  Indeed, the September 18 Decision was designed to summarily destroy Plaintiff's reputation, employment prospects and legal career without giving Plaintiff even so much as a hint of an opportunity to defend himself.   Defendant's actions were an extraordinary abuse of authority unprecedented in American Jurisprudence.  No judicial officer has ever gone to the lengths Defendant has – which includes manufacturing factual assertions dissociated from the parties' allegations and evidence, making summary findings of purported misconduct without affording the litigant/attorney minimal due process, engaging in *ex parte* communications with the media to disseminate a decision and violating a New York sealing statute – to deliberately injure and publicly humiliate a litigant, and more importantly, harm the child at issue in the proceeding by turning the infant into tabloid fodder.

5.      To put things in perspective, without so much as Plaintiff speaking a word in his courtroom, Defendant ruined the career of a young professional, destroyed the earning power of

---

[2] Shamefully, these articles in the *The New York Post* and *The Daily News* more often than more memorialize Justice Cooper improperly degrading and demeaning litigants by calling them such things at "Bed-Pooping Cokeheads," "Deadbeat Dad" and "The Shyster of Smoked Meat."

a two (2) year old child's father directly affecting the child's well-being, blazoned a sealed matrimonial action and the child at issue across tabloid headlines, disclosed confidential facts about the child to the public and used a statutorily sealed judicial decision to inflict harm on a litigant by personally seeing to its publication and dissemination to the media.   And, what did Plaintiff do to deserve this?   He wanted to be a father to his two (2) year old son, defended himself and challenged a family court system rife with fraud, corruption and waste.

6.        It further should be noted that in engaging in the unlawful actions outlined in this Complaint, Defendant only disgraced himself, his elected office and the New York State judiciary.  Upon information and belief, Defendant has been desperately seeking an appointment to the Appellate Division, but has been passed over twice since issuing the September 18 Decision because of the scrutiny it has entailed for him.  Further, upon information and belief, Defendant is under intense investigation by the New York State Commission on Judicial Conduct for his repeated misconduct in *Zappin v. Comfort* and other cases brought to like by Plaintiff's Original Complaint in this matter.  Indeed, Defendant's animus towards Plaintiff and desire to seek reprisal against Plaintiff has manifested to the point where Defendant physically battered and spat on Plaintiff less than one (1) week ago on the street while he was exiting the New York State Commission on Judicial Conduct prompting a New York Police Department investigation.  True to form, Defendant refuses to step down from the *Zappin v. Comfort* matter.

7.        Needless to say, as a result of Defendant's wrongful actions, Plaintiff has suffered significant damages, including but not limited to loss of his employment, destruction of his future earning potential, irreparable harm to his reputation and, most importantly, the denial of a full and fair trial concerning custody of his infant son as a result of Defendant's unlawful acts.  It

is unlikely that Plaintiff will ever recover from the harm that Defendant has wrongfully inflicted. Accordingly, Plaintiff seeks both actual and punitive damages against Defendant.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  The Court also has federal question jurisdiction under 28 U.S.C. § 1331.

9.      Venue is proper pursuant to 28 U.S.C. § 1332(b)(1) and (b)(2) because the events that gave rise to this action occurred in this Judicial District.

## THE PARTIES

10.      Plaintiff Anthony Zappin is a resident of the State of West Virginia with an address of 1827 Washington Blvd., Huntington, WV 25701.  He is the Plaintiff in the matrimonial action *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending before the New York County Supreme Court (the "Matrimonial Action" or "*Zappin v. Comfort*").

11.      Upon information and belief, Defendant Matthew Cooper is a resident of the State of New York.  He is a sitting Justice of the Supreme Court of New York County, IAS Part 51, which hears matrimonial cases.  Since July 2015, Defendant has been the presiding judge in the matter *Anthony Zappin v. Claire Comfort*, Index No 301568/14 pending before the New York County Supreme Court.

## FACTUAL BACKGROUND

### Defendant's Conduct Prior to the September 18 Sanctions Decision

12.      The operative facts in this matter stem from Plaintiff's matrimonial action, *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending before Defendant in the New

York County Supreme Court.  Justice Cooper has presided over the matter since July 22, 2015.
Prior to that, the matter was pending before Justice Deborah Kaplan since February 11, 2013.
The case was transferred to Defendant after Justice Kaplan was assigned to another position in
the court system in May 2015.

13.     At that point in time, Plaintiff was understandably frustrated that he had been
subject to twenty (20) months of supervised access with his son at $150 an hour (over $100,000
in total) imposed without a hearing or fact-finding on the issue.  Plaintiff had made repeated
pleas to the court for a hearing on the issue, which were denied no less than five (5) times or
continuously delayed by the court, Ms. Comfort and most often the Attorney for the Child.
Moreover, Plaintiff was forced to litigate custody of the child with Ms. Comfort in no less than
three (3) different jurisdictions.  Ms. Comfort originally abducted the child when he was four (4)
weeks old from Washington, DC taking him to Tacoma, WA.  Ms. Comfort filed actions in both
the District of Columbia and Washington State in November 2013.  Some months later in
February 2014, Ms. Comfort again moved the child without consent from Tacoma, WA to New
York, NY where Plaintiff ended up in New York County Supreme Court.  Plaintiff had to hire
counsel in all three jurisdictions, which eventually depleted his savings. Plaintiff's income was
also exhausted on supervised access and counsel fees putting him in debt, which forced him to
proceed *pro se*.  To add insult to injury, the record was replete with instances where he was
mocked, personally insulted and stonewalled from all sides, particularly by the court-appointed
Attorney for the Child.  Regardless, Plaintiff's sole desire was to be a parent to his only child.

14.     On July 22, 2015, a hearing was held before Justice Cooper on pre-trial motions
that were previously pending before Justice Kaplan.  It was the parties' first appearance before
Justice Cooper in the case.  Justice Cooper, who had no previous involvement in the case, did not

take any time to hear the parties' positions, become familiar with the issues on the record or otherwise determine if common ground and/or settlement could be reached on some or all issues in dispute.  Instead, he came out of the gate swinging at Plaintiff.

15.     At that first hearing, Justice Cooper personally attacked Plaintiff relentlessly on the record, impugned his character and questioned his professional competency – all without any prior first-hand experience of or with Plaintiff.  It was quite apparent that Justice Cooper had already predetermined the result and the facts of the case.  Defendant even went so far as to go out of his way to mention the full name of his then employer on the record in open court with the public in the courtroom, no doubt a veiled threat towards Plaintiff's livelihood.  Moreover, Plaintiff was made to look like a punching bag, unable to defend himself, as the Defendant began the proceeding by forbidding him from speaking in the courtroom.

16.     Justice Cooper's inappropriate and discourteous behavior continued after the July 22, 2015 spilling over into his written orders.  In these orders Defendant would engage in improper and unprofessional *ad hominem* and personal attacks directed at Plaintiff, without ever addressing the substance of Plaintiff's requests for relief.  For example, Justice Kaplan had previously described the allegations of attorney misconduct against the Attorney for the Child as "quite serious" setting a briefing schedule and hearing on a motion to recuse her.  Yet, when Justice Cooper took over the case he concluded that the allegations were "baseless" without so much as requiring a response by the Attorney for the Child.  Justice Cooper justified his decision by casting conclusory, unsupported and highly improper personal attacks at Plaintiff's character and motivations.  Most disturbing, however, Justice Cooper engaged in nonstop assaults at Plaintiff's employment going out of his way to gratuitously mention the full name of his former employer in written decisions and falsely accusing him of misconduct.   Justice Cooper's

7

improper conduct was called-out and summarized by Plaintiff in a September 1, 2015 affidavit filed **before** the September 18 Decision only serving to highlight Justice Cooper's depravity and clear disregard to the best interests of the child:

> Since unlawfully taking over this case on July 22, 2015, Justice Cooper has attacked me personally and impugned my character and integrity relentlessly, going so far as to endanger my legal career by threatening to file [frivolous] disciplinary charges and gratuitously mentioning the name of my employer on the record and in various court orders. I would ask that this Court consider whether destroying my ability to make a living would be in the best interests of [the child], the 2-year old little boy in question.

(Ex. 2 at 2.)[3]  In apparent response to Plaintiff's contention that Defendant was assaulting his livelihood, Defendant did not temper his statements or conduct. Instead, he double-downed just days later by publishing and disseminating to the tabloid media the September 18 Decision illustrative of Defendant's intemperance and capacity to inflict terror on litigants.

<u>The Attorney for the Child's Motion Practice</u>

17.   The September 18 Sanction Decision was instigated by the Attorney for the Child, Harriet Newman Cohen of *Cohen Rabin Stine Schumann LLP* ("Ms. Cohen" or "Attorney for the Child"). Ms. Cohen had filed two separate motions. The first was to quash a subpoena served on her prior to a July 22, 2015 hearing seeking *inter alia* the amount of fees billed to Plaintiff's wife.[4]  Pursuant to an order issued by the state court, Ms. Cohen was required to bill her fees

---

[3]  As Plaintiff's affidavit demonstrates, the circumstances of Justice Cooper taking over the *Zappin v. Comfort* case were highly irregular and mysterious. (*See* Ex. 3.) Out of over 120 cases reassigned from Justice Kaplan's docket, *Zappin v. Comfort* was the only case to be assigned to Justice Cooper. Neither Justice Cooper, nor the Office of Court Administration have provided any explanation as to how Justice Cooper was chosen to preside over the case. Given how quickly Justice Cooper launched an assault on Plaintiff's livelihood and professional standing immediately after taking over the case as well as his highly prejudicial statements concerning Plaintiff without hearing a single exhibit of evidence, there are substantial questions looming as to Justice Cooper's assignment to the case.

[4]  The subpoena also requested Ms. Cohen disclose the source of a text message Plaintiff purportedly sent to Ms. Comfort that was attached to a prior filing by Ms. Cohen. The purported text

fifty percent (50%) to each party.  However, financial records from Ms. Comfort received during discovery revealed that Ms. Cohen was billing Ms. Comfort significantly less than what was billed to Plaintiff.  By way of example, for period between February 1, 2015 to July 1, 2015, Ms. Cohen billed Plaintiff $47,207.06 while billing Ms. Comfort only $3,516.78 without permission of the court to deviate from the court's order.  Ms. Cohen subsequently conceded that she violated the court's order in motion papers filed in September 2015 as well as at trial in November and December 2015.[5]  Nevertheless, Ms. Cohen brought motions for entry money judgments to incite and put financial pressure on Plaintiff.  In serving the July 22, 2015 subpoena, Plaintiff simply sought disclosure of Ms. Cohen records to determine her compliance with the court's so that Plaintiff could defend against her various motions for money judgments.

18.    Ms. Cohen brought a second motion in August 2015 seeking *inter alia* damages and attorneys' fees in retaliation for Plaintiff filing a confidential grievance against her retained expert to peer review the forensic custody evaluation, Dr. Aaron Metrikin, M.D., with the New York Office of Professional Medical Conduct ("OPMC").  Plaintiff filed the grievance in good faith for four (4) reasons:

- Dr. Metrikin had no prior experience whatsoever with child psychology, forensic custody evaluations or child custody cases.  Without specialized knowledge and competence in the area, Dr. Metrikin's attempts to review the

---

message was not a screenshot, but rather a list of "bubbles" made to appear as a text message.  Screenshots from Plaintiff's phone revealed that the purported text messages were fabricated.

[5] For the less than four (4) month period between September 1, 2015 and December 21, 2015, Ms. Cohen billed the parties an astounding, and quite frankly unethical, **$501,296.26** as Attorney for the Child, of which **$278,005.64** was billed to Plaintiff.  The total included Ms. Cohen's luxury car service to and from the courthouse, expensive sit-down lunches and dinners during trial and work that was unrelated to the Matrimonial Action.  Even more astonishing was that fact that Ms. Cohen billed $600 per hour for her law partner, Paul Kurland, to sit in the courtroom with her and her daughter, Martha Cohen Stine, to sit in the gallery during proceedings.  Neither Mr. Kurland, nor Ms. Stine, ever received court permission to bill as the child's fiduciary as required by law.  Ms. Cohen turned *Zappin v. Comfort* into a profiteering scheme and endeavor.

forensic custody evaluation were an apparent violation of the ethical guidelines set forth in Guideline 4 of the American Psychological Association's Guidelines for Child Custody Evaluations in Family Law Proceedings[6] and Rule 1.1 of the Association of Family and Conciliation Court's Model Standards Practice for Child Custody Evaluations.[7]

- Dr. Metrikin charged a rate of $700 per hour, roughly $200-350 per hour above the standard rate for forensic child custody evaluators and peer reviewers.  It quite clear that Dr. Metrikin was price-gouging the parties.

- Dr. Metrikin improperly attempted to bill Plaintiff for "lost-time" for a purported cancelled hearing, despite no appearances ever being scheduled for the dates billed.  Moreover, he attempted to bill Plaintiff solely for his "lost-time" even though he was directed by the court to split his fees equally with Ms. Comfort.

- Dr. Metrikin was retained by Ms. Cohen to also provide a mental health diagnosis of Plaintiff and Ms. Comfort and opine on their parenting skills without ever examining either party or observing them with the child.  This was clearly improper and malpractice.

Plaintiff raised his concerns about Dr. Metrikin numerous times with the court through motions, letters and on the record, including with Defendant, but they were never addressed.  Faced with improper threats of motions for money judgments from Ms. Cohen and Dr. Metrikin, Plaintiff filed the confidential grievance with the OPMC.

19.    Of note, Ms. Cohen did not request sanctions in either of her two motions.  After Plaintiff responded with a cross-motion seeking disqualification of Ms. Cohen and pointing out that Ms. Cohen's request for damages on behalf of Dr. Metrikin's created an apparent conflict of interest with her representation of the child, it was only then Ms. Cohen improperly requested sanctions against Plaintiff for his filing the confidential grievance with the OPMC in *reply papers*.  *See Tray Wrap, Inc. v. Pacific Tomato Growers, Ltd.*, 2008 N.Y. Misc. LEXIS 223, at

---

[6] *See* https://www.apa.org/practice/guidelines/child-custody.pdf.

[7] *See* http://www.afccnet.org/portals/0/modelstdschildcustodyevalsept2006.pdf.

*61 (Sup. Ct. Bronx Cnty. Jan. 25, 2008) ("To the extent that legal fees as a sanction pursuant to 22 NYCRR 130-1.1 were first requested in FFVA's reply, such relief is denied as it constitutes an improper use of reply papers.")

<u>The September 18, 2015 Sanctions Decision</u>

20.     With less than two (2) months before the start of the custody and access trial scheduled to commence on November 12, 2015, Defendant published and disseminated to the media his September 18 Decision.  Justice Cooper used Ms. Cohen's sanctions request in her reply papers as pretext to inappropriately impose sanctions on Plaintiff.  But the main thrust of the September 18 Decision was to purposefully inject into the media and publicize scandalous and false statements of fact about Plaintiff designed to harm his reputation and professional standing.[8]

21.     Revealingly, between July 22, 2015 (the date of the first hearing before Defendant) and September 18, 2015, the parties did not have any appearances or hearings before Defendant.  In fact, the oral argument was scheduled on Ms. Cohen's two motions for September 9, 2015, but was specifically cancelled by Justice Cooper at the last minute.  (*See* Ex. 4.)  In other words, without Plaintiff even so much as uttering a word in his courtroom, Justice Cooper

---

[8] Defendant also had an ulterior motive in publishing the September 18 Decision.  Without question, he viewed the September 18 Decision as one of his believed "great occasions" to make his mark in the media and grasp at judicial notoriety.  (*See https://www.youtube.com/watch?v=G9xociqC300.*)  If there was ever any doubt that he had hopes of self-promotion, one only needs to look at the decision itself in which he gives a "shout-out" to the New York Women's Bar Association ("NYWBA"), an organization mostly comprised of matrimonial lawyers, praising them for providing legal services to indigent (female) litigants.  Defendant insinuates that the NYWBA had some sort of participation in *Zappin v. Comfort* after Plaintiff requested the appointment of counsel.  However, the NYWBA was <u>never</u> involved in any part of *Zappin v. Comfort*.  Defendant's mentioning of the NYWBA was no doubt a shameless plug after the organization honored him – and every other matrimonial judge in Manhattan – with the NYWBA "President's Special Award" just two (2) months prior at Gala Event.  *See* http://www2.nywba.org/content/uploads/2015/09/2015-Journal-80th-AnniversaryGala.pdf.    It should further be noted that the CLE presentation where Defendant made the deplorable and intemperate statements cited above were hosted by the NYWBA, who subsequently removed all traces of the CLE presentation on their website when the clips were posted to YouTube.

11

imposed a maximum sanction under 22 NYCRR 130-1.2 of $10,000 for the filing of a confidential grievance with a wholly independent quasi-judicial administrative body, the OPMC. To highlight how truly warped the Defendant's conduct actions were, Defendant goes to great lengths to claim that Plaintiff interfered with Dr. Metrikin's professional license with the confidential grievance (*see* Ex. 1 at 16), yet fails to acknowledge (which continues to this day) the damage he inflicted on Plaintiff's professional standing and livelihood by publishing and disseminating to the media the September 18 Decision containing blatantly incorrect and defamatory statements concerning Plaintiff intended to cause harm.

22.     Justice Cooper's factual recitations in the decision, however, were not simply limited to Plaintiff's filing of a grievance with the OPMC, the conduct which Justice Cooper deemed "frivolous."   Justice Cooper instead recited allegations as facts without affording Plaintiff a hearing in addition to disclosing purported facts that were not only contrary to the record, but also wholly dissociated and inconsistent with the parties' allegations.   In fact, as shown more fully below, the vast majority of Defendant's statements concerning Plaintiff in the September 18 Decision are false, defamatory and pulled out of thin air.   Even more troubling, the September 18 Decision was strewn with personal and *ad hominem* attacks on Plaintiff lacking any basis in fact or the record, even going so far as to unlawfully and publicly question his ability to practice law, in a conclusory statement no less.

23.     Plaintiff was never given any opportunity to dispute Defendant's statements and factual recitations prior to issuance or publication of the September 18 Decision.  Plaintiff was given no notice that Justice Cooper was considering sanctions, let alone that the Justice Cooper would make such radical and extraordinary statements about Plaintiff in a published decision. Moreover, Plaintiff was never given notice that Justice Cooper intended to publish and

disseminate the September 18 Decision to the media.  To put it simply, Plaintiff was blind-sided and left without any means or opportunity to defend himself.

24.     On October 28, 2015, Plaintiff brought a motion seeking *inter alia* correction of the September 18 Decision.  It contained a detailed chart plotting each inaccurate statement made by Justice Cooper against contradictory citations to evidence and documents in the record.  The chart is attached hereto as Exhibit 5.  Even after bringing a motion asking for a correction of the September 18 Decision and demonstrating to Justice Cooper the irreparable harm the decision caused to Plaintiff's reputation, livelihood and the well-being of the child at-issue, Justice Cooper refused to correct the misstatements or take any remedial action whatsoever.

Justice Cooper's Publication and Dissemination of the September 18 Decision

25.     It was not the sanction itself that devastated Plaintiff.  Rather, it was Justice Cooper's extrajudicial actions taken after issuing the decision that caused irreparable harm.  Specifically, Justice Cooper deliberately took extrajudicial steps to inject the September 18 Decision into the media and ensure that it would be published by the press and receive maximum publicity.  Defendant's improper actions included:  (i) violating the statutory seal under DRL 235 by publishing the decision in *The New York Law Journal* and the New York State Official Reports unredacted; (ii) sending the decision to a blogger for the *The New York Law Journal* resulting in a front-page article in the publication; and (iii) providing the decision directly to *The New York Post* and *The Daily News* tabloids in an effort to generate publicity concerning the decision.  The initial dissemination of the September 18 Decision by Justice Cooper to the legal news media and tabloid newspapers set off a cascading series of articles, blogs, Facebook posts and the like across the Internet.

26.     Plaintiff received the September 18 Decision by e-mail from Defendant's law clerk, Timothy Corbo, in the afternoon of Friday September 18, 2015.  Although not explicit, it was immediately clear from the form and substance of the decision that Defendant intended to publish it.  Accordingly, Plaintiff and his counsel sent a series of e-mails that day and over the weekend to Justice Cooper, his law clerks and the New York Attorney General's Office requesting that the September 18 Decision be embargoed until Plaintiff had an opportunity to brief the issue of publication.  All of Plaintiff's e-mails were ignored and Justice Cooper went on to publish and disseminate the decision to the media.

### *The New York Law Journal*

27.     By his own admission, Justice Cooper sent the September 18 Decision to *The New York Journal* for publication, which was an ostensible act to ensure the decision would receive publicity.  On November 2, 2015, Defendant stated the following on the record in open court:

> THE COURT:     [T]he decision was sent to decisions at ALM dot com.  ALM dot com is where decisions to the law journal are sent.  … It was sent to the New York Law Journal … [T]he decision was sent to the law journal at decisions at ALM dot com.[9]

*The New York Law Journal* is an unofficial reporter for the Supreme Court of the State of New York Appellate Decision, First Department pursuant to Judiciary Law § 91(1), which only permits the publication of notices, calendars and advertisements – not judicial decisions.  Justice Cooper's overt act of personally sending the September 18 Decision to *The New York Law Journal* for publication – particularly given its statutorily sealed nature – was inappropriate, contrary to the law and an extrajudicial act.

---

[9] Upon information and belief, ALM Media Properties, LLC is the owner and operator of *The New York Law Journal.*

14

28.     As a result of Justice Cooper's improper publication of the September 18 Decision in *The New York Law Journal*, the decision can be obtained from numerous other sources with a simple web search including, but not limited to, Westlaw, LexisNexis and Justia. The September 18 Decision remains publicly accessible as of the date of filing of this Amended Complaint.  Upon information and belief, the September 18 Decision and its defamatory contents have been viewed by thousands of people as a result of its publication in *The New York Law Journal*.

29.     Plaintiff has requested numerous times that Justice Cooper produce his communications with *The New York Law Journal* in which he sent the September 18 Decision. Pursuant to 22 NYCRR 100.3(B)(6), a judge must "make[] provision for prompt notification of other parties or their lawyers of the substance of the ex parte communication …."  Justice Cooper, however, has refused to provide copies of his communications.  Plaintiff believes that discovery in this action will provide further evidence to support his claims that Justice Cooper engaged in the extrajudicial acts of communicating with the media in an effort to defame and harm Plaintiff's reputation.

### *Blogger Benjamin Bedell*

30.     Upon information and belief, Justice Cooper also sent the September 18 Decision to blogger Benjamin Bedell at *The New York Law Journal*.  On Monday September 21, 2015, Mr. Bedell contacted Plaintiff for comment about the decision.  During a telephone conversation that day between Plaintiff, his counsel and Mr. Bedell, Plaintiff asked Mr. Bedell how he obtained the decision.  Mr. Bedell responded:  "I received it from Judge Cooper's chambers." Plaintiff then inquired:  "They sent it directly to you?"  Mr. Bedell responded:  "Yes."

15

31.    Counsel for *The New York Law Journal* subsequently confirmed Mr. Bedell's above statements.  On October 21, 2015, Plaintiff had a telephone call with Camille Calman of *Davis Wright Tremaine LLP* in which she confirmed that Mr. Bedell received the September 18 Decision directly from Justice Cooper's law clerk.   Ms. Calman followed-up the telephone conversation with the below e-mail:

> Thanks very much for speaking with me this afternoon.  Just to clarify, what I said was that it was my understanding that the reporter had already told you that he received the decision from a clerk in Justice Cooper's chambers.

(Ex. 6.)

32.    On the evening on September 21, 2015, Mr. Bedell briefly published a copy of the September 18 Decision that he obtained from chambers on *The New York Law Journal*'s website.  Mr. Bedell's copy differs substantially from the version sent to the parties in the Matrimonial Action.   It is unsigned and contains several typographical errors and formatting mistakes.  It is attached hereto as Exhibit 7.  It appears that Mr. Bedell received an unsigned draft copy of the September 18 Decision.

33.    Additionally, on the evening of September 21, 2015, Mr. Bedell published a blog post summarizing the September 18 Decision.  It is entitled "Attorney Sanctioned for Handling His Own Divorce."  It is attached hereto as Exhibit 8.  Upon information and belief, Mr. Bedell's blog post has been viewed by thousands of people and is a direct result of Justice Cooper's improper dissemination of the September 18 Decision to Mr. Bedell.

### *The New York Post and The Daily News*

34.    Upon information and belief, Defendant also sent the September 18 Decision to tabloid journalists Julia Marsh at *The New York Post* and Barbara Ross at *The Daily News* – who, as detailed above, have written virtually all of the numerous articles disparaging litigants

appearing in Justice Cooper's courtroom.  (*See* Ex. 2.)  On Monday September 21, 2015, both Ms. Marsh and Ms. Ross contacted Plaintiff numerous times via e-mail and telephone requesting comment concerning Justice Cooper's September 18 Decision.  Based on records confirming the time of the calls and the e-mails, Ms. Marsh and Ms. Ross were in possession of the September 18 Decision at least several hours (and possibly days) prior to its publication on *The New York Law Journal* website and the New York State Official Reporter's archive of unpublished decisions.

35.     At the conclusion of a hearing on October 6, 2015, Plaintiff spoke with both Ms. Marsh and Ms. Ross in the hallway with his counsel.  During the course of the conversation, they both confirmed they received copies of the September 18 Decision directly from Justice Cooper's chambers.  Ms. Marsh was unequivocal stating to Plaintiff that:  "It was published. Tim Corbo [Defendant's law clerk] gave it to me."[10]  Ms. Ross reiterated the same.  It was later learned that Defendant's law clerk, Timothy Corbo, provided Ms. Marsh and Ms. Ross a copy of

---

[10] To highlight the absurdity of Justice Cooper and Julia Marsh's conduct in publicizing *Zappin v. Comfort*, on July 26, 2016 Ms. Marsh published an article in *The New York Post* entitled:  "How Celebs Manipulate the System to Keep Messy Divorces Private."  *See* http://pagesix.com/2016/07/26/how-celebs-manipulate-the-system-to-keep-messy-divorces-private/.  In that article, Ms. Marsh praised Justice Cooper for maintaining the secrecy of celebrity divorces and wrote:

> Manhattan Justice Matthew Cooper is particularly intent on maintaining the charade of secrecy in Gere's case, calling the actor "Mr. Anonymous" even in the courtroom. During a recent court appearance, Gere didn't even realize he was being summoned when Cooper called for him using the moniker.

It is unfortunate that Justice Cooper holds sacrosanct the privacy of Hollywood movie star Richard Gere and not "country boy" Anthony Zappin and his child.  Even worse, Ms. Marsh quotes Harriet Cohen, the Attorney for the Child in *Zappin v. Comfort*, as an expert "veteran divorce lawyer" in the article.  Ms. Cohen is quoted as saying:

> Sometimes the biggest piece of leverage you have in the case is that it will never hit Page Six.

If anything, Ms. Marsh's article serves to demonstrate the incestuous relationship between the court, the tabloid media and the select cartel of matrimonial lawyers in Manhattan.

the September 18 Decision by e-mail on September 18 shortly after it was provided to the parties.

36.     On September 22, 2015, Ms. Marsh wrote an article both in the print and online editions of *The New York Post* entitled "Patent-lawyer a 'Fool' for Representing Himself in Divorce Battle: Judge." (*See* Ex. 9.)  Upon information and belief, the online version of the article appeared on the front page of *The New York Post*'s website for multiple days.  The article summarizes and extensively quotes from Defendant's September 18 Decision.  Upon information and belief, Ms. Marsh's article has been viewed by thousands of people.  The article is a direct result of Justice Cooper's improper dissemination of the September 18 Sanctions Decision to her as Defendant instigated and conspired with Ms. Ross to defame Plaintiff.

37.     On September 22, 2015, Ms. Ross wrote an article both in the print and online editions of *The Daily News* entitled "Manhattan Lawyer Fined $10G for Bullying Judge and Attorney in His Divorce Case." (*See* Ex. 10.)  Upon information and belief, the online version of the article appeared on the front page of *The Daily News'* website for multiple days.  The article summarizes and extensively quotes from Defendant's September 18 Decision.  Upon information and belief, Ms. Ross' article has been viewed by thousands of people.  The article is a direct result of Justice Cooper's improper dissemination of the September 18 Sanctions Decision to her as Defendant instigated and conspired with Ms. Ross to defame Plaintiff.

### *Other Publications*

38.     The articles published in *The New York Law Journal, The New York Post* and *The Daily News* were a direct result of Justice Cooper's dissemination of the September 18 Decision to those publications, which spawned numerous other articles containing Justice Cooper's untrue statements concerning Plaintiff by other publications.  This includes published articles and blog

posts by prominent publications in the legal industry such as the *ABA Journal*, *Law360.com*, *The Family Lawyer Magazine* and *Above the Law* to name a few.   The decision also generated perpetual coverage of the matrimonial action by tabloids *The New York Post* and *The Daily News*, which continued to target Plaintiff well-after the September 18 Decision by publishing untrue allegations made by Ms. Comfort throughout the remainder of the proceeding.

<u>Justice Cooper's Taunting of Plaintiff Concerning the September 18 Decision</u>

39.    Justice Cooper's issuance of the September 18 Decision that destroyed Plaintiff's livelihood and reputation was apparently not enough for him.   Justice Cooper used the September 18 Decision as a means to persistently taunt, mock and ridicule Plaintiff in the aftermath of the publication of the decision.   Justice Cooper's behavior was callous and revealed an ever present deep-seeded antagonism towards Plaintiff throughout the proceeding and that he in fact intended to harm Plaintiff with the publication and dissemination to the media of the September 18 Decision.   Moreover, it is evidence that Plaintiff was denied a full and fair trial as a result of Defendant's behavior and unlawful conduct.   The excerpts below are illustrative, but by no means exhaustive, examples of Defendant's reductive taunting and mocking of Plaintiff concerning the September 18 Decision.

40.    At a hearing on November 2, 2015, Justice Cooper proudly proclaimed that the September 18 Decision made the front page of *The New York Law Journal*:

> THE COURT:          In fact, I'm told the decision was published and there was an article on the front page because apparently sometimes the law journal decides to write articles in matters that they think are of importance to the bar or the bench.

Notably, Justice Cooper blatantly deflects from the fact that he instigated the front page article by contacting Mr. Bedell with a draft copy of the September 18 Decision.

41.    On November 10, 2015, Defendant acknowledged his September 18 Decision destroyed Plaintiff's professional standing taking pains to make reference to it on the record while *The New York Post* and *The Daily News* reporters were in the courtroom:

> THE COURT:    I have actually allowed and I welcome having Mr. Schorr involved.  As I made clear in my sanction's decision, Mr. Zappin representing himself did an amazing disservice both to himself and to this case and to his – and in fact to his professional standing.

It is important to point out that David Schorr entered his appearance and began representing Plaintiff on July 28, 2015, some ***two (2) months*** prior to Defendant's September 18 Decision. (*See* Ex. 11.)  But, Justice Cooper's statement illustrates that the publication and dissemination to the media of September 18 Decision was directed squarely at attacking Plaintiff's professional standing and reputation.

42.    During trial on November 23, 2015, Justice Cooper interrupted Plaintiff's testimony to mock Plaintiff concerning the September 18 Decision and claim ignorance as to why Plaintiff lost his job – even though Plaintiff was terminated the same day that Mr. Bedell's article on the September 18 Decision appeared in *The New York Law Journal*:

> MR. ZAPPIN:    I would like to have a job.  I would like to have a career.  I would like to have access to my child –
>
> THE COURT:    Maybe you should have comported yourself properly and maybe you wouldn't have been fired and I have no reason why you were fired but I did the right thing in writing a decision about totally inexcusable behavior ….

Justice Cooper's claims that he had no idea why Plaintiff was fired from his job was an amazing, yet illustrative, display of mendacity.  Regardless, Justice Cooper's interruption of Plaintiff's testimony to mock Plaintiff was inappropriate to say the least and was demonstrative of Defendant's overall intent to harm Plaintiff.

20

43.     During the trial on December 1, 2015, Justice Cooper again taunted Plaintiff concerning his release of the September 18 Decision to the media:

> THE COURT:     It's done.  I did it.  And if you want to keep coming back and making threats I'm going to expose how you released it to the media, be my guest …
>
> You want to focus on your child or do you want to focus on you, what's more important?  You sit up here and say nothing matters to me more than my son.  I would give anything for my son.  You know, prove it.

Contrary to Justice Cooper's statement, Plaintiff never "threatened to expose" Justice Cooper concerning the release of the September 18 Decision to the media, but rather simply requested copies of his admitted communications with *The New York Law Journal* and other publications, which have never been produced.  Moreover, Justice Cooper's attempts to tie Plaintiff's requests concerning the September 18 Decision – which cost Plaintiff his job – into evidence that Plaintiff did not care for his child was inexplicable.

44.     During the trial on December 10, 2015, Justice Cooper mocked Plaintiff again about losing his job due to the September 18 Decision:

> THE COURT:     We won't.  If she testifies at 2:15, it's not going to work.  Then what I should do is written summations.
>
> MR. ZAPPIN:     I would prefer written summations.
>
> THE COURT:     You would.  You have all the time in the world, but let's be honest here.

Justice Cooper's above crass statements were disrespectful and evidence that – much like his inappropriate demeanor in the above-referenced YouTube videos – he would go out of his way to mock and ridicule Plaintiff.

21

<u>Loss of Plaintiff's Employment as a Result of the September 18 Sanctions Decision</u>

45.     As a result of Justice Cooper's improper conduct associated with the September 18 Decision, Plaintiff has suffered an incalculable amount of damages.  On September 22, 2015 – the day Mr. Bedell, Ms. Marsh and Ms. Ross published their articles – Plaintiff was terminated from his position as an associate at *Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.* ("Mintz Levin").  After receiving a glowing report during his annual review from the firm just one (1) month prior, the sole stated reason for Plaintiff's termination was Justice Cooper's September 18 Decision and the incendiary statements contained therein.  Plaintiff was humiliated in front of his colleagues when he was frog-marched out of the office by building security shortly after being told copies of the September 18 Decision and Ms. Marsh's article in *The New York Post* were faxed to the firm's main New York fax number.

## DEFENDANT IS NOT ENTITLED TO IMMUNITY

46.     Justice Cooper is not entitled to judicial immunity for his publication of the September 18 Sanctions Decision in *The New York Law Journal*.  The New York Court of Appeals has held that a judge sending a decision to *The New York Law Journal* is <u>not</u> a judicial act.  Specially, the Court of Appeals has stated:

> We are asked to take judicial notice that the New York Law Journal and the New York Supplement, though not official reports, are recognized legal publications, and that "opinions in the New York Supplement are continually cited both by judges and attorneys in opinions, decisions and briefs."  Even though that be true, a judge has no official duty in connection with any publication of opinions except in the official reports.  The publication of an opinion begins when the judicial decision is complete, and though in some degree connect with the exercise of a judicial function, ***since the law imposes upon the judge no duty to publish opinions in unofficial reports, acts connected with such publications are not performed by the judge in his judicial capacity***.  The judge's rights and duties there are the same as those of any private person and if he chooses to act he must be held liable like any other person for damages resulting from a wrongful act ….

*Murray v. Brancato*, 290 N.Y. 52, 57 (N.Y. 1942) (emphasis added).

22

47.    Justice Cooper's action of sending the September 18 Sanctions Decision directly to *The New York Law Journal* for publication is <u>not</u> a judicial act is all the more confirmed by statute directed at judicial officers.   DRL 235 specifically enjoins a judicial officer from releasing matrimonial files for public viewing:

> ***An officer of the court*** with whom the proceedings in a matrimonial action … [is] filed … or his clerk, either before or after termination of the suit, shall not permit a copy of any of the pleadings, affidavits, findings of fact, conclusions of law, judgment of dissolution, written agreement of separation or memorandum thereof, or testimony, or any examination or perusal thereof, to be taken by any other person than a party, or the attorney or counsel of a party ….

(emphasis added.)  New York courts have explained that "Domestic Relations §235(1) prohibits a court employee from disseminating papers filed in a matrimonial action …." *Tornheim v. Blue & White Food Prods. Corp*, 73 A.D.3d 747, 748 (2nd Dept. 2010).  In *Danziger v. Hearst Corp.*, 304 N.Y. 244 (1952), the New York Court of Appeals explained that "[t]he rule is addressed to officers and clerks of the New York Supreme Court." *Id*. at 248.  Courts in New York State have stated that DRL 235 provides sealing for all "files" and "records" in matrimonial actions.  *See Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 13 (1970) ("[DRL 235], which prohibits the taking of copies, or even the inspection of the records of matrimonial proceedings by any one other than the parties or their counsel, manifests a clear legislative design that those proceedings be kept secret and confidential."); *see also Kodsi v. Gee*, 54 A.D.3d 613 (1st Dept. 2008) ("[DRL 235] mandates that ***all papers filed*** in a matrimonial matter be designated as confidential" (emphasis added).); *Tornheim v. Blue  White Food Prods. Corp.*, 73 A.D.3d 747, 748 (2nd Dept. 2010) ("[DRL235] prohibits a court employee from disseminating papers filed in a matrimonial action …."); *Parker v. Parker*, 2 Misc. 3d 484, 492 (Sup. Ct. Nassau Cnty. Dec. 8, 2003) (same).  Even Defendant himself has professed the confidentiality of matrimonial proceedings on the record:

> THE COURT:          He [Plaintiff] also threatened that if the AFC attempted to collect the fees owed by the husband any such attempt will be swiftly and publicly met with claims against the AFC and the AFC's firm, even though ***matrimonial actions are presumptively sealed***.

(emphasis added.)  Justice Cooper's above statement was made on July 22, 2015, less than two months prior to the September 18 Decision.

48.     Similarly, Justice Cooper is not entitled to judicial immunity for his dissemination of the September 18 Decision to blogger Benjamin Bedell at *The New York Law Journal*, Julia Marsh at *The New York Post* or Barbara Ross at *The Daily News*.  It is not a judicial act for a judicial officer to directly contact a member of the media, much less with a sealed judicial decision or an unsigned draft copy of it, seeking publicity.  "It is well-settled that the making allegedly false statements to the news media does not qualify as a judicial act."  *Barrett v. Harrington*, 130 F.3d 246, 260-61 (6th Cir. 1997).  Defendant's *ex parte* communications with the media are akin to releasing a press release to the media containing false and defamatory statements, which has been held not to be a judicial act.  *See Yoder v. Workman*, 244 F. Supp. 2d 1077, 1080 (S.D.W.Va. 2002) ("A press release about the recusal order was not a judicial act and, as such, absolute judicial immunity does not apply to shield its author.").

49.     Justice Cooper cannot avail himself to the "Fair Report Privilege."  New York Civil Rights Law § 74 typically shields the author from liability for "the publication of a fair and true report of any judicial proceeding …."  However, even assuming *arguendo* that Justice Cooper's false statements in the September 18 Decision were a "true and accurate" report of the proceedings (which they were not as discussed more fully below), the privilege is not applicable in matrimonial cases.  Specifically, the New York Court of Appeals has carved out an exception to the Fair Report Privilege for matrimonial cases.  It has held that:

> In most types of proceedings the advantage in having judicial proceedings public more than counterbalances the inconveniences to the private person whose conduct may be the subject of such proceedings.  On the other hand, however, the Legislature has, at least since 1847, made it plain that in matrimonial action the balance of convenience is in favor of the individual and that in the case of papers filed in such actions the public interest is served not by publicizing them but by sealing them and prohibiting their examination by the public.
>
> Since, then, such matrimonial actions were and are not proceedings which the public had the right to hear or see, it follows – and it has been consistently held – that the privilege generally according to report of judicial proceedings is unavailable to reports of matrimonial actions … ***It is apparent, therefore, that the privilege created by section 74 of the Civil Rights Law does not attach to the publication of a report of matrimonial proceedings.***

*Shiles*, 7 N.Y.2d at 14-15 (internal quotation marks and citations omitted) (emphasis added).

50.     Lastly, Defendant acted wholly without jurisdiction in imposing sanctions and a fine on Plaintiff.  *See Stump v. Sparkman*, 435 U.S. 349 (1978).  Defendant had no jurisdiction to adjudicate the merits of a complaint filed in an administrative action before a quasi-judicial body, the New York Office of Professional Medical Conduct, in which the aggrieved party failed to petition Defendant for relief.  *See Canzona v. Atanasio*, 2012 N.Y. Misc. LEXIS 6797, at *6 (Sup. Ct. Suffolk Cnty. Aug. 16, 2012); *Nichols v. Branton*, 995 N.Y.S.2d 450, 455 (Sup. Ct. Columbia Cnty. Sept. 24, 2014).  This is confirmed by Defendant's finding that the Attorney for the Child was not acting on Dr. Metrikin's behalf in seeking damages and that there was "no evidence that the expert was even aware of the relief being sought."   (Ex. 1 at 22.) Consequently, there was no case or controversy before Defendant as the Attorney for the Child lacked standing to seek relief and Defendant was therefore completely without jurisdiction as to Plaintiff's OPMC complaint.  *See Silver v. Pataki*, 96 N.Y.2d 532, 539 (N.Y. 2001).

## DEFENDANT'S DEFAMATORY STATEMENTS

51.     In the September 18 Decision, Justice Cooper unlawfully published and disseminated numerous false and defamatory statements concerning Plaintiff.[11]   These false statements, as set forth below, were made deliberately and with actual malice.   Justice Cooper had knowledge that the statements were false, inaccurate and misleading when the September 18 Decision was published and disseminated to the media and acted with reckless disregard for the truth or falsity of his statements.   By publishing the September 18 Decision in *The New York Law Journal* and disseminating these materially false statements to other media outlets, Justice Cooper engaged in acts that were not within his adjudicatory role that irreparably harmed Plaintiff by unlawfully damaging his reputation and professional standing.

### Defendant's False Statements Concerning the Filing of the OPMC Complaint

52.     In the September 18 Decision, Defendant made the following statements with regard to Plaintiff's filing of a complaint with the OPMC against Dr. Aaron Metrikin:

> What is so concerning about plaintiff's complaint to the OPMC is not so much what he says – as reckless and dishonest as those statements may be – but what he has chosen not to say.   ***Never once in his letter does he mention that the psychiatrist was court-appointed pursuant to an order signed by Justice Kaplan on September 12, 2014.   Never once does he mention that the rate the psychiatrist was to be paid is specified in Justice Kaplan's order; the fee being set by the court, not by the doctor himself … And never once does plaintiff mention that Justice Kaplan's order provides that the reason for the appointment is to enable the AFC to have her own expert review the report of the forensic evaluator and observe his testimony, something generally referred to as a "peer review."***   These facts, which plaintiff chose not to reveal, are overwhelming significant and relevant to the disciplinary proceeding that plaintiff

---

[11] Plaintiff notes that Defendant's September 18 Sanctions Decision is laced with false statements of fact concerning the matrimonial proceeding and litigations with Plaintiff's wife.  Although many of Defendant's false statements are defamatory (which are outlined below), Plaintiff is unsure whether some of Defendant's other false and inaccurate statements are defamatory or actionable under the law.  For a full list of Defendant's misrepresentation in the September 18 Decision, the reader should refer to the chart contained in Exhibit 5.

commence through his complaining letter, and they would certainly be essential to the AFC's expert's defense against the charges ….

It is beyond question that action taken in this case by the AFC's expert was done in accordance with a valid court order.  It is equally clear that plaintiff's sole reason for filing the complaint with the OPMC – and doing so only two weeks after I awarded the doctor a money judgment against him – was to send a not-so-subtle message.  That message is [sic] being:  If you do something the plaintiff does not agree with – whether you [sic] a party, an attorney, a judge, or a doctor – he will do whatever he can to harm you.  ***Here, plaintiff has gone beyond the pale by cynically and maliciously interfering with a physician's most valuable asset: his license to practice medicine.***  It is ironic that plaintiff, in his papers, bristles at the mere suggestion that he has violated the Rules of Professional Conduct, and he accuses anyone who makes such a suggestion of recklessly seeking to destroy his livelihood by preventing him from practicing law.  Ironically, it seems plaintiff has no compunction against doing this to another professional.

(Ex. 1 at 16-17 (emphasis added).)  Again, it bemoans the point that Defendant engaged in the precise conduct for which he purportedly sanctioned Plaintiff.  However, where Plaintiff filed a confidential grievance to the OPMC supported by uncontroverted evidence, Defendant went out of his way to publish and disseminated to the media the September 18 Decision containing untrue statements of fact and aspersions directed at Plaintiff's professional standing to "cynically and maliciously interfere with [Plaintiff]'s most valuable asset:"  his ability to practice law.

53.    Defendant's factual statements concerning Plaintiff's OPMC complaint against Dr. Metrkin and assertions that Plaintiff was "dishonest" in filing the complaint are demonstrably false.  Defendant's statement that Plaintiff failed to mention to the OPMC that Dr. Metrikin was "court-appointed" is not true.  This is because Dr. Metrikin was not "court-appointed," but rather "retained" by the Attorney for the Child.  This is evidenced by Defendant's own words at the July 22, 2015 motions hearing:

THE COURT:        In terms of Aaron A. Metrikin, M.D., there was an expert ***retained*** by Ms. Cohen.  Judge Kaplan's order, which was never appealed from or modified, dated the 12th day of September 2014, requires both sides to pay $2,500 each, for

> a total of $5,000 as a retainer to Dr. Metrikin.   The defendant paid her part.  The plaintiff has not paid his part. He now says that it's unnecessary.  He takes issue with Dr. Metrikin being ***retained***, but Judge Kaplan's order stands.

(emphasis added.)  The spuriousness of Defendant's statements in his September 18 Decision is further confirmed by an order dated February 27, 2015 written by Justice Deborah Kaplan in which she states:

> In an Order, dated September 12, 2014, the court granted the AFC permission to ***retain*** Dr. Aaron Metrikin, M.D., to review the Forensic Report and to observe any testimony given by Dr. Ravitz.

(emphasis added.)   But to truly point out the absurdity of Defendant's false statement, it is contradicted by his own words in the September 18 Decision:

> The second motion (Motion Sequence 21) is for permission to communication with the New York State Office of Professional Medical Conduct (the "OPMC") and to release court documents in connection with a disciplinary complaint plaintiff filed with the OPMC against the psychiatrist she ***retained*** as an expert witness …

(Ex. 1 at 3 (emphasis added).)  Accordingly, Defendant's statement that Plaintiff was "dishonest" and improperly withheld information from the OPMC that Dr. Metrikin was "court-appointed" is indisputably untrue and defamatory.

54.      Defendant's statement that Plaintiff was "dishonest" and failed to inform the OPMC that Dr. Metrikin's rate of $700 per hour was a rate set by the court is false.  Again, this is because the rate was set and requested by Dr. Metrikin as evidenced by a September 12, 2014 order signed by Justice Deborah Kaplan, which states: "Dr. Metrikin requests a $10,000 retainer and an hourly rate of $700 per hour."  Consequently, Defendant's statement that Plaintiff was "dishonest" and improperly withheld information from the OPMC that Dr. Metrikin's rate of $700 was chosen by the court is false and defamatory.

55.    Defendant's statement that Plaintiff was "dishonest" and failed to inform the OPMC that the reason for Dr. Metrikin's "appointment" was to allow the Attorney for the Child to peer review the forensic custody evaluation is plainly false.  Exactly the opposite is true as Plaintiff states in the first page his complaint to the OPMC:

> Ms. Cohen has stated that [Dr. Metrikin] has been retained to "assist [her] in [the] review of Dr. Alan Ravitz's forensic child custody report …."  (*See* Attachment A.)

(Ex. 5 at 12.)  Notably, Plaintiff quoted directly from the Attorney for the Child's September 10, 2014 letter to the court concerning her retention of Dr. Metrikin.  Defendant extensively quotes from Plaintiff's grievance filed with the OPMC in his September 18 Decision and therefore knew that his statements and representations concerning Plaintiff's complaint to the OPMC were false.  Put simply, Defendant deliberately misrepresented Plaintiff's statements to the OPMC in the September 18 Decision.  Accordingly, Defendant's statement that Plaintiff was "dishonest" and improperly withheld information from the OPMC that Dr. Metrikin was retained to do a peer review of the forensic child custody report is false and defamatory.

56.    Defendant's statement that Plaintiff's "sole purpose" of filing the OPMC complaint was to send a "not-so-subtle" message to "harm" Dr. Metrikin is false.  Likewise, Defendant's contention that Plaintiff "cynically and maliciously interfered" with Dr. Metrikin's medical license is false.  As explained above, Plaintiff had a good faith basis to alert the OPMC of potential fraud and medical malpractice by Dr. Metrikin.   Plaintiff exercised his First Amendment privilege and statutory right under New York law to petition the OPMC.  The righteousness of Plaintiff's complaints to the OPMC were confirmed when the Attorney for the Child removed Dr. Metrikin from her witness list filed with Defendant just days later on October

6, 2015.  The Attorney for the Child did not use Dr. Metrikin for any purpose at the custody and access trial after the September 18 Decision.

57.     Ironically, it is Defendant's false statements published and disseminated to the media (unlike Plaintiff's highly confidential complaint to the OPMC) as highlighted above that have harmed Plaintiff's most-valuable assets:   his livelihood and professional standing. Defendant has refused to correct his deliberate misstatements of fact.  This is demonstrative of Defendant's deep-seeded antagonism and feverous intent to cause harm to Plaintiff.

<u>Defendant's False Statements Concerning Plaintiff and the Attorney for the Child</u>

58.     In the September 18 Decision, Defendant made the following statements with regard to Plaintiff's conduct towards the Attorney for the Child, Ms. Cohen:

> True to his word, plaintiff responded by "swiftly and publicly" retaliating against Ms. Cohen and her law firm.  He did so by having Zappin Enterprises, a company which lists plaintiff and his father as its owners and plaintiff as its designated agent, and is run from the same West Virginia address where plaintiff claimed to have lived when he left New York, register the internet domain *www.harrietnewmancohen.com*.   "Harriet Newman Cohen" is the AFC's full name.

> The purpose of the website was chillingly clear from various posting made under plaintiff's father's name.  Illustrative of these posting, and indicative of the whole nature of the enterprise, are the following messages:

>> Harriet.  You're a very sick and greedy woman.  I pray for you and hope you seek help.

>> I intend to keep the public apprised of your misconduct and disturbing behavior.

>> Quickly climbing up the Google rankings.  Stay tuned for updates.

(Ex. 1 at 13-14.)

59.     Defendant's statement that Plaintiff placed the various "postings" to the website concerning Ms. Cohen are false.  This is illustrative by the Ms. Cohen's motion papers in which

she unequivocally avows that the statements quoted by Defendant were ***private e-mails*** sent by Plaintiff's father:

> 4.    I had also received threatening and harassing emails on July 16[th], purportedly emanating from the email account of Anthony Zappin's father, who was staying in Anthony Zappin's residence. They read as follows:
>
>> Email dated July 16, 2015, 1:01 a.m., Subject: Reid Zappin: "**Harriet You're a very sick and greedy woman. I pray for you and hope you seek help**. Jeff;"
>>
>> Email dated July 16, 2015, 3:35 a.m., Subject: Reid Zappin: "**Harriet My company now owns www. harrietnewmancohen.com, I intend to keep the public apprised of your continued misconduct and disturbing behavior. Jeff**;" and
>>
>> Email dated July 16, 2015 10:35 a.m., Subject: Harriet Cohen's New Website: "www.harrietnewmancohen.com.   **Quickly climbing up the Google rankings. Stay tuned for updates.  Jeff Zappin**." (Emphasis added.)

(Ex. 5 at 10.)  Defendant knew that his statements in the September 18 Decision concerning the alleged "posts" were not true as evidenced by the fact that he altered and excised sentences from the quoted passages in Ms. Cohen's motion papers that made it clear the quoted messages were ***private e-mails*** and not "postings" to a website.  Moreover, Defendant's statement that Plaintiff unlawfully used his father's name and/or Zappin Enterprises LLC to make "postings" or statements concerning the AFC is false.

60.    Defendant's contention that Plaintiff has "retaliated" against Ms. Cohen and her law firm are false.  Plaintiff has never "retaliated" against either party, either publicly or privately.

61.    It should be further noted that Defendant's contention that Plaintiff had Zappin Enterprises LLC register the domain name www.harrietnewmancohen.com to retaliate against Ms. Cohen is false.  Defendant received a sworn affidavit on July 22, 2015 from the Chairman of Zappin Enterprises LLC with corroborating exhibits attached attesting that Plaintiff "has not had anything to do with the company."   This affidavit with attached exhibits was uncontroverted.

31

Likewise, Defendant's claim that Zappin Enterprises LLC is registered to Plaintiff's residential address is inaccurate and contrary to the record in the Matrimonial Action.   Accordingly, Defendant's statements concerning Plaintiff registering and "posting" to www.harrietnewmancohen.com are false and defamatory.

<u>Defendant's False Statements Concerning His Son's Medical Evaluation</u>

62.      In the September 18 Decision, Defendant made the following statement directed at Plaintiff seeking a developmental assessment for his son:

> In my July 22, 2015 decision, I detailed the fact that there was nothing in the record to indicate that the child suffered from any developmental issues, and that all the evidence firmly established that he is a healthy, thriving infant, ***who, in the words of his pediatrician, "will reach developmental milestones in a timely fashion."***   In our legal system, we do not force children involved in a divorce to undergo unnecessary medical exams so that one parent can pursue an unfounded fixation or search for material to use against the other.

(Ex. 1 at 24.)

63.      In this instance, Defendant deliberately and intentionally misrepresents the record that was before him.   Specifically, the child's pediatrician never uttered Defendant's purported quote above.   Rather, Defendant quotes comes from "Goals" section of the child's initial assessment with a physical therapist, which stated:

> History of Presenting Problem:  Mild developmental delay.
>
> ***
>
> <u>ASSESSMENT</u>:  Almost 7 month old infant referred to PT with dx of torticollis. P L torticollis with spasms, stiffness, weakness & mild developmental delay of gross motor skills.
>
> ***
>
> <u>GOALS:</u>
>
> ***

32

> Functional Outcomes:  PT will reach developmental milestones in timely fashion
> and neutral positioning of cervical spine.

(Ex. 12.)  Defendant had the complete medical record from the physical therapist before him.

Accordingly, Defendant knew that his representations concerning the pediatrician's statements

were false and that the child was diagnosed with developmental delay.

64.    Moreover, as reflected in the child's medical records in the possession of the

court, the child's pediatrician specifically recommended physical therapy as well as a

developmental assessment.   Plaintiff's concerns of the child's developmental delay were

corroborated by supervisors who indicated that the child had trouble verbalizing and socializing

with other children as well as that the child was still suffering from a congenital medical

condition.  In fact, Defendant was aware that through e-mails attached to motion papers that Ms.

Comfort offered to take the child to the Department of Pediatric Child Development at Weill

Cornell for the developmental assessment.  The dispute was over which parent would take the

child to the assessment, not whether the child would be taken for the assessment.  Consequently,

Defendant's statements that Plaintiff attempted to subject his child to "unnecessary medical

exams" or that he was fixated on searching for material to use against the child's mother are

simply false and defamatory.  Moreover, Defendant's publicizing private facts about the child's

medical care and Plaintiff's relationship with the child was shameful and in direct contravention

of the best interests of the child.

   Defendant's False Statements Concerning "Neglect" of the Child by Ms. Comfort

65.    In the September 18 Decision, Defendant made the following statements asserting

that Plaintiff had alleged that his wife "neglected or abused" their child:

> It also involves the AFC's assertions that whatever minor bruises and scrapes the
> child has exhibited, and which plaintiff has sought repeatedly to portray as proof
> of defendant's physical neglect or abuse of the boy, are simply the normal result

33

of being an active two-year-old … Rather, it is the AFC advocating on behalf of her client, the child, by seeking to have him avoid needless medical exams or unwarranted, and very likely harmful, intervention by the police or child protection officials.

(Ex. 1 at 25.)

66.     Defendant's statement that Plaintiff accused Ms. Comfort of "neglect and abuse" of their child for "minor bruises and scrapes" is false.  Plaintiff never made any such assertion to the court or otherwise.

67.     Defendant's assertion that Plaintiff attempted to subject the child to "needless medical exams" is false.  Plaintiff has addressed the speciousness and falsity of Defendant's assertions above.

68.     Defendant's assertion that Plaintiff attempted to subject the child to "unwarranted" and "harmful" intervention by "police or child protection officials" is false and defamatory.  Plaintiff never sought any such unwarranted intervention by police or child protection officials.  Defendant's publicizing purported private facts about the child's care and Plaintiff's relationship with the child was disgraceful and in direct contravention of the best interests of the child.

<u>Defendant's False Statements that Plaintiff "Harmed" His Son</u>

69.     In the September 18 Decision, Defendant made the following statements concerning Plaintiff's conduct towards his two (2) year old son:

This divorce case, unfortunately, presented a situation where an attorney has used his *pro se* status to inflict harm … on their child …[12]

(Ex. 1 at 2.)

---

[12] Plaintiff disputes Defendant's further contentions that he inflicted harm on "his wife" and "the court" as well.  However, Defendant's statements concerning Plaintiff's child are wildly egregious warranting harsh legal consequences against Defendant.

70.     Defendant's conclusory contention that he inflicted harm on his child is unequivocally false.  Despite the acrimonious nature of their divorce – and to her credit – Ms. Comfort has never alleged or claimed that Plaintiff has harmed or attempted to harm their child. It is important to note that Defendant made such a wildly baseless statement without entertaining or reviewing a single piece of evidence in the case and after having presided over the case for a single motions hearing in which the parties and counsel did not speak.  Defendant knew that his statement was contrary to the record and made such statement anyways without regard for its falsity or the damage it might inflict on Plaintiff or the child.  Defendant's conduct in publishing and disseminating to the media such a false statement that will no doubt be read by Plaintiff's child was again shameful and entirely contrary to the best interests of child.

### Defendant's Statement that Plaintiff "Delayed" Commencement of Trial

71.     In the September 18 Decision, Defendant made the following statements concerning Plaintiff's conduct during the Matrimonial Action:

> Although plaintiff has repeatedly charged that he is being deprived of a prompt hearing to determine whether his access to the child must remain supervised, the record shows that he has acted in a manner actually designed to prevent such a hearing from happened.

***

> Even after the case moved beyond the machinations described by Justice Kaplan – including plaintiff first discontinuing the divorce action in the middle of trial, then claiming to have relocated to North Carolina, then to West Virginia, and finally reinstating the action, plaintiff has endeavored to halt its forward progress.  In the relatively brief time that I have had the case, it has become apparent that while plaintiff vehemently complains that he is being denied a hearing on continued supervised access with the child, he intentionally continues the pattern of delay and disruption described by Justice Kaplan.

> After plaintiff interrupted the custody trial by discontinuing the action, only to then reinstate it, Justice Kaplan sought to set new dates for the trial to continue. By an order dated February 13, 2015, she directed that the trial resume on March 6, 2015.  However, the trial did not go forward as schedule and was adjourned to

35

May, apparently at plaintiff's request.  When May approached, plaintiff delayed the trial again.

***

Plaintiff's barrage of motion and his deluge of subpoenas, coupled with constant e-mails to the court and his threats to commence Article 78 proceedings and federal civil rights actions, are reflective of an unfortunate litigation strategy: avoid resuming the trial in favor of attempting to bludgeon defendant, the AFC, and the court into submission.  As that strategy have proven increasingly unsuccessful, plaintiff's tactics, and the language he employs in his motion papers, have grown evermore extreme and out of step with what is appropriate and permissible advocacy by an attorney, even on representing himself.  It is in the midst of this maelstrom of misconduct that the AFC has been forced to bring the two motions that are not before the court.

(Ex. 1 at 6-9.)

72.    Unfortunately, Defendant in his quest to discredit and injure Plaintiff paints an untrue and misleading picture of the litigation.  Defendant's statements that Plaintiff engaged in misconduct as he wished to "avoid" trial in the Matrimonial Action are not only false, but illogical.  It defies logic that Plaintiff would avoid a trial only to pay $5,500 to $6,500 a month for limited access with his son.

73.    Defendant's statements that Plaintiff wrongfully "delayed" trial are contrary to the record.  The record is quite clear that Ms. Comfort and her attorney requested several adjournments of trial dates, which were granted.  (*See* Ex. 5 at 4.)  The Attorney for the Child also requested adjournment of all trial dates in April 2015 for the stated reason that she was going on a European vacation.  (*See id.* at 4-5.)  Moreover, Defendant's statement that Plaintiff "delayed the trial again" in May 2015 are false as Plaintiff's employer, Mintz Levin, submitted an affidavit requesting an adjournment of trial due to a conflict with a statutory deadline on a matter Plaintiff was engaged.  (*See id.* at 5.)

36

74.     Defendant statements that Plaintiff wrongfully "interrupted" trial in September 2014 are false.  This is evident by the fact that there was no trial concerning custody and access that commenced in September 2014.  Defendant conceded this during statements made on the record during the actual trial that commenced on November 12, 2015.

75.     Defendant's conclusory statement that Plaintiff engaged in a strategy of "bludgeon[ing] defendant, the AFC, and the court into submission" is false.  In fact, quite the opposite is true.  Ms. Comfort (through demands for costly supervised visitation), the Attorney for the Child (with needless experts and bills totaling in the hundreds of thousands of dollars) and the court, (through its September 18 Sanctions Decision causing Plaintiff to lose his job, among other things) pummeled Plaintiff into financial submission to a point where not only could he not try the Matrimonial Action, but he now does not have the financial means to even see his son.

76.     Defendant's statement that Plaintiff used "extreme" language that was "out of step" with permissible advocacy is false.  Quite telling, Defendant cites no examples in his motion papers before his court.[13]  Moreover, Defendant's statements that Plaintiff engaged in a "maelstrom of misconduct" are false as evidenced by the fact that Defendant relies upon his demonstrably false statements of fact to reach his stated conclusion.  Defendant's conclusory statements concerning Plaintiff's actions in the Matrimonial Action which he uses to conclude that Plaintiff engaged in misconduct are materially false and defamatory.

---

[13] Justice Cooper points to an order by Judge Anthony Epstein of the Superior Court for the District of Columbia claiming that Plaintiff filed a motion "replete with intemperate and uncivil language …." (*See* Ex. 1 at 4.)  The motion in question is attached hereto as Appendix Exhibit F in Exhibit 5.  Plaintiff is at loss as to what could be considered "intemperate and uncivil language" in that motion.  However, Judge Epstein's order was confidential and sealed.  Justice Cooper admittedly failed to review Plaintiff's motion before including Judge Epstein's seemingly incorrect statement in the September 18 Decision.

<u>Defendant's Misleading Statements</u>
<u>Concerning the Handwritten Note to Judge Anthony Epstein</u>

77.     In the September 18 Decision, Defendant made the following statements

concerning a purported handwritten note to Judge Anthony Epstein on the Superior Court for the

District of Columbia:

> Not only was plaintiff unreceptive to Judge Epstein's suggestion that he retain
> counsel, but he was aggressively hostile to the judge's criticism of his conduct as
> a self-represented attorney.  Judge Epstein, in a decision dated May 28, 2014 in
> which he denied plaintiff's motion to reconsider his prior ruling, referred to an
> incident where he believed plaintiff had engaged in inappropriate conduct towards
> him.  He described the incident as follows:
>
> > On the front of the copy of the reconsideration motion that Mr. Zappin
> > provided to chambers, a handwritten note is attached that states, "You're
> > pathetic (Judicial Complaint forthcoming)."  The note is unsigned, but Mr.
> > Zappin, who now represents himself in this case and provided the
> > document, appears to be the person who wrote and attached the note.

(Ex. 1 at 4-5.)

78.     Defendant's inclusion of this "incident" as a purported factual finding in the

September 18 Decision was materially misleading and contained knowingly false and

defamatory representations.  On October 31, 2014, Plaintiff provided overwhelming evidence to

Justice Kaplan that he did not attach the handwritten note to Judge Epstein.  (*See* Ex. 5 at 3.)

This included evidence that Plaintiff was in West Virginia when his hard-copy of the motion

papers were mailed, while the FedEx receipt to Judge Epstein's chambers confirmed that the

package was mailed from his former New York office.  (*See id.*)  Plaintiff theorized that the

handwritten note was sent by Ms. Comfort.  This was all but confirmed after issuance of the

September 15 Decision when a copy of the motion papers surfaced with the note attached that

had a court e-filing stamp on the top from the version of the motion automatically served only on

Ms. Comfort's counsel by the e-filing system.     Accordingly, Defendant's statements that

Plaintiff sent the handwritten note and "breach[ed]" the Rules of Professional Conduct are false and defamatory.  (*See* Ex. 1 at 10.)

79.     It bears noting that neither Ms. Comfort, nor the court raised the note as an issue again after the evidence was presented to the court that the note was not sent by Plaintiff.  That is until Defendant resurrected this diversion in his September 18 Decision without notice, warning or providing any opportunity to legitimately adjudicate the contention.  Indeed, Judge Epstein made no finding that Plaintiff sent the note and mentioned its receipt in passing in a footnote of an order without taking any further action.  Defendant's statements that Plaintiff affirmatively sent the handwritten note and "breach[e]" the Rules of Professional Conduct are necessarily false and defamatory.

<u>Defendant's Statements Concerning Conduct toward Robert Wallack</u>

80.     In the September 18 Decision, Defendant makes the following statements concerning Plaintiff's conduct towards his wife's counsel, Robert Wallack:

> As I set forth in my July 22, 2015 decision, he persisted in sending Mr. Wallack and his associates taunting emails referring to Mr. Wallack's personal life and relationships.  Such communications are in clear violation of an attorney's obligation to refrain from engaging in "undignified or discourteous conduct" ….

(Ex. 1 at 10-11.)

81.     Defendant's statement that Plaintiff sent taunting e-mails to Mr. Wallack is false. As is often the case with Defendant, the record reveals the exact opposite is true.  Mr. Wallack persistently taunted, mocked and terrorized Plaintiff with unprofessional behavior, which is illustrated by the e-mail exchange referred to in Defendant's July 22, 2015 decision:

**E-mail from Anthony Zappin – May 8, 2015 at 10:25 AM**

Rob and Harriet –

39

Please be advised that I intend to present an emergency application to the Court at 10:00 a.m. on Tuesday May 12, 2015.

Best,
Anthony Zappin

**E-mail from Robert M. Wallack – May 8, 2015 at 10:47 AM**

An "emergency application" seeking what relief?

**E-mail from Anthony Zappin – May 8, 2015 at 11:13 AM**

Rob,
Provisions to safeguard the well-being of the child.
Anthony

**E-mail from Robert M. Wallack – May 8, 2015 at 11:35 AM**

So, it's a motion to prohibit you from having contact with [the child]?

(Ex. 13.)  These statements are illustrative of Mr. Wallack's discourteous behavior throughout the proceeding.[14]  Regardless, Defendant's statements and accusations of misconduct concerning Plaintiff's communications to Mr. Wallack are false and defamatory.

---

[14] Mr. Wallack was disruptive and discourteous throughout the proceeding.  Highlights of Mr. Wallack's behavior include, but are not limited to, falsely accusing Mr. Doggart of recording a proceeding, directly calling Plaintiff's employer to threaten and intimidate service of a subpoena, proffering demonstrably untrue statements to the court concerning his repeated failure to timely serve papers, falsely accusing Plaintiff of spitting on him outside his office (which was unequivocally proven untrue by Plaintiff's calendar and phone records), stripping metadata out of digital files that were ordered to be produced and even attempting to serve an entirely frivolous subpoena to Taylor Swift (to promote his "celebrity divorce attorney" mantra, no doubt).  Perhaps most egregious, Mr. Wallack responded to a contempt motion to compel compliance with a so-ordered Judicial Subpoena signed by Justice Kaplan with a discourteous and wholly inappropriate written affirmation responding with "blah, blah, blah, blah …."  (*See* Ex. 14.)

Not unsurprising, Mr. Wallack had previously been reprimanded by Justice Kaplan in other matters for attempting to engage in impermissible *ex parte* communications with the court, bombarding the court with unsolicited letters, sending "misleading" letters to banks falsely representing that the court had frozen the opposing parties' funds, repeatedly disregarding "agreements, orders and directors," making "unsubstantiated claims" and "omit[ing] salient facts" in papers filed with the court and interfering with the Attorney for the Child's access to the children.  (*See* Ex. 15.)  Even with respect to Justice Kaplan's letter, Mr. Wallack falsely asserted to the court that Plaintiff had "hacked" his computer to obtain the file when in fact the letter is a public document attached to the complaint in a malpractice

<u>Defendant's False Statements Concerning Child Support</u>

82.    In the September 18 Decision, Defendant makes the following statements concerning Plaintiff paying child support:

> He pays no child support to defendant [Ms. Comfort], the full-time custodial parent, but instead contends that it is he who is actually supporting the child because he buys him toys, clothing and diapers.  In making this claim, plaintiff seems to have ignored the fact that a child's needs also include food, shelter, medical care, and where, as here, the custodial parent works, childcare.  If plaintiff were in fact paying child support as legally required, his basic obligation, based on his base salary alone and in accordance with child support calculations applicable to high income parties in New York County, would compute to approximately $37,000 per year.  With statutory add-ons for medical costs and childcare, his total obligation would likely exceed $55,000 per year.  This is far more than plaintiff possibly pays for supervised access, clothing, diapers and toys.

(Ex. 1 at 13, fn 4.)

83.    Defendant's contention that Plaintiff did not pay his wife child support is false and merely an attempt to inappropriately label Plaintiff as a "deadbeat dad" like he has done to so many others in *The New York Post* and *The Dailey News*.  (*See* Ex. 2.)  Defendant knew his statements were false as Ms. Comfort **never** filed a motion seeking child support in the Matrimonial Action.  In fact, Ms. Comfort revealed during testimony at the custody and access trial in December 2015, that in addition to bearing the full cost of supervised visitation as well as "clothing, diapers and toys," Plaintiff had given her ***thousands of dollars*** in child support since

---

action asserted against Mr. Wallack, *Nacos v. The Wallack Firm, P.C.*, Index No 154278/12 (Sup. Ct. N.Y. Cnty. 2012).  Mr. Wallack's improper behavior only escalated in *Zappin v. Comfort*.

Not once was Mr. Wallack chastised or reprimanded by Defendant.  Indeed, Defendant embraced Mr. Wallack's flamboyant behavior as evidenced by his statements during the custody and access trial.  After repeatedly complaining that Plaintiff was delaying the trial and stating that the trial must be concluded forthwith, Defendant interrupted Plaintiff's cross-examination by Mr. Wallack to compliment Mr. Wallack on his hair:

> THE COURT:  I would observe Mr. Wallack's hairline is a lot better than my hairline.  I would be very happy to have that hairline.

It was unreal and a microcosm of Defendant's bizarre behavior throughout the proceeding.

their separation in November 2013, despite Plaintiff bearing the full cost of supervised visitation which was approximately six (6) times the amount of any child support obligation that could be imposed.   That cost is an enumerated statutory factor in Child Support Standards Act for reduction or elimination of child support.   *See* Family Court Act § 413(f)(9).

<u>Damages to Plaintiff as a Result of Defendant's False Statements</u>

84.     As a result of Defendant's false and defamatory statements in the September 18 Decision, Plaintiff has suffered incalculable damages.   As a direct result of Defendant's false statements published and disseminated to the media, Plaintiff lost his job and has been unable to find new employment.   Defendant's false statements directed at the bar have irreparably harmed Plaintiff's professional standing.   Furthermore, Defendant's seeking out media attention for the September 18 Decision by contacting at least *The New York Law Journal*, *The New York Post* and *The Daily News* created undue and prejudicial publicity targeting Plaintiff with false statements.   Plaintiff has been unjustly held up to public contempt, ridicule and disgrace because of Defendant's unlawful conduct towards Plaintiff.    Moreover, due to Defendant's false statements, Plaintiff has suffered immense psychological and physical distress.   Lastly, Plaintiff has been forced to expend tens of thousands of dollars in legal expenses and costs in order to defend himself against Defendant's false statements of fact contained in the September 18 Decision.

## **DEFENDANT'S TORTIOUS INTEFERENCE**

85.     By and through Defendant's false statements in his September 18 Decision, which he published and disseminated to the media in an extrajudicial capacity, Defendant tortiously interfered with Plaintiff's employment and professional standing.   As stated above, Plaintiff was terminated as an associate at Mintz Levin.   The firm's sole stated reason for Plaintiff's

termination was because of Defendant's September 18 decision and the incendiary statements contained therein disparaging Plaintiff and falsely asserting that he had committed misconduct.

86.     Although Plaintiff's employment at Mintz Levin was "at-will," but for Defendant's September 18 Decision Plaintiff expected to remain employed at the firm and obtain prospective economic advantages.

87.     At the time Defendant improperly published and disseminated his September 18 Decision to the media he was aware that Plaintiff was employed as an associate attorney at Mintz Levin.  Defendant gratuitously stated the full name of Plaintiff's former employer multiple times on the record on July 22, 2015 as well as in orders dated July 24, 2015, August 13, 2015 and August 26, 2015.

88.     Upon information and belief, Defendant's September 18 Decision was written and improperly disseminated to the media with the sole intent to cause Plaintiff to lose his employment at Mintz Levin as well as standing in the legal profession.  Defendant knew or should have known that his false and misleading statements concerning Plaintiff contained in the September 18 Decision would have an adverse effect on his employment.  This is all the more the case where Defendant violated a statutory prohibition against publication of the September 18 Decision to take deliberate acts to ensure dissemination of false statements concerning Plaintiff, including in legal journals and tabloid media.

89.     At the time of the September 18 Decision, there was no pressing urgency to publish the decision, particularly where he was statutorily forbidden from doing so under DRL 235.[15]  Even so, Defendant could have avoided any harm to Plaintiff if he had issued the

---

[15] It bears noting that the New York State Reporter refused to publish the September 18 Decision in its official reports, despite Justice Cooper requesting that it do so.  The New York State Reporter appears to have concluded that the September 18 Decision had no precedential value reaffirming the

September 18 Decision and embargoed its publication until after the custody and access trial to prevent prejudice.  He could have also issued the September 18 Decision with appropriate redaction of the parties' names pursuant to 22 NYCRR 202.16(h).  Defendant did not even give Plaintiff the opportunity to contest decision's publication.  Indeed, it was apparent that Defendant issued the September 18 Decision with the intent to cause harm to Plaintiff's reputation and employment at Mintz Levin.

90.     During a hearing on November 6, 2015, Defendant specifically admitted that the September 18 Decision was directed at the bar and consequently Plaintiff's employment:

> THE COURT:          The decision was released in its form because it was a decision that was important for the bar.

By directing it at the bar – in *The New York Law Journal*, no less – Defendant deliberately intended for the September 18 Decision to be seen by members at Mintz Levin with whom Plaintiff had a prospective relationship with as an associate.  Defendant should have known that his materially false statements of fact concerning Plaintiff in the September 18 Decision would be read by members at Mintz Levin with whom Plaintiff had a prospective relationship with as an associate.  Accordingly, Defendant tortiously interfered with Plaintiff's prospective business relationship with Mintz Levin by unlawfully issuing and disseminating the September 18 Decision containing defamatory and disparaging statements concerning Plaintiff and false statements alleging that Plaintiff had committed misconduct.

## DEFENDANT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

91.     Defendant intentionally and/or recklessly engaged in extreme and outrageous conduct designed to cause Plaintiff to suffer severe emotional distress.  Defendant's actions

---

apparent fact that the September 18 Decision was little more than an unbridled, improper and unwarranted assault on Plaintiff's reputation and livelihood.

toward Plaintiff cannot be characterized as anything other than "extreme" and "outrageous" given the nature of Defendant's position as a judge.  As a duly elected member of the judiciary, Defendant is unquestionably held to a higher standard both in the legal profession and in our society.  But here, Defendant abused his position as a member of the judiciary.  Defendant has violated a host of Judicial Canons with his conduct towards Plaintiff eroding confidence in the judiciary.

92.     Defendant's conduct is unprecedented.  There is no recorded record of any judge acting with such blatant disregard for his authority and injecting himself as an active adversary to maliciously and wrongfully injure a litigant.  Defendant did not simply issue an inaccurate order.  Rather, Defendant repeatedly and deliberately recited materially false statements of fact concerning Plaintiff that were primarily targeted at irreparably harming his professional reputation and employment, in addition to irreparably damaging his relationship with his infant son.  Defendant engaged in such conduct without providing Plaintiff notice or an opportunity to be heard.  All the more, Defendant undertook extraordinary actions – in violation of New York statute and law – to ensure that the false statements would be published not only in preeminent legal journal in New York, but also in New York's most popular tabloid newspapers.

93.     As a consequence, in addition to causing Plaintiff harm professionally and personally, Defendant's conduct caused Plaintiff to suffer severe psychological distress and mental anguish.  Plaintiff has incurred damages as a result, which includes well over $100,000 in medical bills, inability to perform job related activities due to the distress as well as pain and suffering as a direct result of Defendant's outrageous conduct.

## DEFENDANT'S DENIAL OF PLAINTIFF'S RIGHT TO A FAIR CUSTODY TRIAL

94.      At the time Defendant issued the September 18 Decision, the custody and access trial in Plaintiff's Matrimonial Action was calendared to begin on November 12, 2015. Defendant's improper conduct of publishing and disseminating the September 18 Decision denied Plaintiff the right to a fair custody trial.  Specifically, Defendant took deliberate and intentional acts to generate unwarranted and deleterious pre-trial publicity of the Matrimonial Action less than two (2) months prior to the commencement of the custody trial.  This publicity was highly prejudicial to Plaintiff and his ability to try the case, particularly where Plaintiff and Defendant's credibility were in direct conflict as a result of Defendant's false statements of fact in the September 18 Decision.  Moreover, Defendant's conduct of disseminating the September 18 Decision to the media was an improper "leak" of information or statement to the press prejudicing Plaintiff's right to a fair trial.  *See Powers v. Coe*, 728 F.2d 97, 100 (2d Cir. 1984); *Jovanovic v. City of New York*, 2006 U.S. Dist. LEXIS 591165 at *42-44 (S.D.N.Y. Aug. 17 2006).

95.      Defendant was in the unique role of being the sole fact-finder at the custody trial. No reasonable person could conclude that Plaintiff would receive a full and fair trial after Defendant published the September 18 Decision and sparked the media attention surrounding it. This is particularly so where Defendant intentionally and deliberately publicized false statements of fact concerning Plaintiff mere days before trial.  And, in fact, Plaintiff did not receive a full and fair trial from Defendant as a result of the September 18 Decision.[16]  Defendant did not grant

---

[16] Defendant's surprise September 18 Decision gave Ms. Comfort license to proceed and force Plaintiff into a lengthy and costly custody trial.  Ms. Comfort refused numerous attempts by Plaintiff to settle the case.  Likewise, Defendant not only refused to intervene and hold any settlement conferences or hearings, but became an active litigant prosecuting Plaintiff as discussed below.

Plaintiff a single item of relief from the custody trial, and, actually granted Ms. Comfort extraordinary and unusual remedies, many of which she did not even request.

96.     Defendant undertook no actions to ensure that Plaintiff received a fair custody trial.  As set forth more fully below, Defendant used the custody trial to provoke, discredit and mock Plaintiff as well as attempt to justify his September 18 Decision.  Where Defendant was the sole finder of fact, the only remedy that would have ensured Plaintiff received a fair trial was Defendant's recusal from the case and declaration of a mistrial.  On October 28, 2015, Plaintiff did indeed seek recusal of Defendant prior to the commencement of trial.  By order dated November 6, 2015, Defendant denied Plaintiff's motion for recusal.  Furthermore, Plaintiff stated his intention on November 24, 2015 of bringing a motion for a mistrial due to Defendant's improper conduct during trial.  Defendant denied the motion without even reviewing it:

| | |
|---|---|
| MR. ZAPPIN: | I would like [sic] to know given what happened yesterday, given the numerous statements where you attacked me, given the history of this case with you I'm filing a motion for a mistrial Monday … |
| THE COURT: | That motion for a mistrial will be denied immediately. Don't even bother bringing it. |

***

| | |
|---|---|
| THE COURT: | There's been enough time wasted on nonsense and a request for a mistrial is nonsense.  And – |
| MR. ZAPPIN: | Your Honor, you haven't heard the motion. |
| THE COURT: | I'm not going to hear the motion. |

There were no other alternative remedies available to Plaintiff.

<u>Defendant's Admission That He Was Not Giving Plaintiff a Fair Trial</u>

97.     Most telling are Defendant's own words as to the issue of whether Plaintiff

received a fair trial.  On November 23, 2015, during a heated exchange between Plaintiff and

Defendant during trial, Defendant acknowledged that he was not according Plaintiff a fair trial:

> MR. ZAPPIN:          Your Honor, I want a fair [trial] –
>
> THE COURT:          ***No***.  I want you to grow up, number one, and number two,
> comport yourself properly and when Mr. Schorr just
> touched you on the shoulder I know you just said get your
> hand off me.[17]  Come on.  What are you going to sue him
> for assault now too.  Stop it.

(emphasis added.)  Defendant's outright admission to denying Plaintiff a full and fair trial is

corroborated by his conduct exhibited throughout trial as set forth more fully below.  More

importantly, however, the passage demonstrates Defendant's deep-seeded antagonism towards

Plaintiff in that he made such a crass remark and embellished the record at a time where

Plaintiff's counsel who was merely leaning over to whisper something to Plaintiff.

<u>Defendant's Conduct Prejudiced Plaintiff's Financial Ability to Try the Case</u>

98.     Plaintiff incurred significant costs in attempting to prosecute the custody and

access trial.  To illustrate just how costly the 13-day custody trial was, Plaintiff incurred

transcript fees totaling well over $25,000.  Based on the issues in dispute, he was forced to retain

three experts (two of which testified) – a psychologist to peer review the forensic custody

evaluator's report, a digital forensic expert and a forensic pathologist – whose fees and expenses

totaled well over $30,000.  Plaintiff paid copying costs for exhibits and other items that totaled

over $15,000 for the several hundred exhibits at issue.  He was ordered to pay the forensic

---

[17] Mr. Schorr, who was sitting next to Plaintiff, leaned over to whisper something in Plaintiff's
ear concerning the trial.  Defendant's statement was exaggerated and an inaccurate depiction of the
interaction, a common occurrence by Defendant.

48

custody evaluator, Dr. Alan Ravitz, $6,000 for his testimony alone and over $42,000 in total. Also, Plaintiff solely paid five social workers who supervised his visits with the child for their time testifying at trial.  This was in addition to the ***hundreds of thousands of dollars*** of fees imposed by the Attorney for the Child and her experts.

99.     Plaintiff made numerous efforts to settle the case, and in the alternative, to reallocate some of the costs to Plaintiff's wife who makes approximately $380,000 per year at *Weil, Gotshal & Manges LLP*.  Defendant summarily denied each of Plaintiff's attempts to seek financial relief.  As a consequence, without any source of income as a result of Defendant's September 18 Decision, Plaintiff was forced to turn to his father for financial support.  However, that support was limited as Plaintiff's father's sole source of income is social security disability after Plaintiff's father had a heart attack while working at his place of employment as a pharmacist in July 2012.

100.     In publishing and disseminating the September 18 Decision, Defendant undertook deliberate actions to interfere with Plaintiff's employment and cut-off his sole source of income needed to try the custody and access trial.  Again, Defendant knew or should have known that the September 18 Decision would result in the loss of Plaintiff's employment.  Plaintiff was forced into a costly trial without any source of income to sustain the overwhelming cost of trial, exacerbated by Defendant's September 18 Decision.  As a result of the loss of Plaintiff's employment due to Defendant's publication and dissemination of the September 18 Decision, he was unable to financially prosecute the case as it left Plaintiff without the financial means to hire the additional experts demanded by Defendant, retain experienced trial counsel and pay other necessary litigation expenses.

101.   Plaintiff's loss of income as a result of Defendant's improper conduct had a direct and prejudicial effect on the outcome of trial.   This came partially in the form of Defendant bogging Plaintiff down with needless and costly expert fees he could not afford – something he did not do to Ms. Comfort – as a vehicle to exclude evidence favorable to Plaintiff.   Indeed, evidencing Defendant's prejudice towards Plaintiff, Defendant shifted the burden to Plaintiff to both affirmatively prove the authenticity of his evidence and disprove the authenticity Ms. Comfort's evidence with technical experts:

- During the trial, Plaintiff disputed a purported text message Ms. Comfort provided to the forensic custody evaluator where she changed the words "yelled at" to "hit."   Ms. Comfort never hired her own expert, permitted Plaintiff (or his expert) to examine her phone or even provided an actual screenshot of the text message.   Rather, she gave the forensic custody evaluator a computer print-out of "bubbles" containing the purported text messages generated by a computer program.   These print-out "bubbles" were later discovered to contain different text than the "bubbles" she entered into evidence.[18] Plaintiff, in addition to retaining his own expert to confirm the authenticity of the text message contained on his phone, put into evidence a screenshot of the actual text message from his iPad and allowed opposing counsel, the Attorney for the Child and the court to inspect the iPad. Immediately after and during the middle of trial, Defendant appointed his own "neutral" expert ordering Plaintiff to pay tens of thousands of dollars in costs even though he had no source of income.   When Plaintiff could not afford to pay the "neutral" expert, Defendant excluded Plaintiff's digital forensic expert prior to his testimony and decided the issue of text message on "credibility." Of course, Defendant concluded that Plaintiff's text message on his iPad was inauthentic, and, by implication farcically found that Plaintiff cracked Apple's encryption to alter the message.

- Ms. Comfort introduced several photographs at trial.   The metadata to the photographs conclusively revealed that they were digitally altered using filters and photo editing programs such as Photoshop.   Despite Justice Kaplan issuing a Judicial Subpoena for the metadata to be produced by September 15,

---

[18] Plaintiff filed a motion on June 24, 2016 for a new trial or to otherwise amend Defendant's factual findings placing the two different versions of Ms. Comfort's "bubble" text messages side-by-side demonstrating her alterations.   Defendant not only denied Plaintiff's motion on June 27, 2016 without permitting opposition papers, but he make his ruling from the bench *without reading Plaintiff's affidavit or exhibits*.   It was illustrative of the Defendant's bias towards Plaintiff and his tunneled intention to engineer an outcome in the proceeding adverse to Plaintiff.

2014 in addition to three subsequent orders directing production of the digital images, Ms. Comfort did not produce the files until November 6, 2015 – over a year later and less than a week before trial.  On the last day of trial, Defendant refused to permit Plaintiff, mark as an exhibit, let alone question Ms. Comfort concerning the metadata without expert testimony – even though Ms. Comfort did not provide any expert testimony of her own on the issue.  When Plaintiff could afford to hire an expert, Defendant excluded the metadata from evidence and concluded that Ms. Comfort's photographs were authentic.

- Ms. Comfort introduced audio recordings of Plaintiff at trial (which were obtained through illegal wiretaps).  Digital records, timestamps and fact witness testimony conclusively showed that audio recordings were spliced and portions were missing.  Plaintiff attempted to introduce the digital records and timestamps into evidence, but again Defendant, in the middle of trial, refused to permit Plaintiff's documents into evidence without expert testimony that the audio recordings were spliced.  Ms. Comfort did not produce any expert testimony of her own to corroborate her claims as to the authenticity of the audio recordings.  When Plaintiff could not afford to hire an expert, Defendant credited the audio recordings.

Had Plaintiff not lost his job as a result of the September 18 Decision, it is very likely that he would have had the financial ability to retain the numerous experts enumerated above and fully try the case.  Defendant made no attempts to remedy this prejudice to Plaintiff, and, in fact, aggravated it.  This is demonstrated by his own statements made during trial showing that he had little regard for Plaintiff's financial circumstances and expected Plaintiff to continue to request money from his disabled father living on a fixed income:

| MR. ZAPPIN: | But it has nothing to do with a neutral expert and – it's a real problem because I've already went out and spent $10,000.  I don't have any income to pay a neutral and – |
|---|---|
| THE COURT: | I heard you spent Ms. – what was her name again, Kase case, $13,000 for her.  What was it $12,000, $10,000 for the other expert.  A whole lot of money being spent.  You've told me that your father is paying for everything that's why you are giving him – you were turning over – that was your reason for turning over all the records because your father is footing the bill.  So I don't understand why suddenly money is now an issue. |

51

MR. ZAPPIN:          Money does not grow on trees and Miss – I find it shocking that I bring in an iPad here in court and yet we have never seen Miss Comfort's phone, not once.

102.    Plaintiff also could not afford trial counsel as a result of the loss of his income. He was forced to proceed largely *pro se* with the assistance of David Schorr, Esq. who had never previously tried a case on behalf of a client and had not practiced law in at least fifteen (15) years.   Defendant repeatedly denied Plaintiff's requests for the appointment of counsel.  *See Moloney v. Moloney*, 19 A.D. 496, 497 (2nd Dept. 2005) ("The deprivation of a party's fundamental right to counsel in a custody or visitation proceeding is a denial of due process and requires reversal, without regard to the merits of the unrepresented party's position.")   As a result, Plaintiff did not receive a full and fair trial as a result of Defendant's publication and dissemination of the September 18 Decision that cost Plaintiff his employment.

<u>Defendant Generated Prejudicial Media Coverage</u>

103.    As demonstrated above, Defendant deliberately attracted media attention to the matter with the publication and dissemination to the media of the September 18 Decision.  That media attention was pointedly negative towards Plaintiff and painted him in a false and unfavorable light to the public.  This targeted negative media coverage brought on by Defendant through his extrajudicial acts was prejudicial to Plaintiff's right to a fair trial.

104.    It is fundamental that "the trial judge has an affirmative constitutional duty to *minimize* the effects of prejudicial pretrial publicity."  *Westchester Rockland Newspapers, Inc. v. Legget*, 48 N.Y.2d 430, 438 (N.Y. 1978) (emphasis added).   Prejudicial pretrial publicity can occur even in bench trials.  *See Anonymous v. Anonymous*, 191 Misc.2d 707 (Sup. Ct. N.Y. Cnty. 2002) ("[D]isseminaton of news or comments may tend to influence the judge … from being impartial at trial."); *see also In re Halkin*, 598 F.2d 176, 193 (D.C. Cir. 1979) (nothing that "the

threat of prejudicial publicity is entitled to some weight in a bench trial").   As a result of publication and dissemination of the September 18 Decision, *The New York Post* and *The Daily News* – Defendant's apparent go-to tabloid publications – were a constant presence in the courtroom during pretrial proceedings and the custody trial itself.   Plaintiff provides some examples below, although not exhaustive, of how he was prejudiced as a result of the inappropriate publicity generated by Defendant.

105.   For example, Defendant did everything to unconstitutionally ***maximize*** publicity prejudicial to Plaintiff with the September 18 Decision.   The effect was felt throughout the pretrial proceedings and the custody trial itself.   Indeed, Defendant encouraged media coverage of the case.   To illustrate, Defendant held an impromptu evidentiary hearing prior to the custody trial on November 10, 2015 that the parties did not learn about until they walked into the courtroom.[19]   He did not provide any prior notice to the parties of an evidentiary hearing and refused to permit Plaintiff to call witnesses, even though Defendant called three (3) of his own witnesses.[20]   At the conclusion of the hearing, Defendant read from a prepared statement calling Plaintiff a "criminal."   Reporters from *The New York Post* and *The Daily News* were prepared and sitting in the front row of the gallery at the start of the proceeding and later published articles

---

[19] The parties were supposed to appear on an unrelated motion to quash a subpoena filed by Plaintiff's wife three (3) days prior, which had not been on the calendar.

[20] Defendant's impromptu November 10, 2015 was again illustrative of Defendant's intention to steer the outcome of the proceeding against Plaintiff.   On November 6, 2015, the Attorney for the Child's partner, Paul Kurland, ripped subpoenaed documents out of Plaintiff's hands and elbowed him unprovoked.   Plaintiff had just had surgery to relieve a congenital illness in his back.   Defendant subsequently called no less than six (6) witnesses to the incident into his chambers between November 7, 2015 and the morning of November 10, 2015 and interviewed them *ex parte* as to the substance of their potential testimony.   Defendant never provided notice to the parties that he was doing so.   He then selected the three (3) witnesses whose rendition was most unfavorable to Plaintiff – including his own clerk – again without noticing the parties of his doing so.   The three (3) witnesses then testified at the impromptu hearing as "court witnesses" giving vastly different accounts of what they saw.   Nevertheless, Defendant read his "decision" from a ***prepared statement*** reaffirming that he was predisposed against Plaintiff.

about the hearing.  Plaintiff later learned from those reporters that they were tipped off about the hearing by Defendant and his staff earlier in the day.

106.     Defendant also improperly permitted *The New York Post* and *The Daily News* into the courtroom during the testimony of the forensic custody evaluator, Dr. Alan Ravitz.  In child custody cases, the forensic custody report is highly confidential and numerous safeguards are placed on the report, including forbidding its removal from the courtroom, to prevent dissemination of its contents.  Almost always, the courtroom is sealed during testimony of the forensic custody evaluator due to the sensitive nature of their testimony.  In *Zappin v. Comfort*, however, Defendant permitted Ms. Comfort's counsel to read from virtually the entire report with the press in the gallery, even though the report was already in evidence as a court exhibit.  Indeed, Mr. Schorr noted to Defendant that "Mr. Wallack [was] holding a news conference with the media" in the courtroom reading the salacious details of the forensic custody report to the press, which Defendant ignored.  *The New York Post* and *The Daily News* subsequently published series of articles containing unsubstantiated and false allegations as well as purported assertions about Plaintiff's mental health gleaned from Ms. Comfort's counsel selectively reading portions of the forensic custody report that painted Plaintiff in an unfavorable light.  They did not publish anything unfavorable about Ms. Comfort, despite a treasure trove of salacious material in the forensic custody report.  More importantly, they published <u>nothing</u> positive about Plaintiff.  As a result, Defendant's refusal to enact safeguards to prevent the dissemination of the contents of the forensic child custody report undeniably prejudiced Plaintiff's ability to receive a fair trial.

107.     By way of another example, Plaintiff moved to close the courtroom to protect the identity of certain witnesses he intended to call as a result of *The New York Post* and *The Daily*

*News'* persistent presence in the courtroom during trial.  Defendant waited until both tabloids were in the courtroom to deny the motion, in effect alerting them as to who Plaintiff's witnesses were.  As a result, Plaintiff was unable to call these witnesses as they feared being negatively portrayed in *The New York Post* and *The Daily News*, which would have no doubt resulted in an adverse effect on their jobs and reputations.[21]  All of the potential witnesses had agreed to testify prior to Defendant's publication and dissemination of the September 18 Decision.   These witnesses included:

- An individual who was violently assaulted by Ms. Comfort in a nightclub in 2012;

- An individual who saw Ms. Comfort consuming alcohol during her pregnancy, an issue at the trial.  The witness also observed Ms. Comfort referring to the unborn child with racial slurs and stating that Plaintiff was not the father of the child;

- An individual who observed Ms. Comfort physically abuse Plaintiff;

- Individuals at Plaintiff's former employers who saw Ms. Comfort initiate altercations with Plaintiff at his office; and

- A witness who observed Plaintiff with a stab wound inflicted by Ms. Comfort on November 1, 2013.

Had it not been for Defendant's publication and dissemination of the September 18 Decision, Plaintiff would have likely been able to call many, if not all, of these witnesses voluntarily at trial.  As a result, Plaintiff did not receive a fair trial as a result of Defendant's prejudicial press coverage improperly initiated and encouraged by Defendant.

108.    Throughout the course of the proceeding, *The New York Post* and *The Daily News* published approximately a dozen articles about the Matrimonial Action.   All of these articles

---

[21] Most of these witnesses reside outside New York.  Plaintiff therefore could not compel their testimony.

were precipitated by Defendant's publication and dissemination of the September 18 Decision. And, in every one of these articles, Plaintiff was portrayed in a negative and unfavorable light almost entirely as a result of statements or actions by Defendant. Defendant took no action to remedy the prejudicial effect of the media that he himself generated. Rather, the record is clear that Defendant fed the media circus. As a result, Plaintiff did not receive a fair custody trial as a result of Defendant's tortious and extrajudicial conduct.

<u>Defendant Improperly Used the Custody Trial to Justify the September 18 Sanctions Decision</u>

109.    Defendant used the custody and access trial to inappropriately question Plaintiff in an attempt to bolster his extrajudicial conduct of publishing and disseminating to the media the September 18 Decision. The below is illustrative of Defendant's improper questioning and conduct:

| | |
|---|---|
| MR. ZAPPIN: | And I will say that started after Mr. Wallack made the comment to me that I should seek an – that whatever exhibit, the e-mail was that I should seek an order of protection keeping [the child] away from me or whatever that e-mail said to that effect. I thought that was, to use Justice Cooper's words, outrageous. |
| THE COURT: | Mr. Zappin, do you believe Mr. Wallack's alleged misbehavior or misconduct should be something that should be brought to the public? |
| MR. ZAPPIN: | If he's actually committed misconduct, yes. If he hasn't then no. |
| THE COURT: | So you believe he has committed misconduct? |
| MR. ZAPPIN: | Misconduct in what sense? Attorney misconduct, yes. He's made false statements on the record. He's proffered knowingly frivolous arguments. He's bullied, intimidated third-parties. Yes, I think he's committed attorney misconduct. |
| THE COURT: | That should be brought to the notice of the public? |

56

MR. ZAPPIN:          If he's actually done it, yes.

THE COURT:          Next question.  We're sort of meandering here.

As the above passage demonstrates, Defendant interjected himself as a participant to question Plaintiff on a wholly irrelevant topic – Mr. Wallack's alleged misconduct in the proceeding – in an effort to use Plaintiff's own testimony against him to justify publication of the September 18 Decision.  The record is replete with such instances of Defendant's improper conduct such as that highlighted above.  As a consequence, Plaintiff did not receive a fair trial where Defendant abandoned his role as a neutral arbiter to become an active litigant in the proceeding to reinforce his own credibility and conduct.

<u>Defendant Deliberately Provoked and Antagonized Plaintiff Throughout the Trial</u>

110.    Perhaps most disturbing was Defendant's use of the custody and access trial to mock, antagonize and provoke Plaintiff to diminish his credibility and lure sound bites out of Plaintiff to validate his September 18 Decision.  The record is replete with instances where Defendant personally insulted and attempted to incite Plaintiff, both verbally and physically.  As shown by the examples below, which are by no means exhaustive, Defendant's conduct denied Plaintiff a fair custody trial.

111.    Perhaps most illustrative were Defendant's bizarre interruptions during testimony to attempt to irritate Plaintiff and paint him as sexist.  This began during trial on November 19, 2015 when Defendant interjected to apparently insinuate – out of the blue, no less – that Plaintiff was engaged in a relationship with an underage girl:

MR. SCHORR:          Can you tell us who Amy Steadman is.[22]

---

[22] Defendant knew exactly who Amy Steadman was.  On his own accord, Defendant referenced her numerous times during pre-trial proceedings.

MR. ZAPPIN:            She's a girl who reached out to me in March of 2014 and I
                       hung out with her maybe a dozen times intermittently.

THE COURT:             A girl?  How old is she?

MR. ZAPPIN:            I think she's 31.

THE COURT:             31?

MR. ZAPPIN:            Yes.

THE COURT:             She's a woman?

MR. ZAPPIN:            Yeah.  Her name is Amy.

THE COURT:             You said a girl.

MR. ZAPPIN:            Yeah.  I hung out with her but she had a lot questions [sic].

THE COURT:             My question is a girl is somebody who is under a certain
                       age.  She's a woman.  Correct?

MR. ZAPPIN:            Well, yes.

THE COURT:             Go on.

It continued during trial on November 24, 2015 when Defendant interjected again with similar

inappropriate suggestions and questioning:

MR. ZAPPIN:            Okay.  I will get through this quickly.  We were at a party.
                       The girl was there and Claire had called her a shrew.  The
                       girl said something not so nice to Claire.  They started
                       pulling each other's hair.  They had to be pulled apart.

MR. SCHORR:            Where was this and when was this?

MR. ZAPPIN:            It was maybe December of 2012.  I think it was like the
                       Ganza Bar [sic].

THE COURT:             When you say girl, you don't mean somebody whose 15 or
                       16?

MR. ZAPPIN:            I mean a woman.

Defendant's sexist innuendo continued throughout trial, but only with respect to Plaintiff and never to Ms. Comfort, despite Ms. Comfort using the word "girl" repeatedly during her testimony.   It reached a crescendo on December 10, 2015 when Defendant flat-out called Plaintiff sexist after he questioned his wife about her admission during her direct testimony that she was having sex with other men during their relationship and around the time period of the conception of the child in late 2013:

MR. ZAPPIN:          You testified that you were having sex with multiple men … in November 2013, is that correct?

MS. COMFORT:        Yes …

                                          ***

THE COURT:           Were you married to Mr. Zappin at the time?

MS. COMFORT:        We weren't even engaged or married. [23]

THE COURT:           I'm putting an end to this absurd line of questioning.

MR. ZAPPIN:          It's not an absurd line of questioning.  This is all about –

THE COURT:           If you're arguing to me that she slept with somebody else while she was dating you and that somehow that enticed you to do what you did, that is –

MR. ZAPPIN:          Do what I did?  Are you making a finding?

THE COURT:           That's really far fetched.

MR. ZAPPIN:          No, your Honor.

THE COURT:           Far fetched problems.  Go on to something else, sir.

MR. ZAPPIN:          What I'm trying to show is that this is [the] Miss Claire Comfort Show.  She has no empathy, show [sic] sympathy, for anyone else.

---

[23] Plaintiff and his wife married in early May 2013, approximately five months into the pregnancy of the child.  The passage is also demonstrative of how Defendant would interject to question Ms. Comfort to bolster and/or rehabilitate her testimony.

| | |
|---|---|
| THE COURT: | I find it an amazingly sexist position, amazingly old fashioned position in line with you calling Miss Cohen honey, it's to be able to be pillaging her because she had sexual relations with a man; is that what you are doing? |
| MR. ZAPPIN: | No, I'm pillaging her – I'm not even pillaging.  I'm asking her questions because it goes to a pattern of her not showing any sort of feelings, any caring to any other individual … You're beating me up.  You're just picking on me.  You're beating me up. |
| THE COURT: | Go ahead, sir.  Go ahead, sir. |
| MR. ZAPPIN: | Do we need summations because we know what the decision is going to be? |
| THE COURT: | You know, you want to keep doing that, it's sad.  Then I shouldn't bother you if you want to call your witness tomorrow.  If you know what the decision is, don't bother calling your other witness. |

Plaintiff's line of questioning was important as it was not only meant to establish that Ms. Comfort was emotionally uncaring towards Plaintiff as the child's father, but that the paternity of the child was in dispute.  Unrefuted testimony had previously established that Ms. Comfort had repeatedly told Plaintiff during her pregnancy that he was not the child's father and that a partner at her law firm was.  And, as shown above, Ms. Comfort admitted to a relationship with this individual around the time of the conception of the child during her direct testimony.  Accordingly, Defendant's statements were highly prejudicial and evidenced that Defendant was not a neutral fact-finder, but a participant in the prosecution of the case against Plaintiff.

112.    Additionally, Defendant openly mocked and ridiculed Plaintiff during the trial evidencing a deep-seeded antagonism towards Plaintiff.   This ranged from making fun of Plaintiff for texting with his mother:

| | |
|---|---|
| THE COURT: | How often do you speak to your mother?  You're an adult male.  Do you speak to her like – do you send her text messages every day about everything in your life? |

to Defendant even interjecting himself to ridicule Plaintiff because he was not potty-trained at

the age of three:

| | |
|---|---|
| MS. COHEN: | [Y]ou've been using the computer since the age of three.  Is that accurate? |
| MR. ZAPPIN: | No way.  I was still pooping in diapers at the age of three. |
| MS. COHEN: | And that you could program at the age of four.  Is that accurate?[24] |
| THE COURT: | You weren't toilet trained at the age of three? |

to outright insults and aspersions casts at Plaintiff by Defendant designed to antagonize,

disparage and incite him.  This included Defendant repeatedly name-calling Plaintiff during trial,

which included Defendant stating that Plaintiff was a "sad" or "sick" person suggesting that he

was predisposed against Plaintiff.  In the midst of trial, Defendant would attack Plaintiff over and

over again calling him "disingenuous," "dishonest" and "not credible," most of the time

---

[24] In order to support his finding in the February 29, 2016 custody decision in *Zappin v. Comfort* that Plaintiff hacked Apple's iPhone proprietary and uncrackable encryption to change a single inconsequential text message, Defendant relied on assertions by Ms. Comfort in the forensic custody report that Plaintiff began using a computer at the age of three (3) and began programming computers at the age of (4):

> In addition, as the custody forensic report reveals, plaintiff began using a computer by the time he was three-years old, and he started to program at a very early age.

Defendant's only other support for his conclusion was that Plaintiff was a Computer Science major. Nonetheless, Defendant's statements concerning Plaintiff programming computers at the age of four (4) highlight the absurdity of not only the entire proceeding, but his clear and apparent antagonism towards Plaintiff that he would accept anything Ms. Comfort said as gospel.  Putting aside the fact that Ms. Comfort did not know Plaintiff until he was twenty-four (24) years of age and that Plaintiff could *maybe* read a few words at the age of four (4), it would have been impossible for Plaintiff to use a computer at such an early age because personal computers did not exist in rural West Virginia (where Plaintiff was born) in the mid-to-late 1980's.

concerning issues that were not in dispute.[25]  If Plaintiff disputed something a witness claimed he said, Defendant would make remarks like "that sounds like something you [Plaintiff] would say" prior to Plaintiff cross-examining the witness or presenting rebuttal evidence, again suggesting a predisposition.  Defendant regularly would make sarcastic remarks such as stating "I would like the record to reflect that I have a father who really cares about his child," after Defendant sent a third-party witness out of the courtroom in the middle of testimony to read from a prepared statement attacking Plaintiff, which Plaintiff pointed out on the record.  Defendant would make remarks evidencing that he loathed Plaintiff such as stating that Plaintiff was the "last person he wanted to talk to" during Plaintiff's testimony.   Indeed, Defendant went even further to repeatedly attack Plaintiff's professional competence.   For instance, he repeatedly interrupted Plaintiff's cross-examination of Ms. Comfort's father to berate Plaintiff that he was incompetent and doing a poor cross-examination.  Defendant incessantly derided Plaintiff about even the most

---

[25] In one instance, Defendant called Plaintiff "disingenuous" for denying putting the child's name and unredacted photograph on the Internet.  Plaintiff never put the child's name or unredacted photograph on the Internet.  In fact, neither Ms. Comfort nor the Attorney for the Child ever made any such assertion. Rather, Defendant wholly concocted the allegation based on his alleged own personal Internet research. Defendant admitted it at trial:

| | |
|---|---|
| MR. ZAPPIN: | Barbara Ross is sitting in the gallery.  [The witness] should not use the child's name. |
| THE COURT: | I notice, Mr. Zappin, that the child's name is still on various web sites.  I would ask you to have them removed. |
| MR. ZAPPIN: | What web sites? |
| THE COURT: | It's on – I had to look something up and someone brought it to my attention it's on Judicialwatch.com. |
| MR. ZAPPIN: | I don't own the website. |

Indeed, JudicialWatch.com never printed anything about *Zappin v. Comfort*, and Defendant's statement appears to be categorically untrue.  Nonetheless, Justice Cooper's use of the Internet to conduct independent research about purported facts not in evidence was improper and denied Plaintiff a full and fair hearing, particularly where they were relied upon in rendering a decision.

minor things such as marking exhibits or moving in evidence, even where Plaintiff did it correctly.  Likewise, Defendant continually placed Plaintiff under a microscope throughout the trial with never-ending criticisms of him for actions such as smiling, placing a paperclip in his mouth while looking for a document, exhaling and placing his hand on counsel's table to name a few examples.  This is all merely illustrative as many of Defendant's attacks are so voluminous and personal that a complete list would be a disservice to this Complaint.

113.    What was most offensive and personal to Plaintiff was Defendant's mocking of his upbringing and southern background.  Defendant referred to Plaintiff as a "country boy" multiple times on the record apparently to make fun of him.  He incessantly mocked and criticized the way Plaintiff talked claiming that he could not understand Plaintiff.  Defendant audibly huffed and laughed when there was discussion that Plaintiff attended NASCAR races.  Even more offensive, Plaintiff and several other witnesses heard Defendant and his court staff refer to Plaintiff as "Gomer Pile" on a persistent basis.  Defendant's conduct was unprofessional, highly offensive and demonstrated a deep seeded personal prejudice against Plaintiff.[26]

114.    Defendant's attacks were not limited to words, however.  On November 23, 2015, Defendant attempted to provoke a physical altercation or "rumble" in the courtroom because Plaintiff exhaled while walking off the witness stand:

THE COURT:          Mr. Schorr, how much longer will Mr. Zappin's testimony take?

MR. SCHORR:        Unfortunately, Your Honor, it will take some time.  We are going through the daily – the various days of November and moving in various things into evidence.

---

[26] If there was ever any doubt that Defendant was highly critical of conservative values, Plaintiff is in possession of an audio recording from 2014 in which he rails against Ted Cruz and strongly insinuates that he would rule against any Ted Cruz supporter.

> THE COURT:      It will move faster it we don't have outbursts like we had.
> Mr. Zappin, were you just now – you had no reaction?  You
> didn't just look up?
>
> MR. ZAPPIN:     I sighed.  I sighed.  You want to have a hearing on it?  Let's
> do it right now.[27]
>
> THE COURT:      What is this a schoolyard.  You want to go ahead.  ***You
> want to rumble***?  Is that what you are doing?  Come on.

It should be noted that Defendant was observed to gesture at Plaintiff as if to provoke him closer

to the bench.  Of course, no altercation broke out because Plaintiff ignored Defendant's attempts

to antagonize him.   Moreover, Defendant admitted to engaging in violent physical outbursts

directed at Plaintiff throughout the trial prompted by the most routine procedures such as

preserving an objection to a document in evidence:

> MR. WALLACK:    Offer Defendant's N, except for the first page, but from the
> second page on.  The first page was the email coversheet to
> Miss Comfort.

---

[27] Defendant previously attacked Plaintiff and threatened to hold a hearing to determine whether
Plaintiff had ***smiled*** in the courtroom:

> THE COURT:  And do not sit there and smile.  Do not sit there and smirk.  It shows a
> lack of control on your part and –
>
> MR. ZAPPIN:  Your Honor, you are tainting the record.
>
> THE COURT:  Don't give me that stuff about tainting the record.  You, Sir, are doing
> what you are doing.   I'm simply admonishing you for acting
> unprofessionally.
>
> MR. ZAPPIN:  I would like the record to reflect I'm sitting here with my laptop open, I
> have three sets of documents, and I'm writing on a note pad.  So, your
> saying me smiling is absolutely false.  I would like to put that on the
> record.
>
> THE COURT:  I think probably everyone else saw it.  If you want to have a hearing on
> whether you were smiling, Sir ...

This exchange only one example of the over-the-top attacks Defendant inflicted on Plaintiff during the
trial and demonstrates an apparent antagonism towards Plaintiff, even where he simply and respectfully
preserved the record.

| MR. ZAPPIN: | Obviously I object, Your Honor.  It was sent to Miss Comfort.  It wasn't sent to him. |
| THE COURT: | I said you are to make simply objections on word. |
| MR. ZAPPIN: | Please don't slam your hand at me.  I'm scared.  I'm scared, Your Honor.  You're scaring me … You slammed your hand down very hard … |
| THE COURT: | I've done that numerous times. |

On another occasion during trial, Defendant's conduct actually turned frightfully violent.  While Defendant was in the middle of a so-called "impromptu" reprimand of Plaintiff's conduct, Plaintiff pointed out that Defendant was reading from a prepared statement.  Defendant stood up from the bench and began approaching Plaintiff, screamed at Plaintiff and forcefully threw his papers in Plaintiff's direction.[28]  These outbursts caused Plaintiff to be fearful of his safety just being in the courtroom.  The outbursts and attempts at physical provocation are yet even more evidence of a deep seeded antagonism by Defendant towards Plaintiff that began with the September 18 Decision, which made it impossible for Plaintiff to receive a fair trial before Defendant.

115.    Additionally, Defendant's conduct during Plaintiff's testimony demonstrated that he had utter disdain and contempt for Plaintiff.  During Plaintiff's seven (7) days of testimony, Defendant engaged in conduct that revealed that he was not interested in listening to the vast majority of Plaintiff's testimony.  For instance, while Plaintiff was testifying Justice Cooper read the newspaper, peeled and ate oranges, read motions and papers from other cases, texted between his legs on his cell phone and did cross-word puzzles.[29]  Defendant also took the opportunity to

---

[28] Multiple witnesses have observed, including Plaintiff, that Justice Cooper keeps a small sign on his desk that states "STAY QUIET" suggesting he is aware of his temper.

[29] Plaintiff was sitting next to Defendant during his testimony.  Defendant's actions were clearly visible to Plaintiff as he had a full view of Defendant's desk/bench.

antagonize Plaintiff while he was on the state.  For example, while Plaintiff was testifying about his time with his child, Defendant proudly displayed and was reading from the September 18 Decision in an apparent attempt to taunt Plaintiff.  When Plaintiff pointed it out, Defendant did not deny it but rather chastised Plaintiff for looking at him:

> MR. ZAPPIN:   I'm sure there's never been an instance stance [sic] of American jurisprudence of a judge writing a decision the way you did or speaking to a litigant the way you did.  I saw you up there this morning sitting there reading your sanctions decision, sitting there, you know, with a big smile on your face.
>
> THE COURT:   Mr. Zappin, what are you doing when you are up there you're looking up on the bench to see what I am doing?  Is that what you are spending –

When Ms. Comfort testified, however, it was observed that Defendant attentively listened to her testimony and took notes.  Again, Defendant's behavior was indicative of his deep-seeded prejudice and predisposition towards Plaintiff that denied Plaintiff a full and fair opportunity to be heard.

<u>Defendant's Prejudicial Active Participation in Prosecuting Plaintiff</u>

116.   Defendant's prejudice towards Plaintiff was apparent throughout the trial to the extent that he would personally direct Ms. Comfort's counsel how to try the case.  This included directing Ms. Comfort's counsel to perform a *voir dire* of Plaintiff's expert, telling Ms. Comfort's counsel how to rephrase objectionable questions, suggesting that Ms. Comfort's counsel move the court for a missing-witness charge and assisting Ms. Comfort's counsel in coming up with lines of questioning for Plaintiff during his cross-examination of Plaintiff to name a few of Defendant's improper actions.  Needless to say, by assisting Ms. Comfort's counsel throughout the trial and directing him how to prosecute the case, Defendant abandoned

his role as a neutral arbiter and became an active participant in the prosecution of Plaintiff. Defendant's conduct was highly prejudicial and denied Plaintiff and full and fair trial.

117.    Defendant not only gave guidance to Ms. Comfort's counsel as to how to prosecute the case, but Defendant actively participated in questioning witnesses that went well beyond merely clarifying issues.  For example, Defendant interjected multiple questions during the cross-examination of Ms. Comfort and her father to ask questions that were clearly designed to rehabilitate their testimony.  Moreover, throughout the trial and prior to the close of evidence, Defendant repeatedly referred to Ms. Comfort as "very honest" and "credible."

118.    Defendant would refer to Plaintiff with statements during the proceeding inferring the opposite, that he was "dishonest" and "not credible," demonstrating clear preconceived and prejudicial notions about Ms. Comfort and Plaintiff.   In fact, Defendant actively cross-examined Plaintiff during parts of his testimony that lasted seven (7) days.  Defendant's questions went well-beyond merely clarifying issues and demonstrated an intent to undermine Plaintiff's claims even in other litigations.  For example, Defendant took over the cross-examination of Plaintiff to interrogate him for nearly twenty (20) minutes on a wholly unconnected allegation Plaintiff made concerning his mother in an unrelated proceeding.  (*See* Ex. 16.)  Defendant was well-aware that Plaintiff did not have notice that the allegation would be at issue, that the information Defendant was questioning Plaintiff about was statutorily and administratively sealed, that Plaintiff was unable to compel the testimony of out-of-state witnesses that could corroborate Plaintiff's allegation and that Defendant was improperly eliciting hearsay testimony.  (*See id*.) Nonetheless, Defendant used his improper cross-examination to conclude in his February 29, 2016 decision on custody and access that Plaintiff had falsely testified on the issue.  Defendant's

inappropriate cross-examination of Plaintiff cited above is illustrative of his questioning of Plaintiff throughout the proceeding, which denied Plaintiff a fair trial.

119.    Defendant directed repeated questions to Plaintiff's peer review expert and forensic pathologist that were clearly designed to impeach their credibility.   Defendant's questions were highly inappropriate and went beyond merely clarifying issues or testimony.  The questions demonstrated a desire to undermine Plaintiff's claims.

120.    Defendant posed questions to both the forensic custody evaluator and Plaintiff's peer review expert only about Plaintiff's conduct and his mental health.  This is despite the fact that both experts raised substantial questions about Ms. Comfort's parenting, credibility and claims in the case.  In fact, the forensic custody evaluator diagnosed Ms. Comfort as suffering from "moderately severe mental illness" and administered psychological testing that revealed she was "highly deceptive."  Defendant failed to ask the forensic custody evaluator a single question about Ms. Comfort, however.  It was quite apparent that Justice Cooper's questioning of the expert was designed to elicit testimony that he could rely on to rule against Plaintiff.

121.    Plaintiff has not quoted from the transcripts as to Defendant's statements and questioning (with the exception of Defendant's questioning of Plaintiff on a wholly unrelated issue and Defendant's flashing the September 18 Decision during Plaintiff's testimony cited above) discussed above in this Complaint since much of the questioning is highly confidential and pertains to the child.  Plaintiff will, however, provide the transcripts separately to the Court under seal if needed.  Regardless, Defendant's conduct was a clear departure from his role as an arbiter and demonstrated that he became an active litigant against Plaintiff.  As a result, Plaintiff was denied a full and fair hearing as a result of Defendant's conduct.

<u>Defendant's Statements Indicating That He Predetermined the Facts</u>

122.    Both prior to and during the custody and access trial, Defendant made improper statements that he had predetermined the facts of the case prior to the close of the evidence – and in some instances – prior to reviewing any evidence at all.

123.    In the September 18 Decision and prior to trial, Defendant states that Plaintiff had "harmed" Ms. Comfort and the child.  (*See* Ex. 1 at 2.)  Defendant made such statements without the parties uttering a single word in his courtroom, much less him reviewing any evidence as to the issues in dispute.  Defendant's statements in the September 18 Decision were prejudicial and indicated that he had predetermined the facts of the case.

124.    On April 30, 2015, Judge Carol Goldstein of the New York County Family Court issued an Order of Protection against Ms. Comfort on Plaintiff's behalf based primarily on an incident that took place on April 29, 2015 as well as other prior events.   Judge Goldstein held a hearing, took testimony and received evidence prior to issuing the Order of Protection.  Indeed, Ms. Comfort did not contest its issuance.  When the Family Court matter was consolidated into the Matrimonial Action on July 22, 2015, Defendant summarily vacated Judge Goldstein's Order of Protection calling Plaintiff's accusations "farcical."[30]  Defendant did not review the transcript of the hearing before Judge Goldstein.  He similarly did not review any of the evidence or testimony presented to her.   Rather, it was quite apparent that Defendant had predisposition against Plaintiff.

125.    Ms. Comfort attempted to subpoena Plaintiff's ex-girlfriend (and her law school friend), "Ms. Doe," to testify as to whether Plaintiff had certain injuries to his back prior to 2012.

---

[30] It bears reminding that Defendant did not allow the parties or counsel to speak at the July 22, 2015 hearing when the Family Court action was consolidated into the Matrimonial Action.

Both Plaintiff and Ms. Doe requested that Defendant not compel her testimony as it would be irrelevant.   In granting request, Defendant made wholly improper and outrageous statements radically mischaracterizing the record and casting Plaintiff's ex-girlfriend as a domestic violence victim:

> THE COURT:   I understand how it could be relevant to any claims that Mr. Zappin makes of his good character etcetera, but when I weigh everything here requiring this woman to testify, to have to come into court and to have to relive things that happened five or six years ago, the negative, the downside of doing that, the problems are going to outweigh what I see the importance of her testimony is in this proceeding … This case does not need Jane Doe's testimony particularly in light of what I am seeing today.  I believe she's suffered enough.  From what I'm told she does not need to suffer anymore by being brought here as a witness.

Ms. Doe never made a single allegation of domestic abuse, recited anything that would require her to "relive" events or claimed that she "suffered."  Ms. Doe did not want to testify because her testimony would have drummed up comprising photographs taken of her and statements made by her in 2011.  Indeed, in petitioning the court, Ms. Doe sought to enjoin the "filing, publishing or disseminating [of] any photographs of Jane Doe in any manner."   Defendant's statements implying that Ms. Doe was a domestic violence victim were improper and deliberately misrepresented the record.  These statements demonstrate not only Defendant's predisposition against Plaintiff, but his willingness to recast the facts to paint Plaintiff in an unfavorable light.

126.    As mentioned above, during Plaintiff's cross-examination of Ms. Comfort, Defendant indicated that he had already determined that Plaintiff had committed family offenses prior to the close of evidence. Unprompted, Defendant stated that Plaintiff was questioning Ms. Comfort in order to justify "do[ing] what you [Mr. Zappin] did."  Plaintiff vigorously denied ever having committed a family offense.  Defendant's statements during Ms. Comfort's cross-

examination were prejudicial and indicated that Defendant had predetermined that Plaintiff had committed family offenses prior to the close of evidence.

127.    Defendant statements make clear that he had a predisposition against Plaintiff and had predetermined the facts and outcome of the case prior to hearing all the evidence.  His predisposition was apparent in the September 18 Decision and continued throughout the proceeding in an apparent attempt to justify his publishing and dissemination to the media of the September 18 Decision, which cast Plaintiff in a highly unfavorable manner.  With Defendant as the fact-finder, Plaintiff was denied a neutral arbiter and consequently deprived of his right to a full and fair trial.

Defendant's Erroneous Evidentiary Rulings That Denied Plaintiff a Full and Fair Hearing

128.    Defendant interjected himself to improperly manipulate the evidence deduced and heard at the custody and access trial so as to conform to his statements and portrayal of Plaintiff in the September 18 Decision.  In fact, Defendant found a way to exclude or render meaningless virtually every piece of evidence favorable to Plaintiff.  Defendant's evidentiary rulings were blatantly erroneous, unfair, prejudicial and contrary to the law that Defendant made it impossible for Plaintiff to present a case.  In so doing, Defendant denied Plaintiff his right to a full and fair hearing on the merits.

129.    Defendant went out of his way to disparage Plaintiff's evidence admitted at trial. For example, as referenced above, Defendant repeatedly claimed that Plaintiff put the child's name and photograph on the Internet.  In denying Plaintiff custody and imposing supervised visitation, Defendant stated that Plaintiff "revealed the name of the parties' child and made available to the world photographs taken of him" on the Internet.  Again, Defendant's statements are not accurate and lack an evidentiary basis.  Nonetheless, when Plaintiff introduced numerous

Facebook postings made by Ms. Comfort and her friend containing the name, photograph and location of the child, Defendant disparaged his evidence:

| | |
|---|---|
| MR. ZAPPIN: | When did you take this photograph? |
| WITNESS: | I don't know when I took the photo, but it appears on December 15 … |
| MR. ZAPPIN: | And that was a time that Ms. Comfort was in DC …, is that correct? |
| WITNESS: | That is correct. |
| MR. ZAPPIN: | And it says lunch with Claire and baby [R].  So you posted the name of the child on the Interest; is that correct? |
| MR. WALLACK: | Objection. |
| THE COURT: | Sustained. |
| MR. ZAPPIN: | It says at Soho DC.  Can you tell me what Soho DC is? |
| WITNESS: | It's a restaurant in DC. |
| MR. ZAPPIN: | You posted the location of the child on the Internet? |
| MR. WALLACK: | Objection. |
| THE COURT: | That's an absurd question.  If you want to answer it, go ahead. |
| WITNESS: | Yes. |

Defendant's statements clearly demonstrate the application of a double standard.  His statements were prejudicial and denied Plaintiff a full and fair trial.

130.    As mentioned above, the New York County Family Court issued an Order of Protection against Ms. Comfort and in favor of Plaintiff primarily based on an April 29, 2015 incident at the Time Warner Center in New York, NY.  Defendant improperly excluded security footage of the incident from evidence that had been ordered to be produced by the Family Court

and was in the case file.  Defendant failed to provide any explanation for the exclusion of the security footage that would have corroborated Plaintiff's allegations concerning the incident.  In fact, the record in the Matrimonial Action reflects that Defendant not only failed to view the video, but made his decision without ever reviewing the motion papers concerning the footage.  In his February 29, 2016 custody and access decision, Defendant went on to make findings of facts against Plaintiff based on credibility, despite excluding the best evidence of the incident without a legal basis – the security footage.

131.    On November 30, 2015 in the middle of trial, Plaintiff filed a motion *in limine* (Mot. Seq. 33) during trial seeking various evidentiary relief, including among other requests, inclusion of testimony from two (2) witnesses on an issue central to the case, exclusion of audio recordings that were illegal wiretaps and relief related to the Court's appointment of a neutral digital forensic expert ("Mot Seq. 33").  Mot. Seq. 33 was stamped in the *Ex Parte* Clerk's office and, according to the Clerk, delivered to Justice Cooper's chambers that day.  It was also electronically docketed that day as well.  When Plaintiff raised Mot. Seq. 33 with Defendant on the record on November 30, December 1, December 3 and December 4, 2015, Defendant claimed he was not in possession of the motion.  His statements were demonstrably false.  Defendant made no effort to find the motion and refused to accept a copy from Plaintiff.  Defendant did not decide Mot. Seq. 33 until well over a month after the conclusion of trial on January 15, 2016.  At that point, the requested relief was denied as moot and not considered on the merits.  Defendant's failure to timely consider Mot. Seq. 33 denied Plaintiff a full and fair opportunity to be heard at trial on issues that were central and in dispute.

132.    During the Matrimonial Action, Ms. Comfort placed at issue and entered into evidence at trial approximately a dozen photographs central to the issues litigated at the custody

and access trial.  Although the photographs were produced to Defendant in digital form on a flashdrive, they were produced only two (2) days before trial and fourteen (14) months after having been subpoenaed.[31]   Defendant refused to give Plaintiff proper access to the digital photographs themselves to examine the photographs and their metadata.  Defendant provided Plaintiff only a partial print out generated by his law clerks from the website JeffreyExif.com of the metadata connected to the photographs.  Even those printouts indicated that they had been visually altered, which Plaintiff explained both in a motion *in limine* and on the record at trial on November 19, 2015, in addition to contradicting Ms. Comfort's sworn statements as to when the photographs were taken.   However, Defendant refused to permit Plaintiff access to the digital copies of the photographs and excluded the metadata from evidence, which was contrary to established case law.  Defendant subsequently credited Ms. Comfort's altered photographs as authentic and relied on them in making his determinations as to custody and access of the child. Defendant's erroneous evidentiary ruling as to providing Plaintiff access to the highly relevant digital photographs and excluding the metadata from evidence were prejudicial and denied Plaintiff a full and fair trial.

133.    Defendant improperly excluded Ms. Comfort's medical records related to her mental health and substance abuse and denied Plaintiff an opportunity to inspect them prior to trial.[32]  Ms. Comfort had conceded in sworn statements submitted to the court that she had been

---

[31]  On September 8, 2014, Justice Deborah Kaplan signed a so-ordered Judicial Subpoena directing Ms. Comfort to produce the digital photographs by September 15, 2014.  Ms. Comfort failed to produce them by that date.  The court subsequently issued two more orders directing Ms. Comfort to comply with the Judicial Subpoena.  She declined in both instances and did not produce the photographs until the eve of trial.

[32]  A litigant's "mental health [is] clearly a relevant consideration" in determining custody and access of a child.  *See Frierson v. Golston*, 9 A.D.3d 612, 615 (3rd Dept. 2004).  "It is also true that parties to a contested custody proceeding place their physical and mental condition at issue."  *See Garvin v. Garvin*, 162 A.D.2d 497, 499 (2nd Dept. 1990).

diagnosed and treated for psychiatric disorders.  Moreover, during law school and just prior to her pregnancy in 2012, Ms. Comfort received treatment for substance abuse.  Ms. Comfort admitted many of these facts to the forensic custody evaluator in the Matrimonial Action, as well as conceding to him that she used illegal drugs and prescription medication without a prescription, which is noted in his report.  As substance abuse is subject to recidivism, Ms. Comfort's medical records were clearly relevant to the child custody proceeding and at least warranted inspection of her medical records.  Moreover, the forensic custody evaluator's report indicated that Ms. Comfort suffered from several mental health disorders in addition to suffering from delusions and indicated she was "highly deceptive."  Despite the multitude of evidence that Ms. Comfort's medical records should have been examined, Defendant denied Plaintiff a full and fair opportunity to examine the records and explore these highly relevant issues at trial.  It bears reminding that despite Defendant directing numerous questions to the forensic custody evaluator at trial concerning Plaintiff's mental health, Defendant failed to ask the evaluator a single question concerning Ms. Comfort on any issue.

134.    While Defendant denied Plaintiff an opportunity to inspect Ms. Comfort's mental health records, Defendant applied an unequal standard to the issue and permitted Ms. Comfort, the Attorney for the Child and the forensic custody evaluator access to his.  In fact, Ms. Comfort and the Attorney for the Child were allowed to inspect the records in the courtroom twice on October 2, 2015 and again on November 6, 2015.  Defendant then permitted Ms. Comfort's counsel and the Attorney for the Child to question witnesses about the records and argue in summations the information gleaned from them.  Moreover, information from Plaintiff's mental health records were included in the forensic custody evaluator's report, which was not the case

for Ms. Comfort.  Here, Defendant's unequal evidentiary standard denied Plaintiff a full and fair opportunity to litigate the case.

135.    During the trial, Defendant admitted illegal audio recordings, which Plaintiff also contended were spliced.  (*See* Ex. 17.)  Defendant admitted the audio recordings without an authenticating witness and over Plaintiff's objections.  (*See id*.)  Indeed, Defendant used Plaintiff's testimony elicited through Defendant's cross-examination of Plaintiff to improperly admit the recordings.  (*See id*.)  Plaintiff sought to include evidence that the recordings were illegally obtained and were incomplete in his motion *in limine* Mot. Seq. 33, but Defendant refused to issue a timely ruling on Mot. Seq. 33 during trial.  Defendant subsequently heavily relied on the recordings in denying Plaintiff custody and access to his son.  Defendant's conduct was plain error and denied Plaintiff a fair trial.

136.    Defendant improperly conducted trial summations *ex parte* without Plaintiff present, which denied Plaintiff a full and fair opportunity to be heard.  On December 21, 2015, Defendant heard summations from Ms. Comfort's counsel and the Attorney for the Child while Plaintiff was not present due to illness confirmed by an emergency room doctor's note. Defendant permitted Ms. Comfort's counsel and the Attorney for the Child to introduce new theories, facts and contentions that were not previously part of the trial record that Defendant later relied upon in rendering a decision.   For example, Plaintiff had introduced several photographs and text messages showing that Ms. Comfort had beat Plaintiff and stabbed him on the night of November 1, 2013.[33]  During trial, Ms. Comfort offered no evidence to refute Plaintiff's claims.  However, Ms. Comfort's counsel raised for the first time during summations

---

[33] Mot. Seq. 33 mentioned above sought to introduce testimony of an out-of-state witness who observed Ms. Comfort's attack on Plaintiff on November 1, 2013.  This testimony would have corroborated the photographs and text messages already in the record.  It is no mystery why Defendant failed to rule on Mot. Seq. 33 under over a month after trial concluded.

the theory that Plaintiff had self-inflicted injuries.[34]  Plaintiff obviously was not present to object.

Defendant went on to credit this theory – solely based on attorney argument – in rendering a

decision on custody and access, which was acknowledged in his February 29, 2016 decision:

> The inescapable conclusion that must be drawn is that, to the extent the photos do
> not depict injuries inflicted on him by persons other than defendant, they reflect
> injuries that were self-inflicted.  As defendant's counsel stated in his closing
> argument, plaintiff was so intent on avoiding being held responsible for what he
> did to defendant that he would even stab himself to create false evidence against
> her.

Needless to say, Defendant denied Plaintiff a full and fair opportunity to be heard not only by

engaging in *ex parte* communications with Ms. Comfort's counsel and the Attorney for the

Child, but by knowingly relying on attorney argument not in the record and wholly

unsubstantiated by evidence.   It further serves to highlight Defendant's prejudice and

predisposition against Plaintiff that denied him a fair trial.

<u>Plaintiff Did Not Receive a Fair Trial with Defendant as Fact-Finder</u>

137.    It would be a disservice to this already very long Complaint to include each and

every instance where Defendant acted inappropriately and denied Plaintiff the right to a fair trial.

However, the above is illustrative that Defendant's improper conduct permeated every aspect of

the custody and access trial and the Matrimonial Action itself.  Ultimately, Defendant issued a

decision that was unconscionable and designed solely to punish and caused further harm to

Plaintiff, rather than address the best interests of the child, which included:

- Imposing supervised visitation with the child for at least eighteen (18)
  additional months at a cost of approximately $130,000 per year.[35]  Plaintiff

---

[34] On June 27, 2016, Plaintiff received copies of Ms. Comfort's invoices from her counsel.  They
indicate that Defendant and the matrimonial court engaged in numerous *ex parte* phone calls and e-mails
with Ms. Comfort's counsel and the Attorney for the Child prior to and during the custody and access
trial, not unlike the *ex parte* summations that Defendant conducted.  This was wholly improper and only
serves to highlight Defendant's misconduct.

was ordered to pay the cost even though the issue was not addressed at trial and Plaintiff remains unemployed as a result of Defendant's September 18 Decision;

- Directing that Plaintiff's weekday visitation with the child take place between the business hours of 4:00 p.m. to 6:00 p.m.  Previously, Plaintiff's visitation during weekdays took place from 6:00 p.m. to 8:00 p.m.  Neither Plaintiff, nor Ms. Comfort requested the change.  Defendant's decision was designed to force Plaintiff to make the impossible decision of going to school/work or seeing his child;

- Directing that Plaintiff cease communications with the child's caregivers and extracurricular providers.  Ms. Comfort never made such a request for relief; and

- Ordering a five (5) year Order of Protection against Plaintiff on behalf of Ms. Comfort, despite the fact that Ms. Comfort did not request an Order of Protection in her Pre-trial Statement of Disposition. Defendant issued the prolonged order despite failing to make findings of "aggravating factors" as required by Family Court Act § 842.  Defendant's issuance of the Order of Protection effectively ended any hope that the parties would be able to resolve the matter and/or co-parent the child and ensured continued conflict.

Indeed, Plaintiff parental rights were *de facto* terminated by Defendant.  In rendering his custody and access decision, Defendant – much like he did with the September 18 Decision – made findings of fact that did not comport with the record, evidence or the parties' allegations. Defendant's decision is currently on appeal.

138.    Each and every one of Defendant's improper actions or erroneous and prejudicial rulings can be tied back to buttressing his pronouncements against Plaintiff in the September 18 Decision.   Given the nature of the publicity Defendant generated with the decision and Defendant's ostensible extrajudicial acts, it was overwhelmingly and demonstrably in Defendant's interests that Plaintiff be unable to fully and fairly prosecute the custody and access

---

[35] It bears reiteration that Ms. Comfort never made an allegation that Plaintiff had harmed the child.  Plaintiff had supervised visitation for over two (2) and a half years receiving glowing reports from supervisors and without even a single suggestion that continued supervised visitation was necessary. Indeed, supervisors who had spent hundreds of hours with Plaintiff and the child testified at trial and stated that they had never observed anything that would warrant continued supervised visitation.

trial.  Indeed, by publishing and disseminating the September 18 Decision to the media in order to generate negative publicity concerning Plaintiff, Defendant improperly and ostensibly placed his credibility at odds with Plaintiff.  Based on his statements and conduct, no reasonable person could conclude that Defendant was an impartial fact-finder.  Indeed, it is perhaps one of the greatest travesties and injustices of the American court system that Justice Cooper was permitted to not only preside over the custody and access trial in *Zappin v. Comfort*, but act as the sole fact-finder when he issued the September 18 Decision.  It destroyed a litigant and the well-being of an infant child.  As the above demonstrates, Plaintiff was deprived of his right to a fair trial as a result of Defendant's provoking pretrial publicity by publishing and disseminating the September 18 Decision.

## CONCLUSIONS

139.    The evidence cited above conclusively demonstrates that Justice Cooper is a man who set out not only to destroy a young professional's career, but virtually every aspect of Plaintiff's life making it impossible to move forward.  It began by Justice Cooper's unlawful publication and dissemination to the media, through *ex parte* communications, falsehoods concerning Plaintiff targeted at destroying Plaintiff's reputation and livelihood.  Justice Cooper's acts were without question extrajudicial.  And when Plaintiff challenged Justice Cooper's unlawful conduct, Justice Cooper acted in furtherance of his wrongful conduct to justify and conceal his improper conduct by falsely vilifying Plaintiff and denying him any opportunity for a full and fair opportunity to be heard as to the underlying merits of the litigation.

140.    Justice Cooper's behavior described above is an affront and is the antithesis to the values and principles espoused by the judiciary.  There is no justification or excuse for his wrongful conduct or abuse of his position as a judicial officer.  Rather than attempting to resolve

the case such that all parties could move on with their lives peacefully, Justice Cooper turned *Zappin v. Comfort* into a media spectacle with publicity stunts and extrajudicial conduct. And, in doing so, he took a productive member of society and buried him with deliberate falsehoods, personal attacks and assaults on his livelihood improperly aired to the public through non-judicial means doing a monumental disservice to the child he was entrusted to protect. Accordingly, Justice Cooper must be held accountable and responsible for his extrajudicial actions that have caused immense harm and untolled damages to Plaintiff.

## COUNT I – DEFAMATION/INJURIOUS FALSEHOOD

141.     Plaintiff re-alleges and incorporates by references paragraph 1 - 140 of this Complaint as though fully set forth herein.

142.     Defendant has made false and defamatory statements concerning Plaintiff as set forth above in this Complaint.

143.     Defendant's statements are statement of fact and are demonstrably false.

144.     Defendant has published these false statements to numerous individuals through print and electronic means. Defendant has also caused and participated in the publication of these false statements with third-parties.

145.     Defendant enjoys no privilege concerning his statements:

      a.     Defendant knew his statements were false and/or made his statements with reckless disregard as to the truth;

      b.     His statements were outrageous, unnecessarily insulting and were intentionally directed at permanently harming Plaintiff's personal and profession reputation;

80

      c.      Defendant's publication in an unofficial reporter and dissemination to the media of his false statements concerning Plaintiff were not a judicial act.

146.    When Plaintiff made Defendant aware that his statements concerning Plaintiff were false, Defendant took no action to mitigate Plaintiff's damages or retract his false statements concerning Plaintiff.

147.    As a result of Defendant's defamatory statements, Plaintiff has suffered severe harm and is entitled to actual and punitive damages in an amount to be proven at trial.

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

148.    Plaintiff re-alleges and incorporates by references paragraph 1 - 147 of this Complaint as though fully set forth herein.

149.    Defendant has engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff, namely the publication and dissemination to the media of Defendant's statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*, which contains numerous untrue statements of fact and false accusations of misconduct discussed in detail above.

150.    Defendant also engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff by physically assaulting Plaintiff and spitting on him on a public street transcending the bounds of human decency.

151.    As a proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer severe and extreme emotional distress, entitling him to actual and punitive damages in an amount to be proven at trial.

## COUNT III – TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE

152.     Plaintiff re-alleges and incorporates by references paragraph 1 - 151 of this Complaint as though fully set forth herein.

153.     At the time of the September 18, 2015 Decision in *Zappin v. Comfort*, Plaintiff maintained a continuing economic relationship with *Mintz Levin Cohn Ferris Glovsky & Popeo P.C.* as an associate attorney.  Plaintiff expected his employment with the firm to continue, which would have resulted in the continuation of economic benefits and other future economic benefits to Plaintiff.

154.     Defendant knew or should have known about Plaintiff's prospective economic relationship with *Mintz Levin Cohn Ferris Glovsky & Popeo P.C.* at all relevant times.

155.     Defendant intentionally acted to disrupt the relationship between Plaintiff and *Mintz Levin Cohn Ferris Glovsky & Popeo P.C.* by publishing and disseminating to the media his statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*.

156.     As a direct and proximate result of Defendant's intentional acts to disrupt Plaintiff's continuing and prospective economic relationship with *Mintz Levin Cohn Ferris Glovsky & Popeo P.C.*, Plaintiff suffered actual and consequential damages, including the loss of his employment as well as other business opportunities, revenues, good will, and profits, and Plaintiff will continue to suffer similar losses after the filing of this Complaint.  Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial.

## COUNT IV – *PRIMA FACIE* TORT

157.     Plaintiff re-alleges and incorporates by references paragraph 1 - 156 of this Complaint as though fully set forth herein.

158.    Defendant undertook actions – namely the publication and dissemination to the media of his statutorily sealed September 18, 2015 decision containing untrue statements of fact and accusations of misconduct described above – to intentionally and deliberately inflict harm on Plaintiff.

159.    Defendant's actions were unlawful and tortious.  In engaging in such action, Defendant violated New York statute, binding case law and court rules as described above.

160.    Defendant has no excuse or justification for his unlawful actions.

161.    As a result of Defendant's conduct, Plaintiff has suffered special damages, including but not limited to, permanent loss of his income, damage to his personal and professional reputation and severe emotional distress.  Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial.

### COUNT V – DENIAL OF FAIR TRIAL DUE TO EXTRAJUDICIAL STATEMENTS MADE BY DEFENDANT AND UNDUE PRETRIAL PUBLICLITY CAUSED BY DEFENDANT PRIOR TO TRIAL (42 U.S.C. §§ 1983, 1988)

162.    Plaintiff re-alleges and incorporates by references paragraph 1 - 161 of this Complaint as though fully set forth herein.

163.    Defendant made extrajudicial statements to the press by publishing and personally disseminating to the media the statutorily sealed September 18, 2015 decision in *Zappin v. Comfort*.

164.    As detailed above, Defendant engaged in the extrajudicial act of sending an unsigned draft of the September 18, 2015 decision in *Zappin v. Comfort* to *The New York Law Journal*.  Defendant also provided copies of the decision to *The New York Post* and *The Daily News*.  Additionally, he personally provided a copy of decision for publication to *The New York Law Journal*.  Such publication was prohibited by New York Domestic Relations Law 235.

Moreover, personally directing the publication of a judicial decision or order in *The New York Law Journal* – an unofficial reporter – has been explicitly held to be an extrajudicial act. Defendant published and disseminated the September 18, 2015 decision in *Zappin v. Comfort* with the express purpose of generating media coverage.

165.    Defendant made such extrajudicial statements in order to create a "high-profile" case that would generate negative publicity towards Plaintiff to cause him harm and prevent him from fully and fairly litigating the custody and access trial in *Zappin v. Comfort*.

166.    Defendant knew his statements about Plaintiff in the September 18, 2015 decision in *Zappin v. Comfort* were false and untrue as explained in more detail above.  Defendant made his false statements particularly salacious and over-the-top to generate media coverage and to inflict harm on Plaintiff.    Defendant made his false statements knowing they were false and/or with reckless disregard for the falsity.  Furthermore, Defendant made such statements with the deliberate intent to harm Plaintiff's reputation, employment, livelihood and professional standing.

167.    As set forth above, the custody and access trial was heavily influenced by Defendant's September 18, 2015 decision in *Zappin v. Comfort*.  Plaintiff was unduly prejudiced at trial by the September 18, 2015 decision and Defendant's extrajudicial acts of publishing and disseminating it to the media.

168.    As a result of Defendant's extrajudicial statements to the press, Plaintiff was denied his constitutional right to due process and to a fair trial in *Zappin v. Comfort* under the United States Constitution, Fourteenth Amendment.  Plaintiff's constitutional right to access to his child has been unduly restricted and denied for an extended period of time, which continues as of the filing of this Complaint.  Additionally, Plaintiff has unconstitutionally been denied and

84

stripped of his property as a result of Defendant's denial of Plaintiff's right to a fair trial. Plaintiff has suffered substantial economic losses, permanent damage to his personal and professional reputation and deprivation of his liberty.  Plaintiff is entitled to damages in an amount to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

(a)     Enter judgment in favor of Plaintiff against Defendant;

(b)     Enter judgment awarding Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendant's activity complained of herein and for any injury complained of herein, inclusive of interest and costs, in an amount to be determined at trial;

(c)     Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)     Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)     Order such other relief that the Court deems just and appropriate.

Dated: November 7, 2016
      Huntington, WV

_____
Anthony Zappin
1827 Washington Blvd.
Huntington, WV 25701
(304) 654-6195 (tel.)
anthony.zappin@gmail.com
*Plaintiff, Pro Se*