UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                :

ANTHONY ZAPPIN,                 :
                                :

                    Plaintiff,   :
                                :

               v.              :
                                :

MATTHEW F. COOPER, a Justice of the :
Supreme Court of the State of New York, in :
his individual and personal capacity,   :
                                :

                    Defendant.  :
                                :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 2, 2018

16 Civ. 5985 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      This is one in a series of federal actions that Plaintiff Anthony Zappin[1] has filed against individuals and entities connected to his divorce proceedings in New York State Supreme Court. He filed two lawsuits against news companies for their allegedly defamatory coverage of those proceedings; this Court dismissed one of those suits with prejudice last year, *see Zappin* v. *Daily News L.P.*, No. 16 Civ. 8762 (KPF), 2017 WL 3425765, at *15 (S.D.N.Y. Aug. 9, 2017) ("*Zappin Federal I*"), and dismisses the second one today, *see Zappin* v. *NYP Holdings, Inc.*, *et al.*, No. 16 Civ. 8838 (KPF) ("*Zappin Federal II*"). Plaintiff also recently filed a fourth lawsuit, this time against several judges; individuals involved with the attorney disciplinary process in the New York State Supreme

---

[1]    Plaintiff is an attorney proceeding *pro se* in this matter. While "a court is ordinarily obligated to afford a special solicitude to pro se litigants," such as by liberally construing their pleadings, "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

Court Appellate Division, First Department; and the New York County District Attorney. *See Zappin* v. *Collazo, et al.*, No. 17 Civ. 8837 (KPF).

The instant suit names as Defendant Matthew F. Cooper, the New York County Supreme Court Justice who presided over most of Plaintiff's divorce proceedings. Plaintiff here seeks to hold Defendant liable for transmitting to purportedly unauthorized recipients a judicial opinion that, Plaintiff alleges, contains false, malicious, or defamatory statements about Plaintiff. In his First Amended Complaint (the "FAC"), Plaintiff asserts claims of defamation, intentional infliction of emotional distress, and tortious interference with prospective economic advantage, among others. Defendant moves to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on multiple grounds, including absolute judicial immunity, sovereign immunity, the *Rooker-Feldman* doctrine, collateral estoppel, and failure to state a claim.

At first blush, Defendant's alleged conduct would appear to fit within the ambit of judicial immunity, and were this suit against a federal judge, such might be the case. But New York law governs the substantive judicial immunity inquiry here, and a relic of that body of law appears to leave state judges briefly exposed for the very particular conduct at issue. Still, because Plaintiff's claims would necessarily require relitigation of material and decisive factual issues previously adjudicated in state court, this Court grants Defendant's motion and dismisses the FAC with prejudice on collateral estoppel grounds.

## A. Factual Background

The Court assumes familiarity with its decision in Plaintiff's earlier suit against Daily News L.P., *see Zappin Federal I*, 2017 WL 3425765, at *1-3, which described some of the underlying factual and procedural history of Plaintiff's divorce proceedings. The New York chapter of those proceedings began in February 2014, when Plaintiff initiated the divorce action *Zappin* v. *Comfort* in New York County Supreme Court (the "Divorce Action"). (Sanctions Decision 5). Defendant began presiding over that case after reassignment in July 2015 from a different New York judge. (FAC ¶ 12).

Plaintiff alleges that from the first hearing before Defendant (or the "Trial Court"), in July 2015, through multiple orders and proceedings, Defendant engaged in personal attacks on Plaintiff that "impugned [Plaintiff's] character

---

[2] This Opinion draws from the First Amended Complaint (the "FAC" (Dkt. #26)), the well-pleaded facts of which are taken as true for purposes of this motion. *See City of Los Angeles* v. *Preferred Commc'ns, Inc.*, 476 U.S. 488, 493 (1986); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). The Court has considered the 17 exhibits attached to the FAC, but finds most of them to be either tangentially or not at all relevant to the issues presented by the instant motion. This Opinion principally draws on five sources beyond the FAC: (i) Defendant's (or the "Trial Court") September 18, 2015 decision resolving several motions and sanctioning Plaintiff, attached as Exhibit 1 to the FAC (Dkt. #26-1 (the "Sanctions Decision" or the "Decision")); (ii) Plaintiff's chart of allegedly erroneous statements in the Decision, attached as Exhibit 5 to the FAC (Dkt. #26-5); (iii) Plaintiff's July 11, 2016 brief filed in his appeal of the Sanctions Decision to the First Department, attached as Exhibit A to the Declaration of Michael A. Berg ("Berg Decl.") in support of Defendant's motion to dismiss (Dkt. #41-1 ("Zappin Appellant Br.")); (iv) the First Department's January 17, 2017 affirmance of the Trial Court's Sanctions Decision (the "Affirmance"), *see Zappin* v. *Comfort*, 49 N.Y.S.3d 6 (1st Dep't 2017) ("*Zappin State I*") (also contained in Berg Decl. Ex. B (Dkt. #41-2)); and (v) the First Department's affirmance of the Trial Court's ultimate judgment of divorce, including its orders of protection, child support, supervision, and custody, *see Zappin* v. *Comfort*, 65 N.Y.S.3d 30 (1st Dep't 2017) ("*Zappin State II*"). The grounds for the Court's consideration of these materials at the motion to dismiss stage are set forth in the Discussion section *infra*. And for convenience, Defendant's moving brief is referred to as "Def. Br." (Dkt. #42); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #46); and Defendant's reply brief as "Def. Reply" (Dkt. #48).

and questioned his professional competency [as an attorney].” (*Id.* at ¶¶ 14-16).[3] According to Plaintiff, Defendant's September 18, 2015 decision, which resolved several motions and ultimately imposed sanctions on Plaintiff (referred to in this Opinion, somewhat imprecisely, as the “Sanctions Decision” or the “Decision”), was “nothing more than a publicity stunt” that was “designed to summarily destroy Plaintiff's reputation, employment prospects and legal career[.]” (*Id.* at ¶¶ 3-4).

### 1.    The Trial Court's Sanctions Decision

Plaintiff alleges that the Sanctions Decision was “instigated” by the court-appointed attorney for Plaintiff's child (the “AFC”), who filed two motions that are relevant here.  (FAC ¶ 17).  One was to quash a subpoena that Plaintiff had served on her prior to the July 2015 hearing seeking, *inter alia*, information about the amount of fees billed to Plaintiff's wife, whom Plaintiff suspected had been under-billed to his detriment.  (*Id.*).  The second motion sought several things.  First, the AFC moved for permission to communicate with, and release certain court documents to, the New York State Office of Professional Medical Conduct (the “OPMC”) regarding a confidential

---

3        Plaintiff notes that he described Defendant's “improper conduct ... in a September 1, 2015 affidavit filed *before* the [Sanctions] Decision” (FAC ¶ 16), and Plaintiff attaches the affidavit as Exhibit 3 to the FAC (FAC Ex. 3), not Exhibit 2 as Plaintiff erroneously cites (FAC ¶ 16).  Plaintiff's September 1, 2015 affidavit notes in relevant part that

> Since unlawfully taking over this case on July 22, 2015, [Defendant] has attacked me personally and impugned my character and integrity relentlessly, going so far as to endanger my legal career by threatening to file disciplinary charges and gratuitously mentioning the name of my employer on the record and in various court orders.

(FAC, Ex. 3, at 3).

disciplinary complaint that Plaintiff had filed against the AFC's retained medical expert witness. (Sanctions Decision 3; FAC ¶ 18). The motion also sought any attorneys' fees and damages that the expert may have incurred as a result of Plaintiff's OPMC complaint. (Sanctions Decision 3). Finally, the AFC asked the Trial Court to impose financial sanctions on Plaintiff "as a result of his actions with respect to her expert and his overall misconduct throughout the pendency of the [D]ivorce [A]ction." (*Id.*). Plaintiff points out, and the Sanctions Decision acknowledges, that the AFC requested sanctions in her reply papers. (*See* FAC ¶ 19; Sanctions Decision 19).

Of note, the Sanctions Decision resolved Plaintiff's cross-motions seeking: (i) to have the AFC disqualified; (ii) permission to call as a witness and cross-examine the AFC at trial; (iii) to renew Plaintiff's application for leave to take his child to a hospital for a developmental assessment; and (iv) to vacate the Trial Court's July 22, 2015 order granting the AFC a money judgment against Plaintiff for outstanding fees. (Sanctions Decision 3-4). In the course of resolving those motions, the Sanctions Decision made a series of factual findings addressing Plaintiff's misconduct throughout the Divorce Action, including misconduct directed towards Defendant, his predecessor judge, opposing counsel, the AFC, and the medical expert witness. The details of those findings are discussed as appropriate throughout this Opinion. Broadly speaking, the Decision found that Plaintiff had "done everything in his power to undermine the legal process and use his law license as a tool to threaten, bully, and intimidate," behavior that "call[ed] into question [Plaintiff's] fitness to

practice law." (Sanctions Decision 3). The Trial Court likewise found that Plaintiff's "tactics, and the language he employ[ed] in his motion papers, ha[d] grown [ever more] extreme and out of step with what is appropriate and permissible advocacy by an attorney, even one who is representing himself." (*Id.* at 9; *see id.* (describing behavior as a "maelstrom of misconduct")).

Moreover, while the Trial Court found Plaintiff's filing of the OPMC complaint to be particularly egregious (*see* Sanctions Decision 18), it expressly considered "the circumstances under which the [OPMC conduct] took place" pursuant to the relevant judicial sanctions provision, 22 NYCRR § 130-1.1 (*id.* at 21). In this respect, the Trial Court observed:

> As should be obvious from the recitation of the history of this case, [P]laintiff's misconduct exhibited with regard to the OPMC complaint is not an isolated incident. Regrettably, it is but one instance in a pattern of improper behavior. Although the hope was that [P]laintiff would heed the court's admonitions and represent himself according to the dictates of his profession, that has not happened.
>
> Under these circumstances, where warnings have had no effect on [P]laintiff's conduct, it is incumbent — *for the integrity of the judicial process, as well as for the protection of the other litigants and the child* — that penalties be imposed.

(*Id.* (emphasis added)).

Ultimately, the Sanctions Decision (i) quashed Plaintiff's subpoena on the AFC; (ii) denied as moot the AFC's motion for relief concerning Plaintiff's OPMC complaint; (iii) denied Plaintiff's cross-motion in full; and (iv) imposed sanctions on Plaintiff in the amount of $10,000, with half due to the AFC for attorney's

fees incurred as a result of Plaintiff's misconduct and half due to New York's

Lawyer's Fund for Client Protection. (Sanctions Decision 26).

## 2. The First Department's Affirmance of the Sanctions Decision

Plaintiff appealed the Trial Court's Sanctions Decision to the Appellate

Division of the First Department, which unanimously affirmed the Decision.

*See Zappin* v. *Comfort*, 49 N.Y.S.3d 6, 6 (1st Dep't 2017) ("*Zappin State I*").

Specifically, the appeals court described the Trial Court's Decision as "detailed"

and "amply supported by the record." *Id.* The First Department concluded:

> The record establishes that [Plaintiff] engaged in unprofessional, outrageous and malicious conduct on multiple occasions, most recently by filing the bad faith disciplinary complaint against the attorney for the child's (AFC) medical expert with the Department of Health's Office of Professional Medical Conduct. Under the circumstances, particularly where [Plaintiff] has exhibited a pattern of bad faith conduct throughout the proceedings despite repeated warnings not to do so, the sanctions imposed by Supreme Court were entirely proper.

*Id.* at 6-7. The First Department also rejected Plaintiff's argument that

Defendant had imposed sanctions without fair notice:

> We have considered each of [Plaintiff's] procedural arguments, including that he was entitled to a hearing because he did not have fair notice that sanctions were being considered against him, and find them unavailing. *[Plaintiff] had fair notice that sanctions were being considered*, as the AFC requested sanctions in both her moving affirmation[4] and again in her reply

---

4      Plaintiff argues that the First Department erred in stating that the AFC's request for sanctions was initially made in her moving affirmation. This Court does not sit in review of the First Department; whether that court made such an error and, if so, whether the error was material to Plaintiff's appeal of the Sanctions Decision are issues that could have been properly raised elsewhere, including in Plaintiff's motion to the First Department for reargument of the Affirmance or alternatively leave to appeal to the New York Court of Appeals, which motion the First Department denied. *See Zappin* v.

papers on the motion, but [Plaintiff] did not address the AFC's request either in opposition or in surreply. [Plaintiff] was also warned repeatedly throughout the proceedings that he must adhere to the Rules of Professional Conduct.

*Id.* at 7 (citations omitted) (emphasis added).  Plaintiff then moved the First Department for reargument or leave to appeal the January 17, 2017 decision to the New York Court of Appeals, but the First Department denied the motion in an April 13, 2017 decision.  *See Zappin* v. *Comfort,* No. 301568/14, 2017 N.Y. Slip Op. 70559(6), 2017 WL 1360299, at *1 (1st Dep't Apr. 13, 2017).

### 3.  Defendant's Publication and Dissemination of the Sanctions Decision

According to Plaintiff, Defendant's ulterior motives were revealed in his publication of the Sanctions Decision; in brief, he alleges that Defendant "used [the AFC's] sanctions request in her reply papers as pretext to inappropriately impose sanctions on Plaintiff."  (FAC ¶ 20).  Worse yet, "the main thrust" of the Sanctions Decision, Plaintiff alleges, "was to purposefully inject into the media and publicize scandalous and false statements of fact about Plaintiff designed to harm his reputation and professional standing."  (*Id.*).  In this regard, Plaintiff repeatedly acknowledges that the instant action does not seek to challenge the merits of the Sanctions Decision.  (*See, e.g.*, Pl. Opp. 14 ("Plaintiff is not complaining of harm caused by the imposition of the sanction or [Defendant's] issuance of the Sanctions Decision.  What Plaintiff seeks relief

---

*Comfort*, No. 301568/14, 2017 N.Y. Slip Op. 70559(6), 2017 WL 1360299, at *1 (1st Dep't Apr. 13, 2017).  More generally, the issue of adequate notice is discussed *infra* in the context of whether Plaintiff received a full and fair opportunity to litigate the Sanctions Decision's factual findings for collateral estoppel purposes.

from is [Defendant's] separate and distinct unlawful extrajudicial conduct of publishing and disseminating the Sanctions Decision to the media and tabloid newspapers[.]"); FAC ¶ 2 ("It was not Defendant's rendering of the [Sanctions] Decision that caused Plaintiff the harm complained of herein[.]"); *id.* at ¶ 25 ("It was not the sanction itself that devastated Plaintiff. Rather, it was [Defendant's] extrajudicial actions taken after issuing the [D]ecision that caused irreparable harm.")).[5]

Plaintiff says he "received the [Sanctions] Decision by e-mail from Defendant's law clerk ... in the afternoon of Friday September 18, 2015," and it was clear to him based on the "form and substance of the [D]ecision that Defendant intended to publish it." (FAC ¶ 26). Plaintiff and his counsel "sent a series of e-mails that day and over the weekend to [Defendant], his law clerks and the New York Attorney General's Office requesting that the [Sanctions] Decision be embargoed until Plaintiff had an opportunity to brief the issue of publication," but "[a]ll of Plaintiff's e-mails were ignored and [Defendant] went on to publish and disseminate the [D]ecision to the media." (*Id.*).

---

[5] Despite Plaintiff's provisos, the FAC devotes dozens of pages to criticizing the merits of the Decision or of the Trial Court's administration generally of the Divorce Action, with only a threadbare connection to the ostensibly narrow, dissemination-based claims asserted here. (*See, e.g.,* FAC ¶¶ 96-99, 101-02, 110-38). This Court will not adjudicate those merits, but instead takes judicial notice that the First Department has affirmed the Trial Court's Sanctions Decision, *see Zappin State I,* 49 N.Y.S.3d at 6, as well as the Trial Court's ultimate judgment of divorce, including its orders of protection, child support, supervision, and custody, *see Zappin State II,* 65 N.Y.S.3d at 31. To be clear, the Court finds it difficult to resolve the etiological issue of the degree to which Plaintiff was harmed by the issuance of the Sanctions Decision and the degree to which he was harmed by any one transmission of it. However, to decide the instant motion, the Court can and does accept Plaintiff's representations about the precise conduct of Defendant for which he seeks redress.

Indeed, the FAC alleges, Defendant "took extrajudicial steps to inject the [Sanctions] Decision into the media and ensure that it would be published by the press and receive maximum publicity." (FAC ¶ 25). These steps included Defendant's alleged dissemination of the unredacted Sanctions Decision to the *New York Law Journal* and one of its bloggers as well as to the *New York Post* and the *Daily News*. (*See id.*). The FAC further alleges that "[this] initial dissemination ... set off a cascading series of articles, blogs, Facebook posts and the like across the Internet." (*Id.*).

### a. The New York Law Journal

Plaintiff alleges that Defendant "[b]y his own admission ... sent the [Sanctions] Decision to *The New York [Law] Journal* for publication, which was an ostensible act to ensure the [D]ecision would receive publicity." (FAC ¶ 27). As a result, "the [D]ecision can be obtained from numerous other sources with a simple web search including, but not limited to, Westlaw, LexisNexis and Justia," and remained "publicly accessible as of the date of filing of [the FAC]." (*Id.* at ¶ 28). Plaintiff states upon information and belief that the Sanctions Decision has "been viewed by thousands of people as a result of its publication in *The New York Law Journal*." (*Id.*).

Plaintiff further alleges that Defendant sent the Sanctions Decision to *New York Law Journal* blogger Benjamin Bedell, who, on September 21, 2015, contacted Plaintiff for comment about the Decision. (FAC ¶ 30). When Plaintiff asked Mr. Bedell how he obtained the Decision, Mr. Bedell responded that he received it directly from Defendant's chambers. (*Id*). The same evening, "Mr.

Bedell published a blog post summarizing the [Sanctions] Decision," which post Plaintiff believes "has been viewed by thousands of people." (*Id.* at ¶ 33). Somewhat more troublingly, the FAC alleges that on the same evening "Mr. Bedell briefly published a copy of the [Sanctions] Decision that he obtained from chambers on *The New York Law Journal*'s website," but that "Mr. Bedell's copy differs substantially from the version sent to the parties in the [Divorce] Action." (*Id.* at ¶ 32). Specifically, the version posted by Mr. Bedell was "unsigned and contains several typographical errors and formatting mistakes," which Plaintiff claims indicates that "Mr. Bedell received an unsigned draft copy of the [Sanctions] Decision." (*Id.*; *id.* at Ex. 7).

### b. The New York Post and the Daily News

Plaintiff alleges that Defendant also sent the Sanctions Decision to journalists Julia Marsh at the *New York Post* and Barbara Ross at the *Daily News*, both of whom "have written virtually all of the numerous articles disparaging litigants appearing in [Defendant's] courtroom" (FAC ¶ 34; *id.* at Ex. 2), and with whom Defendant has allegedly "conspired" to defame Plaintiff (*id.* at ¶¶ 36-37). Ms. Marsh and Ms. Ross "contacted Plaintiff numerous times via e-mail and telephone requesting comment concerning [the Sanctions] Decision." (*Id.* at ¶ 34). Plaintiff claims that "[b]ased on records confirming the time of the calls and the e-mails, Ms. Marsh and Ms. Ross were in possession of the [Sanctions] Decision at least several hours (and possibly days) prior to its publication on *The New York Law Journal* website and the New York State Official Reporter's archive of unpublished decisions." (*Id.*). "Defendant's law

clerk … provided Ms. Marsh and Ms. Ross a copy of the [Sanctions] Decision by e-mail on September 18 shortly after it was provided to the parties." (*Id.* at ¶ 35).

On September 22, 2015, "Ms. Marsh wrote an article in the print and online editions of *The New York Post* … [that] summarize[d] and extensively quote[d] from Defendant's [Sanctions] Decision." (FAC ¶ 36). Plaintiff alleges that "the online version of the article appeared on the front page of *The New York Post*'s website for multiple days … [and was] viewed by thousands of people." (*Id.*). Also on September 22, 2015, Ms. Ross wrote an article in the print and online editions of the *Daily News* that likewise summarized and quoted from the Sanctions Decision, and which article "appeared on the front page of *The Daily News'* website for multiple days … [and] has been viewed by thousands of people." (*Id.* at ¶ 37).

### c. Further Dissemination

According to Plaintiff, "[t]he articles published in *The New York Law Journal, The New York Post* and *The Daily News* were a direct result of [Defendant's] dissemination of the [Sanctions] Decision to those publications, which spawned numerous other articles," including "published articles and blog posts by prominent publications in the legal industry such as the *ABA Journal, Law360.com, The Family Lawyer Magazine* and *Above the Law.*" (FAC ¶ 38). The Sanctions Decision "also generated perpetual coverage of the matrimonial action by tabloids *The New York Post* and *The Daily News*, which continued to target Plaintiff well-after the [Sanctions] Decision by publishing

untrue allegations made by Ms. Comfort throughout the remainder of the proceeding." (*Id.*).

### 4.   Plaintiff's Claims

Plaintiff principally sues for defamation resulting from Defendant's dissemination of the Sanctions Decision and also asserts a series of related claims. Plaintiff alleges that Defendant's conduct "tortiously interfered with Plaintiff's employment and professional standing" by causing the termination of Plaintiff's employment. (FAC ¶¶ 85-90). This conduct also caused Plaintiff to suffer severe emotional distress. (*Id.* at ¶¶ 91-93). Finally, Defendant's dissemination of the Sanctions Decision denied in various ways Plaintiff the right to a fair trial on the custody of his child, including causing prejudicial media coverage and impairing Plaintiff's financial ability to prosecute the trial (*Id.* at ¶¶ 94-108). In all, the FAC asserts five causes of action: (i) defamation and injurious falsehood (*id.* at ¶¶ 141-47); (ii) intentional infliction of emotional distress (*id.* at ¶¶ 148-51); (iii) tortious interference with prospective economic advantage (*id.* at ¶¶ 152-56); (iv) prima facie tort (*id.* at ¶¶ 157-61); and (v) denial of due process and a fair trial under 42 U.S.C. § 1983 (*id.* at ¶¶ 162-68).

## B.   Procedural Background

Plaintiff filed the Complaint, with its 34 attached exhibits, on July 27, 2016 (Dkt. #1), and the FAC, with its 17 attached exhibits, on November 8, 2016 (Dkt. #26). Defendant filed his motion to dismiss and supporting materials on March 13, 2017. (Dkt. #40-42). Thereafter, the Court

granted Plaintiff's request on consent to extend the briefing deadlines. (Dkt. #44). On April 27, 2017, Plaintiff filed his opposition brief and supporting materials (Dkt. #45-46), and on May 15, 2017, Defendant filed his reply brief (Dkt. #48).

On June 8, 2017, Plaintiff sought leave to file a sur-reply, but the Court denied that request after finding that a sur-reply was neither necessary nor appropriate. (Dkt. #50-52). Two days later, Plaintiff submitted a 32-page filing, consisting of a letter to the Court and supporting attachments, which Plaintiff captioned as a "supplemental response" to five-month-old correspondence from Defendant. (Dkt. #54). The Court's resulting endorsement warned Plaintiff that "[i]nsofar as [his] correspondence was designed as an end-run around the Court's [order denying leave to file a sur-reply], ... the Court w[ould] not consider Plaintiff's correspondence as part of the briefing on the pending motion to dismiss"; that briefing was completed upon the filing of Defendant's reply brief. (Dkt. #55).

## DISCUSSION

### A.  Applicable Law

#### 1.  Motions to Dismiss Under Rule 12(b)(1)

"When presented with a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has subject matter jurisdiction necessary to consider the merits of the action." *Wong* v. *CKX, Inc.*, 890 F.

Supp. 2d 411, 414-15 (S.D.N.Y. 2012) (collecting cases). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In resolving a Rule 12(b)(1) motion, "the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain* v. *Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (quoting *Makarova*, 201 F.3d at 113).

## 2. Motions to Dismiss Under Rule 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In resolving a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (collecting cases). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). Here, the Court considers the FAC, along with the 17 documents attached as exhibits totaling roughly 350 pages; the most relevant of these exhibits is the Sanctions Decision, attached as Exhibit 1 (Dkt.#26-1), and Plaintiff's chart of

allegedly false and erroneous statements in the Decision, attached as Exhibit 5 (Dkt.#26-5). *See Goel* v. *Bunge, Ltd.,* 820 F.3d 554, 558-59 (2d Cir. 2016) (including exhibits attached to the complaint as among the documents that may properly be considered in resolving a motion to dismiss).

A court may also consider on a Rule 12(b)(6) motion "matters as to which judicial notice may be taken, such as pleadings in other lawsuits and other public records[.]" *Rosado-Acha* v. *Red Bull Gmbh*, No. 15 Civ. 7620 (KPF), 2016 WL 3636672, at *6 (S.D.N.Y. June 29, 2016) (quoting *Agron* v. *Douglas W. Dunham, Esq. & Assocs.*, No. 02 Civ. 10071 (LAP), 2004 WL 691682, at *2 (S.D.N.Y. Mar. 31, 2004)) (internal quotation marks omitted); *see also Pani* v. *Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6).").

More specifically, "[i]n the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice.*" *Jianjun Lou* v. *Trutex, Inc.*, 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012); *see also Rothman* v. *Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleading in another lawsuit). The Court may also "take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Glob. Network Commc'ns, Inc.* v. *City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks and citation omitted).

As such, the Court takes judicial notice of Plaintiff's July 11, 2016 merits brief in his appeal of the Sanctions Decision to the First Department, attached as Exhibit A to the Berg Declaration (Dkt. #41-1 ("Zappin Appellant Br.")). The Court likewise takes judicial notice of the First Department's January 17, 2017 affirmance of the Trial Court's Sanctions Decision, *see Zappin State I*, 49 N.Y.S.3d at 7, and the First Department's November 21, 2017 affirmance of the Trial Court's ultimate judgment of divorce, including its orders of protection, child support, supervision, and custody, *see Zappin* v. *Comfort*, 65 N.Y.S.3d 30, 31 (1st Dep't 2017) ("*Zappin State II*").

**B.     The Court Has Subject Matter Jurisdiction over This Action**

The Court begins by considering Defendant's jurisdictional arguments. *See Wong*, 890 F. Supp. 2d at 414-15. Defendant maintains that Eleventh Amendment immunity and the *Rooker-Feldman* doctrine each divest the Court of subject matter jurisdiction. These arguments fail.

The Eleventh Amendment bars suits against states unless the state expressly waives, or Congress abrogates, the state's sovereign immunity. *See Va. Office for Prot. & Advocacy* v. *Stewart*, 563 U.S. 247, 253-54 (2011); *Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 73 (1996). Claims barred under the Eleventh Amendment must be dismissed for lack of subject matter jurisdiction. *See Stewart*, 563 U.S. at 253-54; *Doe* v. *Delaware State Police*, 939 F. Supp. 2d 313, 320-21 (S.D.N.Y. 2013). A state's immunity extends to state officials sued in their official capacities where the state is the "real, substantial party in interest." *See Huang* v. *Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001).

Here, Defendant argues that he is being sued in his official capacity because the FAC challenges the merits of the Sanctions Decision and the administration of the Divorce Action, which he terms "quintessential judicial acts." (*See* Def. Br. 14-15). But despite Plaintiff's extraneous rumblings to the contrary, identified *supra*, the Court is holding Plaintiff to representations in his pleadings and his briefing that he is suing Defendant in his individual capacity and only for harms arising from the purportedly "extrajudicial" conduct of allegedly disseminating the Decision to unofficial publishers, a claim evaluated below. (*See* FAC ¶¶ 1-2; Pl. Opp. 13-14). The Court thus rejects Defendant's Eleventh Amendment immunity argument as presented.

Defendant's *Rooker-Feldman* argument fails for similar reasons. The *Rooker-Feldman* doctrine bars federal courts from hearing claims "'brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Hoblock* v. *Albany Cty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (quoting *Exxon Mobil Corp.* v. *Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). In other words, under the doctrine, "federal district courts lack jurisdiction over cases that essentially amount to appeals of state court judgments, including claims that are inextricably intertwined with a prior determination of a state court." *Rountree* v. *U.S. Bank NA*, No. 15 Civ. 9018 (KPF), 2017 WL 31405, *7 (S.D.N.Y. Jan. 3, 2017) (internal quotation marks and citations omitted). Courts sparingly apply *Rooker-Feldman, see Exxon Mobil*, 544 U.S. at 287-88 (collecting cases), and

"[f]ederal plaintiffs are not subject to the *Rooker-Feldman* bar unless they complain of an injury caused by a state judgment," *Hoblock*, 422 F.3d at 88 (emphasis removed); *see also McKithen* v. *Brown*, 481 F.3d 89, 97-98 (2d Cir. 2007) ("[T]he applicability of the *Rooker-Feldman* doctrine turns … on the causal relationship between the state-court judgment and the injury of which the party complains in federal court." (emphasis removed)).

Again, although the FAC at times blurs the line between injuries arising from the rendering of the Sanctions Decision, as opposed to its extrajudicial dissemination, the Court binds Plaintiff to his representations that he "is not complaining of harm caused by the imposition of the sanction or [Defendant's] issuance of the Sanctions Decision.  What Plaintiff seeks relief from is [Defendant's] separate and distinct unlawful extrajudicial conduct of publishing and disseminating the Sanctions Decision to the media and tabloid newspapers[.]"  (Pl. Opp. 14; *see also* FAC ¶ 2 ("It was not Defendant's rendering of the [Sanctions] Decision that caused Plaintiff the harm complained of herein[.]")).  Accordingly, the *Rooker-Feldman* doctrine is inapplicable because Plaintiff does not complain of an injury caused by the Sanctions Decision itself, but rather of an injury caused by Defendant's alleged dissemination of that Decision.

## C.     The Doctrine of Judicial Immunity Does Not Bar This Action

Defendant claims absolute judicial immunity from this suit, arguing that the FAC tries to hold him liable for the "quintessential judicial acts" of issuing the Sanctions Decision and presiding over the Divorce Action.  (Def. Br. 10).

Plaintiff disputes this claim, principally on the ground that Defendant acted extrajudicially in disseminating the Sanctions Decision to unofficial publishers. (Pl. Opp. 2-13). Examining the relevant New York state law, which governs the inquiry, the Court finds that Defendant's immunity argument falls short.

### 1. Judicial Immunity General Principles

It is settled law that judges are absolutely immune from civil liability for actions performed in their judicial capacity. *See Bliven* v. *Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (collecting cases); *Alvarez* v. *Snyder*, 702 N.Y.S.2d 5, 11-12 (1st Dep't 2000). This immunity "is an immunity from suit, not just from [the] ultimate assessment of damages." *Alvarez*, 702 N.Y.S.2d at 12 (citing *Mireles* v. *Waco*, 502 U.S. 9, 11 (1991) (per curiam)). As the New York Court of Appeals has explained:

> Judicial immunity discourages inappropriate collateral attacks on court rulings and fosters judicial independence by protecting courts and judges from vexatious litigation. Indeed, most judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability. Allowing members of the judiciary to exercise independent judgment, without the threat of legal reprisal, is critical to our judicial system.

*Mosher-Simons* v. *Cty. of Allegany*, 99 N.Y.2d 214, 219 (2002) (internal quotation marks, citations, and alterations omitted).

Consequently, "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." *Huminski* v. *Corsones*, 386 F.3d 116, 137 (2d Cir. 2004) (internal citations omitted). Rather, a judge will be subject to liability only when (i) "a

Judge does not act as a Judge," or (ii) "a Judge, though acting under color of judicial authority, lacks any jurisdiction supporting judicial authority for the action taken." *Alvarez*, 702 N.Y.S.2d at 12 (citing *Mireles*, 502 U.S. at 11-12); *see also Huminski*, 386 F.3d at 138 ("if the relevant action is judicial in nature, the judge is immune so long as it was not taken in the complete absence of jurisdiction"). Plaintiff here maintains that both exceptions apply to Defendant, though he bases each argument on slightly different conduct.

### 2. Analysis

#### a. Defendant Had Jurisdiction to Impose Sanctions

As to the latter exception, Plaintiff argues that Defendant "acted wholly in the absence of subject matter jurisdiction" when he sanctioned Plaintiff for filing what Defendant deemed a "frivolous" OPMC complaint. (Pl. Opp. 7-8). Plaintiff explains that this sanctioning necessarily adjudicated the merits of Plaintiff's OPMC complaint, a matter beyond Defendant's jurisdiction. (*Id.*).

Plaintiff's argument misses the mark. Under the judicial immunity exception, "there is a critical distinction between jurisdiction and authority, and jurisdiction, for these purposes, is to be broadly construed." *Alvarez*, 702 N.Y.S.2d at 12 (citing, *inter alia*, *Stump* v. *Sparkman*, 435 U.S. 349, 355-56 (1978)). Plaintiff's filing of the OPMC complaint may have been the tipping point for the imposition of sanctions, but it was by no means the exclusive basis; in Defendant's view, the OPMC complaint was part of Plaintiff's documented "campaign of harassment and abuse" throughout the litigation. (Sanctions Decision 25; *see id.* at 21 ("As should be obvious from the recitation

of the history of this case, [P]laintiff's misconduct exhibited with regard to the OPMC complaint is not an isolated incident. Regrettably, it is but one instance in a pattern of improper behavior.")).

Moreover, even if the imposition of sanctions were necessarily an implied appraisal of the merits of Plaintiff's OPMC complaint, and even if that appraisal were in excess of Defendant's authority — two factual premises that the Court is not prepared to endorse at this time — Defendant's conduct was sufficiently tied to the divorce proceedings. Defendant's imposition of sanctions was within the context of presiding over and managing the Divorce Action in the face of Plaintiff's pattern of misconduct; addressing what Defendant viewed as "cynical[] and malicious[] intererfer[ence]" with the medical license of a court expert witness; and resolving the related motions pending before Defendant. Accordingly, this Court easily finds that Defendant's imposition of sanctions was not "in the clear absence of all jurisdiction." *See Mireles*, 502 U.S. at 13 (concluding that even if judge's conduct were in excess of his authority, it was "taken in the very aid of [his] jurisdiction over a matter before him [and] cannot be said to have been taken in the absence of jurisdiction").

### b. Defendant's Dissemination of the Sanctions Decision to Unofficial Publishers May Not Be a Judicial Act Under New York Law

#### i. Immunity Principles Related to Judicial Decisions

"A judge is not protected under the doctrine of judicial immunity … if the action in question is not judicial in nature," so the question here is whether the conduct for which Defendant is being sued is properly considered judicial or

extrajudicial.  *See Huminski*, 386 F.3d at 138.  The Second Circuit employs a

"functional" approach to determining whether an act by a judge is "judicial"

because judicial immunity "is justified and defined by the functions it protects

and serves, not by the person to whom it attaches."  *Bliven*, 579 F.3d at 209-10

(quoting *Forrester* v. *White*, 484 U.S. 219, 227 (1988)) (internal quotation marks

omitted).  Generally, "acts arising out of, or related to, individual cases before

the judge are considered judicial in nature," *id.*, whereas for example,

"[a]dministrative decisions, even though they may be essential to the very

functioning of the courts, have not similarly been regarded as judicial acts,"

*Forrester*, 484 U.S. at 228.  As the Supreme Court observed in *Forrester*:

> When applied to the paradigmatic judicial acts involved
> in resolving disputes[,] the doctrine of absolute judicial
> immunity has not been particularly controversial.
> Difficulties have arisen primarily in attempting to draw
> the line between truly judicial acts, for which immunity
> is appropriate, and acts that simply happen to have
> been done by judges.

*Id.* at 227.

The Second Circuit has confirmed that it is state law that informs

whether an act by a state judge is judicial or extrajudicial in nature.  *See*

*Huminski* v. *Corsones*, 396 F.3d 53, 76 (2d Cir. 2005) (examining Vermont state

law to determine whether Vermont state judges acted within their jurisdiction

and in their judicial capacities such that they were entitled to judicial

immunity); *Shtrauch* v. *Dowd*, 651 F. App'x 72, 73-74 (2d Cir. 2016) (summary

order) (examining New York state law to determine whether New York state

judge's conduct was judicial in nature and thereby entitled to immunity); *see*

*also Marino* v. *Jonke*, No. 11 Civ. 430 (VB), 2011 WL 3251585, at *2 (S.D.N.Y. June 30, 2011) (same); *cf. Garfield* v. *Palmieri*, 297 F.2d 526, 527 (2d Cir. 1962) (holding that federal law governs the contours of judicial immunity afforded a federal judge).[6]

In analyzing whether Defendant's alleged dissemination of the Sanctions Decision to unofficial publishers is a judicial act under New York law, it is helpful to review first the legal context in which that inquiry arises. For starters, it is clearly established under New York law that publishers are entitled to absolute immunity for a "fair and true," meaning substantially accurate, publication of a judicial decision. *See Beary* v. *West Publishing*, 763 F.2d 66, 68-69 (2d Cir. 1985) (citing N.Y. Civ. Rights Law § 74 and recognizing that New York's fair and true report privilege "grants absolute immunity to the publisher of a true report of a New York state court judicial opinion"); *see generally Zappin Federal I*, 2017 WL 3425765, at *7-8 (discussing contours of the § 74 privilege). Importantly, the Second Circuit has held that this immunity applies irrespective of "whether the reporter is classified as 'official' or 'unofficial.'" *Beary*, 763 F.2d at 69. Here, that means both *official* and *unofficial* publication of the Sanctions Decision is absolutely immune conduct so long as the publication is a substantially accurate reflection of the Decision.

---

[6] In *Gross* v. *Rell*, the Circuit clarified that for federal claims against state judges in federal court, the federal law test of judicial immunity applies, but the substantive inquiry turns on state law. *See* 585 F.3d 72, 80 (2d Cir. 2009) (citing *Huminski v. Corsones,* 386 F.3d 116, 137 (2d Cir. 2004), a*s amended on reh'g*, 396 F.3d 53 (2d Cir. 2005)). By contrast, for state law claims against state officials in federal court, state law "determine[s] if judges enjoy immunity and, if so, under what circumstances." *Id.* Here, the substantive state law inquiry dictates the same result for Plaintiff's state law claims as well as his federal § 1983 claim.

Next, shifting perspectives from publisher to composer, there is no dispute that Defendant's act of composing the Sanctions Decision is a judicial act entitled to absolute judicial immunity. *See Murray* v. *Brancato*, 290 N.Y. 52, 56 (1943) ("It is clear that even if those opinions had been written with knowledge of their falsity and with actual intent to injure the plaintiff, the defendant, in accord with the well-established public policy, would be exempt from liability for 'composing' the opinions."). It is also undisputed that Defendant's act of disseminating the Sanctions Decision to *official* publishers is likewise judicial in nature. *Id.* ("[E]ach judge [has] an official duty to facilitate the publication in the official reports of opinions worthy of being reported. ... [W]e assume that all acts done in connection with th[is] statutory duty fall within the scope of judicial immunity though done maliciously [or] corruptly.").

That leaves one interstitial possibility, and it is the critical issue here: Whether a judge is absolutely immune from suit for the act of *disseminating* a judicial decision to an *unofficial* publisher. Where the judge is a federal judge, the answer in this Circuit is clear: yes. In *Garfield* v. *Palmieri*, the Second Circuit held that under federal law — which governs the contours of judicial immunity afforded a federal judge "for statements made by him in an opinion written by him" — the judge's transmission of an opinion to an unofficial publisher "was within the perimeter parking the outlines of the absolute privilege of federal judges against civil liability[.]" 297 F.2d at 527. Such immunity, the court explained, is "necessary in order that federal judges may

act fearlessly in performing their vital responsibilities that include duties in the administration of justice as well as in the deciding of cases." *Id.*

### ii. *Murray*'s Judicial Immunity Gap

But New York state law furnishes a different answer for state judges. The New York Court of Appeals has squarely held that a state court judge is not entitled to judicial immunity for disseminating a decision to an unofficial publisher because such conduct is functionally non-judicial. *See Murray*, 290 N.Y. at 56-58. In *Murray*, the state high court reasoned:

> [A] judge has no official duty in connection with any publication of opinions except in the official reports. The publication of an opinion begins when the judicial decision is complete, and though in some degree connected with the exercise of a judicial function, since the law imposes upon the judge no duty to publish opinions in unofficial reports, acts connected with such publication are not performed by the judge in his judicial capacity. The judge's rights and duties there are the same as those of any private person and if he chooses to act he must be held liable like any other person for damages resulting from a wrongful act maliciously performed with intent to injure another[.]

*Id.* at 57. *Murray*'s facts resemble those here. There, an attorney sued a Kings County judge for "maliciously compos[ing]" two opinions containing defamatory statements about the plaintiff and then facilitating the publication of those opinions in unofficial reporters, including the *New York Law Journal. Id.* at 54-55. As noted, the court ultimately found that while the judge "is exempt from liability for all acts done in the exercise of his judicial function," the act of transmitting an opinion for publication in an unofficial report is "not [an act]

performed by the judge in his judicial capacity," and so ineligible for judicial immunity. *Id.* at 57-58.

### iii. The Court Cannot Accept Defendant's Efforts to Distinguish *Murray*

Defendant tries to avoid the consequences of *Murray*'s holding, but none of his proffered bases is ultimately persuasive. First, he argues that *Murray*'s distinction between official and unofficial publishers is no longer valid, citing the Second Circuit's rejection of this bifurcation in the § 74 reporting privilege context and the Northern District of New York's observation that "*Murray* is not the current law in New York." (*See* Def. Br. 12 n.4; Def. Reply 4-5). But a closer look at these decisions reveals no basis to consider *Murray*'s distinction abrogated or otherwise cabined as applied here.

As Defendant acknowledges, the Second Circuit's decision in *Beary* involved New York's fair and true report privilege, *see* N.Y. Civ. Rights Law § 74, and specifically the question of "whether [the privilege] provides an absolute defense to [an unofficial publisher]." *See Beary*, 763 F.2d at 68. (Def. Br. 12 n.4). The Circuit was concerned with the scope of a statutory privilege for publishers; it did not opine upon the scope of judicial immunity for judges. Indeed, this was the Second Circuit's basis for distinguishing *Murray*. *Id.* at 69. The *Beary* plaintiff had relied on *Murray* to argue that § 74's immunity extends only to official reporters of judicial decisions. *Id.* at 68-69. Far from rejecting *Murray* in response, the Circuit acknowledged the decision's bifurcation of official versus unofficial reporters for judicial immunity purposes, but distinguished *Murray* on the basis that that decision had "declined to rule"

on the § 74 question.  *Id.* at 69.  Then, relying on a series of subsequent New York state court decisions, *Beary* rendered its conclusion concerning the scope of the statutory, § 74 privilege.  *Id.*  Nothing in *Beary*'s analysis indicates an abrogation of *Murray*'s judicial immunity holding.

Defendant also relies on the Northern District of New York's decision in *Nationwide Tarps*, but that decision appears to misperceive the interplay of *Murray* and *Beary*.  *Nationwide Tarps* understands *Murray* to have held "that [§ 74] did not extend absolute immunity to judges for opinions they authored and sent to 'unofficial' reporters," and understands *Beary* to have "disavowed" that rule in holding that "[§] 74 provides an absolute immunity to both the 'official' and 'unofficial' publishers of New York state judicial opinions"; it was on the basis of this analysis that the district court commented that "*Murray* is not the current law in New York."  *Nationwide Tarps, Inc.* v. *Midwest Canvas Corp.*, 228 F. Supp. 2d 202, 211 (N.D.N.Y. 2002).  But as indicated above, *Murray* expressly reserved decision on questions of § 74 statutory immunity since "[t]he defendant ha[d] pleaded only his absolute immunity from liability for any acts done in his judicial capacity," and so "no such questions [about the statutory privilege] [we]re [t]here presented or considered."  *Murray*, 290 N.Y. at 58-59.  So, contrary to *Nationwide Tarp*'s analysis, *Murray*'s judicial immunity holding was not at issue in *Beary*, much less disavowed.

Defendant next argues that even assuming "*Murray*'s distinction between official and unofficial reporters remains valid, subsequent cases have held that arranging to publish a case in the [*New York*] *Law Journal* is now a judicial act

entitled to absolute immunity." (Def. Br. 12). For this proposition, Defendant

cites only *Sassower* v. *Finnerty*, where the Second Department held:

> The execution of an annual contract with the publisher
> of the New York Law Journal pursuant to … the
> Judiciary Law imposes an implied duty upon the [the
> judge] to make copies of opinions and decisions
> available to the New York Law Journal for publication.
> Consequently, an act to procure the publication of a
> judicial decision or opinion in the New York Law
> Journal is now a judicial act entitled to absolute
> immunity.

465 N.Y.S.2d 543, 545 (2d Dep't 1983) (citations omitted). But when Plaintiff

responds in opposition that the *First* Department (as opposed to the *Second* in

*Sassower*) has yet to expressly recognize the *New York Law Journal* as an

official reporter (Pl. Opp. 5), Defendant offers no rebuttal, and indeed is silent

on the issue altogether in reply (*see generally* Def. Reply 3-6).[7] In any event,

the FAC alleges that Defendant disseminated the Sanctions Decision to

numerous other publications beyond the *New York Law Journal*, such as the

*New York Post* and the *Daily News*. Defendant fails at this stage to undermine

a key factual premise of Plaintiff's suit: that Defendant transmitted the

Sanctions Decision to unofficial publishers of the Decision.

Finally, Defendant argues that as a "practical matter," decisions like the

Sanctions Decision are "routinely reported" to unofficial publishers (Def.

Br. 13), and that it "defies logic" to expose judges to lawsuits based on their

---

[7]     At this stage, the Court need not conclusively decide whether the *New York Law Journal*
is an official reporter of judicial decisions in the First Department. Plaintiff has pleaded
that it is not. (FAC ¶ 27). Defendant has offered no legal authority or other judicially
noticeable source at this stage that contradicts that allegation. Thus, for purposes of
this motion, the Court presumes that the *New York Law Journal* was not an official
reporter of the Sanctions Decision at the time of Defendant's alleged conduct.

transmission of judicial decisions to unofficial publications (Def. Reply 5). This Court tends to agree with Defendant, and yet must exercise restraint and reject Defendant's judicial immunity argument nonetheless for the reasons discussed next.

### c. *Murray* Governs This Court's Analysis

To review, the labyrinth of judicial decision-related immunity under New York law immunizes a judge in composing and rendering a judicial decision and in transmitting that decision to an official publisher; it also immunizes both official and unofficial publishers alike in accurately reporting the decision. And yet, because of *Murray*, the same judge is not immune in transmitting the same decision to an immunized unofficial publisher because New York law does not consider that act judicial in nature. This Court shares Defendant's skepticism about the sensibility and continued vitality of this carve-out, announced by the New York Court of Appeals nearly 75 years ago in a divided 4-3 decision. And while Plaintiff is correct that *Murray* continues to be cited today, it is frequently cited for general principles of judicial immunity. Indeed, neither party has proffered, nor has this Court found, any modern case that relies on this aspect of *Murray*'s holding to strip a judge of immunity.

In this Court's view, *Murray*'s immunity gap leaves judges exposed in a manner inconsistent with judicial immunity principles. And were this Court free to do so, it would adopt here the Second Circuit's analogous stance on federal judicial immunity under federal law: that transmission of a decision to an unofficial publisher is conduct "within the perimeter parking the outlines of

the absolute privilege of federal judges against civil liability." *Garfield*, 297 F.2d at 527. But the Court enjoys no such liberty. As earlier examined, New York state law governs whether the action of a New York state court judge is judicial in character and, so, entitled to immunity. *See Huminski*, 396 F.3d at 76; *Shtrauch*, 651 F. App'x at 73; *see also Marino*, 2011 WL 3251585, at *2. *Murray* is squarely on point and remains the state law on the books, relic though it may be. This Court hesitates to defy the New York Court of Appeals' clear statement of New York judicial immunity law in favor of implementing what this Court may think sensible.[8] This is particularly the case where, as here, Defendant presses an alternative, narrower ground for dismissal — collateral estoppel — that this Court finds persuasive.[9]

---

[8] Unlike the Circuit, this Court of course does not have authority to certify questions to the New York Court of Appeals, *see Amalfitano* v. *Rosenberg*, 533 F.3d 117, 125 (2d Cir. 2008), such as whether *Murray*'s unofficial publisher holding should be abrogated (*see* Def. Reply 5).

[9] Given this Opinion's judicial immunity and collateral estoppel analyses, the Court need not resolve the question whether Defendant's dissemination of the Sanctions Decision violated N.Y. Domestic Relations Law § 235's statutory seal. (*See* FAC ¶ 164; Pl. Opp. 10-13). However, the Court notes that the First Department, in affirming the Trial Court's ultimate judgment of divorce, acknowledged the public release of the Sanctions Decision and rejected the argument that Defendant's conduct caused Plaintiff's loss of employment. The appeals court held:

> [P]laintiff claims that he was terminated from his position at his law firm because of the negative publicity he received after he had been sanctioned during [the Divorce Action] proceedings in 2015. Even if he was terminated for that reason, the sanctions — and therefore his unemployment — resulted from his own misconduct at trial, not from the [Trial] [C]ourt's conduct in sanctioning him or *publicly releasing the sanctions order*.

*Zappin State II*, 65 N.Y.S.3d at 32 (emphasis added) (citing the Sanctions Decision and the Affirmance).

**D.     The Doctrine of Collateral Estoppel Bars This Action**

Defendant argues that Plaintiff's claims are barred by the doctrine of collateral estoppel because the factual issues dispositive of those claims were litigated and decided in the Divorce Action proceedings that resulted in the Sanctions Decision and its Affirmance.

The collateral estoppel analysis here reveals an idiosyncratic situation arising directly from *Murray*'s awkward judicial-immunity carve-out.  That is, the Sanctions Decision serves a dual role.  On the one hand, the Decision is itself the disseminated document that contains the allegedly false, defamatory, or malicious statements at the heart of Plaintiff's claims.  On the other hand, the Decision remains a judicial decision on the merits issued by "a court of competent jurisdiction," whose factual findings, *i.e.*, the allegedly false and defamatory statements themselves, were rendered after litigation in the Trial Court and later affirmed by the First Department on appeal.  Thus, even accepting *Murray*'s holding that the act of disseminating the Sanctions Decision to unofficial publishers is not a *judicial act*, that conclusion does not undermine the fact that the Decision remains a *judicial decision,* eligible to command preclusive effect on subsequent proceedings if the requisite conditions are met.[10]  For the reasons discussed below, the Court finds those conditions satisfied and dismisses Plaintiff's claims.

_____

[10]     This result is not inconsistent with *Murray*.  That decision acknowledged the possibility — without passing judgment — of protecting a judge against suit via the fair and true report privilege for disseminating a decision to an unofficial publisher, since the privilege immunizes from suit "any person … for the publication of a fair and true report of any judicial proceeding[.]"  *See Murray* v. *Brancato*, 290 N.Y. 52, 58-59 (1943) (acknowledging that the privilege "was extended to cover publications by all persons,"

### 1.    Collateral Estoppel Generally

Collateral estoppel, also known as issue preclusion, "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc.* v. *Simon*, 310 F.3d 280, 288 (2d Cir. 2002); *see generally Proctor* v. *LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013).

The doctrine "serves to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Envtl. Def.* v. *EPA*, 369 F.3d 193, 202 (2d Cir. 2004) (quoting *Allen* v. *McCurry*, 449 U.S. 90, 94 (1980)) (quotation marks omitted); *see also Kaufman* v. *Eli Lilly & Co.*, 65 N.Y.2d 449, 455 (1985) (recognizing that the doctrine is "based upon the general notion that it is not fair to permit a party to relitigate an issue that has already been decided against it").

Non-mutual collateral estoppel allows a defendant who was not party to the previous litigation to bar issues raised in subsequent litigation. *See Ranasinghe* v. *Kennell*, No. 16 Civ. 2170 (JMF), 2017 WL 384357, at *3 (S.D.N.Y. Jan. 25, 2017); *see also Blonder-Tongue Labs., Inc.* v. *Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971) ("Permitting repeated litigation of the same issues as long as the supply of unrelated defendants holds out reflects either

---

questioning "whether the statute is intended to apply to the publication by a judge of an opinion written by himself," and concluding that "[n]o such questions are here presented or considered.  The defendant has pleaded only his absolute immunity from liability for any acts done in his judicial capacity, and the courts below considered no other defense").

the aura of the gaming table or a lack of discipline and of disinterestedness on the part of the lower courts." (internal quotation marks omitted)).

Collateral estoppel can be "offensive" or "defensive," and as relevant here, defensive use "occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Parklane Hosiery Co., Inc.* v. *Shore*, 439 U.S. 322, 326 n.4 (1979). Thus, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana* v. *United States*, 440 U.S. 147, 153 (1979); *see also Ryan* v. *New York Tel. Co.*, 62 N.Y.2d 494, 500 (1984) (recognizing that preclusion can apply "whether or not the tribunals or causes of action are the same").

Here, Defendant's invocation of the doctrine implicates non-mutual defensive collateral estoppel because Defendant seeks to bar relitigation of fact issues in this proceeding that he contends were decided in the Divorce Action proceedings, a prior litigation in which Defendant was not a party but the presiding judge. *See Jasper* v. *Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) ("[A] new defendant in the plaintiff's second lawsuit may defensively invoke collateral estoppel regarding issues of law or fact decided in the plaintiff's first action.").

### 2.    Collateral Estoppel Under New York Law

"To determine the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of

the rendering state." *Conopco, Inc.* v. *Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000)

(citing *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *id.*

("Federal courts may not employ their own rules ... in determining the effect of

state judgments, but must accept the rules chosen by the State from which the

judgment is taken." (internal quotation marks and citation omitted)).  This

applies to claims under 42 U.S.C. § 1983, as well.  *See Leather* v. *Eyck*, 180

F.3d 420, 424 (2d Cir. 1999); *Migra*, 465 U.S. at 82-83.  Thus, New York law

governs the preclusive effect of the Sanctions Decision on all of Plaintiff's

claims.  *See Marvel Characters*, 310 F.3d at 286.

Under New York's collateral estoppel doctrine,[11] a party may not

relitigate an issue that is "[i] identical to an issue already decided ... in a

---

[11] The precise elements of New York collateral estoppel doctrine are the source of some confusion within the Second Circuit and the New York state courts.  The Second Circuit has offered conflicting guidance on whether there exists any material distinction between the federal and New York state doctrines.  In *Marvel Characters*, the Court accepted the parties' position that "there is no discernible difference between federal and New York law concerning ... collateral estoppel."  *Marvel Characters, Inc.* v. *Simon*, 310 F.3d 280, 286 (2d Cir. 2002).  This echoed its conclusion from a year earlier, *see Pike* v. *Freeman*, 266 F.3d 78, 91 n.14 (2d Cir. 2001) ("[T]here appears to be no significant difference between New York preclusion law and federal preclusion law[.]"), and it is a position that the Circuit has reiterated recently as well, *see, e.g,. NML Capital, Ltd.* v. *Banco Cent. de la Republica Argentina*, 652 F.3d 172, 185 (2d Cir. 2011).

But just a few months before its decision in *Marvel Characters*, the Circuit had issued *LaFleur*, which identified a distinct element under New York collateral estoppel law, namely, that the issue "be 'decisive of the present action.'"  *LaFleur* v. *Whitman*, 300 F.3d 256, 271 (2d Cir. 2002) (quoting *Schwartz* v. *Public Adm'r of Bronx*, 24 N.Y.2d 65, 71 (1969)).  The Circuit confirmed this view the following year and expressly recognized that this requirement "makes New York collateral estoppel law slightly different from federal collateral estoppel law."  *Curry* v. *City of Syracuse*, 316 F.3d 324, 331 & n.4 (2d Cir. 2003).  Here too, subsequent decisions have maintained this position and recognized the element as distinct under New York law.  *See, e.g., Indus. Risk Insurers* v. *Port Auth. of N.Y. & NJ*, 493 F.3d 283, 287-88 (2d Cir. 2007); *Jenkins* v. *City of New York*, 478 F.3d 76, 85 (2d Cir. 2007).

Further confusing matters, the New York Court of Appeals has itself offered conflicting guidance in recent years.  *Compare Howard* v. *Stature Elec., Inc.*, 20 N.Y.3d 522, 525 (2013) (using "decisiveness" formulation), *with Conason* v. *Megan Holding, LLC*, 25 N.Y.3d 1, 17 (2015) (making no mention of "decisiveness" formulation).

previous proceeding [ii] in which that party had a full and fair opportunity to litigate, and where [iii] the issue that was raised previously is decisive of the present action." *Indus. Risk Insurers* v. *Port Auth. of N.Y. & NJ*, 493 F.3d 283, 287-88 (2d Cir. 2007) (quoting *Curry* v. *City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003)) (internal quotation marks and alteration omitted). If these conditions are met, "issue preclusion is applicable even if the two suits are not based on the same cause of action." *Proctor*, 715 F.3d at 414.

The Court is mindful in evaluating these elements that the collateral estoppel doctrine is based on "general notions of fairness involving a practical inquiry into the realities of the litigation," *Matter of Halyalkar* v. *Bd. of Regents of State of N.Y.*, 72 N.Y.2d 261, 268 (1988), and "should not be rigidly or mechanically applied," *D'Arata* v. *N.Y. Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 664 (1990); *see also Remington Rand Corp.* v. *Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).

The allocation of the burden of proof is divided. The burden of demonstrating that the factual issues are identical, previously decided, and decisive of the present action rests with the party seeking to apply collateral estoppel, here Defendant; the burden of demonstrating that the prior

---

An additional point of internal inconsistency within the Second Circuit involves the requirement that the identical, decided issue be "material in the first action." *LaFleur*, 300 F.3d at 271. *Industrial Risk Insurers* and *Curry* recite the elements of New York collateral estoppel law with no mention of this requirement, while the precedent on which they are predicated, *LaFleur*, expressly requires it.

Out of an abundance of caution, this Opinion addresses both the materiality requirement, in analyzing element one below, as well as the decisiveness requirement, in analyzing element three below.

proceeding did not afford a full and fair opportunity to litigate the issues rests with the party opposing preclusion, here Plaintiff. *See Kaufman*, 65 N.Y.2d at 456; *see also Proctor*, 715 F.3d at 414.

### 3. Analysis

Plaintiff's principal argument against the application of collateral estoppel is that he was denied "a full and fair opportunity to litigate th[e] factual determinations by [Defendant]." (Pl. Opp. 16-17). He also appears to argue that the relevant factual issues were not actually decided by the First Department (*id.* at 18), and relatedly argues in a footnote that the contested factual findings by the Sanctions Decision were "not necessary or essential to the imposition of sanctions" (*id.* at 16 n.8).

The Court finds Plaintiff's arguments unavailing and the conditions for collateral estoppel met. As a preliminary matter, the Court notes that while it generally accepts as true all well-pleaded allegations in the FAC and draws all reasonable inferences in Plaintiff's favor, collateral estoppel "will nonetheless bar a plaintiff's claim when [a] plaintiff's factual allegations have been decided otherwise in a previous litigation." *Lefkowitz* v. *McGraw-Hill Glob. Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 360 (S.D.N.Y. 2014) (quoting *Poindexter* v. *Cash Money Records,* No. 13 Civ. 1155 (RWS), 2014 WL 818955, at *3 (S.D.N.Y. Mar. 3, 2014)) (internal quotation marks omitted); *cf. Linden Airport Mgmt. Corp.* v. *N.Y.C. Econ. Dev. Corp.,* No. 08 Civ. 3810 (RJS), 2011 WL 2226625, at *3 (S.D.N.Y. June 1, 2011) ("[I]t is well settled that a court may dismiss a claim on res judicata or collateral estoppel grounds on a Rule 12(b)(6) motion."). In

such circumstances, dismissal is appropriate when "it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law." *Lefkowitz*, 23 F. Supp. 3d at 360; *see also Conopco*, 231 F.3d at 86.

### a. The Factual Issues in This Action Are Identical to Material Factual Issues Previously Decided in the Sanctions Decision and the Affirmance

The material factual issues decided in the Sanctions Decision and affirmed on appeal are identical to the factual issues underlying each of Plaintiff's five claims (and, as will be discussed later, are decisive of those claims). The identical nature of the two sets of factual issues is not in serious doubt; after all, Plaintiff's claims are predicated on the dissemination of those very factual determinations and their falsity. It is perhaps for this reason that Plaintiff nowhere contests the *identity* of issues. (*See generally* Pl. Opp. 16-18). Instead, Plaintiff argues in a footnote that the factual determinations in the Sanctions Decision were merely background and unessential to the Decision, and also argues that those determinations were not actually decided on appeal. (Pl. Opp. 16 n.8). Plaintiff is mistaken on both counts.

The factual findings that Plaintiff alleges were false, defamatory, or malicious are principally those concerning: (i) Plaintiff's filing of the OPMC complaint (FAC ¶¶ 52-57); (ii) Plaintiff's conduct towards the AFC (*id.* at ¶¶ 58-61); (iii) Plaintiff's child's medical evaluation (*id.* at ¶¶62-64); (iv) the treatment of Plaintiff's child (*id.* at ¶¶ 65-68); (v) the effect of Plaintiff's litigation misconduct on his child (*id.* at ¶¶ 69-70); (vi) Plaintiff's efforts to delay the

Divorce Action trial (*id.* at ¶¶ 71-76); (vii) Plaintiff's handwritten note to the District of Columbia judge (*id.* at ¶¶ 77-79); (viii) Plaintiff's conduct towards opposing counsel in the Divorce Action (*id.* at ¶¶ 80-81); and (ix) Plaintiff's non-payment of child support (*id.* at ¶¶ 82-83). These factual determinations were integral to the Sanctions Decision. As detailed earlier, the Trial Court resolved multiple motions, only one of which was for sanctions, after meticulously reviewing the record and making factual findings in support of its analysis. *See In re Cox*, 931 N.Y.S.2d 568, 569 (1st Dep't 2011) (giving preclusive effect to sanctions order's professional misconduct findings in subsequent disciplinary proceedings); *In re Neroni*, 20 N.Y.S.3d 496, 498 (4th Dep't 2015) (same); *cf.* 5A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1336.3 (3d ed.) (recognizing that collateral estoppel may be available for factual determinations made in connection with Rule 11 sanctions provided that other preclusion requirements met); *cf. Ball* v. *A.O. Smith Corp.*, 451 F.3d 66, 69-70 (2d Cir. 2006) (holding that factual determinations in sanctions decision collaterally estopped debtor from contesting factual predicate for bankruptcy court's determination that sanctions debt was non-dischargeable because it arose from debtor's "willful and malicious injury" to another).

The Sanctions Decision shows no indication that those factual determinations were merely dicta. Just the opposite. The Decision's structure and analysis demonstrates that its findings were designed to serve as the necessary foundation for the Trial Court's disposition of the motions and

40

sanctioning of Plaintiff — after repeated warnings (*see* Sanctions Decision 19

n.8) — for his pattern of misconduct throughout the Divorce Action, including

his filing of the OPMC complaint.  For this reason, the Sanctions Decision:

- notes that the that the AFC was forced to bring two motions at issue "[a]s a direct result of [P]laintiff's conduct in this case," including his efforts "to undermine the legal process and use his law license as a tool to threaten, bully, and intimidate," "ill-advised behavior [that] seriously calls into question his fitness to practice law" (*id.* at 3);

- describes the AFC's request for financial sanctions "as a result of [Plaintiff's] actions with respect to her expert and his overall misconduct throughout the pendency of the divorce action" (*id.*);

- transitions from factual findings to legal analysis by observing that "[i]t is in the midst of this maelstrom of misconduct that the AFC has been forced to bring the two motions that are now before the court" (*id.* at 9);

- pursuant to the relevant judicial sanctions provision, *see* 22 NYCRR § 130-1.1, expressly considers "the circumstances under which the [OPMC conduct] took place" (*id.* at 21);

- and based on an evaluation of those circumstances concluded that, "[a]s should be obvious from the recitation of the history of this case, [P]laintiff's misconduct exhibited with regard to the OPMC complaint is not an isolated incident.  Regrettably, it is but one instance in a pattern of improper behavior. Although the hope was that [P]laintiff would heed the [Trial] [C]ourt's admonitions and represent himself according to the dictates of his profession, that has not happened. [ ] Under these circumstances, where warnings have had no effect on [P]laintiff's conduct, it is incumbent — *for the integrity of the judicial process, as well as for the protection of the other litigants and the child* — that penalties be imposed. " (*id.* at 21 (emphasis added)).

Plaintiff also criticizes the First Department's Affirmance as "conclusory" and "lack[ing] any analysis or detail" and so maintains that the Affirmance cannot be considered to have actually passed judgment on the Sanctions Decision's factual findings. (Pl. Opp. 18). This criticism, too, is misplaced. The First Department emphatically affirmed the entirety of the Sanctions Decision; that more than suffices here. *See Ball*, 451 F.3d at 70-71 (finding it appropriate to "infer that the [Fifth Circuit's] affirmance constitutes a ruling that [the district court's] opinion sufficed as findings that [attorney's conduct] was unreasonable and for an improper purpose," despite the fact that the affirmance did not opine on precise issue); *cf. DiSorbo* v. *Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Under New York law, the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." (internal quotation marks and citation omitted)).

But in addition to that, the Affirmance expressly highlights the Sanctions Decision's factual determinations in the course of upholding the Trial Court's analysis. The First Department need not have restated each upheld fact in order to command preclusive effect. *Cf. LaFleur*, 300 F.3d at 273 (finding factual issues "necessarily decided" for collateral estoppel purposes where state court found agency's determination to be "supported in the record" and "rejected [plaintiff's] central contention" to the contrary, even if "the state court did not rule explicitly" on certain specific factual issues involved). Labeling the Sanctions Decision "detailed" and "amply supported by the record," the First

42

Department held in its Affirmance that the pattern of bad-faith conduct, coupled with repeated warnings, justified the sanctions. *See Zappin State I*, 49 N.Y.S.3d at 6-7.

In short, the Court finds that Defendant has carried his burden of establishing that the factual issues raised in this action are identical to the material factual issues that were actually decided in the Sanctions Decision and the Affirmance both individually and most certainly in tandem. (*See* Def. Br. 17-18).

### b. Plaintiff Had a Full and Fair Opportunity to Litigate the Relevant Factual Determinations in the Divorce Action

Plaintiff's main argument against collateral estoppel is that he was denied a full and fair opportunity to litigate the Sanctions Decision's factual determinations because "they were not raised in the briefing papers and never previously litigated before the [Trial] [C]ourt." (Pl. Opp. 16). Moreover, he argues, "because [those factual determinations] were not litigated in the motion papers, Plaintiff was denied a full and fair opportunity to dispute them on appeal in the First Department where the record was constrained to only the motion papers underlying the interlocutory order, *i.e.*, [the Sanctions] Decision." (*Id.* at 16-17). Finally, even as to "the few instances" that factual findings were discussed in the underlying papers, Plaintiff was still deprived of a full and fair opportunity "because [Defendant] deliberately and intentionally misrepresented the alleged facts in the ultimate Sanctions Decision." (*Id.* at 17).

In determining whether a party has had a "full and fair opportunity" to litigate an issue, "the New York Court of Appeals has instructed that the various elements which make up the realities of litigation, should be explored[.]" *Curry*, 316 F.3d at 332 (internal quotation marks omitted). These elements include "'the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation.'" *Kosakow* v. *New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 734 (2d Cir. 2001) (quoting *Schwartz* v. *Public Adm'r*, 24 N.Y.2d 65, 72 (1969)).

Plaintiff's lack-of-opportunity arguments go nowhere. The "realities of [the] litigation," including the various applicable elements, weigh in Defendant's favor. The forum of the prior litigation was the New York County Supreme Court; Defendant was the presiding judge over the Divorce Action and thus intimately familiar with the extensive record of the case, including Plaintiff's pattern of "misconduct throughout the pendency of the [D]ivorce [A]ction" (Sanctions Decision 3); the instant action and the potential for preclusive effect was foreseeable at least as of Plaintiff's appeal, given that he specifically protested Defendant's dissemination of the Sanctions Decision to the First Department (*see* Zappin Appellant Br. 11-12, 26); and there is no new evidence or difference in applicable law that would make it unfair to hold Plaintiff to the

Sanctions Decision and its Affirmance. Plaintiff had a full and fair opportunity to contest these factual issues.[12]

What is more, the Sanctions Decision itself anticipated the question whether Plaintiff was afforded a full opportunity to contest the factual and legal grounds for his sanctioning. The Decision held that "[a]lthough the AFC's request for sanctions was initially made in her reply affirmation, [P]laintiff had ample opportunity to respond, and thus be heard on the issue of sanctions, in his sur-reply … [but] offers no defense for his actions." (Sanctions Decision 19).

Plaintiff's failure to respond to the AFC's call for sanctions was of his own doing. The "full and fair opportunity" element is satisfied under New York law "where the party against whom collateral estoppel is sought to be invoked has appeared in the prior action or proceeding and has, by deliberate action, refused to defend or litigate the charge or allegation that is the subject of the preclusion request." *In re Abady*, 800 N.Y.S.2d 651, 660 (1st Dep't 2005); *accord Kanat* v. *Ochsner*, 755 N.Y.S.2d 371, 374 (1st Dep't 2003) (same). Plaintiff all but admits this in his appellate filing, saying that "[he] did not

---

[12]    That the Trial Court may not have held an evidentiary hearing before making these adverse factual findings in the course of resolving multiple motions and imposing sanctions does not alter this conclusion. *See Wolff* v. *City of New York Fin. Servs. Agency (FISA)*, 939 F. Supp. 258, 266 (S.D.N.Y. 1996) (rejecting argument that the lack of a hearing or opportunity to present witnesses deprived party of a full and fair opportunity to litigate for collateral estoppel purposes); *cf. Bartel Dental Books Co. Inc.* v. *Schultz*, 786 F.2d 486, 489 (2d Cir. 1986) ("New York courts look to whether a claim has been 'brought to a final conclusion,' not to whether a full evidentiary hearing has been held on the claim … In light of this reasoning, we apply the doctrine of res judicata to the facts of this case without regard to whether a hearing was actually granted in state court." (citations omitted)).

respond to the AFC's sanction request in his [three-]page [reply] affidavit, *instead choosing to solely reply* to several [points] raised in [the AFC's] opposition" to Plaintiff's disqualification motion.  (Zappin Appellant Br. 20 (emphasis added)).

Moreover, Defendant's imposition of sanctions was in the context of a pattern of misconduct throughout the Divorce Action in the face of repeated warnings:

> Both the AFC and [Plaintiff's ex-spouse] have made numerous requests in prior motions for sanctions to be imposed against [P]laintiff for transgressions alleged to be in violation of the Rules of Professional Conduct and other acts of attorney misconduct.  Both [a previous judge] and [the Trial Court], in the decisions rendered on those motions, chose not to sanction [P]laintiff.  Instead, each of us opted to caution plaintiff about his behavior and remind him of his ethical obligations as an attorney at law.

(Sanctions Decision 19 n.8).  On top of everything else, then, the Sanctions Decision could not have been a surprise to Plaintiff, who had been afforded multiple opportunities to correct his conduct under the threat of sanctions.

Turning to the appellate proceedings, one of Plaintiff's principal grounds for appeal of the Sanctions Decision was the supposed lack of a full and fair opportunity to litigate this issue before the Trial Court.  Over the course of nearly a dozen pages, Plaintiff argued to the First Department that he had had no opportunity to respond to the AFC's request for sanction nor any opportunity to be heard on the numerous factual conclusions in the Sanctions Decision, which Plaintiff argued were erroneous and unsupported by the record.  This is a sample of Plaintiff's lack-of-opportunity arguments on appeal:

[Plaintiff] was not given a full and fair opportunity to respond to the AFC's purported request for sanctions prior to the imposition of sanctions.

* * *

The lack of notice and an opportunity to be heard is of even more consequence given the character of the [Sanctions] Decision. The [Trial] [C]ourt chose to recite as fact and factual background a litany of contested issues and claims pointedly against. [Plaintiff] that were never previously adjudicated or even noticed in the motion papers.

* * *

Furthermore, in some instances, the [Trial] [C]ourt improperly reached apparent factual conclusions about the litigation and [Plaintiff] in general without [Plaintiff] uttering a single word in the courtroom and having presiding over the case for less than two (2) months.

* * *

Much more troubling, however, is that the [Trial] [C]ourt used misapprehended and undeveloped facts to publicly accuse [Plaintiff] of attorney misconduct and question his fitness to practice law.

* * *

Here, there is no question that [Plaintiff] was significantly harmed by the lower court's erroneous factual conclusions and the lack of notice or a full and fair opportunity to be heard.

* * *

Given the tenor and stakes of the [Sanctions] Decision, it simply cannot be said that [Plaintiff] had notice or a full and fair opportunity to be heard on the issues raised and addressed in that decision. This is particularly so with respect to the [Trial] [C]ourt's harsh reproaches of [Plaintiff], its recitation and findings of undeveloped facts not at issue in the motion papers, its misapprehension of the record before it and its decision

to publish and disseminate the [Sanctions] Decision publicly to the media.

(Zappin Appellant Br. 19, 21, 25, 27-28).[13]

The First Department considered Plaintiff's appeal "as limited by the briefs" — which, as illustrated above, included Plaintiff's clear arguments that the Sanctions Decision's factual findings and sanctions imposition were without record support, erroneous, and unfair — and nonetheless unanimously affirmed the Sanctions Decision. *Zappin State I*, 49 N.Y.S.3d at 6. Labeling the Decision "detailed" and "amply supported by the record," the First Department rejected Plaintiff's appeal and found instead that:

> [t]he record establishe[d] that [Plaintiff] engaged in unprofessional, outrageous and malicious conduct on multiple occasions, *most recently* by filing the bad faith disciplinary complaint against the [AFC's expert] … Under the circumstances, particularly where the [Plaintiff] has exhibited *a pattern of bad faith conduct throughout the proceedings* despite repeated warnings not to do so, the sanctions imposed by Supreme Court were entirely proper.
>
> * * *
>
> [Plaintiff] was also warned repeatedly throughout the proceedings that he must adhere to the Rules of Professional Conduct.

*Id.* at 6-7 (emphases added). The First Department concluded that it had "considered each of [Plaintiff's] procedural arguments, including that he was entitled to a hearing because he did not have fair notice that sanctions were

---

[13] Plaintiff expressly challenged on appeal, and the First Department decided, the issue of whether Plaintiff had a full and fair opportunity to litigate these factual findings before the Trial Court. There is a colorable argument, then, that Plaintiff is precluded from relitigating that legal issue in the instant action — an "estoppel squared" of sorts. However, that argument is nowhere raised so the Court does not pass judgment on it.

being considered against him, and f[ound] them unavailing." *Id.* at 7. As illustrated by the excerpts of Plaintiff's appellate brief and the First Department's Affirmance, Plaintiff had a full and fair opportunity to challenge on appeal, and actually did challenge on appeal, the factual predicates of the Sanctions Decision.

In sum, Plaintiff has failed to carry his burden of demonstrating that he lacked a full and fair opportunity to contest the Sanctions Decision's factual determinations.

### c.  The Factual Issues Are Decisive of the Present Claims

A factual issue is decisive of the present action "if it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint." *Curry*, 316 F.3d at 332. Each of Plaintiff's claims, as pleaded, is necessarily predicated on the false, defamatory, or malicious nature of the contested portions of the Sanctions Decision. (*See, e.g.*, FAC ¶ 51 (defamation claim); *id.* at ¶ 85 (tortious interference); *id.* at ¶ 92 (intentional infliction of emotional distress); *id.* at ¶ 158 (prima facie tort); *id.* at ¶ 166 (§ 1983 denial of fair trial)).

But, as established, those statements constitute adjudicated factual findings deemed accurate by the Trial Court in the Sanctions Decision and confirmed by the First Department in the Affirmance. Because dissemination of these accurate, adjudicated facts cannot serve as the basis for the aforementioned causes of action, none of Plaintiff's five claims as pleaded can

ultimately prevail.[14]  *See, e.g., Sullivan* v. *American Airlines, Inc.*, 613 F. Supp. 226, 230 (S.D.N.Y. 1985) (dismissing defamation claim on collateral estoppel grounds because unfavorable, allegedly defamatory characterization of plaintiff had been deemed factually correct by panel of arbitrators); *Sandler* v. *Simoes*, 609 F. Supp. 2d 293, 301 (E.D.N.Y. 2009) (dismissing defamation claim against certain defendants on collateral estoppel grounds where state court had determined that allegedly libelous statements were non-actionable).  For these reasons, the previously decided facts are decisive of the present claims, and all of Plaintiff's claims must be dismissed as collaterally estopped.

## E.     The FAC Is Dismissed with Prejudice

Plaintiff has not sought leave to amend the FAC for a second time and, accordingly, the Court affords him no such opportunity.  *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994) ("Although federal courts are inclined to grant leave to amend following a dismissal order, we do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought. …  It is not clear that the failure of pleading could be remedied by further amendment, nor has [the plaintiff] suggested how that could be done."); *Komlossy* v. *Faruqi & Faruqi, LLP*, No. 17-834-cv, — F. App'x —, 2017 WL 4679579, at *2 (2d Cir. Oct. 18, 2017) (summary order) (same).

---

[14]     The Court need not reach Defendant's merits arguments that the FAC fails to state claims for defamation, intentional infliction of emotional distress, tortious interference with economic advantage, prima facie tort, and § 1983, which arguments are predicated in significant measure on the same issue addressed in the collateral estoppel analysis above; namely, that the contents of the Sanctions Decision were adjudicated to be not false or erroneous.  (*See* Def. Br. 20-24).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     February 2, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge